TERRENCE COLLINGSWORTH
(DC Bar # 471830)
International Rights Advocates
621 Maryland Ave NE
Washington, D.C. 20002
Tel: 202-543-5811
E-mail: tc@iradvocates.org

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| Amin Allawi Ali, Individually and on behalf of Proposed Class Members, c/o 621 Maryland Ave NE, Washington, D.C. 20002; Ayman Mhamad Saleh Al Sanabani, Individually and on behalf of Proposed Class Members, c/o 621 Maryland Ave NE, Washington, D.C. 20002; Khaled Ali Salem Chaib, Individually and on behalf of Proposed Class Members, c/o 621 Maryland Ave NE, Washington, D.C. 20002; Ali Ahmad Ali Abad Al Roweishan, Individually and on behalf of Proposed Class Members, c/o 621 Maryland Ave NE, Washington, D.C. 20002; Mohamad Ali Hamoud Al Roweishan, Individually and on behalf of Proposed Class Members, c/o 621 Maryland Ave NE, Washington, D.C. 20002; Fatima Mhamad Al Bayahi AL Kharabi, Individually and on behalf of Proposed Class Members, c/o 621 Maryland Ave NE, Washington, D.C. 20002; and Ms. Yousra Abd El Aziz Mhamad Aamad, Individually and on behalf of Proposed Class Members, c/o 621 Maryland Ave NE, Washington, D.C. 20002, | Case No. _____<br><br>**CLASS COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**<br><br>**JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| v. | |

Mohamed Ben Zayed Al-Nahyan, c/o 3522 International Court, NW, Suite 400, Washington, DC 20008; Mohammed bin Rashid Al Maktoum, c/o 3522 International Court, NW, Suite 400, Washington, DC 20008; Mohamed Bin Salman Al Saoud, c/o 601 New Hampshire Ave. NW, Washington, DC 20037; Hamad Mohamed Thani Al Rumaithi, c/o 3522 International Court, NW, Suite 400, Washington, DC 20008; Abdulrahman Ben Saleh Al-Bunyan, c/o 601 New Hampshire Ave. NW, Washington, DC 20037; Fayyadh Al-Ruwaili, c/o 601 New Hampshire Ave. NW, Washington, DC 20037; Raytheon Technologies Corporation, 870 Winter Street, Waltham, MA 02451; Lockheed Martin Corporation, 6801 Rockledge Dr, Bethesda, MD 20817; General Dynamics Corporation, 2941 Fairview Park Drive Suite 100 Reston, VA 22042; Mr. Gregory J Hayes, as the CEO of Raytheon; Mr. Jim Taicley, as the CEO of Lockheed Martin; and Ms. Pheobe Novakovic, as the CEO of General Dynamics; Mr. Antony Blinken, in his official capacity as the Secretary of the U.S. State Department, 2201 C St., NW
Washington, DC 20520; Mr. Lloyd J. Austin III, in his official capacity as the Secretary of the U.S. Department of Defense, 1000 Defense Pentagon, Washington, DC 20301-1000,

           Defendants.

# I.    <u>NATURE OF THE ACTION</u>

1.   The ongoing civil war and slaughter of innocent civilians in Yemen began in 2014 when Houthi insurgents—Shiite rebels with links to Iran and a history of rising up against Yemen's ruling Sunni government—took control of Yemen's capital and largest city, Sana'a, demanding lower fuel prices and a new government. After negotiations failed, the rebels seized the presidential palace in January 2015, forcing President Abd Rabbu Mansour Hadi to resign and flee.

2.   In March 2015, the United Arab Emirates ("UAE"), and specifically its de facto ruler and Supreme Commander of the Armed Forces, Defendant Mohamed bin Zayed Al-Nahyan, formed a coalition with Saudi Arabia, Bahrain, Egypt, Jordan, Kuwait, Morocco, Senegal, and Sudan (hereinafter referred to as "the Coalition") to take military action at the request of deposed President Hadi. (Qatar was among the coalition until June 2017). Hadi rescinded his resignation and returned to the city of Aden, Yemen, in September 2015, and fighting has continued since. As of December 2017, as far as Plaintiffs can determine, Hadi has been residing in exile in Saudi Arabia.

3.   Since March 2015, the United States has been intervening in the hostilities between the Coalition and the Houthis in Yemen by providing lethal aid to the Coalition.[1] As determined by the U.S. Congress,[2] the conflict between the Coalition and the Houthis is within the meaning of section 4(a)(1) of the War Powers Resolution (50 U.S.C. 1543(a)(1)) because United States Armed Forces are either involved in hostilities or their involvement in hostilities is imminent. In 2016, the United States conducted an estimated 35 strikes in Yemen,[3] and in 2017, it conducted about 130.[4] Apart from direct strikes by the U.S. military, with the support and approval of the U.S. government, U.S. defense contractors have supplied and continue to supply weapons to the Coalition that are essential

---

[1] 117th Congress 2nd Session, H.J. Res. 87, para3. Available at
https://www.congress.gov/117/bills/hjres87/BILLS-117hjres87ih.pdf.
[2] *Id.*
[3] https://www.cfr.org/blog/how-many-bombs-did-united-states-drop-2016
[4] https://www.thebureauinvestigates.com/drone-war/data/yemen-reported-us-covert-actions-2017

to the conflict. U.S.-made bombs dropped by the Coalition are regularly found at sites in Yemen where innocent civilians have been killed or injured. Without U.S. weapons, experts say the Coalition – which is for all practical purposes led by Saudi Arabia and the UAE – would be largely unable to wage its war. As of 2017, three out of every five weapons used by the Coalition was U.S.-made, according to the Stockholm International Peace Research Institute.[5]

4.    The conflict continues to take a brutal toll on innocent Yemeni civilians, making Yemen the world's worst humanitarian crisis. The UN estimates that 131,000 of the estimated 233,000 deaths in Yemen since 2015 are the result of indirect causes of the conflict, such as food insecurity and lack of accessible health services.[6] From March 2015 to June 2019, the UN identified at least 18,922 civilian casualties, with 7,292 killed and 11,630 injured in the conflict.[7] International experts believe that the real figure is much higher. The NGO Civilian Impact Monitoring, for example, has documented 12,714 cases of civilians killed from December 2017 to September 2021 alone.[8] Unfortunately, this horrific and ongoing human rights catastrophe was pushed to the very back pages of the world's attention when Russia invaded Ukraine.

5.    Plaintiffs herein are representative victims among the Yemeni civilians who suffered significant bodily harm and property loss due to attacks by the Coalition on civilians with U.S.-made arms. Plaintiffs bring this action on behalf of themselves and all other similarly situated current and former victims of war crimes who have been harmed by the strikes carried out by the Coalition military forces, the U.S. government's unlawful decision to approve arms sales contracts to the Saudi-led coalition, and the relevant U.S. defense contractors' willingness to profit from

---

[5] https://www.sipri.org/sites/default/files/2018-03/fssipri_at2017_0.pdf
[6] https://news.un.org/en/story/2020/12/1078972
[7] https://www.state.gov/reports/2019-country-reports-on-human-rights-practices/yemen/
[8] *See* updated Civilian Impact Monitoring data online: https://civilianimpactmonitoring. org

2

manufacturing and supplying arms to the Coalition, with specific knowledge that such arms have been and will be used for committing war crimes.

6.    Plaintiffs assert claims for injunctive relief and monetary damages under the Alien Tort Statute (ATS), 28 U.S.C. § 1350, against the named leaders of the Saudi Arabian and UAE military forces because they knowingly committed war crimes and extrajudicial killings, including against the Plaintiffs. Second, extrajudicial killings committed by the named leaders of the Saudi Arabian and UAE military forces also violate the Torture Victim Protection Act (TVPA), 28 U.S.C. § 1350, note. Third, Plaintiffs seek injunctive relief and monetary damages under the ATS against the named U.S. defense contractors for aiding and abetting war crimes and extrajudicial killings based on their supply of weapons to the leaders of the Coalition. Fourth, Plaintiffs also allege violations of the TVPA against the named responsible executives of the Defendant Defense contractors because they acted jointly with or aided and abetted these military leaders in committing extrajudicial killings. Fifth, Plaintiffs seek injunctive relief based on the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et. seq.*, against the U.S. Department of State, through the named responsible officer, Secretary Antony Blinken, and the Department of Defense, through the named responsible officer, Secretary Lloyd J. Austin III, since their decisions to approve the arms sales are arbitrary and capricious, and are in violation of various U.S. statutes, including but not limited to, the Foreign Assistance Act, 22 U.S.C. ch. 32 § 2151, and the Arms Export Control Act. 22 U.S.C. ch. 39 § 2751. Sixth and finally, Plaintiffs allege unjust enrichment against the defense contractor Defendants and the named individual executives of those companies, and negligence and intentional infliction of emotional distress against all Defendants except the Departments of State and Defense and their respective Secretaries.

## II.    <u>JURISDICTION AND VENUE</u>

7.   Plaintiffs bring their claims in the United States District Court for the District of Columbia because they cannot bring suit in their home country of Yemen. Even in peacetime, there is no law in Yemen that would allow Plaintiffs to seek civil damages and injunctive relief for their injuries against the Coalition leaders, the major defense contractors, and U.S. government officials. Further, the claims cannot be brought in Yemen because the judicial system is notoriously corrupt, virtually non-functioning, and would not offer any effective remedy for Plaintiffs' claims. Also, it is highly likely that both Plaintiffs and their attorneys would face violent retaliation by Coalition forces if the case was filed there. It is appropriate for Plaintiffs to seek justice in the U.S. because the key policy decisions that facilitated the harms Plaintiffs suffered were made in the U.S. and were implemented in the U.S. by the U.S.-based Defendants.

8.   The primary claims in this case are brought under the ATS and the TVPA providing this Court with federal question jurisdiction pursuant to 28 U.S.C. § 1331. This Court also has supplemental jurisdiction over the state law claims based on 28 U.S.C. § 1367 as they arise out of the same operative facts as the federal claims.  This Court also has jurisdiction over all of the claims based on 28 U.S.C. § 1332(a)(2) because there is diversity of citizenship. All Plaintiffs are foreign nationals and citizens and residents of Yemen, and each of their claims for damages exceeds $75,000. With regard to the Defendants, the named U.S. defense contractors are U.S. corporations headquartered in the United States and their defendant executives reside here; the U.S. Department of State and the Department of Defense are U.S. executive departments located and operating in the territory of the U.S.; and the military leaders of the Saudi Arabia and the UAE are foreign nationals of countries other than Yemen.

9.   This Court has personal jurisdiction over Defendants based on the long arm statute of the District of Columbia, D.C. Code § 13-423. The named leaders of the Saudi Arabian and the UAE

military forces have been conducting substantial and continuous business within the District of Columbia; every arms deal they make requires close ties to the U.S. government and the defense contractors with established businesses in D.C., as well as the direct approvals made by the executive agencies in the U.S. The U.S. defense contractors are U.S. resident companies doing continuous business in and/or operating within the District of Columbia. Finally, the U.S. Department of State and the Department of Defense are U.S. executive departments with major operations within the District of Columbia.  Thus, all of the Defendants conduct significant and ongoing business in the District of Columbia that relates directly to the injuries suffered by Plaintiffs.

10.  Venue over the collective Defendants is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(3) and (c)(2). Based on subsection (b)(3), venue is proper because there is no single judicial district where all Defendants are headquartered, and this judicial district is one where all Defendants are subject to personal jurisdiction. Further, based on subjection (c)(2), all Defendants are deemed to reside in this judicial district because they are subject to personal jurisdiction in this district.

## III.    PARTIES

**A. Yemeni Victims**

11.  Plaintiffs Mr. Amin Allawi Ali, Mr. Ayman Mhamad Saleh Al Sanabani, Mr. Khaled Ali Salem Chaib, as well as Ms. Fatima Mhamad Al Bayahi AL Kharabi, and Ms. Yousra Abd El Aziz Mhamad Aamad, are representative victims of the horrific bombing of a wedding in the village of Sanaban on October 7, 2015.

12.  Plaintiffs Mr. Ali Ahmad Ali Abad Al Roweishan and Mr. Mhamad Ali Hamoud Al Roweishan are representative victims of horrific bombing of a funeral in Sana'a on October 8, 2016.

### 1. *The bombing of a wedding in the village of Sanaban*

13.     On October 7, 2015, the village of Sanaban, the chief town of the Anss tribe, celebrated the wedding of three brothers, Moayad, Ayman and Abdul Rhaman and their respective future wives. The house hosting the wedding had been beautifully prepared for the festivities. Two large tents had been set up outside the house, one to prepare the meal, and the other to welcome the many guests who had come to celebrate the joyous union of their loved ones. At around 10 p.m., however, the celebration was suddenly hit by two missiles launched by Coalition military aircraft. The first missile hit the house, while the second landed in the guest tent, injuring and killing many guests. The attack was documented by the Legal Center for Right and Development in a detailed report. Representatives for the Center went to the site and witnessed the search for victims under the rubble carried out by local residents during the night, as well as the burial of victims in mass graves by the local community.



The yard in front of the home of Jamal al-Sanabani in Sanaban village in Dhammar, Yemen, the morning after the house was destroyed in an airstrike on October 7, 2015, that killed 43 people at the wedding including one of the brides. © 2015 Muhammad Jamal Saleh Ghouba al-Sanabani

[9]

14. According to the Center's report, 49 people were killed in the attack, including 13 women and 22 children. Among the dead were Abdul Raman, one of the grooms, and the wife-to-be of one of his brothers, Ayman; at least 75 people were injured in the attack, 34% of whom were children and 14% were women. Witnesses contacted by the Center recounted severe burns, dismembered and beheaded bodies, and general panic. This was a moment of intense joy turned into a fatal tragedy. This bombing is a war crime because it is an indiscriminate attack on the civilian population, causing severe pain or suffering, whether physical or mental.

15. The following testimony from the Plaintiffs supplies further details regarding the horrific attack.

---

[9] https://www.hrw.org/news/2015/12/20/witness-wedding-bombed-yemen

16. Mr. Amin Allawi Ali, who was present during the attack, provided a sworn statement as a witness to the horrific events:

> I, the undersigned Amin Allawi Ali, testify to the truth of the following facts because I have personally testified to them. I know that in the event of a false statement my criminal responsibility would be at stake. On October 7, 2015, I was next door to my house with some friends. At around 8:30 pm, planes flew over my village (Sanaban) for 40-45 minutes. They were war planes. After that, I heard the sound of a missile followed by a big boom. I was frightened, and with my friends we started running towards the noise. I saw the light of a big fire towards the south of the village. When I got to the bottom of the hill, I saw many frightened people running away, some asking, "where is my son, where is my father" and asking me to look for them. I arrived at the wedding house, there were 3 destroyed cars in front of the house in the yard. With my friends, we started to pick up the unconscious or dead people. Some with broken arms and legs. I picked up ears, heads, hands and legs. Some of the bodies were those of young children, I remember two children who had been pressed together because of the explosion. At one point it was so hard for me that I broke down and cried. There is no army, no weapons, nothing in the village. Before the bombing, the wedding house was brightly lit, and the music was loud. No one could have mistaken the house for a military camp. In the Diwan (living room) there were women (I estimate there were 300) who were waiting for the bride and groom to share their joy with them. I stopped taking care of the bodies around noon the next day. The fire lasted until the morning of the second day. People from other villages came to help. My sister-in-law, her husband and their son died during the bombing.

17. Mrs. Fatima Mhamad Al Bayahi Al Kharabi declared:

> I, Fatima Mohamed Al Biyahi, came at 6pm before the bride and groom arrived in the house. I was near the place reserved for the bride and groom until 9:50 pm when the three couples entered, and I heard a bang and a loud explosion that destroyed the house. The wall of the house fell on me and all the women at the wedding who were near me. I was hit in the head, lost my left eye, and broke my right foot. I was rescued from under the collapse at midnight and taken to the hospital where they treated my foot, but I still lost my left eye. Psychological symptoms: I am very tired and short of breath, and I suffer from intense pain in my right leg. Because of the explosion I can't sleep, and I had bad nightmares.

18. Mrs. Yousra Abd El Aziz Mhamad Ahmad, also a witness to the events, stated under oath:

> On Wednesday, October 7, around 9:40 p.m., the enemy bombed the house of my father, Mohamed Saleh Ghaoui. I was there with my friend for the wedding. Suddenly, I found myself surrounded by fire. I don't know how I ended up there with my friend. My friend and I came out of the "Ghaoui house" disoriented and when we came out, we heard airplane noises and people were fleeing everywhere. And there was crying, fear and fire on all sides in front and in the back of the house, and there was a lot of blood. After that we were rescued in time. On the morning of the second day, I received the tragic news of the death of my brother Mohamad Abdelaziz Al Bal... and my uncle Khaled... as well as the injury of my older brother who was hit by shrapnel that is in his body until now. He is still under treatment. I bear witness to this, and God is the best witness.

19. Mr. Ayman Mhamad Saleh Al Sanabani, relative of several victims who died in the attack,

also testified to the facts he observed:

> I, the undersigned Ayman Mohamed Saleh Al Sanabani- one of the three married members of the family of whom died: Mohammad Saleh Al Sanabani, my father, 60 years old; Fayiza Ahmed Nasr, my mother, 55 years old; Jamal Mohamed Saleh, my brother, 25 years old; Eid Al Rasan Mohamed Saleh, my brother, 19 years old 5- Jamila Ali Eid Rabh, my wife, 19 years old. A house was destroyed and burned by the enemy's plane, and this was on Wednesday 07/10/2015. Many of my family, relatives, my wife's family, and my wife's parents were affected. 59 of us passed away (men and women). It affected me psychologically, and sometimes I remember the crime and feel anxious about tomorrow, and I don't want to visit the house that was hit anymore so I don't remember the tragedy. On the day of the crime, I was hit in the back when the house collapsed, and I tried to save the others, but I could not. God is witness to what I say, and everything I write is true in my faith, and I insist on nothing but this.

20. Mr. Khaled Ali Salem Chaib, also present at the wedding, provided the following facts:

> I, Khaled Ali Salem Chaib, was with my entire family at the wedding, three of whom were my wife, daughter, and son. I was waiting for them outside the house where the wedding was taking place, and at 9:50 p.m. there was an explosion because of a bomb from the coalition plane, which had been flying for half an hour. After that, I ran after them. I found my wife, my daughter, and as for my son Chehab, I didn't find him until 3am. I found him under a burning car, he was dead, his legs were cut off, and his right hand was cut off too, he was completely burnt. Since his death and the accident, my wife and I are tired and suffering psychologically because of his loss. Her mother is very sick because of Chehab's death. Some nights when I sleep, I feel tight in my body, and I have disturbing nightmares and I can't bear to see the scene of the crime since. This is my testimony of what happened in front of me.

21. As these facts make clear, this bombing was an indiscriminate attack on the civilian

population, causing severe pain or suffering, whether physical or mental, and therefore is within the

universally accepted definition of a war crime.

### 2. The bombing of a funeral in Sana'a

22. On October 8, 2016, the Great Hall of Sana'a City hosting the funeral of Mr. Ali bin Ali Al

Roweishan was targeted and hit by Coalition missiles. Several hundred civilians were killed. The

bombing was documented in detail in a report compiling testimonies from the victims entitled "True

Stories from the Great Hall - Written and Photographed by Eyewitnesses." The report includes

more than eighty contributions from direct and indirect witnesses of the scene, many of them close

to the victims. Mr. Ali bin Ali Al Roweishan, chief of the Kawhlan tribe, was known and respected

by the community for having been, according to a witness: "one of the most important sheikhs of

Yemen, known for having encouraged reconciliation among the people by his wisdom and his kind

preaching." Because of his social position and the importance attached to such events in Yemeni

traditions, hundreds of people attended the funeral to pay their last respects to the deceased and his

relatives. More than 140 people were killed and more than 525 wounded the strike.[10]



Smoke rises from the community hall in Sanaa where Saudi-led coalition warplanes attacked a funeral on October 8, 2016.
© 2016 Khaled Abdullah/Reuters

---

[10] https://www.theguardian.com/world/2016/oct/08/saudi-led-coalition-airstrike-hit-yemen-funeral-officials-say



Firefighters try to extinguish a fire at the community hall in Sanaa where Saudi-led coalition warplanes attacked a funeral on October 8, 2016.
© 2016 Khaled Abdullah/Reuters

23. Plaintiff Ali Ahmad Ali Abad Al Roweishan attested to the following facts:

I, the undersigned Mr. Ali Ahmed Ali Abad Al Roweishan, certify that what I say is true and if this was not the truth, I take full responsibility. I arrived at the condolence hall at 1pm on Saturday 08/10/2016, I was dressed in traditional dress and there were 300 people present. And the people present were all in the room, the people when I arrived at the room  were dressed in traditional garb. And I was among the mourners and about 3:00 in the afternoon, the missile and I lay down on my stomach before the missile hit the room. I got up and looked at the fire. And I tried to get up and I couldn't, I was injured, and I had to crawl out, and when I got to the door of the room. A second missile was launched from the Saudi [Emirates] plane. I was taken to the hospital and stayed there for 5 days; I was later taken to the hospital in Oman. Since then, I have been in a permanent state of stress, and I can no longer stand the crowd.

24.  Similarly, Plaintiff Mhamad Ali Hamoud Al Roweishan testified:

I, Mr. Mohamad Ali Hamoud Al Roweishan, hereby certify on my honour that everything I say is true. I arrived at the condolence room at 3pm and was dressed in traditional Yemeni clothing and when I arrived. There were about 350 people in the room. And everybody was dressed in traditional clothes. I remember it was two missile strikes. During the strike, I was injured in my torso and left thigh, and I also lost the ability to speak well since that injury and missile strike. I remember that I was taken to the hospital and then to the military

hospital, and after that to the Saudi hospital. After several weeks I was transported to Oman where they treated the wounded in the ward. As for the bombing I experienced because of the planes, I have been suffering from psychological disorders since the very second and this situation still haunts me throughout my sleep.

25.  Both Mr. Ali Ahmad Ali Abad Al Roweishan and Mr. Mhamad Ali Hamoud Al Roweishan suffered physical and emotional harm as victims of this massive and systematic bombing of a funeral home filled with innocent civilians. As these facts make shockingly clear, this bombing  was an indiscriminate attack on the civilian population, causing severe pain or suffering, whether physical or mental, and therefore is a war crime.

**B.  Saudi Arabian and UAE Military Officials.**

26. The following military leaders are named as Defendants by Plaintiffs because each of them has knowingly perpetrated war crimes, extrajudicial killings, and other crimes against Plaintiffs and numerous other innocent civilians: Defendant Mohamed Ben Zayed Al-Nahyan in his capacity as Supreme Commander of the Armed Forces of the UAE; Defendant Mohammed bin Rashid Al Maktoum in his capacity as the vice president, prime minister, and minister of defense of the UAE; Defendant Mohamed Bin Salman Al Saoud in his capacity as Supreme Commander of the armed forces of the Kingdom of Saudi Arabia; Defendant  Hamad Mohamed Thani Al Rumaithi in his capacity as Chief of Staff of the UAE Armed Forces; Defendant Abdulrahman Ben Saleh Al-Bunyan in his capacity as Chief of Staff of the Saudi Armed Forces until February 2018; and Defendant Fayyadh Al-Ruwaili in his capacity as Chief of Staff of the Saudi Armed Forces since February 2018.

27. In March 2015, the UAE, and specifically its de facto ruler and Supreme Commander of the Armed Forces, Defendant Mohamed bin Zayed Al-Nahyan, formed the Coalition with Saudi Arabia,

Bahrain, Egypt, Jordan, Kuwait, Morocco, Senegal, and Sudan to take military action in Yemen at the request of deposed President Hadi.[11]

28. Coalition forces launched an indiscriminate bombing campaign on the Yemeni people. The campaign was a "decisive storm" of aerial attacks that caused significant civilian casualties. As several NGOs on the ground have documented, civilian targets were knowingly attacked by Coalition aircraft from the very first days of the offensive, strongly demonstrating the Coalition's willingness to rely on the commission of war crimes to wipe out the civilian population of Yemen that was sympathetic to the Houthi insurgents.[12]

29. The Coalition's forces are primarily under the command of the UAE and the Kingdom of Saudi Arabia, which also obtain and provide the lion's share of military and arms support. The UAE, particularly the royal family, has strong relations with Yemen.[13] In addition to conducting aerial attacks over Yemen with some 30 aircraft, the UAE has also provided ground forces. Emirati forces played a major role in the recapture of Aden in 2015 and the port city of Mukalla in 2016.[14] Over time, the UAE seized control of a large portion of southern Yemen, both through its direct action and through forces acting on its behalf.

30. As of mid-2019, Emirati ground troops were gradually withdrawn from Yemen, in favor of a strict strategy of aerial attacks and direct support to armed groups including the Security Belt Forces, the elite Hadramout and Shabwah forces, the Southern Transitional Council, the Giants brigades, the Tuaham brigades and the Tariq forces.[15] The Security Belt Forces is a terrorist group created by the UAE in 2016 to assist with war in Yemen, whose fighters are directly responsible for the

---

[11] Qatar was part of the coalition until June 2017.
[12] See UN Report A/HRC/42/CRP.1 of 3 September 2019
[13] Washington Institute - Yemen Matrix: Allies and Adversaries
[14] The World - The United Arab Emirates' lost wars
[15] UN Report A/HRC/45/CRP.7 of 29 September 2020, Appendix IV

majority of the war crimes alleged herein, as well as financing terrorism. The group remains under the direct control of the UAE, which provides training and U.S.-made arms.[16] According to Human Rights Watch, Security Belt Forces operate Emirati-run detention centers at the behest of the UAE, which must, among other things, give its consent to any release of prisoners. The UAE also supports and maintains operational control over the other militias responsible for war crimes in Yemen, including the Abu Al-Abbas Brigades, the Giants Brigades and the Shabwa Elite Forces.

31. Defendant Sheikh Mohamed Ben Zayed Al-Nayhan has been the Supreme Commander of the UAE armed forces since 2005.[17] He is assisted by his Minister of Defense, Mohammed bin Rashid Al Maktoum, as well as the Chief of Staff of the Armed Forces, Defendant General Hamad Mohamed Thani Al-Rumaithi.

32. For Saudi Arabia, which shares its southern border with Yemen, the war is a matter of internal security and regional influence. While Iran supports the Houthi rebels, its long-time regional rival, Saudi Arabia, is a major ally of the Internationally Recognized Government (IRGC), which it also hosts.

33. In 2015, Saudi Arabia effectively assumed the leadership of the Coalition that intervened in support of President Hadi. Over the course of the war, Riyadh's position has shifted from demanding the Houthi movement's unconditional surrender to a greater interest in political compromise, particularly after a September 2019 attack on vital Saudi oil and gas infrastructure. The 2020 U.S. presidential election and growing international criticism of Saudi Arabia's role in the conflict, particularly regarding war crimes, likely contributed to this policy shift.

---

[16] UN Report A/HRC/45/CRP.7 of 29 September 2020, para 61. Available at https://www.ohchr.org/sites/default/files/Documents/HRBodies/HRCouncil/GEE-Yemen/A-HRC-45-CRP.7-en.pdf.

[17] Washington Institute - Yemen Matrix: Allies and Adversaries

34. The Saudi armed forces were placed under the command of the Crown Prince, de facto ruler and Minister of Defense for Saudi Arabia, Defendant Mohammed Ben Salman. In addition, between 2014 and February 2018,  Defendant General Abdulrahman Ben Saleh Al-Bunyan was head of the military. He was then replaced by Defendant General Fayyadh Al-Ruwaili.

35. These named military leaders continue to wield influence in the United States. Saudi Arabia and the UAE spend millions each year to advocate for their interests before the U.S. government and the media. Social media campaigns, letters to the editor, white papers and traditional lobbying efforts are all carried out for Saudi Arabia and UAE by some of the powerhouses and hired guns of Washington's K Street. Under the Foreign Agents Registration Act, foreign governments that hire agents to influence U.S. policy and public opinion are required to register with the Department of Justice. Registered foreign agents must disclose details of their influence operations, such as meetings with government officials, expenditures, campaign contributions, and copies of informational materials such as advertisements, op-eds and letters. Since 2015, the UAE and Saudi Arabia rank ninth and tenth respectively in spending reported under the Foreign Agents Registration Act, with both countries having spent over $140 million dollars each. Saudi Arabia and the UAE both have reported sustained efforts to address the topic of arms sales and Yemen over several years.[18]

36. In this case, the named Defendant military leaders' war crimes and other illegal conduct caused Plaintiffs severe injuries at the bombing of the wedding on October 7, 2015, and the bombing of the funeral on October 8, 2016, described more fully herein.

37. With respect to the wedding bombing on October 7, 2015, Plaintiff Al Kharabi was in the house targeted by the Coalition aircraft in Sanaban and was buried under the rubble. Like other

---

[18] https://www.opensecrets.org/news/reports/capitalizing-on-conflict/yemen-case-study

page_number: 18 of 100

civilian victims of the attack, Ms. Al Kharabi was severely injured and continues to suffer from severe pain in her right leg and having lost her left eye. But for the command given by and the military strategies formulated by the named Saudi Arabian and UAE military leaders, she would not have suffered those injuries.

38. Plaintiff Mhamad Aamad was also present at the wedding site during the Sanaban bombing. She was saved from the flames with her friend but lost her brother and uncle in the attack carried out by the Coalition. Ms. Al Kharabi has suffered significant psychological distress related to her trauma and the loss of family members. But for the command given by and the military strategies formulated by the named Saudi Arabian and UAE military leaders, she would not have suffered those injuries.

39. Plaintiff Al Sanabani was also present at the wedding site during the Sanaban attack. During the explosion, he was hit in the back by a projectile and suffers from deep psychological trauma, having lost 59 members of his family in the bombing. In the case of Mr. Al Sanabani, he has undergone significant psychological suffering related to his trauma and the loss of family members. But for the command given by and the military strategies formulated by the named Saudi Arabian and UAE military leaders, he would not have suffered these injuries.

40. Plaintiff Chaib attended the wedding in Sanaban with his wife and son. The bombing killed his son, cutting off his legs, hand, and burning him to death. Mr. Chaib has suffered significant psychological suffering from the traumatic loss of his son. But for the command given by and the military strategies formulated by the named Saudi Arabian and UAE military leaders, he would not have suffered those injuries.

41. With respect to the funeral bombing on October 8, 2016, Plaintiff Ali Ahmad Ali Abad Al Roweishan was the victim of the attack perpetrated by the members of the Coalition on the "Great Hall" in Sana'a. He was injured in the attack and had to be hospitalized for a lengthy period, first in

Yemen and then in Oman. Mr. Ali Ahmad Ali Abad Al Roweishan continues to suffer significant psychological harm as a result of this traumatic experience. But for the command given by and the military strategies formulated by the named Saudi Arabian and UAE military leaders, he would not have suffered those injuries.

42.  Plaintiff Mhamad Ali Hamoud Al Roweishan was also a victim of the bombing of the "Great Hall" in Sana'a. He was seriously injured in the torso and left thigh, after which he was hospitalized for a lengthy period in Yemen, then in Saudi Arabia, then in Oman. He continues to suffer from the consequences of the attack, having partially lost his speech and suffering from severe anxiety. Mr. Mhamad Ali Hamoud Al Roweishan was seriously injured and continues to suffer significant psychological suffering as a result. But for the command given by and the military strategies formulated by the named Saudi Arabian and UAE military leaders, he would not have suffered those injuries.

43.  The alleged illegal airstrikes would not have been carried out without the named Saudi Arabian and UAE military leaders' command and authorization. These Defendants also acted with specific knowledge that civilians such as Plaintiffs would be harmed by such attacks, making them liable for the injuries caused.

## C.  U.S. Defense Contractors and their Chief Executive Officers

44.  Defendants Raytheon Technologies Corporation ("Raytheon"), Lockheed Martin Corporation ("Lockheed Martin"), and General Dynamics Corporation ("General Dynamics") knowingly benefit from aiding and abetting the indiscriminate airstrikes conducted by the Saudi/UAE-led coalition targeting Yemeni civilians. Equally liable are the Chief Executive Officers ("CEOs") of these companies, Defendants Gregory J Hayes, the CEO of Raytheon; Jim Taicley, the CEO of Lockheed Martin; and Pheobe Novakovic, the CEO of General Dynamics. The individual

Defendants are responsible for their own acts and for wrongdoing committed by employees under their command and control.

45. Human rights groups, including the Yemen-based Mwatana for Human Rights, Amnesty International, and Human Rights Watch, have documented the devastating harm caused by arms produced by these Defendants and used in airstrikes against civilian targets, including a marketplace, a wedding, a funeral, and even a school bus. Meanwhile, arms industry executives heavily lobby U.S. policymakers to allow them to continue to arm the Coalition's brutal forces.  Over the past two decades, defense contractors have spent $2.5 billion on their lobbying efforts while giving $285 million in campaign contributions to key members of Congress, according to Open Secrets, a group devoted to promoting government transparency.  In an average year, the industry employs around 700 lobbyists, or more than one for every congressional representative.[19]

### 1.  Raytheon Technologies Corporation

46. Raytheon Technologies Corporation is an American multinational aerospace and defense conglomerate headquartered in Waltham, Massachusetts. As the second-largest arms manufacturer in the world, it is a major provider of the weapons used in Yemen. Raytheon researches, develops, and manufactures advanced aerospace and defense technology, including aircraft engines, avionics, guided missiles, air defense systems, satellites, and drones. The company is also a large military contractor, getting a significant portion of its revenue from the U.S. government.

47. Raytheon stands out from the rest of its competitors because of its close ties with Saudi Arabia, having been the first weapons manufacturer to establish permanent operations there in the 1960s, hiring members of the Saudi royal family as consultants, and opening a corporate branch in Riyadh in 2017. After the war began in March 2015, Raytheon's stock price went from about $108 to

---

[19] https://quincyinst.org/report/pathways-to-pentagon-spending-reductions-removing-the-obstacles/

more than $180 in 2019, reflecting billions of dollars in weapons sales to Saudi Arabia. Evidence of the bloody highway stretching between Raytheon and the Saudi government can be found in a January 25, 2022, conference call[20] from Raytheon Technologies Chairman and CEO, Defendant Gregory Hayes, to Raytheon investors. Hayes referred to military actions involving the UAE (part of the Saudi-led Coalition killing innocent civilian Yemenis) as well as "tensions" in Eastern Europe and the South China Sea. He assured investors: "I fully expect we're going to see some benefit from it."

48. Overall, Raytheon reported sales of $64.4 billion for 2021 and predicts sales of $68.5 – $69.5 billion for 2022. The bookings for the fourth quarter of 2021 included: $1.3 billion of classified bookings at Raytheon Intelligence & Space; $729 million for two Standard Missile-2 (SM-2) production contracts for the U.S. Navy and international customers at Raytheon Missiles & Defense; $269 million for Evolved Seasparrow Missile (ESSM) for the U.S. Navy and international customers; $227 million for the Next Generation Jammer (NGJ) Mid-Band for the U.S. Navy. Raytheon CEO Gregory Hayes has personally been receiving a sizable share of the company's profits from military action, including the war in Yemen. His total compensation in 2020 was just shy of 20 million dollars. Of this total, $1,413,333 was received as a salary, $2,500,000 was received as a bonus, $7,178,289 was received in stock options, $7,417,686 was awarded as stock and $887,798 came from other types of compensation.[21] A major portion of Raytheon's sales to Saudi Arabia are weapons used in the attacks on Yemen, including those that injured Plaintiffs and killed their relatives, friends and members of their communities.

---

[20] https://masspeaceaction.org/saudi-arabia-to-yemen-via-raytheon-highways-paved-in-gold-and-blood/
[21] *Id.*

## 2. *Lockheed Martin Corporation*

49. Lockheed Martin Corporation is an American aerospace, arms, defense, information security, and technology corporation headquartered in North Bethesda, Maryland, in the Washington, D.C. area. Lockheed Martin is the world's biggest arms manufacturer, and world's biggest exporter of arms. It was the world's largest defense contractor by revenue for fiscal year 2014. In 2013, 78% of Lockheed Martin's revenues came from military sales. That year, the company also topped the list of U.S. federal government contractors and received nearly 10% of the funds paid out by the Pentagon.

50. In just one month (December 2020), Lockheed won 32 procurement contracts with a combined value of $4.8 billion, with 90% of those contracts coming from the U.S. military. Lockheed's headquarters is located in the United States, but it has subsidiaries and partners all over the world. The company employs over 126,000 people worldwide and builds everything from ballistic missiles to combat ships, robots to satellites, radars to aircraft, and other military products and services. Howard P. "Buck" McKeon, the former chair of the House Armed Services Committee, has worked for Saudi Arabia and Lockheed Martin, both of which have a strong interest in pushing such weaponry out the door with as few questions asked as possible.  Democracy for the Arab World Now (DAWN), Freedom Forward, and other organizations promoting human rights and democracy in the Middle East have placed operatives like McKeon who advocate for repressive regimes in their "lobbyist hall of shame."[22] For every $1 Lockheed Martin spent on lobbying in 2020, they received $5,803 from DOD contracts.[23] A major portion of the company's sales to Saudi

[22] https://dawnmena.org/countries/lobbyist-gallery/
[23] https://www.opensecrets.org/news/2022/04/top-pentagon-contractors-spend-less-on-lobbying-as-demand-for-weapons-to-ukraine-rises/

20

Arabia are weapons used in attacks in Yemen, including those that injured Plaintiffs and killed their relatives, friends and members of their communities.

51. Remnants of bombs produced by Lockheed Martin have been found in Yemen at the site of attacks on civilians. Human Rights Watch has received photographs and videos of munition remnants from a lawyer based in Sanaa, about 235 kilometers south of Saada, who claimed they were at the site of a bombing of a bus. The lawyer traveled to the site of the attack on August 11, 2018. He also took videos at the site showing the collected remnants near the destroyed bus in the market. Photos and videos of markings on the guidance fin of a missile confirm it was GBU-12 Paveway II produced at a General Dynamics Corporation facility in Garland, Texas, for Lockheed Martin. Photographs and videos of munition fragments also show a 500-pound Mk-82 general purpose missile fitted with a laser-guidance system that can strike within meters of its target. Markings visible on another guidance fin allegedly found at the site, include "3LCX2," a unique identification for U.S. arms suppliers, known as a CAGE code, for General Dynamics Corporation, Ordnance and Tactical Systems Division, in Garland, Texas, which produces Mk-82 bombs. The CAGE code for Lockheed Martin was also marked on a different side of the guidance fin. Human Rights Watch could not confirm that the remnants were found at the site. However, images of damage from the scene are consistent with the detonation of a large, impact-fused aerial bomb.[24]

### 3. General Dynamics Corporation

52. General Dynamics Corporation is an American publicly traded, aerospace and defense corporation headquartered in Reston, Virginia. As of 2019, it was the fifth-largest defense contractor in the United States, and the sixth largest in the world by sales.

---

[24] https://www.hrw.org/news/2018/09/02/yemen-coalition-bus-bombing-apparent-war-crime

53. General Dynamics spends millions of dollars each year on lobbying to shape U.S. policy. Since the Yemen war began in March 2015, General Dynamics' stock price has risen from about $135 to $169 per share.[25] A major portion of its sales to Saudi Arabia are weapons used in the attacks on Yemen, including those that injured Plaintiffs and killed their relatives, friends and members of their communities.

54. At General Dynamics' 2021 annual shareholder meeting, a group of shareholders turned out to confront the company's board of directors, asking how they justify the destruction and death they've helped cause. Among the proposals before the board was a request that the company prepare a human rights report to address and remedy the "actual and potential human rights impacts associated with high-risk products and services." As the shareholders pointed out, General Dynamics' products and services are used by Saudi Arabia, the United Arab Emirates, Bahrain, Egypt, Israel, and U.S. government agencies at the U.S.-Mexico border. The company's weapons have also been used in war crimes and human rights violations against Yemenis, Palestinians, asylum-seekers and others. However, the board of General Dynamics unanimously recommended a vote against the proposal, claiming it would "undermine shareholder value."[26]

**D. The U.S. State Department and the Department of Defense**

55. Various offices within the State Department ("State") and Department of Defense ("DOD") oversee and implement programs that provide military support to foreign nations, including Saudi Arabia and UAE. Saudi Arabia and UAE are both among the largest recipients of U.S. arms. DOD provides various types of military support to these countries, including defense articles and defense services; logistic support, supplies, and services; training; and advisory services through a variety of security cooperation programs.

---

[25] https://inthesetimes.com/features/us-saudi-arabia-yemen-war-arms-sales.html
[26] https://progressive.org/op-eds/taking-on-masters-of-war-leibow-220511/

56. State and DOD's review and approval of arms sales must be conducted in accordance with two major laws. First, the Foreign Assistance Act, 22 U.S.C. ch. 32 § 2151, requires that, to the extent practicable, military sales programs must be designed to provide reasonable assurance that recipients are complying with restrictions imposed by the U.S. government on the use, transfers, and security of defense articles and services, and that recipients use such articles and services for the purposes for which they are provided. Second, the Arms Export Control Act, 22 U.S.C. ch. 39 § 2751, requires the President to establish an End-Using Monitoring ("EUM") program that, to the extent practicable, is designed to provide reasonable assurances that defense articles and defense services are being used for the purposes for which they were provided. Section 4 of the Arms Export Control Act states that the authorized purposes of Foreign Military Sales ("FMS") transfers include internal security, legitimate self-defense, and permitting the recipient country to participate in regional or collective arrangements or measures consistent with the Charter of the UN, among other purposes. According to DOD policy, EUM covers all actions to prevent the misuse or unauthorized transfer of defense articles or defense services from the time of title transfer until disposal.

57. From fiscal year 2015 through 2021, DOD administered military support worth at least $54.6 billion to Saudi Arabia and the UAE, primarily for defense articles and defense services, including training, transferred through Foreign Military Sales (FMS), as well as logistic support, supplies, and services exchanged under acquisition and cross-servicing agreements ("ACSAs") and advisory services. Some of the training and advisory services provided have addressed civilian harm reduction. DOD administered sales of at least $54.2 billion in defense articles and defense services, including training, to Saudi Arabia and UAE through FMS agreements signed from fiscal years 2015 through 2021, according to DSCA data. Of the $54.2 billion in defense articles and defense services, DOD administered 197 FMS cases worth $44.6 billion for Saudi Arabia and 55 FMS cases worth

$9.6 billion for UAE.24 The value of individual FMS cases ranged from $20,000 to $7.9 billion. Both Saudi Arabia and UAE use their own funds to purchase defense articles and defense services through FMS, according to DOD officials.

58.  The total annual value of FMS cases for Saudi Arabia and UAE has varied over time, ranging from $1.5 billion in fiscal year 2021 to $14.7 billion in fiscal year 2018. State Department officials noted that the value of FMS cases for these countries declined in fiscal year 2021.[27] See the chart below for more information about the total value of FMS cases for these countries by fiscal year:

**Table 4: Financial Value of Defense Articles and Defense Services Sold by the U.S. to Saudi Arabia and the United Arab Emirates through Foreign Military Sales (FMS) Agreements Signed in Fiscal Years 2015-2021**

Dollars in billions

| Fiscal year | Total case value |
| --- | --- |
| 2015 | 10.5 |
| 2016 | 3.6 |
| 2017 | 2.7 |
| 2018 | 14.7 |
| 2019 | 14.3 |
| 2020 | 6.8 |
| 2021 | 1.5 |
| **Total** | **54.2** |

Source: GAO analysis of Defense Security Cooperation Agency (DSCA) data. | GAO-22-105988

Notes: Amounts do not sum to the total due to rounding. The amounts represented are based on the case value reported in DSCA's data as of October 8, 2021, for FMS agreements implemented (i.e., the foreign partner signs the agreement and provides the initial deposit) from fiscal years 2015 through 2021. Case value represents the value of the original FMS agreement, as well as any amendments and modifications to the case, according to DSCA officials. The case value reported could change over time with additional amendments or modifications.

59.  In the context of U.S. arms sales, FMS is the U.S. government's program for transferring defense articles, services, and training to its international partners and international organizations.

---

[27] GAO-22-105988, *State and DOD Need Better Information on Civilian Impacts of U.S. Military Support to Saudi Arabia and the United Arab Emirates*, page 13. Available at https://www.gao.gov/products/gao-22-105988.

The President designates countries and international organizations eligible to participate in FMS.

The Department of State approves individual programs on a case-by-case basis. Currently, some 189

countries and international organizations participate in FMS. Under FMS, the U.S. Government uses

DOD's acquisition system to procure defense articles and services on behalf of its partners. Eligible

countries may purchase defense articles and services with their own funds or with funds provided

through U.S. Government-sponsored assistance programs. The Office of Regional Security and

Arms Transfers in the Department of State's Bureau of Political-Military Affairs (PM/RSAT)

manages the FMS approval process, in close partnership with the Department of Defense's Defense

Security Cooperation Agency (DSCA). DSCA coordinates implementation of FMS cases foreign

military services negotiate with U.S. defense contractors. Major FMS programs also nurture long-

term relationships with the U.S. military, including access to joint training and increased

opportunities for collaboration with U.S. forces.[28]

   60.  International partners can also obtain U.S. defense articles and services through Direct

Commercial Sales (DCS). For direct commercial sales, the Bureau of Political-Military Affairs'

Directorate of Defense Trade Controls (PM/DDTC) provides regulatory approvals for

approximately $115 billion per year in sales of defense equipment, services, and related

manufacturing technologies within the 21 categories of the U.S. Munitions List (USML). As with

FMS, DCS are subject to applicable U.S. exports laws and regulations and the approval of the

Department of State. Although direct commercial sales are negotiated privately between foreign

end-users and U.S. companies, U.S. companies are required to register with DDTC. Further, a

DDTC license or other approval is required before exporting a defense article or providing a

defense service to a foreign end-user.[29]

---

[28] https://www.dsca.mil/foreign-military-sales-faq
[29] https://www.state.gov/u-s-arms-sales-and-defense-trade/

61. Despite numerous reports of airstrikes and other attacks by Saudi Arabia and the UAE on civilians in Yemen, DOD has not reported and State could not provide evidence that it investigated any incidents of potential unauthorized use of equipment transferred to Saudi Arabia or the UAE. According to DOD policy, officials overseeing security cooperation efforts should be alert to and report any indication that U.S.-origin defense articles are being used against anything other than legitimate military targets. Additionally, State investigates alleged incidents of unauthorized use. DOD officials told GAO they lack guidance for reporting such incidents, and State officials could not provide specific guidance. Failing to provide such guidance, DOD and State have not fulfilled their statutory duty to assess the extent to which U.S.-made arms have contributed to civilian harm in Yemen.

## IV.   FACTUAL ALLEGATIONS

### A. Plaintiffs and Other Innocent Civilians Suffered Severe Bodily Injuries and Property Loss from Defendants' Joint Conduct.

62. Year after year, the bombs fell — on wedding tents, funeral halls, fishing boats and a school bus – killing thousands of civilians and helping turn Yemen into the world's worst humanitarian crisis. Weapons supplied by U.S. companies through sales unlawfully approved by U.S. officials, allowed Saudi Arabia and the UAE through the named Defendant officials to pursue an indiscriminate and brutal bombing campaign. Since the war began, approximately 112,000 people have died in Yemen[30] as a direct result of hostilities, of whom around 12,000 were civilians. The Office of the United Nations High Commissioner for Human Rights has documented at least 7,825 civilians killed (including at least 2,138 children and 933 women) and 12,416 civilians injured (including 2,898 children and 1,395 women) as a direct result of the conflict between March 2015 and June 2020. These figures do not include the many thousands of people who have died as a result

---

[30] https://news.un.org/en/story/2020/12/1078972

of the worsening economic, health and humanitarian conditions directly attributable to the war. Plaintiffs herein are representative examples of victims of the indiscriminate slaughter of innocent civilians.

63. Reports from UN Committee against Torture (CAT) indicate that attacks (air and ground) against civilians in Yemen constitute a violation of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.[31]

64. By way of context, in its Concluding Observations on the implementation of the Convention in Israel dated 23 June 2009, the Committee identified "the use of force and violence in the course of military operations" as one of the main focuses of its concerns regarding the State Party's compliance with the Convention. The Committee stressed: "Despite the continued indiscriminate rocket fire against civilians in the south, which apparently prompted Israel to exercise its right to defend its population by launching Operation Cast Lead against Hamas in the Gaza Strip, the Committee is concerned about the inadequacy of the measures taken by the State party to protect the civilian population in the Gaza Strip and to prevent the damage caused by the Israeli military operation, including the deaths of hundreds of Palestinian civilians, including minors. The report of nine United Nations experts referred to civilians, including medical personnel - 16 of whom were reportedly killed and 25 injured while on duty. As confirmed by Israeli investigators, civilians have suffered the serious consequences of the use of Israeli military equipment containing phosphorus, even though it was apparently used to create smoke curtains or to locate tunnel entrances in Gaza. Notwithstanding the State party's argument that such weapons are not prohibited under international humanitarian law and were not directed against persons, the Committee regrets their use in a densely populated area and the great pain and suffering caused by these weapons, including

---

[31] Committee against Torture - Concluding Observations Israel (2009)

the death of persons who, according to the information received, were not killed by them, the Committee regrets the use of these weapons in a densely populated area and the great pain and suffering caused by these weapons, including the deaths of persons who, according to the information received, could not be adequately treated in Gaza hospitals, which were not able to provide palliative care for various reasons, in particular because the weapons used were not well known and because these hospitals were used as headquarters, command centres and hideouts for Hamas operations. [...] The Committee has received information that the 'closure' of the Gaza Strip, which has been particularly severe since July 2007, has impeded the delivery of humanitarian assistance before, during and after the recent conflict and has affected other human rights of the inhabitants, in particular the right to freedom of movement of both youth and adults.

65. Similarly, in its Concluding Observations on the implementation of the Convention in Syrian Arab Republic dated June 29, 2021, the Committee stated it was: "[...] deeply concerned by the numerous, consistent and substantiated reports from reliable sources of massive violations of the provisions of the Convention by the authorities of the Syrian Arab Republic, including:[...] (b) Massive or systematic attacks against the civilian population, including the killing of peaceful demonstrators and the excessive use of force against them; [...]"[32]

66. As with the examples from Israel and Syria, in the bombings in Yemen, the airstrike conducted on the wedding on October 7, 2015, killed 49 people, including 13 women and 22 children. Among the dead were Abdul Raman, one of the grooms, and the wife-to-be of one of his brothers, Ayman. At least 75 people were injured in the attack, 34% of whom were children and 14% were women. Witnesses contacted by the NGOs mention numerous burns, dismembered and beheaded bodies, and general panic. As for the airstrike conducted on the funeral on October 8,

---

[32] Committee against Torture - Concluding Observations Syria (2012)

2016, more than 140 people were killed and more than 525 wounded. All Plaintiffs in this Complaint have suffered several bodily, mental, and proprietary injuries, as described by their testimonies in paragraphs 14-23, *supra*.

## B. Saudi and UAE Military Officials Committed War Crimes in Yemen

67. As with the established violations in Israel and Syria, the indiscriminate bombing of civilian populations in Yemen by Coalition forces has been amply documented and denounced by numerous NGOs and the United Nations. In view of the number of bombings of exclusively civilian targets, including particularly sensitive targets such as hospitals, in the absence of any military target in the vicinity, the United Nations Group of Experts considers it "very likely" that Coalition airstrikes do not meet the guiding principles of distinction and proportionality:

68. "The specific cases investigated by the Panel raise serious concerns about the targeting process applied by the Coalition. The Panel has requested specific information from the Coalition on this process; unfortunately, no response has been received to date. The brief public reports provided by the Coalition Joint Assessment Team do not include details of the targeting process. As a result, the Panel has been limited to examining the effects of air strikes."

69. On the basis of the facts reviewed and the information received on the targeting process, the Group of Experts has reasonable grounds to consider that: "In the absence of any military objective in the vicinity of the affected objects, there are serious concerns about the respect of the principle of distinction and the manner in which military targets have been defined and selected. When precision-guided munitions are used, the intended target is usually hit; The number of civilian casualties raises serious concerns about the nature and effectiveness of any proportionality assessment that would have been performed ; The timing of some of the attacks and the type of weapons used raise serious concerns about the nature and effectiveness of any precautionary measures taken; The fact that the list of protected assets is not accessible to all commanders

concerned raises serious concerns about the coalition's ability to comply with the special protection measures; The use of 'double strikes' at short intervals, thus affecting first responders (rescue workers), raises serious concerns as to whether updated proportionality assessments have been carried out and whether precautionary measures have been applied for the second strike. Any errors in the targeting process that would, in practice, remove the protections of international humanitarian law would constitute violations. These may, depending on the circumstances, amount to war crimes committed by individuals at all levels within the Coalition member States or the Government of Yemen, including civilian officials."

70. These bombings have thus caused massive civilian casualties. According to the Yemen Data Project, since March 2015, Coalition bombing alone has killed 8,783 civilians (as of 10 November 2021). In addition to these direct victims, the bombings have indirectly cost the lives of many more civilians through the massive destruction of essential infrastructure in Yemen.

71. Indeed, in addition to the physical and psychological suffering directly caused to Yemeni civilians, the Coalition's bombing campaign has also deprived access to basic necessities such as food, drinking water, and medical care.

72. According to the World Food Programme, in 2021 more than 16.2 million Yemenis were living in food insecurity, 47,000 of whom were suffering from famine. This situation is the result of the blockade imposed by the Coalition on imports combined with the bombing of essential infrastructure. International observers have documented at least 730 bombings targeting farms and agricultural infrastructures, 228 bombings targeting food markets, 64 bombings targeting food storage sites, and 150 bombings targeting water and electricity infrastructure. According to Kamel Jendoubi, Chairman of the United Nations Panel of Experts, "Civilians in Yemen are not starving, they are being starved by the parties to the conflict." In other words, Coalition airstrikes not only kill civilians directly, but also indirectly through their destruction of essential infrastructure.

**C.  Defendant Defense Contractors Aided and Abetted the Indiscriminate Airstrikes in Violation of International Law, and Knowingly Profit and Benefit from the Supply of Weapons to the Saudi/UAE-Led Coalition.**

73.  As identified by press releases made by the United States government between May 2020 and February 2022 Raytheon, General Dynamics, and Lockheed Martin are the major U.S. Defense Contractors whose commercial sales to the Coalition countries (Saudi Arabia, United Arab Emirates, and Kuwait) are made through the Foreign Military Sales ("FMS") program. While companies like Raytheon pretend to be merely passive in the war in Yemen, they actually have a large hand in shaping U.S. policy. Every year, Raytheon and other defense contractors spend millions of dollars influencing elections and lobbying for more arms sales – fueling horrific wars like Yemen's for the sake of profits.[33]

### 1.  *Raytheon Technologies Corporation*

74.  In 2016, President Obama blocked Raytheon's sale of approximately 16,000 guided munitions kits to Saudi Arabia, which enabled so-called "dumb bombs" to be upgraded to "smart bombs" with greatly accuracy. The kits, if purchased over the life of the proposed contract, were valued around $350 million. The administration's decision was a setback for Raytheon, which officials say pushed hard for approval of the sale. According to administration officials, Raytheon's chief executive, Thomas A. Kennedy, personally lobbied Tony Blinken, then Deputy Secretary of State, and also reached out to Secretary of State John Kerry and Susan Rice, the national security adviser.[34]

75.  However, records show that foreign military sales, facilitated by the U.S. government, rose sharply after Mr. Trump became president. Sales averaged about $51 billion a year during President Trump's first three years in office, compared with $36 billion a year during the final term of

---

[33] https://www.opensecrets.org/industries/lobbying.php?ind=D
[34] https://www.nytimes.com/2016/12/13/us/politics/saudi-arabia-arms-sale-yemen-war.html

President Obama. In 2018, the Trump Administration defended arms sales to Saudi Arabia as being vital to job growth and the American economy. "We've created an incredible economy," President Trump told Fox Business in October 2018, after the killing of the journalist and American resident Jamal Khashoggi sparked calls to stop selling to the Saudis. "… I want Lockheed and I want Raytheon to take those orders and to hire lots of people to make that incredible equipment."[35]

76. Representatives of Raytheon, Lockheed Martin, General Dynamic, and other defense contractors streamed into the White House to lobby Mr. Peter Navarro, who served in the Trump Administration as the Assistant to the President, Director of Trade and Manufacturing Policy, and the national Defense Production Act policy coordinator. Mr. Navarro's hawkish stance toward China was well known, and defense industry executives played it to their advantage, according to Loren B. Thompson, a consultant, who soon arranged a lunch meeting between Mr. Navarro and industry leaders, including Thomas A. Kennedy, then Raytheon's chief executive and now its executive chairman.

77. The revolving-door between the defense industry and the U.S. government has greatly benefitted Raytheon. Former Raytheon employees and lobbyists have secured powerful positions at the highest levels of government. Presidents Obama and Trump both tapped former Raytheon lobbyists to serve in senior roles in the Defense Department (William Lynn and Mark Esper, respectively), and President Biden has continued the tradition, choosing Gen. Lloyd Austin, who sat on Raytheon's board, for Secretary of Defense. As of October 2020, his Raytheon stock holdings were worth roughly $500,000 and his compensation, including stock, totaled $2.7 million.

78. It certainly did not hurt that Raytheon had allies already embedded throughout the Washington bureaucracy. For example, the company's former chief lobbyist, Mark Esper, became

---

[35] https://www.nytimes.com/2020/05/16/us/arms-deals-raytheon-yemen.html

Secretary of the Army and eventually Secretary of Defense from July 2019 to November 2020. During his confirmation, Esper refused to recuse himself from decisions affecting Raytheon. In addition, Acting Assistant Secretary of State Charles Faulkner had previously lobbied on defense procurement issues for Raytheon. He was eventually removed from his post for his integral role in fast-tracking $8 billion in Raytheon arms sales to Saudi Arabia.

79. Raytheon and other defense contractors employ other tactics to influence U.S. policy. One method involved hiring former State Department officials to lobby their former colleagues to approve the sales President Obama had blocked. In its quest to guarantee President Trump's approval of the weapons sales that President Obama had halted, Raytheon also solicited support from lobbyist David J. Urban, who was in the same class at West Point with Mark Esper and former Secretary of State Mike Pompeo. Urban, Esper, and Pompeo maintain strong ties and affectionately refer to themselves as the "West Point Mafia."

80. Raytheon has also used its massive profits, in part from arms sales to Saudi Arabia, to further its arms sales to the Kingdom, perpetuating a vicious cycle of defense contracts and war. Raytheon's total lobbying expenditures for 2020 amounted to $11,580,000; of that total, $11,370,000 was for "defense electronics." Specifically, Raytheon has given over $4.5 million to the campaigns and leadership PACs of U.S. senators who have voted against blocking weapons sales to Saudi Arabia. For example, Senate Minority Leader Mitch McConnell, who has consistently supported arms sales to Saudi Arabia, has received more than $218,000 from Raytheon over the course of his Senate career.[36]

81. Meanwhile, defense contractors have largely ignored the ongoing civilian deaths caused by U.S.-made bombs. Asked in 2017 whether dead and injured civilians gave him pause, John D. Harris

---

[36] https://masspeaceaction.org/saudi-arabia-to-yemen-via-raytheon-highways-paved-in-gold-and-blood/

II, then Raytheon's vice president of business development, told CNBC that they did not, "because we do the hard work of making sure that the countries that employ our systems have the very best training and the ability to use the system in an appropriate manner."[37]

82. Before and after the two tragic bombings described in this Complaint, Defendants Raytheon and its CEO, Defendant Gregory J Hayes, had much greater access to information related to the illegal use of arms in Yemen than is publicly available and they still executed the weapons sales.



---

[37] https://www.cnbc.com/2017/11/13/raytheon-seeing-growth-in-missile-defense-systems-because-of-rising-threat-dynamics.html

## Al-Matmah District, Jawf Province

**DATE** Sept. 20, 2016

**DEATHS** 15

After a coalition bomb ripped through a truck carrying 15 women and children outside Sana, a Mwatana researcher discovered a shard with Raytheon's identification number. The resulting report linked the company to the attack and raised doubts about a Saudi internal investigation that said the strike had targeted Houthi rebel commanders. "We document, and we publish," said Mwatana's co-founder, Radhya Almutawakel. "This is the work we do."



Top: Part of a Raytheon-made GBU-12 bomb that struck a vehicle packed with women and children. Above: Remnants of the civilian truck after the airstrike. Mwatana for Human Rights



38

---



39



US-made bomb used in deadly air strike on civilians

40

---

[39] A shard from a Raytheon-made GBU-12 that killed a woman named Haifa Zawqari and injured others. https://www.nytimes.com/2020/05/16/us/arms-deals-raytheon-yemen.html.

[40] The laser-guided bomb, manufactured by US company Raytheon and used in the attack, is evidence that the USA is supplying weapons that are being used by the Saudi and Emirati-led

## 2.  Lockheed Martin Corporation

83.  Human rights organizations have recorded the consistent indiscriminatory use of Lockheed Martin weaponry against civilians, and specifically children, in Yemen. However, a recent report published by Amnesty International found that Lockheed Martin, along with other companies in the defense industry, is not undertaking adequate human rights due diligence.[41]

84.  At Lockheed Martin's annual shareholder meeting on April 22, 2021, a shareholder proposal[42] was made that would have required the company to identify, assess, prevent, mitigate, and remedy actual or potential human rights impacts associated with high-risk products and services, including those in conflict-affected areas. According to the shareholders, the policies cited in Lockheed Martin's opposition statement—the Good Corporate Citizenship and Respect for Human Rights Policy, Code of Ethics and Business Conduct, and Supplier Code of Conduct— were not responsive to the proposal. The company's existing policies do not meaningfully monitor the end use of products, despite the high risk for human rights violations. Other human rights impacts raised in the proposal, including civilian casualties in conflict-affected areas, risks for nuclear proliferation, and health impacts of environmental pollution, are not addressed. Similarly, these existing policies do not appear to be integrated into the company's business practices. The mere existence of a human rights policy and related codes on paper does not constitute effective implementation in practice or evidence meaningful human rights due diligence. Instead, Lockheed's policies are focused

---

coalition in attacks amounting to serious violations of international humanitarian law in Yemen. https://www.amnesty.org/en/latest/press-release/2019/09/yemen-us-made-bomb-used-in-deadly-air-strike-on-civilians/

[41] https://www.amnesty.org/en/latest/news/2019/09/arms-companies-failing-to-address-human-rights-risks/

[42] https://www.sec.gov/Archives/edgar/data/0001636143/000121465921003503/j326212px14a6g.htm

on legal compliance, while respect for human rights requires an affirmative commitment consistent international standards. However, the company presents its commitment to human rights as an aspect of "corporate citizenship" rather than as a legal obligation.

85. Lockheed Martin has pursued areas of business, such as weapons sales to conflict-affected areas and the production of nuclear weapons, which clearly are inconsistent with its stated human rights commitments. This business development strategy strongly suggests that Lockheed's human rights policies are not effectively incorporated into the company's business decision-making.

86. Separate from Lockheed's stated human rights policies, the company also claims to have implemented a policy for ethical use of Artificial Intelligence (AI). However, the company prevents investors (or anyone apparently) from reviewing the contents of this policy or how it is implemented.

87. Lockheed Martin also provided one page of supplemental human rights-related disclosure, including information on governance and due diligence. However, the disclosure failed to address the specific human rights impacts of concern raised in the proposal. For example, the company claims its human rights due diligence process is embedded within its operations and business-decision making, but does not describe the steps of its due diligence process or how the company ensures effective implementation. With business decisions to the contrary, as noted above, proponents have no option but to conclude that they are not implemented. The criteria Lockheed Martin provides for evaluating potential contracts does not explicitly include human rights risks, and instead broadly covers values, strategic direction, reputation, and performance. In 2020, the company established a Weapons Review Council, which includes human rights criteria for its review of the Missiles and Fire Control business unit, yet investors lack the necessary details to evaluate whether the council meaningfully contributes to effective human rights due diligence. The council also appears to have a limited mandate, with little effect on Lockheed's business strategy.

88. Lockheed Martin does not provide any evidence that it is conducting human rights impact assessments, which are critical to robust human rights due diligence. The company instead cites routine anti-corruption audits and trade compliance programs; however, these are standard compliance procedures that lack a focus on salient human rights risks.

89. Lockheed Martin does not provide information on effective governance of human rights. Board oversight of general corporate sustainability does not equate to human rights due diligence. The company cites the board's role in overseeing progress towards goals within its Sustainability Management Plan as relevant to human rights, however the plan does not specifically address human rights impacts and only addresses improperly licensed exports. Further, Lockheed Martin does not address remedies for human rights violations. The company only provides information about its ethics reporting helpline, which is not equivalent to a formal process for effective remedy when adverse human rights impacts occur. The company also fails to provide information on reports received or how grievances were addressed. Disclosure on stakeholder engagement focuses on employee training and providing resources to suppliers, without specifying human rights content. Stakeholder engagement does not explicitly cover impacted rights holders, civil society, or human rights experts.

90. It is clear that the Lockheed's existing policies and practices are not sufficient to identify, assess, prevent, mitigate, and remedy actual and potential human rights impacts associated with high-risk products and services, including those in conflict-affected areas, and additional human rights due diligence disclosure is warranted. Contrary to the company's claims that investors would not find further human rights disclosure useful and that the reporting would be overly burdensome, investors are increasingly demanding human rights reporting. This reporting helps investors assess whether companies are effectively managing human rights risks, which is critical to long-term shareholder value creation. The proposal offered by shareholders is not prescriptive in how

Lockheed should carry out human rights reporting. Nor should the reporting be costly, as shareholders are requesting disclosure on existing human rights due diligence practices.

91.  Before and after the two tragic bombings described in this Complaint, Defendants Lockheed Martin and its CEO, Mr. Jim Taicley, had much greater access to information related to the illegal use of arms than is available publicly when they executed the weapons sales to the Coalition. However, even the publicly available reports on the atrocities in Yemen provided sufficient and specific knowledge regarding the misuse of arms. Despite this knowledge, Defendants Lockheed Martin and Mr. Taicley still chose to act in complicity with the principals of the alleged war crimes.

### 3.  *General Dynamics Corporation*

92.  General Dynamics's annual shareholder meeting, held on May 4, 2022, was online with an audio-only broadcast, no chat function and a question submission box that was disabled without explanation halfway through the meeting. General Dynamics sped through the 24-minute meeting with no pushback, criticism, or engagement from shareholder attendees (possibly in response to last year when shareholders were able to directly engage with the General Dynamics Board and ask how they justify the destruction and death their weapons cause). Among the shareholders' proposals[43] before the board was a request that the company prepare a human rights report to address and remedy the "actual and potential human rights impacts associated with high-risk products and services." As the proposal pointed out, General Dynamics' products and services are used by Saudi Arabia, the United Arab Emirates, Bahrain, Egypt, Israel, and U.S. government agencies at the U.S.-Mexico border. The company's weapons have been used in war crimes and human rights violations against Yemenis, Palestinians, asylum-seekers, and others. In 2019, Amnesty International found that General Dynamics did not meet its responsibilities under human rights law. General Dynamics

---

[43] https://materials.proxyvote.com/Approved/369550/20220310/NPS_495354.PDF

roundly rejected the shareholder proposal and unanimously recommended a vote against it. The

company stated that it already maintains a "rational and principled" human rights strategy. However,

while defense contractors like General Dynamics claim to be beholden U.S. policy, they have already

spent almost $2.9 million on lobbying efforts in the first quarter of this year alone to shape U.S.

policy in their favor.[44]

93.  Before and after the two tragic bombings described in this Complaint, Defendants General

Dynamics and its CEO, Ms. Pheobe Novakovic, had much greater access to information related to

the illegal use of arms than is publicly available when they executed the weapons sales to the

Coalition. However, even the publicly available reports on the atrocities in Yemen provided

sufficient and specific knowledge regarding the misuse of arms, but Defendants General Dynamics

and Ms. Novakovic still chose to act in complicity with the principals of the alleged crimes.

### D.  The U.S. Department of State Failed to Monitor the Use of the U.S.-Made Weapons and Assess the Level of Humanitarian Crisis Triggered by the Use of These Weapons in Yemen.

94.  According to a September 2020 report made by the Group of Eminent International and

Regional Experts on Yemen (GEE), since the beginning of the conflict, approximately 112,000

people have died as a direct result of hostilities, of whom around 12,000 were civilians. The GEE

found "reasonable grounds to believe that the parties to the conflict have committed and continue

to commit serious violations of international human rights and international humanitarian law. Some

of which may amount to war crimes."  GEE stressed that "there are no clean hands in this conflict."

The responsibility for violations rests with all parties to the conflict. In its findings, the report

concluded that violations have been committed by the Government of Yemen, the Houthis, the

Southern Transitional Council, as well as members of the Coalition, which is led by Saudi Arabia and

---

[44] https://www.opensecrets.org/federal-lobbying/clients/summary?cycle=2021&id=D000000165

the UAE. GEE concluded that some of the airstrikes conducted by the Coalition appear to have been undertaken without proper regard to principles of distinction, proportionality, and precaution to protect civilians and civilian objects. It also concluded that indiscriminate attacks have been carried out by both the Coalition and the Houthis, inflicting harm on civilians and civilian objects. The report notes that disproportionate and indiscriminate attacks constitute war crimes under customary international law.

95. The indiscriminate attacks also led to a severe lack of food, health services, and infrastructure, which substantially increased the vulnerability of the Yemeni civilians, especially within the context of a worldwide pandemic. The COVID-19 outbreak occurred when barely half of the health facilities in Yemen are operational, and those facilities underequipped to cope with the disease. Additional health care constraints include the compromised immunity of millions of Yemenis, owing to malnutrition, successive outbreaks of infectious disease, such as cholera and dengue, and the particular vulnerability of specific groups, such as internally displaced persons, migrants, and refugees, owing to displacement and poor access to sanitation services. Added to this are the gravely inadequate measures adopted by the Government of Yemen, the de facto authorities and the southern transitional council, poor data collection and reported attempts to conceal information regarding infection rates. The Group of Eminent Experts has repeatedly called for the release of detainees who are at increased risk of infection.

96. Insufficient international humanitarian aid compounds this situation. A fundraising event in Riyadh in June 2020 saw donors pledge only $1.35 billion of the $2.41 billion needed to cover essential humanitarian activities between June and December 2020. This occurred while, according to the United Nations Office for the Coordination of Humanitarian Affairs, since mid-April, 31 of 41 United Nations programmes critical to fighting COVID-19 have been reduced or have closed for lack of funding.

97.  In July 2020, the Houthis reportedly sent a letter approving the deployment of a United

Nations technical team to assess the Safer oil tanker located off the coast of Ra's Isa terminal in the

Red Sea, amid renewed warnings from the United Nations of an environmental catastrophe should

there be a spill.

98.  Notwithstanding the strong recommendations by the Group of Eminent Experts in its

previous reports, the U.S. government continued its support for members of the Coalition through

arms transfers, thereby helping to perpetuate the conflict. (1) Abundant evidence exists as to the

complicity between the Saudi-led Coalition and the Al-Qaeda in the Arabian Peninsula (AQPA),

which has been designated by the U.S. government as a terrorist group, as well as the fact that (2)

the Saudi-led Coalition has committed war crimes by indiscriminately attacking Yemeni civilians; (3)

however, the Department of State neglected the widespread violations of international law and, in

violation of U.S law, failed to evaluate the consequences of its approvals of the arms sales.

### 1.  The Direct Association Between AQAP and the Saudi-Led Coalition

99.  Apart from committing war crimes by using U.S.-made weapons, the Coalition has

maintained a strong connection with Al-Qaeda in the Arabian Peninsula (AQAP). Amid the chaos

of the broader war, AQAP made its way to the frontlines in Taiz in 2015, forging advantageous

alliances with the pro-Saudi militias they fought alongside. One of those militias linked to AQAP,

the Abu Abbas brigade, now possesses U.S.-made Oshkosh armored vehicles, paraded in a 2015

show of force through the city. Abu Abbas, the founder of the brigade, was declared a terrorist by

the U.S. government in 2017,[45] but the group still enjoys support from the Coalition and was

absorbed into the coalition-supported 35th Brigade of the Yemeni army.

---

[45] https://www.refworld.org/docid/5bcf1f2826.html

100.     The Coalition claims to have made significant counter-terrorism efforts to destroy AQAP, and to free the cities it controls. However, many observers have emphasized the Coalition's de facto alliance with AQAP against the Houthi forces, including through financial and material support as well as operational cooperation. The UAE has directly and indirectly financially supported the activities of AQAP in Yemen in at least three ways.

a.   The sums paid to AQAP in exchange for its withdrawal from certain Yemeni cities

101.     The UAE appears to have directly financed AQAP's terrorist activities by paying money to the terrorist organization in exchange for its withdrawal from the cities it controlled in Yemen. According to local journalists, an Associated Press investigation, as well as credible sources within the Yemeni secret service, the UAE negotiated with AQAP leaders in the southern Yemeni city of Mukalla on several occasions.

102.     For example, the UAE reportedly agreed to transfer funds equivalent to the price of two million barrels of oil to Al-Qaeda in exchange for its not destroying the city's oil wells. In addition, the UAE reportedly paid the organization two million US dollars in exchange for its withdrawal from Mukalla in late April 2016.

103.     This information is corroborated by accounts of a widespread Coalition practice of negotiating Al-Qaeda's withdrawal from cities under its control, as well as by public reports of the particularly swift and casualty-free evacuation of AQAP fighters from Mukalla. Indeed, according to Thomas Joscelyn, an Al-Qaeda expert and consultant to the U.S. government on terrorism:

104.     "AQAP apparently expected the assault and began withdrawing its forces from parts of Mukalla well in advance." Reuters quoted local residents as saying AQAP had negotiated with 'local clerics and tribesmen' to 'quietly exit' to 'neighboring Shabwa province'."

105.     According to these and other reports, similar agreements have been concluded by the UAE in the Al-Mansurah district of Aden, as well as in Azzan, Zinjibar, Jaar, Al-Hawta, Al-Said and Al-Bayda.

106.     In Al-Said, a cluster of villages in Shabwa province, the provincial security official, Awad AL-DAHBOUL, as well as the tribal mediator and two legitimate government officials, confirmed to the Associated Press that such negotiations had taken place between Coalition members and AQAP fighters.

107.     According to Awad AL-DAHBOUL's testimony, "approximately 200 AQAP members received payments [in exchange for their departure]". The amounts may have varied, but Awad AL-DAHBOUL indicated that one of the fighters was given 100,000 Saudi rials (approximately US$26,000) in the presence of Emirati officers.

108.     The Al-Said tribal mediator interviewed by the Associated Press, as well as two members of the Yemeni government, indicated that the agreement also included the incorporation of a significant number of AQAP fighters into the Shabwah Elite Forces, supported materially and financially by the UAE.

109.     It should be noted that, as will be detailed below, all of the funds thus transferred by the United Arab Emirates to AQAP most likely transited through various accounts held with First Abu Dhabi Bank, one of the main Emirati banks.

   b.   The UAE's support for Abu Al-Abbas' fighters

110.     In addition, the UAE appears to have directly supported Abdel Abduh Fari AL-DHUBHANI, known as Abu Al-Abbas, an AQAP member listed as a terrorist by the U.S. Treasury Department since October 2017.

111.     It is now undisputed that the Coalition supports militias fighting alongside the Hadi government's army forces. Some of these militias, such as the "Abu Al-Abbas Brigades," are particularly and directly supported by the UAE.

112.     This support takes many forms, ranging from political empowerment to the provision of funds and weapons, to the integration of this militia into the regular armed forces.

113.     The testimony of Sheikh Hamood AL MIKHLAFI of Ta'izz indicates that the growing influence of Abu Al Abbas in the region is a direct result of the support guaranteed to him by the UAE under the terms of an agreement to make the Abu Al-Abbas Brigades the equivalent in Ta'izz of the Security Belt Forces in Aden.

114.     According to Hamood AL MIKHLAFI, when the Emiratis arrived in Ta'izz in 2016, he was tasked with gathering all the local officials for a meeting with representatives of the Coalition in Aden. Upon his arrival, however, he found that the UAE had already taken all the important decisions regarding the governance of the city with Abu Al-Abbas, to whom they then promised material support and arms to extend control over Ta'izz.

115.     Thus, it is now indisputable that Abu Al-Abbas receives financial, material and arms support directly from the UAE. In this regard, it should be noted that the Coalition-funded militias in the Ta'izz region receive their funds through the leaders of the alliance of local armed resistance groups.

116.     In particular, the surveys showed that in November 2015 the Abu Al-Abbas brigades celebrated the receipt of three U.S. made OSHKOSH M-ATV armored vehicles by raising the UAE flag next to the Yemeni flag. According to the Stockholm International Peace Research Institute, Saudi Arabia and the UAE purchased 2,600 of these vehicles between 2011 and 2014. In March 2016, anti-tank grenade launchers produced by the Jordanian company JADARA for its sole client, the UAE, were used on several occasions in Ta'izz, exclusively by members of Abu Al-Abbas'

forces. A film published by AQAP shows one of its fighters also using such a weapon in Ta'izz. In April 2017, a hand grenade used by the Abu Al- Abbas brigades, produced in Switzerland, was traced through its serial number. The grenade was part of a batch delivered to the UAE. In November 2018, although Abu Al-Abbas was designated as a member of a terrorist organization by the U.S. government in October 2017, Al-Jazeera reported that he had received more than 40 pickup trucks from the UAE, with an estimated total value of US $600,000. According to CNN, a follow-up investigation by Al-Jazeera, and a statement issued by Abu Al-Abbas himself, he continues to receive political and material support from the UAE.

117.     By the end of 2016, Abu Al-Abbas' brigade was officially incorporated into the 35th armored brigade of the Yemeni armed forces in Ta'izz and Abu Al-Abbas was given the rank of colonel. The designation of Abu Al-Abbas as a member of a terrorist organization did not jeopardize his rank, nor the financial and material support he continued to receive from the UAE.

118.     In 2020, following strong dissension and armed clashes between Abu Al-Abbas's forces and the fighters of the 35th Armored Brigade, now under pro-Islah command, the UAE reportedly worked to reintegrate Abu Al-Abbas's forces into the forces led by Tariq SALEH (see above). The UAE thus reportedly worked to integrate Abu Al-Abbas and his fighters into an armed force that it directly supports, despite his placement on the U.S. Treasury's terrorist list in 2017.

    c.   UAE's indirect support for AQAP through the Security Belt Forces and the Southern Transitional Council

119.     The also UAE supports the Southern Transitional Council, including training and funding its armies and in particular the Security Belt Forces, which are known to collaborate with AQAP.

120.     Indeed, it has been established that the Coalition negotiated with AQAP for the withdrawal of the terrorist organization from the Yemeni cities it had seized and placed under its control.

121.     While the compensation received by AQAP from the UAE varies, it has been reported that as part of the agreements negotiated for the withdrawal of AQAP from Abyan province, the UAE required the Security Belt Forces to incorporate 250 AQAP fighters into its ranks. It will be recalled that the UAE is paying and arming the Security Belt Forces, which is now under the command of the Southern Transitional Council. This information has been corroborated by the Houthi Movement's intelligence services, according to which Al-Qaeda maintains several sleeper cells within the Security Belt Forces in Abyan province.

122.     Similarly, it has been reported that as part of the negotiated agreement for the "liberation" of the Al-Said district, more than 100 AQAP fighters were incorporated into the elite Shabwah Forces. According to the United Nations, this militia is openly trained, armed and financed by the UAE.

123.     As a result, the UAE has arranged for the incorporation of AQAP fighters into one of the militias it controls and funds. Therefore, the UAE is knowingly and deliberately paying these 250 AQAP fighters.

124.     In addition, it has been reported that some of the funds transferred by the UAE directly to the leaders of the Southern Transitional Council, Aidaroos AL-ZUBAIDI and Hani BEN BRIK, were used to finance criminal activities perpetrated by terrorists.

125.     As explained above, the STC is a parallel authority to the Hadi government in the south of the country. The STC was founded by Aidarous AL-ZOUBAIDI and Hani BEN BRIK, respectively governor of the city of Aden and minister of state dismissed by President Hadi in April

2017. Although not recognized by the international community, the STC is financially and militarily supported by the UAE.

126.      It was reported that Aidaroos AL-ZUBAIDI used part of the funds transferred by the UAE to finance the activities of Nasser al-Shiba AL-KAZIMI, known as Abu Juhayman, an infamous member of Al-Qaeda. AL-KAZIMI was convicted of organizing an attack on a hotel in Aden in 2007. Imprisoned for three years, he has reportedly been working for the JTS since his release.

127.      The close ties maintained by the Coalition and AQAP are maintained through (i) a military alliance assumed by the UAE and (ii) by a political alliance assumed by Saudi Arabia through its support for the Hadi government and its strongman, Ali Mohsen.

128.      Various reports have documented the existence of a de facto alliance between the Coalition forces and the AQAP, despite its history of terrorist activities. AQAP was responsible for the attack on Charlie Hebdo on January 7, 2015, less than three months before the Coalition's intervention in Yemen.

129.      In concrete terms, this alliance translates into a mutual non-aggression pact. On April 16, 2015, the Coalition spokesman (General Ahmed AL-ASSERI) stated in a press conference that "Members of Daesh and Al-Qaeda are not targets of the Coalition," thus justifying the absence of attacks by the Coalition against these terrorist groups. The spokesman for AQAP in Yemen later published a video in which he specifically called on his fighters to join forces with those of the Coalition to fight the Houthis. More recently, the new AQAP emir, Khalid Batarfi, has confirmed in a filmed interview that the organization had fought the Houthis more than any other armed group in Yemen.

130.      Thus, despite its stated objective of fighting terrorism, the Coalition has been particularly lenient towards AQAP fighters. Following the negotiated liberation of the town of

Mukalla, discussed above (see supra II. A. 1.2. a) (i)), AQAP fighters were allowed to transfer tanks from the town of Mukalla to Al-Wadi district in October 2016. These heavy weapons passed through Coalition-controlled territory, without the Coalition taking any action to prevent such transfers.

131.    Tolerance of AQAP training camps in Coalition-controlled territory means that AQAP has been able to train its fighters in several training camps located in areas controlled by Coalition forces. In particular, AQAP reportedly trained its fighters in camps in Aden, Lawar (Jabal Taran camp), Abyan (Al-Qatii camp), Marib (Al-Naqaa Al-Sufla and Al-Hadba camps), Al-Haoutah, Yafa'a in the Gayfa area, and Hadramaut.

132.    The Coalition also provided official military documents to AQAP fighters. When the Houthi forces captured the city of Marib, one of AQAP's main strongholds in Yemen, they found numerous documents belonging to AQAP fighters. Among these documents, the Houthi Movement forces reportedly found official military movement cards issued by the Coalition, including a movement card for Abdel-Hafiz Mohammad Abou Sarima, an AQAP member who was granted a pass as a member of an armored brigade of the Coalition forces.

133.    Documents found by the Yemeni secret services in AQAP hideouts in Gayfa, in the province of Al-Bayda, show that AQAP fighters received treatment in Saudi hospitals, such as the Riyadh hospital. In addition, through Bashir Ahmad Qaid AL-OMRANI, known as Abu Baker Al-Ebi, a doctor at the General Hospital in Marib, AQAP fighters were regularly treated at this hospital, which also receives Coalition forces fighters.

134.    AQAP fighters were seen alongside Coalition forces in the battles of Lahij, Hajja, Marib, al-Jaouf, al-Bayda, Ta'izz, Sarouah and Mahiliyya. In Ta'izz, they were even filmed. The BBC reports on the experience of one of its journalists:

> During a visit to the frontline outside Taiz in late [2016], documentary filmmaker Safa Al Ahmad spoke with pro-government militiamen who were attacking Houthi fighters on a key

hilltop, supported by troops from the United Arab Emirates (UAE), who provided tactical advice. At the scene, Ms. Al Ahmad was warned by a group participating in the battle not to film them. He was told that they were members of Ansar al-Sharia, a group affiliated with al-Qaeda in the Arabian Peninsula (AQAP), and that the presence of a woman made them angry.

d.   A political alliance between AQAP, the UAE and Saudi Arabia

135.      General Ali Mohsen, Vice-President of Yemen, and right-hand man of President Hadi, is closely linked to Al-Qaeda's establishment in Yemen.

136.      According to U.S. intelligence, the general maintained close ties with Osama bin Laden in the 1980s and 1990s, recruiting Yemenis to join the forces with the 'Afghan Arabs' and to fight the Soviets in Afghanistan. At the end of this conflict, bin Laden entrusted him with the task of organizing the repatriation of these fighters, including a budget of 20 million dollars for this purpose. These "Afghan Arab" fighters were also deployed by Ali Mohsen during the battle for the city of Aden in the war to reunify Yemen in 1994, a bloody battle during which more than 10,000 civilians were killed.

137.      Because of the significant presence of Islamist fighters affiliated with Bin Laden in Yemen, a branch of Al-Qaeda (Al-Qaeda in Yemen or "AQY") emerged there at the end of the 1990s. AQY eventually merged with the Saudi branch of al-Qaeda in 2009 to form AQAP.

138.      Being therefore familiar with AQAP members from "AQY,"General Ali Mohsen still maintains close relations with certain figures of this terrorist organization. In particular, Vice President Ali Mohsen continues to maintain a particularly close relationship with Khalid Al-Aradah despite the latter's placement on the official U.S. Treasury terrorist list in May 2017.

139.      Khalid Al-Aradah has been identified as a prominent member of AQAP in Yemen, in charge of the training camps of Al-Mil, Al-Sahil and Al-Lajma, and has been accused of financing

and supplying AQAP with weapons and fighters. Al-Aradah is also the brother of Mr. Sultan AL-ARADAH, appointed governor of Marib by President Hadi.

140.     Like his brother, Khalid Al-Aradah was for a long time an important member of political life in Marib (he is considered a "tribal leader" by the U.S. government) and consequently had close ties with members of the Coalition. Notably, he was filmed alongside Ali Mohsen during a visit by the latter to Al-Aradah-led fighters in Marib in August 2016.

141.     Despite Khalid Al-Aradah's placement on the U.S. Treasury's list of designated terrorists, Vice President Ali Mohsen continues to maintain close relations with him, publicly demonstrating his support for one of the leaders of AQAP in Yemen. Indeed, a photograph dated by several sources in November 2017, i.e. several months after the said listing on the U.S. Treasury's terrorist list, shows Ali MOHSEN publicly praying alongside Khalid Al-Aradah.

142.     Like his brother Khalid Al-Aradah, Sultan Al-Aradah supports the terrorist activities of Al-Qaeda in Yemen. He was the official governor of the city of Marib, and thus the local representative of the Hadi government, until the city was taken by the Houthi forces. Indeed, searches carried out by the Houthi forces after the capture of Marib revealed that the buildings held by the two Al-Aradah brothers in and around Marib had been used by AQAP as weapons caches. This information was the subject of an official report to the command of the Houthi forces, an extract of which is attached to this complaint.

143.     Similarly, the Governor of Al-Bayda City and local representative of the Hadi government, Nayif Salim Saleh Al-Qaysi, had been publicly supporting AQAP's activities since 2014.

144.     According to U.S. intelligence, as early as 2014, Al-Qaysi encouraged the local population to avoid any confrontation with AQAP. In 2015, his support intensified when he provided funds and weapons to AQAP fighters, and also participated directly in the financing of training camps. In 2016, he again raised funds for AQAP, including from foreign donors, and sent

some of these funds and weapons to AQAP fighters in Al-Bayda province. He was also used his

powers as Governor to facilitate the establishment of AQAP in Al-Bayda province.

145.     In May 2016, Al-Qaysi was consequently placed on the list of members of

organizations terrorists by the U.S. Treasury. However, he retained his position as Governor.

146.     In February 2017, it was the UN that finally officially designated Al-Qaysi as a

terrorist, corroborating all the facts that the U.S. government had accused him of. However, he still

retained his position as Governor, before finally being replaced in July 2017.

147.     As a result, Al-Qaysi continued to represent President Hadi and the government, and

was supported by the Coalition despite being listed as a terrorist organization by the U.S. Treasury

and United Nations.


### 2.  *The Department of State and the Department of Defense's Failure to Monitor the Use of U.S.-Made Weapons*

148.     The ongoing war in Yemen could not be sustained without military support from the

United States. However, the U.S. government has failed in its legal duty to obtain a clear and

complete picture of how military support provided to Saudi Arabia and UAE has contributed war

crimes in Yemen.

149.     Notwithstanding the strong recommendations by the GEE in its previous reports,

the U.S. government has continued their support for the Coalition, including through arms transfers,

thereby helping to perpetuate the conflict. According to Larry Lewis, who worked as a State

Department adviser from 2015 to 2017, the U.S. government took steps to positively influence the

conduct of the Saudi-led coalition and reduce civilian causalities. The efforts temporarily reduced the

frequency of airstrikes on civilian targets, but the efforts were not sustained. Meanwhile, operational

support and arms sales to the Saudi-led Coalition continued, with the U.S. government "struggling"

to monitor how U.S.-made weapons were being used. This fragmented U.S. approach resulted in

unmitigated civilian harm. President Trump's aggressive arms sale policies were met with alarm by

some in the State Department, in part because the administration did not seem concerned with

human rights issues, according to several current and former State Department officials, who were

not authorized to speak publicly.[46]

150.     The State Department's policy of approving arms sales to the Coalition has been

rebuffed by other branches of the U.S. government. The U.S. Congress has passed several

resolutions to halt the sales. The Senate Foreign Relations Committee Chair Robert Menendez

summarized his response to Thomas Kennedy, Raytheon's then-CEO, this way to a New York

Times reporter: "I told him I don't have an ideological problem; I have supported other arms sales.

But you cannot, as a company, be promoting the arms sales to a country that is using it in violation

of international norms. I understand the motivation for profit, but I don't understand the

motivation for profit in the face of human rights violations and civilian casualties."[47] Still, the U.S.

has continued to supply arms to the Coalition.

151.     As discussed in part IV.B, Saudi Arabia and its Coalition partners have transferred

U.S.-made weapons to Al-Qaeda-linked fighters, brutal Salafi militias, and other factions waging war

in Yemen, in violation of their agreements with the United States.[48] U.S.-made weapons have also

made their way into the hands of Iranian-backed rebels battling the coalition for control of the

country, exposing sensitive military technology and potentially endangering the lives of US troops in

other conflict zones.[49] The Department of Defense, when asked specifically about the Giants

---

[46] https://www.nytimes.com/2020/05/16/us/arms-deals-raytheon-yemen.html

[47] https://www.nytimes.com/2020/05/16/us/arms-deals-raytheon-yemen.html

[48] See https://edition.cnn.com/interactive/2019/02/middleeast/yemen-lost-us-arms/

[49] By handing off this military equipment to third parties, the Saudi-led coalition is breaking the terms of its arms sales with the US, according to the Department of Defense. After CNN presented its findings, a US defense official confirmed there was an ongoing investigation into the issue.

Brigades, said it had not given Saudi Arabia or the UAE permission to hand over U.S. weaponry to other factions on the ground. "The United States has not authorized the Kingdom of Saudi Arabia or the United Arab Emirates to re-transfer any equipment to parties inside Yemen," Pentagon spokesman Johnny Michael told CNN. "The US government cannot comment on any pending investigations of claims of end-use violations of defense articles and services transferred to our allies and partners."[50]

152.      In August 2020, in response to congressional requests, the Office of Inspector General ("OIG") reviewed the Department of State's (State) role in arms transfers to the Kingdom of Saudi Arabia and the United Arab Emirates following the Secretary's May 2019 certification that an emergency existed under Section 36 of the Arms Export Control Act. The Secretary's emergency certification waived congressional review of 22 arms transfer cases to the Kingdom of Saudi Arabia, the United Arab Emirates, and the Hashemite Kingdom of Jordan, with a total value of approximately $8.1 billion. Congress had previously placed holds on 15 of the 22 arms transfer cases in the May 2019 emergency certification. At the time the Secretary certified the emergency, 6 of the 15 cases had been held by Congress for more than a year. The held cases included at least $3.8 billion in precision-guided munitions and related transfers. In explaining the decision to place the holds, members of Congress cited concerns about the actions of the Saudi-led Coalition (Coalition) in Yemen since 2015, including high rates of civilian casualties caused by Coalition airstrikes employing U.S.-supplied precision guided munitions. OIG found that State did not fully assess risks and implement mitigation measures to reduce civilian casualties and legal concerns associated with the transfer of PGMs included in the May 2019 emergency certification. In addition, OIG found that State regularly approved arms transfers to Saudi Arabia and the United Arab Emirates that fell

---

[50] https://www.cnn.com/interactive/2019/02/middleeast/yemen-lost-us-arms/

below AECA thresholds that trigger notification to Congress. These approvals included items such as PGM components on which Congress had placed holds in cases where the transfers reached the thresholds requiring congressional notification.[51]

153.    According to a report[52] made by the Government Accountability Office ("GAO"), from fiscal years 2015 through 2021, DOD authorized at least $319 million in logistic support, supplies, and services for items ranging from fuel to bombs, according to data reported in the Acquisition and Cross-Servicing Agreements ("ACSA") system of record. In general, DOD officials said they do not track how countries use the logistic support, supplies, and services provided under ACSAs. However, DOD identified approximately $300 million in logistic support provided to Saudi Arabia and UAE for operations in Yemen—83 percent of the total value of logistic support authorized to both countries from fiscal years 2015 through 2021 reported. Defense Logistics Agency Energy officials told GAO that they do not record ACSA orders for fuel by operation. Therefore, this percentage does not include the value of fuel identified for operations in Yemen because it is not identified as such in the ACSA system of record.[53]

154.    As pointed out by in GAO report, the law required the Secretary of State to certify whether the governments of Saudi Arabia and UAE were undertaking appropriate measures to alleviate the humanitarian crisis in Yemen. In 1996, Congress amended the Arms Export Control Act ("AECA") to require the President to establish a program for monitoring the end use of defense articles and defense services sold, leased, or exported under the act, or the Foreign Assistance Act of 1961 ("FAA"), including through FMS. The law requires that, to the extent practicable, the program

---

[51] https://www.stateoig.gov/system/files/isp-i-20-19_rdweb_508.pdf
[52] GAO-22-105073SU, "Yemen: State and DOD Need Better Information on Civilian Impacts of U.S. Military Support to Saudi Arabia and the United Arab Emirates." Available at https://www.gao.gov/products/gao-22-105988
[53] *Id.* at 61.

be designed to provide reasonable assurance that recipients are complying with restrictions imposed by the U.S. government on the use, transfers, and security of defense articles and services, and that recipients use such articles and services for the purposes for which they are provided. Both State and DOD have failed these requirements set forth in the FAA and the AECA.

155.      First, investigations into unauthorized use could provide agencies with information on the extent to which U.S.-made arms contributed to civilian harm in Yemen. However, neither DOD nor State could provide examples of reports or investigations of any incidents of potential unauthorized use of U.S.-made arms transferred to Saudi Arabia and UAE through FMS from fiscal years 2015 through 2021. In addition, DOD has not fully measured the extent to which its advising and training have facilitated civilian harm reduction in Yemen.[54] From fiscal years 2015 through 2021, DOD has not reported to relevant State officials nor could State provide evidence that it investigated indications that U.S.-origin equipment transferred to Saudi Arabia and UAE through FMS was used for unauthorized purposes or against anything other than legitimate military targets.

156.      Second, State and DOD have not implemented specific definition or standards for evaluating the possible impact brought by the inappropriate use of U.S. arms. According to DOD policy, end-use monitoring ("EUM") includes all actions to prevent the misuse or unauthorized transfer of defense articles or defense services from the time of title transfer until disposal. However, the terms "misuse" or "unauthorized use" are not even defined in DOD or State policy. DOD and State officials both said that arms use that causes civilian harm would not necessarily constitute "misuse." In its section on unauthorized end use, DOD policy states that it is particularly important that security cooperation organizations are alert to, and report on, any indication that

---

[54] *Id.* at 62.

U.S.-origin defense articles are being used against anything other than legitimate military targets or are otherwise being used for unauthorized purposes, among other things.

157.     Third, DSCA officials confirmed that neither U.S. Military Training Mission officials in Saudi Arabia nor DOD security cooperation officials in UAE have submitted any reports regarding indications that U.S.-made defense articles were used by Saudi Arabia or the UAE in Yemen against other than legitimate military targets. DOD officials said there is no mechanism to track how foreign partners use defense articles transferred through FMS. Officials from DOD's U.S. Military Training Mission—the security cooperation organization in Saudi Arabia that manages the largest number of FMS cases and is responsible for drafting the country assessment—admitted to the GAO that they do not track how the equipment provided to Saudi Arabia is used, including whether Saudi Arabia has used such equipment for operations in Yemen. DOD officials told GAO that the vast majority of Saudi operations are done without any oversight or visibility by U.S. advisors.

158.     Fourth, State and DOD failed to respond to inquiries made by GAO. In response to GAO's request, The Secretary of State submitted a Memorandum of Justification ("MOJ") on September 10, 2018, which addressed the Saudi government's efforts to increase access to food and medicine in Yemen. The FAA and AECA required the Secretary of State to certify whether the governments of Saudi Arabia and UAE were taking demonstrable actions to reduce the risk of harm to civilians and civilian infrastructure resulting from their military operations, including by complying with applicable agreements and laws regulating defense articles purchased or transferred from the United States. However,  the MOJ did not address Saudi Arabia's to increase access to fuel or medical evacuation in Yemen, nor did it discuss the UAE's efforts to increase access to food, fuel, and medical treatment in Yemen with specificity. The MOJ stated that the governments of Saudi Arabia and UAE were following applicable agreements and laws "with rare exception." By including

the phrase "with rare exception," State indicated that it believed there were instances where Saudi Arabia and the UAE were not complying with applicable agreements and laws, but the MOJ provided no additional insight into what the rare exceptions were. Under DOD policy, DOD's security cooperation organizations must report any indication that U.S.-origin defense articles are being used against anything other than legitimate military targets or for unauthorized purposes to relevant officials within DOD and State. DOD and State have not determined whether U.S. military support provided to Saudi Arabia and UAE has contributed to or reduced civilian harm in Yemen.[55] Further, the UN has indicated that U.S.-origin defense articles may have been used in strikes that caused substantial civilian harm in a manner that violated international humanitarian law. However, DOD has not reported to relevant State officials and State could not provide evidence that it has investigated any indications that U.S.- origin defense articles were used against anything other than a legitimate military target or for other unauthorized purposes in violation of the terms of their transfer agreements.[56] According to DOD officials, they have not done so, in part, because they lack guidance for implementing EUM requirements related to reporting potential end-use violations after they receive allegations. In addition, State officials could not provide evidence that they conducted any investigations of potential misuse or any specific guidance for doing so. As a result, DOD and State lack reasonable assurances that Saudi Arabia and UAE have only used U.S.-origin articles against legitimate military targets and for authorized purposes.

159.     Further, without such guidance, State and DOD are unable to assess the extent to which U.S.- origin equipment is being used in offensive operations in Yemen against civilian populations. DOD has also not fully assessed the extent to which the advisory services and training provided to Saudi Arabia and the UAE have contributed to reducing civilian harm in Yemen.

---

[55] *Id.* at 49.
[56] *Id.* at 39.

160.     In response to GAO's recommendation that State develop guidance for investigating any indications that U.S.-origin defense articles have been used by Saudi Arabia or the UAE in Yemen in violation of relevant agreements with those countries, State concurred with GAO's recommendation and noted that it has started drafting specific guidance and procedures regarding reports of civilian casualties or unauthorized use. However, State noted that it has existing guidance to weigh significant allegations of civilian harm by partner military operations before approving new transfers under the Conventional Arms Transfer Policy. In addition, State highlighted that it also has provided guidance to investigate potential unauthorized use or transfer of U.S.- origin arms under the AECA.[57] Finally, State noted that it has, together with other federal agencies, routinely investigated reports of civilian harm, violations of the law of armed conflict, unauthorized use of arms, and unauthorized transfers, consistent with those guidelines.

161.     The GAO provided a draft of its report to State and DOD for review and comment. In its written comments, State concurred with one recommendation, and neither agreed nor disagreed with another. State said that it found significant factual and analytical errors in the draft and provided additional documentation and feedback to clarify its concerns. GAO disagreed with this assessment. In response to several requests GAO had made over the course of its review, State provided additional documentation. GAO reviewed this information and incorporated it where appropriate, but it did not fundamentally change its findings.[58]

162.     The GAO report concluded that DOD and State have not fully determined the extent to which U.S. military support provided to Saudi Arabia and the UAE has contributed to or reduced civilian harm in Yemen despite reports that U.S.-origin defense articles may have been used in strikes against civilians.

---

[57] *Id.* at 41.
[58] *Id.* at 41.

163.     In sum, investigations by the GAO, NGOs, and the media indicate that State and DOD have failed to fulfill their due diligence obligation to monitor the use of U.S.-made weapons against Yemeni civilians.

164.     In the current case, the Plaintiffs from both the wedding attack and the funeral attack were injured by U.S.-made weapons. If State and DOD had adopted monitoring standards and procedures as outlined in the FAA and the AECA, they would have affirmatively denied the arms sales from the defense contractor Defendants to the Coalition, and thus prevented civilian deaths. Under the FAA and AECA, these agencies had a duty to implement the Foreign Military Sales program to provide reasonable assurance that recipients complied with restrictions imposed by the U.S. government, and should have fully determined the extent to which U.S. military support provided to Saudi Arabia and the UAE contributed to civilian harm in Yemen. Despite sufficient and specific knowledge that U.S.-made weapons would be used by the Coalition to commit war crimes,  State and DOD approved the sale of lethal weapons to the Coalition that eventually led to the Plaintiffs' injuries.

# V.   CLAIMS FOR RELIEF

## COUNT I -- WAR CRIMES AND EXTRAJUDICIAL KILLING UNDER THE ATS BY ALL PLAINTIFFS AGAINST DEFENDANT SAUDI ARABIAN AND UAE MILITARY OFFICIALS

165.     Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein. Under the ATS, "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.

166.     For the Plaintiffs to maintain a claim under the ATS, the following elements must be satisfied: (1) Plaintiffs must establish that the conduct relevant to the statute's focus touches and concerns the territory of the United States, so that the ATS provides a jurisdictional basis for the plaintiffs' alleged violations of international law. *Nestle USA, Inc. v. Doe*, 141 S. Ct. 1931 (2021); *Kiobel v. Royal Dutch Petroleum Co.*, 133 S.Ct. 1659, 185 (2013). (2) The violations of international law asserted must be sufficiently definite in their content and reflect "historical paradigms" of international law that were familiar at the time that the ATS was enacted. *Sosa v. Alvarez–Machain*, 542 U.S. 692, 732 (2004).Here, the violations alleged by the Plaintiffs, namely war crimes and extrajudicial killing, satisfy these requirements.

167.     The military leaders of Saudi Arabia and the UAE have maintained close contractual relationships with U.S. defense contractors and the U.S. government. Amity between U.S. and the Saudi Arabia grew especially close during the Trump Administration. President Trump's personal relationship with Defendant Mohammed bin Salman flourished during his time in office. From the start of his presidency, Trump cultivated a strong relationship with Saudi Arabia and placed the kingdom at the heart of his Middle East policy, backing its stance against Iran and encouraging its purchase of U.S.-made weapons. President Trump praised a Saudi crackdown on hundreds of top

businessmen, officials, and members of the royal family at the Ritz-Carlton hotel in Riyadh in

November 2017. He stood by Saudi Arabia even after the CIA concluded that the Crown Prince

ordered the brutal killing of Saudi journalist Jamal Khashoggi, a Washington Post columnist and

U.S. resident, in Istanbul in October 2018. Trump ultimately vetoed three bills in 2019 aimed at

stopping more than $8 billion in arms sales to the Coalition.

168.     Aided by U.S.-made weapons and policy, the Coalition committed the atrocities

suffered by the Plaintiffs. The military supplies provided through U.S. contracts and U.S.

government approval in violation of oversight laws, and manufactured in the U.S. by U.S.

companies that profited in the U.S., have been directly used by the Coalition countries to harm the

Plaintiffs. As discussed in the factual allegations and supported by statements made by numerous

domestic and international authorities, including the United Nations, without the aid of U.S.-

weapons, the indiscriminate attacks on Yemini civilians would not have been possible. These close

and continuous contractual relationships are sufficient to satisfy the "touch and concern"

requirement of the ATS. The contractual relationships and the substantial aid provided by U.S.

actors from within United States territory establish jurisdiction in U.S. courts.

1.  **War Crimes and Extrajudicial Killings Are Sufficiently Definite in Their Content and Acceptance among Civilized Nations That They Reflect "Historical Paradigms" as Required by ATS**

169.     Contemporary ATS claims can invoke rights created under modern human rights

treaties, and federal courts have allowed ATS claims stemming from "a broad range of misconduct,

including genocide, war crimes, torture, and supporting terrorism." *Jane W. v. Thomas*, 560 F. Supp.

3d 855 (E.D. Pa. 2021). Specifically, claims of war crimes, torture, and cruel treatment are cognizable

under the ATS. *Presbyterian Church Of Sudan v. Talisman Energy*, Inc., 582 F.3d 244, 256-57 (2d Cir.

2009) (finding "war crimes" and "crimes against humanity" actionable under the ATS); *Kadic v.*

*Karadzic*, 70 F.3d 232, 240 n.3 (2d Cir. 1995) (citing Restatement (Third) of Foreign Relations Law §

702 (1987), specifying "torture or other cruel, inhuman or degrading treatment" as a violation of international law).

<p style="padding-left:2em">a.   <u>War Crimes</u></p>

170.       U.S. courts have recognized war crimes under the ATS. The War Crimes Act, 18 U.S.C. § 2441, defines a war crime to include, among other conduct, "grave breaches of Common Article 3" of the Geneva Conventions. It further defines such grave breaches to include "torture, cruel or inhuman treatment, performing biological experiments, murder, mutilation or maiming, intentionally causing serious bodily injury, rape, sexual assault or abuse, and taking hostages." The three elements of "war crimes" are well-established and could be summarized as following:

(1) that there was an armed conflict;

(2) that the Defendants failed to distinguish between civilians and combatants; and

(3) that the Defendants committed torture, cruel or inhuman treatment, performing biological experiments, murder, mutilation, or maiming, intentionally causing serious bodily injury, rape, sexual assault, or abuse, and taking hostages against the Plaintiffs.

171.       *As to the first element*, there is no dispute that Yemen has been involved in an armed conflict since 2014, when Houthi insurgents took control of Yemen's capital and largest city, Sana'a. Since March 2015, the Defendants—as leaders of the UAE and Saudi Arabia—have been directly intervening in this armed conflict. As determined by the U.S. Congress, [59] the conflict between the Saudi-led Coalition and the Houthis constitutes, within the meaning of section 4(a)(1) of the War Powers Resolution (50 U.S.C. 1543(a)(1)), either hostilities or a situation where imminent involvement in hostilities is clearly indicated by the circumstances into which United States Armed

---

[59] 117th Congress 2nd Session, H.J. Res. 87, para3

Forces have been introduced. As determined by the UN, the conflict continues to take a heavy toll on Yemeni civilians, making Yemen the world's worst humanitarian crisis.

172.     The two incidents alleged in this Complaint, namely the bombing of the wedding on October 7, 2015, and the bombing of the funeral on October 8, 2016, took place during the time of this armed conflict.

173.     *As to the second element,* the military leaders demonstrably failed to distinguish between military members and civilians by directly attacking residential districts.

174.     The fundamental aim of the law of armed conflicts is to limit suffering in wartime by sparing persons who are not, or are no longer, participating in hostilities. The law of armed conflicts require that the Defendants obey principles including military necessity, discrimination and distinction, proportionality, and avoidance of unnecessary suffering. Parties to a conflict are required to take all feasible measures to avoid and to minimize the incidental loss of civilian life, injury to civilians, and damage to civilian objects.

175.     Defendants' obligations, therefore, include taking precautions in the choice of means and methods of warfare; verifying that targets are military objectives; undertaking appropriate proportionality analyses; selecting the target which may be expected to cause the least danger to civilian lives and objects where there is a choice of military objectives with similar military advantage; suspending an attack if it becomes apparent that the target is not a military objective or that it would be a disproportionate attack; and giving effective advance warning of attacks which may affect the civilian population (unless the circumstances do not permit such warning). A party must also take all feasible measures to protect civilians from the effect of attacks within areas under their control ("precautions against the effect of attacks"). This includes an obligation to avoid locating military objectives within or near densely populated areas to the extent feasible, as well as taking all feasible

measures to remove civilian persons and objects under the control of a party to the conflict from the vicinity of military objectives.

176.     However, the conduct of hostilities in Yemen have crossed the permissible limits on civilian targeting and causalities. Saudi-led Coalition forces have been repeatedly accused of indiscriminate attacks on Yemeni civilians. Defendants directly attacked the civilian targets that have long been used for ceremonies, including weddings, funerals, and other public ceremonies. The named Defendants, as military leaders of the Coalition armies, failed to take any precaution to avoid excessive sufferings of the Plaintiffs, and instead directly carried out airstrikes against targets where Plaintiffs and other civilians resided. There is no lawful military objective that could justify the Defendants' airstrikes. From the perspective of a "reasonable military commander," the named Defendants apparently did not take all feasible precautions to avoid and minimize harm to civilians and civilian objects arising from military operations.

177.     *As to the third element*, by carrying out airstrikes in residential areas, the Defendants committed inhuman treatment and murder, intentionally causing serious bodily injury to the Plaintiffs. Here, the specific Defendants,  Mr. Mohamed Ben Zayed Al-Nahyan, Mr. Mohammed bin Rashid Al Maktoum, Mr. Mohamed Bin Salman Al Saoud, Mr. Hamad Mohamed Thani Al Rumaithi, Mr. Abdulrahman Ben Saleh Al-Bunyan, and Mr. Fayyadh Al-Ruwaili, were the direct perpetrators of the injuries to the civilian Plaintiffs, who were in no way combatants involved in the conflict.

178.     As to bombing of the wedding on October 7, 2015, according to reports, 49 people were killed in the attack, including 13 women and 22 children. Among the dead were Abdul Raman, one of the grooms, and the wife-to-be of one of his brothers, Ayman; at least 75 people were injured in the attack, 34% of whom were children and 14% were women. Witnesses recounted numerous burns, dismembered and beheaded bodies, and general panic. This was a moment of intense joy

turned into a horrific tragedy. This bombing undoubtedly constitutes an indiscriminate attack on the civilian population, causing severe pain or suffering, whether physical or mental.

179.     As to the bombing of the funeral on October 8, 2016, the attack killed at least 100 people and wounded more than 500, including children. On October 8, several hundred people had gathered in the al-Sala al-Kubra community hall, which has a capacity of over 1,000, for the funeral ceremony of Ali al-Rawishan, the father of the Sanaa-based administration's interior minister, Jalal al-Rawishan. According to the witnesses, at about 3:30 p.m., at least two air-dropped munitions penetrated the roof of the hall and detonated a few minutes apart. Photos and video footage taken after the attack show charred and mutilated bodies strewn in and outside the hall, the building destroyed, and rescuers carrying out bodies. In the immediate aftermath, a spokesman for the Sanaa-based Health Ministry, Dr. Tamim al-Shami, said that at least 110 people had been killed and 610 wounded, but that the death toll was likely to rise because a number of bodies had been burned or mutilated beyond recognition. Soon after the attack, Doctors Without Borders reported that six of its hospitals had treated over 400 wounded.[60]

180.     Attacks on civilians in Yemen have been widespread. As documented by Human Rights Watch, there have been at least 90 apparently unlawful Saudi-led Coalition airstrikes, including deadly attacks on Yemeni fishing boats that appeared to be deliberate attacks on civilians. According to the Yemen Data Project, the Saudi-led Coalition has conducted more than 20,100 airstrikes on Yemen since the war began, an average of 12 attacks a day. The Coalition has bombed hospitals, school buses, markets, mosques, farms, bridges, factories, and detention centers. All facts as documented and alleged in this Complaint have demonstrated that the named Defendants, Mr. Mohamed Ben Zayed Al-Nahyan, Mr. Mohammed bin Rashid Al Maktoum, Mr. Mohamed Bin

---

[60] https://www.hrw.org/news/2016/10/13/yemen-saudi-led-funeral-attack-apparent-war-crime

Salman Al Saoud, Mr. Hamad Mohamed Thani Al Rumaithi, Mr. Abdulrahman Ben Saleh Al-

Bunyan, and Mr. Fayyadh Al-Ruwaili, when acting as military leaders of Saudi Arabia and the UAE,

have violated international humanitarian laws and committed war crimes against the Plaintiffs.

181.      In sum, the Plaintiffs' ATS claims for war crimes allege sufficiently definite and

universal violations of international law.

### b. Extrajudicial killing

182.      Congress passed the Torture Victims Protection Act (TVPA) in order to create an

explicit federal cause of action for plaintiffs to bring claims of torture and extrajudicial killing against

foreign states to ensure that federal courts would have original jurisdiction over such claims under

the ATS. *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88 (D.D.C. 2017). The TVPA's definition of

extrajudicial killing allows plaintiffs to assert liability for a defendant's attempted extrajudicial killing,

even if the attempt does not result in death. *Id.* Here, the Plaintiffs all survived the attempt by

Coalition forces to execute them by bombing but suffered severe injuries, whether physical and

mental.

183.      Under the TVPA, an extrajudicial killing is defined as:

(1) a deliberated killing; and

(2) not authorized by a previous judgment pronounced by a regularly constituted court

affording all the judicial guarantees which are recognized as indispensable by civilized peoples. 106

Stat. 73, 28 U.S.C. § 1350 (note).

184.      *As to the first element*, Plaintiffs incorporate by reference paragraphs 1 through

183 of this Complaint as is set forth herein. By carrying out airstrikes on residential areas, the

Defendants actions constitute actual or attempted extrajudicial killings, as well as inhuman

treatment, intentionally causing serious bodily injury and threat of death to the Plaintiffs.

185.     *As to the second element*, Plaintiffs incorporate by reference paragraphs 1 through 184 of this Complaint as is set forth herein. As alleged above, the military leaders demonstrably failed to distinguish between military members and civilians by directly attacking residential area  in direct violation of international law and without authorization by a constituted court.

186.     In sum, the Plaintiffs' ATS claims for extrajudicial killing allege sufficiently definite and universal violations of international law.

## COUNT II -- VIOLATION OF THE TVPA BY ALL PLAINTIFFS AGAINST DEFENDANT SAUDI ARABIAN AND UAE MILITARY OFFICIALS

187.     Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein. The TVPA allows any person who is tortured or who is  victim of extrajudicial killing under color of law to sue in U.S. courts for damages. 28 U.S.C. 1350. The Plaintiffs' claims against the military leaders of Saudi Arabia and the UAE and the defense contractors satisfy all the elements as required by the TVPA:

(1) the Defendant must be an individual with "actual or apparent authority, or color of law, of any foreign nation."

(2) the crimes in question must be either torture and/or extrajudicial killing;

(3) prior to bringing the lawsuit before a U.S. court, the Plaintiffs have exhausted redress in the country in which the crime was committed. TVPA § 2(a).

188.     Courts generally conclude that the TVPA has extraterritorial application. *Chowdhury v. Worldtel Bangladesh Holding*, Ltd., 746 F.3d 42 (2d Cir. 2014). Extraterritoriality therefore would not be a hurdle for the Plaintiffs' claims under the TVPA.

1.  **The Saudi And UAE Military Leaders Acted Under the Actual And Apparent Authority of Foreign Nations.**

189.     *As to the first element*, the named Saudi and the UAE military leaders all have actual and apparent authority of their respective foreign sovereigns. Mr. Sheikh Mohamed bin Zayed bin Sultan Al Nahyan GCMG, colloquially known by his initials as MBZ, is the third president of the UAE and the ruler of Abu Dhabi. He is seen as the driving force behind the UAE's interventionist foreign policy. In 2017, Mr. Sheikh Mohamed met with former President Trump and discussed the importance of the expanding bilateral UAE-US trade and investment relationship. Sheikh Mohamed also met with US Secretary of Defense James Mattis and marked the signing of a new Defense Cooperation Agreement. Mr. Mohammed bin Salman Al Saud, colloquially known as MBS, is  Crown Prince, deputy prime minister, and minister of defense of Saudi Arabia. He is also the Supreme Commander of the armed forces of the Kingdom of Saudi Arabia. Mr. Hamad Mohammed Thani Al Rumaithi is the Chief of Staff, Lieutenant General, Commander of United Arab Emirates Armed Forces. Mr. Abdulrahman Ben Saleh Al-Bunyan was the Chief of Staff of the Saudi Armed Forces until February 2018. Last, Mr. Fayyadh Al-Ruwaili is the Chief of Staff of the Saudi Armed Forces since February 2018. Mr. Fayyadh Al-Ruwaili has always maintained close ties to the U.S. On Wednesday, May 11, 2022, U.S. Central Command's commander, Gen. Erik Kurilla, met with Royal Saudi Chief of General Staff, Gen. Fayyad Al-Ruwaili at the Diriyah Joint Operations Center. The leaders reaffirmed the ironclad strategic defense relationship between the Royal Saudi Arabian Armed Forces and U.S. Central Command.[61]

---

[61] https://www.centcom.mil/MEDIA/STATEMENTS/Statements-View/Article/3030579/readout-gen-kurillas-visit-to-saudi-arabia-may-13-2022/

190.     In sum, the defendants are individuals who acted with actual or apparent authority, or color of law, of the Saudi/UAE governments. Without the Defendants' instructions and command, no airstrikes would have been carried out.

## 2.  The Crime in Question is Extrajudicial Killing

191.     *As to the second element*, the crimes in question are extrajudicial killings without the sanction of any judicial proceeding or legal process.

192.     In *Mamani v. Sanchez-Berzain*, 636 F. Supp. 2d 1326 (S.D. Fla. 2009), Bolivian plaintiffs initiated an ATS and TVPA suit against former Bolivian President Gonzalo Sánchez de Lozada and former Minister of Defense José Carlos Sánchez Berzaín.  The plaintiffs alleged that the Defendants planned and carried out attacks on civilians in 2003 that left dozens dead and hundreds injured as part of a government effort to suppress opposition. In *Sanchez-Berzain*, district court held that sufficient evidence supported jury's conclusion that each death was a "deliberated killing" under the TVPA. Here, as discussed in Part IIIA-B, the airstrikes have caused massive civilian casualties. Since March 2015, Coalition bombing alone has killed 8,783 civilians (as of 10 November 2021). In addition to these direct victims, the bombings have indirectly cost the lives of many more people through the massive destruction of infrastructure essential to the survival of the civilian population. These indiscriminate bombings have also had the effect of depriving the civilian population of access to basic necessities such as food, drinking water, and medical care. Moreover, as testified by the Plaintiffs, agents of the UAE and Saudi armed forces, as well as militia fighters under their control, have systematically tortured detainees arbitrarily incarcerated in order to extract confessions from them.

## 3.  The Plaintiffs Have Exhausted Judicial Remedies in Yemen.

193.     *As to the third element*, prior to bringing the lawsuit before a U.S. court, Plaintiffs have attempted to find redress in the country in which the crime was committed (and that the

country lacked "adequate and available" remedies for the victims). The exhaustion requirement pursuant to the TVPA is an affirmative defense, requiring the defendant to bear the burden of proof. *See Hilao*, 103 F.3d at 778, n. 5; *Estate of Rodriquez v. Drummond Co.*, 256 F.Supp.2d 1250, 1267 (N.D. Ala. 2003) (citing *Wiwa v. Royal Dutch Petroleum Co.*, 2002 WL 319887, at 55–56 (S.D.N.Y. Feb. 28, 2002); *Sinaltrainal v. The Coca Cola Co.*, 2003 WL 1846195 (S.D.Fla. March 31, 2003)). The Senate Report to the TVPA specifically stated: the committee recognizes that in most instances the initiation of litigation under this legislation will be virtually prima facie evidence that the claimant has exhausted his or her remedies in the jurisdiction in which the torture occurred. *Jean v. Dorelien*, 431 F.3d 776 (11th Cir. 2005).

194.     Here, even the Defendants would not dispute that there has been a violent war in Yemen, and corruption in the Yemeni judicial system has always been a serious problem. In fact, Yemen is the most corrupt country in the Gulf region.[62] The overall political uncertainty and the frailty of the divided transitional government have eroded state control and weakened rule of law. As a result, justice institutions have struggled to provide services at even the modest levels that existed in 2010. Courts have been shuttered or obstructed from carrying out normal functions due to the general insecurity, direct threats against courts and judicial actors, and strikes and political disturbances. Citizens complain about increased corruption and poor performance of the judiciary and state impotence to handle increasing criminality, gangs, and armed groups.[63] Even if Plaintiffs were able to bring a lawsuit in Yemen, it would be impossible for Yemeni courts to obtain jurisdiction over U.S. corporations, U.S. executive agencies, and the Coalition military armies or their assets. Finally, the Defendants would not be able to meet the requisite burden of proof to support an affirmative defense of non-exhaustion of remedies.

---

[62] https://blogs.worldbank.org/arabvoices/fighting-culture-corruption-yemen
[63] https://www.usip.org/sites/default/files/PW99_Justice-in-Transition-in-Yemen.pdf

195.      In conclusion, the named Defendants, Mr. Mohamed Ben Zayed Al-Nahyan, Mr.

Mohammed bin Rashid Al Maktoum, Mr. Mohamed Bin Salman Al Saoud, Mr. Hamad Mohamed

Thani Al Rumaithi, Mr. Abdulrahman Ben Saleh Al-Bunyan, and Mr. Fayyadh Al-Ruwaili, as military

leaders of the Saudi Arabian and the UAE armies, committed torture and extrajudicial killings in the

Yemeni war, and must be held liable to the Plaintiffs under the TVPA.

## <u>COUNT III -- AIDING AND ABBETING WAR CRIMES, TORTURE AND EXTRAJUDICAL KILLINGS UNDER THE ATS BY ALL PLAINTIFFS AGAINST THE U.S. DEFENSE CONTRACTORS AND THEIR CHIEF EXECUTIVE OFFICERS</u>

196.      Plaintiffs reallege and incorporate by reference all paragraphs previously alleged

herein. Defendant Defense Contractors and their CEOs have aided abetted war crimes, torture, and

extrajudicial killings under the ATS. Accomplice liability is central to the ATS. *See Lizarbe v. Rondon*,

642 F. Supp. 2d 473, 490 (D. Md. 2009) aff'd in part, appeal dismissed in part, 402 F. App'x 834 (4th

Cir. 2010) (recognizing that numerous U.S. and international bodies have recognized causes of

action under ATS/TVPA based on theories of conspiracy and aiding and abetting); *Khulumani v.

Barclay Nat. Bank Ltd.*, 504 F.3d 254, 270 (2d Cir. 2007), aff'd sub nom. *Am. Isuzu Motors, Inc. v.

Ntsebeza*, 553 U.S. 1028, 128 S. Ct. 2424, 171 L. Ed. 2d 225 (2008) (finding that individual liability for

aiding and abetting a violation of international law is universally recognized); *Doe I v. Unocal Corp.*,

395 F.3d 932 (9th Cir. 2002), on reh'g en banc sub nom. *John Doe I v. Unocal Corp.*, 403 F.3d 708 (9th

Cir. 2005) (finding that forced labor, murder, rape, and torture are violations of the law of nations

and that certain violations, and  adapting international law for the aiding and abetting standard).

Similarly, in international law, the tribunals following World War II (including the ICTY, the ICTR

and the Rome Statute of the International Criminal Court) have all recognized a cause of action for

aiding and abetting. *See Khulumani*, 504 F.3d at 270.

197.      Under U.S. law, the requirement for establishing aiding and abetting is:

(1) the principal violated international law;

(2) the defendant knew of the specific violation, and the defendant specifically directed his acts to assist in the specific violation;

(4) the defendant's acts had a substantial effect upon the success of the criminal venture. *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1158 (11th Cir. 2005); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F.Supp. 2d 633, 668 (S.D. N.Y. 2006).

### 1.  The Principal Violated International Law

198.      *As to the first element*, Plaintiffs incorporate by reference paragraphs 1 through 197 of this Complaint as is set forth herein. The military leaders of Saudi Arabia and the UAE committed war crimes, extrajudicial killings, and torture against the Plaintiffs, in violation of international law.

### 2.  The Defendants Knew of the Specific Violation And Acted with the Intent to Assist that Violation.

199.      *As to the second element*,  Plaintiffs' allegations satisfy both possible tests for establishing knowledge. As identified by press releases from the federal government, during the time period from May 2020 to February 2022, Raytheon, General Dynamics, and Lockheed Martin were among the major U.S. Defense Contractors whose commercial sales with the Coalition countries. These defense contractors "purposefully" cultivated relationships with Congress members by lobbying, and Saudi Arabian purchasers who were responsible for the torture and extrajudicial killing, by marketing the ability of their arms product to destroy targets. Every year, Raytheon and the rest of the weapons industry spend millions of dollars influencing elections and lobbying for more arms sales – fueling the horrific war in Yemen for the sake of profits. Evidence of the gilded (and bloodied) highway stretching between Raytheon and the Saudi government can be found in a

January 25, 2022, conference call[64] from Raytheon Technologies Chairman and CEO Gregory Hayes to Raytheon investors. Hayes referred to military actions involving the United Arab Republics (part of the Saudi-led coalition killing Yemenis) as well as "tensions" in Eastern Europe and the South China Sea. He assured investors: "peace is not going to break out in the Middle East anytime soon. I think it remains an area where we'll continue to see solid growth." Howard P. McKeon, the former chair of the House Armed Services Committee, has worked for Saudi Arabia and Lockheed Martin, both of which have a strong interest in pushing such weaponry out the door with as few questions asked as possible.[65] Democracy for the Arab World Now, Freedom Forward, and other organizations promoting human rights and democracy in the Middle East have placed operatives like McKeon who advocate for repressive regimes in their "lobbyist hall of shame."[66] One well-documented case study of such lobbying from within the government itself offers a glimpse into how the process works. Charles Faulkner, a former Raytheon lobbyist, came to serve as a member of the State Department's Office of Legal Affairs during the Trump administration. In September 2018, he pressed to give Saudi Arabia a clean bill of health when it came to whether or not it was intentionally targeting civilians in its Yemen air strikes. He won that argument, which laid the groundwork for a sale of Raytheon precision-guided bombs to the Saudis to move forward. The Plaintiffs have also established constructive knowledge of the defense contractors because numerous news and official reports have documented the war crimes committed by the Saudi-led coalition, and therefore the defense contractors should have known that its conduct would assist the underlying violations. In sum, the Defendants have been consistently obtaining huge amounts of direct profits

---

[64] https://www.fool.com/earnings/call-transcripts/2022/01/25/raytheon-technologies-rtx-q4-2021-earnings-call-tr/

[65] https://www.kcrw.com/news/shows/greater-la/lobbying-grocery-stores-oc/california-politicians-dictatorship-lobbyists

[66] https://dawnmena.org/countries/lobbyist-gallery/

from its violations of international and domestic norms, from which an inference of purpose shall arose. Since the Defendants have satisfied both elements for aiding and abetting war crimes, they shall be held responsible to the Plaintiffs.

### 3. The Defendant's Acts Had a Substantial Effect Upon the Success of the Criminal Venture

200.    *As to the third element*, the weapons supplied by the U.S. defense contractors significantly aided and abetted the Coalition force's atrocities.

201.    Since March 2015, Amnesty International's researchers have investigated dozens of air strikes and repeatedly found and identified remnants of US-manufactured munitions.[67]

202.    U.S. corporations make billions a year from federal government contracts supplying weapons to the U.S military, and billions more selling arms to foreign militaries. Over the last five years, the U.S. accounted for 39% of global arms exports according to Stockholm International Peace Research Institute.[68] Of those exports, 43% went to the Middle East. The largest recipient, Saudi Arabia, received nearly a quarter of U.S. arms exports. Both Saudi Arabia and the United Arab Emirates (UAE) are among the top 10 recipients, putting them on par with stalwart allies like Australia, the United Kingdom and Japan. For years, the Saudi-led coalition has used those weapons against civilians in Yemen. The resulting humanitarian crisis has claimed over a hundred thousand lives from military conflict, famine, and disease.

203.    In order to secure arms sales, Defendants Raytheon, General Dynamics, and Lockheed Martin also lobby to advance Saudi interests. In recent years, Raytheon has been most active lobbyist on the weapons sales issue, according to disclosures analyzed by OpenSecrets. The company is publicly careful to portray a hands-off approach and emphasize their strict adherence to

---

[67] https://www.amnesty.org/en/latest/news/2022/01/yemen-us-made-weapon-used-in-air-strike-that-killed-scores-in-escalation-of-saudi-led-coalition-attacks/
[68] https://www.opensecrets.org/news/reports/capitalizing-on-conflict/yemen-case-study

the law. In February 2019, when asked about potential congressional action to suspend weapons transfers to the Saudis, then-CEO of Raytheon International John Harris acknowledged to CNBC that Raytheon is "an element of U.S. policy" but clarified that "our role is not to make policy, our role is to comply with it." Just months later however, filings revealed that Raytheon lobbyists were working to influence arms sales to Saudi Arabia. In late 2021, when the issue of halting sales to the Saudis came up for debate again, Raytheon once more had their lobbyists raise the issue in their communications with policymakers. The company spent $2.7 million lobbying on all issues in just the last three months of 2021.[69] A recent OpenSecrets analysis found that Raytheon alone has given over $4.5 million to the campaigns and leadership PACs of senators who voted against blocking sales to Saudi Arabia in December 2021.[70]

204.     Saudi Arabia relies on U.S. arms to carry out military operations in Yemen. The Saudi-led Coalition has used bombs produced by U.S. corporations and sold to Saudi Arabia with the approval of State and DOD to carry out thousands of catastrophic airstrikes in Yemen that have killed almost 9,000 civilians.

205.     In sum, the named U.S. defense contractors, Defendants Raytheon, Lockheed Martin, and  General Dynamics, along with their Chief Executive Officers, Defendants Gregory J Hayes, the CEO of Raytheon;  Jim Taicley, the CEO of Lockheed Martin; and Pheobe Novakovic, the CEO of General Dynamics, are complicit in the Coalition leaders' commission of war crimes, extrajudicial killing, and torture against the Plaintiffs.

---

[69] https://www.opensecrets.org/news/reports/capitalizing-on-conflict/yemen-case-study
[70] https://www.opensecrets.org/news/2021/12/saudi-arms-deal-advances-amid-foreign-influence-operation-and-defense-lobbying/

## COUNT IV -- AIDING AND ABBETING TORTURE AND EXTRAJUDICAL KILLINGS UNDER THE TVPA BY ALL PLAINTIFFS AGAINST THE CHIEF EXECUTIVE OFFICERS OF THE U.S. DEFENSE CONTRACTORS

206.	Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein. Defendants Gregory J Hayes, as the CEO of Raytheon;  Jim Taicley, as the CEO of Lockheed Martin; and Pheobe Novakovic, as the CEO of General Dynamics have aided abetted torture and extrajudicial killings under the TVPA.

207.	Under U.S. law, the requirement for establishing aiding and abetting is:

(1) the principal violated international law;

(2) the defendant knew of the specific violation, and the defendant specifically directed his acts to assist in the specific violation;

(4) the defendant's acts had a substantial effect upon the success of the criminal venture.

*Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1158 (11th Cir. 2005); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F.Supp. 2d 633, 668 (S.D. N.Y. 2006).

### 4.  The Principal Violated International Law

208.	*As to the first element*, Plaintiffs incorporate by reference paragraphs 1 through 207 of this Complaint as is set forth herein. The military leaders of Saudi Arabia and the UAE committed war crimes, extrajudicial killings, and torture against the Plaintiffs, in violation of international law.

### 5.  The Defendants Knew of the Specific Violation And Acted with the Intent to Assist that Violation.

209.	*As to the second element*, Plaintiffs' allegations satisfy both possible tests for establishing knowledge. As identified by press releases from the federal government, during the time period from May 2020 to February 2022, Raytheon, General Dynamics, and Lockheed Martin were among the major U.S. Defense Contractors whose commercial sales with the Coalition countries. These defense contractors, acting through Defendants Gregory J Hayes, as the CEO of Raytheon;

79

Jim Taicley, as the CEO of Lockheed Martin; and Pheobe Novakovic, as the CEO of General

Dynamics, "purposefully" cultivated relationships with Congress members by lobbying, and Saudi

Arabian purchasers who were responsible for the torture and extrajudicial killing, by marketing the

ability of their arms product to destroy targets. Every year, Raytheon and the rest of the weapons

industry spend millions of dollars influencing elections and lobbying for more arms sales – fueling

the horrific war in Yemen for the sake of profits. Evidence of the gilded (and bloodied) highway

stretching between Raytheon and the Saudi government can be found in a January 25, 2022,

conference call[71] from Raytheon Technologies Chairman and CEO Gregory Hayes to Raytheon

investors. Hayes referred to military actions involving the United Arab Republics (part of the Saudi-

led coalition killing Yemenis) as well as "tensions" in Eastern Europe and the South China Sea. He

assured investors: "peace is not going to break out in the Middle East anytime soon. I think it

remains an area where we'll continue to see solid growth." Howard P. McKeon, the former chair of

the House Armed Services Committee, has worked for Saudi Arabia and Lockheed Martin, both of

which have a strong interest in pushing such weaponry out the door with as few questions asked as

possible.[72] Democracy for the Arab World Now, Freedom Forward, and other organizations

promoting human rights and democracy in the Middle East have placed operatives like McKeon

who advocate for repressive regimes in their "lobbyist hall of shame."[73] One well-documented case

study of such lobbying from within the government itself offers a glimpse into how the process

works. Charles Faulkner, a former Raytheon lobbyist, came to serve as a member of the State

Department's Office of Legal Affairs during the Trump administration. In September 2018, he

---

[71] https://www.fool.com/earnings/call-transcripts/2022/01/25/raytheon-technologies-rtx-q4-2021-earnings-call-tr/

[72] https://www.kcrw.com/news/shows/greater-la/lobbying-grocery-stores-oc/california-politicians-dictatorship-lobbyists

[73] https://dawnmena.org/countries/lobbyist-gallery/

pressed to give Saudi Arabia a clean bill of health when it came to whether or not it was intentionally targeting civilians in its Yemen air strikes. He won that argument, which laid the groundwork for a sale of Raytheon precision-guided bombs to the Saudis to move forward. The Plaintiffs have also established constructive knowledge of the defense contractors because numerous news and official reports have documented the war crimes committed by the Saudi-led coalition, and therefore the defense contractors should have known that its conduct would assist the underlying violations. In sum, the Defendants have been consistently obtaining huge amounts of direct profits from its violations of international and domestic norms, from which an inference of purpose shall arose. Since the Defendants have satisfied both elements for aiding and abetting war crimes, they shall be held responsible to the Plaintiffs.

### 6.  The Defendants' Acts Had a Substantial Effect Upon the Success of the Criminal Venture

210.     *As to the third element*, the weapons supplied by the decisions made by Defendants Gregory J Hayes, as the CEO of Raytheon;  Jim Taicley, as the CEO of Lockheed Martin; and Pheobe Novakovic, as the CEO of General Dynamics significantly aided and abetted the Coalition force's atrocities.

211.     Since March 2015, Amnesty International's researchers have investigated dozens of air strikes and repeatedly found and identified remnants of US-manufactured munitions.[74]

212.     U.S. corporations make billions a year from federal government contracts supplying weapons to the U.S military, and billions more selling arms to foreign militaries. Over the last five years, the U.S. accounted for 39% of global arms exports according to Stockholm International Peace Research Institute.[75] Of those exports, 43% went to the Middle East. The largest recipient,

---

[74] https://www.amnesty.org/en/latest/news/2022/01/yemen-us-made-weapon-used-in-air-strike-that-killed-scores-in-escalation-of-saudi-led-coalition-attacks/
[75] https://www.opensecrets.org/news/reports/capitalizing-on-conflict/yemen-case-study

Saudi Arabia, received nearly a quarter of U.S. arms exports. Both Saudi Arabia and the United Arab Emirates (UAE) are among the top 10 recipients, putting them on par with stalwart allies like Australia, the United Kingdom and Japan. For years, the Saudi-led coalition has used those weapons against civilians in Yemen. The resulting humanitarian crisis has claimed over a hundred thousand lives from military conflict, famine, and disease.

213.　　　In order to secure arms sales, Defendants Gregory J Hayes, as the CEO of Raytheon;  Jim Taicley, as the CEO of Lockheed Martin; and Pheobe Novakovic, as the CEO of General Dynamics, caused their companies to also lobby to advance Saudi interests. In recent years, Raytheon, acting through CEO Hayes, has been most active lobbyist on the weapons sales issue, according to disclosures analyzed by OpenSecrets. The company is publicly careful to portray a hands-off approach and emphasize their strict adherence to the law. In February 2019, when asked about potential congressional action to suspend weapons transfers to the Saudis, then-CEO of Raytheon International John Harris acknowledged to CNBC that Raytheon is "an element of U.S. policy" but clarified that "our role is not to make policy, our role is to comply with it." Just months later however, filings revealed that Raytheon lobbyists were working to influence arms sales to Saudi Arabia. In late 2021, when the issue of halting sales to the Saudis came up for debate again, Raytheon once more had their lobbyists raise the issue in their communications with policymakers. The company spent $2.7 million lobbying on all issues in just the last three months of 2021.[76] A recent OpenSecrets analysis found that Raytheon alone has given over $4.5 million to the campaigns and leadership PACs of senators who voted against blocking sales to Saudi Arabia in December 2021.[77] As previously alleged in paragraphs 1-212 herein, Jim Taicley, as the CEO of Lockheed

---

[76] https://www.opensecrets.org/news/reports/capitalizing-on-conflict/yemen-case-study
[77] https://www.opensecrets.org/news/2021/12/saudi-arms-deal-advances-amid-foreign-influence-operation-and-defense-lobbying/

Martin; and Pheobe Novakovic, as the CEO of General Dynamics, despite their knowledge of the atrocities committed by them in Yemen, also acted to support Saudi Arabia and UAE in order to enhance business opportunities for their respective companies.

214.	Saudi Arabia relies on U.S. arms to carry out military operations in Yemen. The Saudi-led Coalition has used bombs produced by U.S. corporations and sold to Saudi Arabia with the approval of State and DOD to carry out thousands of catastrophic airstrikes in Yemen that have killed almost 9,000 civilians.

215.	In sum, Defendants Gregory J Hayes, as the CEO of Raytheon;  Jim Taicley, as the CEO of Lockheed Martin; and Pheobe Novakovic, as the CEO of General Dynamics, are directly complicit in the Coalition leaders' commission of extrajudicial killings and torture against the Plaintiffs.

## COUNT V -- ADMINISTRATIVE PROCEDURE ACT CHALLENGE BY ALL PLAINTIFFS AGAINST THE STATE DEPARTMENT AND THE DEPARTMENT OF DEFENSE

216.	Plaintiffs reallege and incorporate by reference all paragraphs previously alleged. The Administrative Procedure Act (APA) applies to all agencies of the federal government and provides general procedures for agency rulemaking and adjudications. A successful APA challenge should be maintained, and a judicial review should be performed by court if the plaintiff meets the following criteria:

(1) the acts committed by the defendant(s) are not exempted from the APA regulation;

(2) the Plaintiffs fall within the zone of interest that the APA was designed to protect;

(3) the approval of the arms sales at issue was arbitrary, capricious, or in excess of statutory authority.

217.        Here, the Plaintiffs have satisfied all three elements discussed above.

## 1.   A Decision to Approve Arms Sales Made by the State Department and the Department of Defense is Not Exempted from the APA

218.        *As to the first element*, the APA does not categorically exclude the State Department and the Department of Defense from its coverage. The APA applies to each "agency", which is defined as "each authority of the Government of the United States."[78] Thus, even if certain war and defense functions may be exempted, the War or Navy Departments per se are not exempted in the performance of their functions.[79] Second, the approval of arms sales does not fall within the scope of exemption from the APA. Based on the plain meaning of the words "military" and "function" and on the APA's legislative history, the exemption applies to the extent that there are "clearly and directly involved matters specifically fitted for, appropriate to, or expected of the armed forces in light of their peculiar nature and qualifications." Courts considering the question have found the APA applicable to the military departments except to the extent the APA specifically exempts certain of their functions.[80] The term "military function" is not coextensive with all the activities of the military departments. Congress' failure to totally exempt the War and Navy Departments from the APA and the APA's legislative history indicate that Congress did not intend the term "military function" to include all activities of the military departments. When construing the

---

[78] 5 U.S.C. § 551(1), 701(b)(1) (1982). Courts have found this broad definition of agency to include nonappropriated fund instrumentalities such as post exchanges. *See Young v. United States*, 498 F.2d 1121 (5th Cir. 1974).

[79] Senate Committee on the judiciary, Administrative Procedure Act Legislative History, S. Doc. No. 248, 79th Cong., 2d Sess. 191 (1947).

[80] *Roelfs v. Secretary of the Air Force*, 628 F. 2d 594, 599 (D.C. Cir. 1980); *Nicholson v. Brown*, 599 F.2d 639, 648 (5th Cir. 1979); *Jaffe v. United States*, 592 F.2d 712, 719 – 20 (3d Cir. 1979); *Ornato v. Hoffman*, 546 F.2d 10, 14 (2d Cir. 1976);  *United States "ex rel." Schonbrun v. Commanding Officer*, 403 F.2d 371, 375 n.2 (2d Cir. 1968); *Story v. Marsh*, 574 F. Supp. 505, 512 (E.D. Mo. 1983).

term "military function," there is a "strong presumption" of judicial review, and such presumption only runs aground when it encounters concerns of "national security."[81] Courts interpret "national security" to include activities including "adopting a policy requiring that background checks for foreign nationals be completed before they ship to basic U.S. military training,"[82] "excluding persons from a submarine launching area," and "declaring merchant seamen to be security risks." In contrast, when the decision is about "whether and when to certify honorable service,"[83] or even "the designation of company as a Communist Chinese military company pursuant to the National Defense Authorization Act,"[84] courts hold that it is not a decision committed to agency discretion and therefore does not preclude judicial review.

219.    Here, the decision to approve arms sales concerns a conflict overseas that does not directly implicate U.S. national security. No evidence has been presented to show that the Houthis are an existing threat to U.S. national security, or that they are premediating attacks in the U.S. territory. The factors considered by the U.S. executive branch in approving arms sales to foreign nations are "political, military, economic, arms control, and human rights conditions." As evidence by President Trump's statement in support of arms sales to the Coalition, the primary motivation for approving the sales appears to economic growth and support of the U.S. defense industry. Moreover, the approval of some dual-use weapons is controlled by the Department of Commerce on the Commerce Control List (CCL), and since 2013, the U.S. Government has transferred a significant number of items and technologies from the U.S. Munitions List to the CCL to ease the burden on U.S. industry. Such facts demonstrated that the approval of arms sales to foreign countries is primarily commercial, rather than a matter "specifically fitted for, appropriate to, or

---

[81] *Department of Navy v. Egan*, 484 U.S. 518, 527-28 (1988).
[82] *Jiahao Kuang v. United States Dep't of Def.*, 778 F. App'x 418 (9th Cir. 2019)
[83] *Kirwa v. United States Dep't of Def.*, 285 F. Supp. 3d 21 (D.D.C. 2017)
[84] *Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174 (D.D.C. 2021)

expected of the armed forces in light of their peculiar nature and qualifications." Hence, both the

State Department and the Department of Defense's decisions to approve the arms sales are not

exempted from the APA or immune from judicial review.

### 2.   Plaintiffs are within the Zone of Interest Designed by the APA

*220.*        ***As to the second element***, in order to bring a claim, the APA has a court-imposed

requirement that the interest the plaintiff seeks to protect must arguably be within the "zone of

interests" intended by Congress to be protected in granting the agency the authority under which it

acted. *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340 (1984). In the APA context, the test is not

"especially demanding." *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 132 S.Ct.

2199, 2210 (2012). Courts have often "conspicuously included the word 'arguably' in the test to

indicate that the benefit of any doubt goes to the plaintiff," and have said that the test "forecloses

suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes

implicit in the statute that it cannot reasonably be assumed that'" Congress authorized that plaintiff

to sue. *Patchak*, 132 S.Ct., at 2210. This lenient approach is an appropriate means of preserving the

flexibility of the APA's omnibus judicial-review provision, which permits suit for violations of

numerous statutes of varying character that do not themselves include causes of action for judicial

review. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 (2014). Courts have also

made clear that the breadth of the zone of interests varies according to the provisions of law at

issue. *Bennett v. Spear*, 520 U.S. 154, 163 (1997). Even if the plaintiff is not itself the subject of the

contested regulatory action, the test would still permit a right of review as long as the plaintiff's

interests are not "so marginally related to or inconsistent with the purposes implicit in the statute

that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus.*

*Ass'n*, 479 U.S. 388, 399 107 S. Ct. 750 (1987). Identifying the interests protected by an Act requires

no guesswork if the Act includes an "unusual, and extraordinarily helpful," detailed statement of the

statute's purposes. *H.B. Halicki Productions v. United Artists Communications, Inc.*, 812 F.2d 1213, 1214 (C.A.9 1987). When a statute clearly stated that "the intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce," a plaintiff must allege an injury to a commercial interest in reputation or sales to come within the zone of interests in a suit for false advertising under § 1125(a),. *Id.*

221.     Here, the Defendants violated the APA specifically when they failed to follow the procedure and meet the requirements of the Foreign Assistance Act and the Arms Export Control Act. The Foreign Assistance Act was enacted because "the Congress finds that fundamental political, economic, and technological changes have resulted in the interdependence of nations… the individual liberties, economic prosperity, and security of the people of the United States are best sustained and enhanced in a community of nations which respect individual civil and economic rights and freedoms and which work together to use wisely the world's limited resources in an open and equitable international economic system. Furthermore… the traditional humanitarian ideals of the American people and renews its commitment to assist people in developing countries to eliminate hunger, poverty, illness, and ignorance."[85] Similarly, the Arms Export Control Act was enacted because "an ultimate goal of the United States continues to be a world which is free from the scourge of war and the dangers and burdens of armaments; in which the use of force has been subordinated to the rule of law; and in which international adjustments to a changing world are achieved peacefully. In furtherance of that goal, it remains the policy of the United States to encourage regional arms control and disarmament agreements and to discourage arms races."[86] The intention of Congress in passing these two Acts was precisely to protect the interest of those who

---

[85] https://www.foreign.senate.gov/imo/media/doc/Foreign%20Assistance%20Act%20Of%201961.pdf
[86] https://www.govinfo.gov/content/pkg/COMPS-1061/pdf/COMPS-1061.pdf

would suffer severe property loss and bodily harms caused by the U.S. supplies of weapons. By

passing these Acts, Congress has made a commitment to assist people in developing countries to

eliminate hunger, illness, and sufferings associated with warfare.  The Plaintiffs–all of whom suffered

severe bodily harms and proprietary injuries due to the U.S.-made weapons–fit perfectly within the

class of people that Congress intended to protect. Therefore, the Plaintiffs are entitled to bring an

APA challenge, demanding that the corresponding executive branches fulfill their obligations under

the Foreign Assistance Act and the Arms Export Control Act.

### 3.  The Approval of the Arms Sales is Arbitrary, Capricious, and in Excess of Statutory Authority

222.      *As to the third element*, the APA requires courts to "hold unlawful and set aside

agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction,

authority, or limitations, or short of statutory right," id. § 706(2)(C). Courts are to afford heightened

deference to an agency's determination only in extremely narrow situations such as these concerning

national security. *See Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007); *see also*

*Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 84 (D.D.C. 2002) (noting that

sanction determinations "are an important component of U.S. foreign policy, and ... entitled to

particular deference."), aff'd, 333 F.3d 156 (D.C. Cir. 2003). However, even in this context, "courts

retain a role, and an important one, in ensuring that agencies have engaged in reasoned decision

making." *Judulang v. Holder*, 565 U.S. 42, 53 (2011).

223.      Courts commonly apply an arbitrary and capricious standard of review to agency

actions. 5 U.S.C. § 706(2)(A)(2). The APA further provides for agency action to be set aside when it

is "not in accordance with law;" "contrary to constitutional right, power, privilege, or immunity;" or

"in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. *Id.* §

706(2)(A)-(C). Reasoned decision-making requires that an agency "articulate a satisfactory

explanation for its action" with a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). For "record- based factual conclusion[s]" this requires that an agency's final determination be "supported by substantial evidence." *Dickinson v. Zurko*, 527 U.S. 150, 164 (1999). A lack of substantial evidence can be shown when an agency "offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* In this situation a court must set the agency determination aside as arbitrary and capricious. *Id.* Additionally, the APA empowers a reviewing court to "set aside" an agency action that exceeds its statutory "authority" or "limitations." 5 U.S.C. § 706(2).

224.     Here, the Office of Regional Security and Arms Transfers in the Department of State's Bureau of Political-Military Affairs (PM/RSAT) manages the FMS approval process, in close partnership with the Department of Defense's Defense Security Cooperation Agency (DSCA). DSCA coordinates implementation of FMS cases negotiated with U.S. defense contractors. For direct commercial sales, the Bureau of Political-Military Affairs' Directorate of Defense Trade Controls (PM/DDTC) provides regulatory approvals for approximately $115 billion per year in sales of defense equipment, services, and related manufacturing technologies controlled under the 21 categories of the U.S. Munitions List (USML). Although direct commercial sales are negotiated privately between foreign end-users and U.S. companies, U.S. companies are required to register with DDTC. Further, a DDTC license or other approval is required before exporting a defense article or providing a defense service to a foreign end-user.[87]

---

[87] https://www.state.gov/u-s-arms-sales-and-defense-trade/

225.     In the international plane, many of Saudi Arabia's suppliers, including France and the UK, are parties to the UN Arms Trade Treaty (ATT), which prohibits parties to transfer arms "if the transfer would violate its relevant international obligations under international agreements."[88] The ATT also prohibits transfers if the party "has knowledge at the time of authorization that the arms or items would be used in the commission of genocide, crimes against humanity, grave breaches of the Geneva Conventions of 1949, attacks directed against civilian objects or civilians protected as such, or other war crimes"[89] Furthermore, if the export is not prohibited, each exporting State Party must carry out a risk assessment prior to authorization, including of the potential that the arms could be used to commit a serious violation of international law.[90] While the U.S. is not a Party to the ATT, it is a Signatory, meaning that it is bound, at minimum, to not do anything to defeat the "object and purpose" of the treaty.

226.     Under U.S. law, two major Acts, namely, the Foreign Assistance Act and the Arms Export Control Act, set out the framework for regulating the export of U.S.-made arms. The Arms Control Export Act requires the President to establish an EUM program designed, to the extent practicable, to provide reasonable assurances that defense articles and defense services being transferred are being used for the purposes for which they were provided. Section 4 of the Arms Export Control Act states that the authorized purposes of FMS transfers include internal security, legitimate self-defense, and permitting the recipient country to participate in regional or collective arrangements or measures consistent with the Charter of the UN, among other purposes. The law requires that, to the extent practicable, the program be designed to provide reasonable assurance that recipients are complying with restrictions imposed by the U.S. government on the use, transfers,

---

[88] Art. 6(2).
[89] Art. 6(3).
[90] Art. 7 (1).

and security of defense articles and services, and that recipients use such articles and services for the purposes for which they are provided. Given that the FAA prohibits security assistance "to any country the government of which engages in a consistent pattern of gross violations of internationally recognized human rights," and that the AECA approves military assistance under only one or more of the five situations,[91] the U.S. government's decision to continue to approve the arms sales has violated both FAA and AECA, and therefore should be overturned by the judicial branch.

227.     Both the State Department and the Department of Defense (DOD) have breached their  obligations under the FAA and AECA. In 2021, the United States vowed to end support of the coalition's offensive operations, including through arms sales.[92] But the report made by the GAO, as cited in Part IV(D) of this Complaint, raises troubling questions about how seriously State Department and Defense Department officials complied with this duty in this case. DOD and State have not fully determined the extent to which U.S. military support provided to Saudi Arabia and UAE has contributed to civilian harm in Yemen, even though the U.S. government has had indications that U.S.-origin defense articles may have been used in strikes against civilians. "In February 2021 the President announced his intent to end U.S. support for offensive operations in Yemen," Jason Bair, GAO's director of international affairs and trade, said in an email. "While State officials told us that they attempt to distinguish between 'offensive' and 'defensive' weapons, they have no specific definitions of 'offensive' and 'defensive… Without clear definitions of 'offensive'

---

[91] (1) "for internal security"; (2) "for legitimate self-defense"; (3) "for preventing or hindering the proliferation of weapons of mass destruction and of the means of delivering such weapons"; (4) "to permit the recipient country to participate in regional or collective arrangements," including the United Nations; and (5) "for the purpose of enabling foreign military forces in less developed friendly countries to construct public works and to engage in other activities helpful to the economic and social development of such friendly countries."

[92] https://www.washingtonpost.com/politics/biden-yemen-saudi-war-support/2021/02/04/ae61c14a-670d-11eb-8468-21bc48f07fe5_story.html

and 'defensive' weapons, it can be difficult for the State Department to implement the President's wishes" to end offensive weapons assistance," Bair added. Bair noted that "State's assessment is based on the intended use of the weapons, which may or may not match the actual use. State and DOD lack a comprehensive picture of how U.S. assistance has actually been used in the war in Yemen." Neither DOD nor State could provide examples of reports or investigations of any incidents of potential unauthorized use of U.S.-origin equipment transferred to Saudi Arabia and UAE through FMS from fiscal years 2015 through 2021. State and DOD claim to have made some efforts to understand civilian harm and the use of U.S.-origin defense articles in Yemen during that period. However, DOD has not reported to relevant State officials nor could State provide evidence that it investigated indications that U.S.-origin equipment transferred to Saudi Arabia and UAE through FMS was used for unauthorized purposes or against anything other than legitimate military targets.[93] Moreover, DOD has not reported and State could not provide evidence that it has investigated indications that U.S.-origin equipment transferred to Saudi Arabia and UAE through FMS may have been used for unauthorized purposes or against anything other than legitimate military targets. DOD and State policies and documents indicate DOD should incorporate reporting and State should incorporate investigations of incidents of potential misuse into their EUM processes.

228.     In conclusion, the State Department and the DOD's decisions to continue to approve arms sales are arbitrary, capricious, and constitute an abuse of discretion, because the

---

[93] In August 2020, State's Office of Inspector General (OIG) reported that State did not fully assess risks and implement mitigation measures to reduce casualties and legal concerns associated with the transfer of certain precision-guided munitions. In the report, State/OIG described this matter in detail and made an associated recommendation in the classified annex to its report. See Office of Inspector General U.S. Department of State, Review of the Department of State's Role in Arms Transfers to the Kingdom of Saudi Arabia and the United Arab Emirates ISP-I-20-19, (Arlington, VA: August 2020).

weapons supplied by the United States are not used for internal security or legitimate self-defense. Rather, the Coalition has used U.S.-made arms to perpetrate war crimes. Nor have State and DOD sufficiently investigated the end-use of U.S.-made arms as required by law. Hence, this Court should grant Plaintiffs' request for injunctive relief requiring that State and DOD cease all further military sales to the Coalition parties and require a full investigation consistent with the applicable law to determine whether prior sales were in violation of the law and impose clear restrictions on future sales to require full compliance with the law.

## COUNT VI -- UNJUST ENRICHMENT BY ALL PLAINTIFFS AGAINST THE U.S. DEFENSE CONTRACTORS

229.     Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

230.     The Defense contractors have been unjustly enriched by selling at huge profits the weapons that were misused by the Saudi and UAE military officials, causing Plaintiffs' injuries as alleged herein. Between the parties, it would be unjust for these Defendants to retain the benefits attained by their wrongful actions at the expense of Plaintiffs who were wrongfully injured.

231.     Accordingly, Plaintiffs and Class Members seek full restitution of Defendant's enrichment, benefits, and ill-gotten gains acquired as a result of the wrongful conduct alleged herein.

232.     To the detriment of Plaintiff and Class Members, Defendants have been and continue to be unjustly enriched as a result of the wrongful conduct alleged herein. Focusing on Raytheon alone, after the war began in 2015, Raytheon's stock price went from about $108 to more than $180 in 2019, reflecting billions of dollars in weapons sales to Saudi Arabia.  From fiscal years 2015 through 2021, DOD administered military support worth at least $54.6 billion to Saudi Arabia and the UAE. It would be inequitable and unconscionable for the defendants to continue to enjoy

the benefits of arms sales that are in violation of international law and directly caused the Plaintiffs' suffering. The war in Yemen has been lucrative for other defendants as well. Maryland-based Lockheed Martin, the largest defense contractor in the world, is estimated to have had $44.9 billion in arms sales in 2017 through deals with governments all over the world. Lockheed's revenue from the U.S. government alone is well more than the total annual budgets of the IRS and the Environmental Protection Agency, combined. Since the war began in March 2015, General Dynamics' stock price has risen from about $135 to $169 per share.

233.    Accordingly, Plaintiffs and Class Members seek full restitution of Defendant's enrichment, benefits, and ill-gotten gains acquired as a result of the wrongful conduct alleged herein.

234.    The Restatement (Third) of Restitution & Unjust Enrichment § 1(e)(2) explains that "another context in which the word 'restitution' means something closer to 'damages' is a product of statutes authorizing compensation to victims as a part of criminal sentencing. It is a natural use of the language to speak of requiring a criminal to 'make restitution'… To the extent that this aspect of criminal sanctions has a basis in civil obligations, it is found in tort rather than restitution." Defendants' conduct has constituted, among other things, war crimes, and aiding and abetting war crimes. Therefore, damages for the mental anguish and pain and suffering Plaintiffs experienced as a result of being harmed by the alleged indiscriminate airstrikes, as well as punitive and exemplary damages, shall be awarded to the Plaintiffs.

235.    Further, Defendants are all jointly and severally liable for the injuries caused to Plaintiffs by Defendants' joint actions and participation in the plans and programs that depend upon unjust and unlawful arms sales. In *Sindell v. Abbott Lab'ys*, 26 Cal. 3d 588, 607 P.2d 924 (1980), plaintiffs brought class actions against drug companies seeking to recover for injuries sustained as result of administration of drug DES to their mothers during pregnancy. The court held that although specific manufacturer of drug DES, which was administered to plaintiff's mother during

pregnancy causing plaintiff's injuries, could not be identified, plaintiff could hold the manufacturers of the drug which was produced from an identical formula liable for her injuries upon a showing that the manufacturers produced a substantial percentage of the drug in question, with each manufacturer being held liable for the proportion of the judgment represented by its share of the drug market unless it demonstrated that it could not have made the product which caused plaintiff's injuries. The court also reasoned that the manufacturer is in the best position to discover and guard against defects in its products and to warn of harmful effects; thus, holding the manufacturer liable for defects and failure to warn of harmful effects will provide an incentive to product safety.  In *Shields v. Eli Lilly & Co.*, 895 F.2d 1463 (D.C. Cir. 1990), plaintiff filed a tort claim against Lilly alleging that she contracted cancer as a result of having been exposed in utero to Lilly's product, diethylstilbestrol ("DES"). The D.C. Circuit held that in a world short of absolutes, the jury is called upon to process less than perfect evidence. Litigants may not offer speculations or slight possibilities in support of their claims; but neither are they limited to offering only the incontrovertible. The jury's function contemplates that evidence may be less than indubitable.

236.    Here, Plaintiffs have direct evidence that the Defendants' weapons were responsible for their injuries. Plaintiffs have provided photographs of weapons with certain serial numbers on them as evidence that the named Defendants produced such weapons. In addition, Defendant Defense Contractors as key members of and participants in the arms supply chain venture are liable for the injuries caused to the Plaintiffs by the venture's illegal conduct. Hence, Defendants are all jointly and severally liable for the injuries.

## COUNT VII -- NEGLIGENT SUPERVISION BY
## ALL PLAINTIFFS AGAINST ALL DEFENDANTS

237.     Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

238.     Defendants had the authority to supervise, prohibit, control, and/or regulate the purchase/ sale, as well as the use of weapons. The Defense Contractors all boast of their overseas arms sales. The State Department and the Department of Defense also had the duty and ability to cease operations until such time as the violations alleged herein were stopped and/or prevented. The Saudi and UAE military leaders also have the authority to monitor and regulate the use of arms purchased from the United States.

239.     Defendants knew or reasonably should have known that unless they intervened to protect Plaintiffs and properly supervise, prohibit, control and/or regulate the conduct described herein, Plaintiffs would suffer the injuries alleged herein.

240.     However, Defendants failed to exercise due care by failing to supervise, prohibit, control or regulate their employees and/or agents, and similarly failed to make appropriate investigations into the possible negative impact on Plaintiffs and others similarly situated who were harmed by continuous indiscriminate airstrikes on Yemeni civilians. As a direct and proximate result of Defendants' negligent supervision, Plaintiffs have suffered and continue to suffer injuries entitling them to damages in amounts to be ascertained at trial.

241.     All Defendants, as key members of and participants in the arms supply chain venture, are liable for the injuries caused to the Plaintiffs by the venture's illegal conducts. Hence, by Defendants' joint actions and participation in the sales of weapons that have been used to commit the crimes as alleged in this Complaint, Defendants are all jointly and severally liable for the injuries.

## COUNT VIII -- INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BY ALL PLAINTIFFS AGAINST THE MILITARY LEADERS OF SAUDI ARABIA AND THE UAE, THE U.S. DEFENSE CONTRACTORS, AND THEIR CEOs.

242.     Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

243.     By intentionally and continuously participating in a venture that profits from Plaintiffs' suffering and injuries, Defendants engaged in outrageous conduct which went beyond all bounds of decency.

244.     The outrageous conduct of Defendants was the cause of severe emotional distress and physical damage suffered by the Plaintiffs.

245.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages in an amount to be ascertained at trial.

246.     The Coalition military leaders, the U.S. defense contractor companies, and their CEOs, as key members of and participants in the arms supply chain venture, are liable for the injuries caused to the Plaintiffs by the venture's illegal conducts. Hence, by Defendants' joint actions and participation in the sales of weapons that have been used to commit the crimes as alleged in this Complaint, Defendants are all jointly and severally liable for the injuries.


# DEMAND FOR JURY TRIAL

247.     Plaintiffs demand a trial by jury on all issues so triable.

# PRAYER FOR RELIEF

248.     WHEREFORE, Plaintiffs pray this Court will enter an order:

a. Entering judgment in favor of each of the Plaintiffs on all counts of the Complaint;

b. Awarding each of the Plaintiffs monetary damages, subject to proof and in an amount to be determined at trial, including but not limited to medical expenses incurred;

c. Awarding each of the Plaintiffs consequential damages, including but not limited to the loss of assets and of educational and business opportunities as a result of Defendants' illegal conduct;

d. Awarding each of the Plaintiffs damages for the mental anguish and pain and suffering Plaintiffs experienced as a result of being harmed by the alleged indiscriminate airstrikes;

e. Awarding each of the Plaintiffs punitive and exemplary damages;

f. Awarding Plaintiffs any and all other damages allowed by law according to proof to be determined at time of trial in this matter;

g. Awarding Plaintiffs reasonable attorneys' fees and costs;

h. Awarding all Plaintiffs injunctive relief, disgorgement of all profits resulting from these illegal transactions of arms alleged herein such that restitution is made to the general public;

i. Awarding class-wide relief based on the award to the individual Plaintiffs; and

j. Awarding such other relief as the Court deems just and equitable.


Respectfully submitted this 2nd day of March 2023


        /s/ Terrence P. Collingsworth
        Terrence P. Collingsworth
        (DC Bar # 471830)
        INTERNATIONAL RIGHTS ADVOCATES
        621 Maryland Avenue NE
        Washington, D.C. 20002
        Tel.: (202) 543-5811
        tc@iradvocates.org
        *Counsel for Plaintiffs*