**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AMIN ALLAWI ALI, et al.

      *Plaintiffs*,

v.                                                          No. 1:23-cv-576-RDM

MOHAMED BEN ZAYED AL-NAHYAN, et
al.,

      *Defendants*.

**MEMORANDUM OF POINTS AND AUTHORITIES**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................... 1

STATUTORY BACKGROUND ...................................................................................................... 2

I.      Sale of Defense Articles Under the Arms Export Control Act ........................................... 2

        A.      Arms Export Control Act ....................................................................................... 2

                1.      Foreign Military Sales ................................................................................ 3

                2.      Direct Commercial Sales ............................................................................ 5

        B.      End-Use Monitoring of U.S. Origin Defense Articles ........................................... 6

II.     The Foreign Assistance Act ............................................................................................... 6

FACTUAL BACKGROUND AND PROCEDURAL POSTURE .................................................... 7

I.      The State Department and DOD's authorizations to Sell Defense Articles to Saudi
        Arabia and the UAE. .......................................................................................................... 7

II.     This Lawsuit ....................................................................................................................... 8

LEGAL STANDARD .................................................................................................................... 10

ARGUMENT ................................................................................................................................. 11

I.      Plaintiffs Lack Article III Standing to Challenge the State Department's and DOD's
        Decisions to Authorize Sales of Defense Articles and Services to Saudi Arabia and
        the UAE. ........................................................................................................................... 11

        A.      Plaintiffs' allegations of past injuries are insufficient to support prospective
                relief. .................................................................................................................... 12

        B.      The State Department and DOD did not cause Plaintiffs' alleged injuries. ............. 16

        C.      The requested relief will not redress Plaintiffs' alleged injury. ............................. 20

II.     Plaintiffs' APA claims fail at inception and must be dismissed. ....................................... 22

        A.      Approval of arms sales is committed to agency discretion. ................................... 22

        B.      End-use monitoring is not challengeable under the APA. ..................................... 25

III.    Plaintiffs' claims raise non-justiciable political questions. .............................................. 27

IV.     Plaintiffs' Negligent-Supervision Claim Must Be Dismissed. ......................................... 31

A.    Plaintiffs' tort claim cannot arise under the ATS because that statute does not waive the United States' sovereign immunity.................................................32

B.    Plaintiffs' negligent-supervision claim also fails under the FTCA. .............................32

CONCLUSION.................................................................................................................................34

# TABLE OF AUTHORITIES

**Cases**

*Abulhawa v. Dep't of Treasury,*
239 F. Supp. 3d 24 (D.D.C. 2017) ........................................................................... 17, 20

*Abusharar v. Hagel,*
77 F. Supp. 3d 1005 (C.D. Cal. 2014) ............................................................................ 27

*Aerotrade Inc. v. Agency for Int'l Dev.,*
387 F. Supp. 974 (D.D.C. 1974) ............................................................................ 22, 30

*Afifi v. Lynch,*
101 F. Supp. 3d 90 (D.D.C. 2015) ................................................................................. 21

*Allen v. Wright,*
468 U.S. 737 (1984) ...................................................................................................... 18

*Al-Aulaqi v. Obama,*
727 F. Supp. 2d 1 (D.D.C. 2010) ............................................................................ 27, 28

*Al-Tamimi v. Adelson,*
916 F.3d 1 (D.C. Cir. 2019) .......................................................................................... 28

*Am. Freedom L. Ctr. v. Obama,*
821 F.3d 44 (D.C. Cir. 2016) ............................................................................ 16, 18, 19

*Am. Jewish Cong. v. Vance,*
575 F.2d 939 (D.C. Cir. 1978) ...................................................................................... 27

*Am. Lung Ass'n v. Env't Prot. Agency,*
985 F.3d 914 (D.C. Cir. 2021) ...................................................................................... 17

*Arpaio v. Obama,*
797 F.3d 11 (D.C. Cir. 2015) ............................................................................ 12, 16, 17

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ...................................................................................................... 10

*Atl. Tele-Network, Inc. v. Inter-Am. Dev. Bank,*
251 F. Supp. 2d 126 (D.D.C. 2003) ........................................................................ 21, 22

*Baker v. Carr,*
369 U.S. 186 (1962) .................................................................................... 27, 28, 30, 31

*Banneker Ventures, LLC v. Graham,*
798 F.3d 1119 (D.C. Cir. 2015) .................................................................................... 10

*Bega v. Jaddou,*
2022 WL 17403123 (D.D.C. Dec. 2, 2022) .................................................................. 11

*Bernstein v. Kerry*,
   962 F. Supp. 2d 122 (D.D.C. 2013) ............................................................. 18, 21

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................ 10

*Bennett v. Spear*,
   520 U.S. 154 (1997) ...................................................................................... 16, 26

*Biafra v. Blinken*,
   639 F. Supp. 3d 79 (D.D.C. Oct. 31, 2022) .................................................. *passim*

*Campbell v. Clinton*,
   203 F.3d 19 (D.C. Cir. 2000) .............................................................................. 31

*Carik v. Dep't of Health & Human Servs.*,
   4 F. Supp. 3d 41 (D.D.C. 2013) .......................................................................... 14

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
   333 U.S. 103 (1948) ............................................................................................ 29

*Cierco v. Mnuchin*,
   857 F.3d 407 (D.C. Cir. 2017) ............................................................................ 11

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ........................................................................................ 12, 14

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ...................................................................... 11, 12, 13, 16

*Conf. of State Bank Supervisors v. Off. of Comptroller of Currency*,
   313 F. Supp. 3d 285 (D.D.C. 2018) .................................................................... 14

*Corrie v. Caterpillar, Inc.*,
   503 F.3d 974 (9th Cir. 2007) ........................................................................ 28, 29

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000) ............................................................................................ 29

*Ctr. for Bio. Diversity v. Dep't of Interior*,
   563 F.3d 466 (D.C. Cir. 2009) ............................................................................ 17

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) ............................................................................................ 10

*Dalton v. Spencer*,
   511 U.S. 462 (1994) ............................................................................................ 24

*Dearth v. Holder*,
   641 F.3d 499 (D.C. Cir. 2011) ............................................................................ 12

*Dickson v. Ford*,
   521 F.2d 234 (5th Cir. 1975) .............................................................................. 30

*Dist. No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n v. Mar. Admin.,*
    215 F.3d 37 (D.C. Cir. 2000) ............................................................ 24

*Drake v. FAA,*
    291 F.3d 59 (D.C. Cir. 2002) ............................................................ 23

*El–Shifa Pharma. Indus. Co. v. United States,*
    607 F.3d 836 (D.C. Cir. 2010) .................................................... 27, 29

*Elec. Privacy Info. Ctr. v. Dep't of Educ.,*
    48 F. Supp. 3d 1 (D.D.C. 2014) .................................................. 14, 19

*Elec. Privacy Info. Ctr. v. Fed. Aviation Admin.,*
    892 F.3d 1249 (D.C. Cir. 2018) ........................................................ 16

*Epps v. Howes,*
    2007 WL 2248072 (D.D.C. Jul. 31, 2007) ........................................ 34

*FAA v. Cooper,*
    566 U.S. 284 (2012) .......................................................................... 32

*FDIC v. Meyer,*
    510 U.S. 471 (1994) .......................................................................... 32

*Fed. Forest Res. Coal. v. Vilsack,*
    100 F. Supp. 3d 21 (D.D.C. 2015) .............................................. 18, 19

*Fla. Audubon Soc. v. Bentsen,*
    94 F.3d 658 (D.C. Cir. 1996) ............................................................ 16

*Food & Water Watch, Inc. v. Vilsack,*
    808 F.3d 905 (D.C. Cir. 2015) .......................................................... 13

*Franklin-Mason v. Mabus,*
    742 F.3d 1051 (D.C. Cir. 2014) ........................................................ 31

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) .......................................................................... 24

*Fryshman v. U.S. Comm'n for Pres. of Am.'s Heritage Abroad,*
    422 F. Supp. 3d 1 (D.D.C. 2019) ...................................................... 18

*GAF Corp. v. United States,*
    818 F.2d 901 (D.C. Cir. 1987) .......................................................... 33

*Gregory v. Mitchell,*
    634 F.2d 199 (5th Cir. 1981) ............................................................ 33

*Harbury v. Hayden,*
    522 F.3d 413 (D.C. Cir. 2008) ................................................ 28, 29, 34

*Heckler v. Chaney,*
    470 U.S. 821 (1985) .................................................................. 22, 23, 25

*Hildreth v. Obama,*
    950 F. Supp. 2d 63 (D.D.C. 2013) ................................................................. 33, 34

*In re Domestic Airline Travel Antitrust Litig.,*
    221 F. Supp. 3d 46 (D.D.C. 2016) ................................................................. 10

*Industria Panificadora, S.A. v. United States,*
    957 F.2d 886 (D.C. Cir. 1992) ....................................................................... 32

*Japan Whaling Ass'n v. Am. Cetacean Soc'y,*
    478 U.S. 221 (1986) ....................................................................................... 27

*Jerome Stevens Pharms., Inc. v. FDA,*
    402 F.3d 1249 (D.C. Cir. 2005) .................................................................. 10, 15

*Jesner v. Arab Bank, PLC,*
    138 S. Ct. 1386 (2018) .................................................................................... 32

*Joorabi v. Pompeo,*
    464 F. Supp. 3d 93 (D.D.C. 2020) ............................................................... 10

*Kareem v. Haspel,*
    986 F.3d 859 (D.C. Cir. 2021) .................................................................. 13, 14

*Lane v. Pena,*
    518 U.S. 187 (1996) ....................................................................................... 32

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State,*
    104 F.3d 1349 (D.C. Cir. 1997) ................................................................ 23, 24

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .................................................................................. *passim*

*Lujan v. National Wildlife Federation,*
    497 U.S. 871 (1990) ....................................................................................... 27

*Mac'Avoy v. Smithsonian Inst.,*
    757 F. Supp. 60 (D.D.C. 1991) ..................................................................... 33

*Marshall v. Reno,*
    915 F. Supp. 426 (D.D.C. 1996) ................................................................... 32

*McConnell v. FEC,*
    540 U.S. 93 (2003) ......................................................................................... 15

*McNeil v. United States,*
    508 U.S. 106 (1993) ....................................................................................... 33

*Mobarez v. Kerry,*
    187 F. Supp. 3d 85 (D.D.C. 2016) ............................................................... 29

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) .................................................................................... 26, 27

*Nyambal v. Mnuchin*,
   245 F. Supp. 3d 217 (D.D.C. 2017) ................................................................................ 21

*Perez v. United States*,
   8 F.4th 1095 (9th Cir. 2021) .......................................................................................... 32

*Presidential Bank, FSB v. 1733 27th St. SE LLC*,
   271 F. Supp. 3d 163 (D.D.C. 2017) ............................................................................... 10

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
   489 F.3d 1279 (D.C. Cir. 2007) ........................................................................... 11, 13, 21

*Pub. Emps. For Env't Resp. v. Bernhardt*,
   No. 18-cv-1547-JDB, 2020 WL 601783 (D.D.C. Feb. 7, 2020) ...................................... 14

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*,
   324 F.3d 726 (D.C. Cir. 2003) ....................................................................................... 26

*Sanchez-Espinoza v. Reagan*,
   770 F.2d 202 (D.C. Cir. 1985) ....................................................................................... 32

*Scenic Am., Inc. v. Dep't of Transp.*,
   836 F.3d 42 (D.C. Cir. 2016) ......................................................................................... 20

*Schlesinger v. Reservists Committee to Stop the War*,
   418 U.S. 208 (1974) ...................................................................................................... 27

*Schneider v. Kissinger*,
   412 F.3d 190 (D.C. Cir. 2005) ................................................................................. 28, 29

*Siegel v. Dep't of Treasury*,
   304 F. Supp. 3d 45 (D.D.C. 2018) ........................................................................... 18, 21

*Smith v. Scalia*,
   44 F. Supp. 3d 28 (D.D.C. 2014) ................................................................................... 32

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004) ................................................................................................. 32, 34

*Spacil v. Crowe*,
   489 F.2d 614 (5th Cir. 1974) ......................................................................................... 29

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ...................................................................................................... 11

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ...................................................................................................... 13

*Swanson Grp. Mfg. LLC v. Jewell*,
   790 F.3d 235 (D.C. Cir. 2015) ....................................................................................... 11

*Talenti v. Clinton*,
   102 F.3d 573 (D.C. Cir. 1996) .................................................................................. 21, 31

*Tozzi v. Dep't of Health & Human Servs.*,
   271 F.3d 301 (D.C. Cir. 2001) ........................................................................... 16

*Trudeau v. FTC*,
   456 F.3d 178 (D.C. Cir. 2006) ........................................................................... 22

*Turlock Irr. Dist. v. FERC*,
   786 F.3d 18 (D.C. Cir. 2015) ............................................................................. 17

*United States v. Curtiss–Wright Export Corp.*,
   299 U.S. 304 (1936) ............................................................................... 28, 30

*United States v. Mitchell*,
   445 U.S. 535 (1980) ........................................................................................... 32

*United States v. Mitchell*,
   463 U.S. 206 (1983) ........................................................................................... 31

*United States v. Texas*,
   599 U.S. 670 (2023) ........................................................................................... 25

*Vacek v. U.S. Postal Serv.*,
   447 F.3d 1248 (9th Cir. 2006) ........................................................................... 33

*Ward v. D.C. Dep't of Youth Rehab. Servs.*,
   768 F. Supp. 2d 117 (D.D.C. 2011) .................................................................. 10

*Webster v. Doe*,
   486 U.S. 592 (1988) ........................................................................................... 23

*West v. Lynch*,
   845 F.3d 1228 (D.C. Cir. 2017) ........................................................................ 20

*Westbay Steel, Inc. v. United States*,
   970 F.2d 648 (9th Cir. 1992) ............................................................................. 33

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990) ................................................................................... 12, 16

*Williams v. Lew*,
   819 F.3d 466 (D.C. Cir. 2016) ........................................................................... 12

*Zhu v. Gonzales*,
   411 F.3d 292 (D.C. Cir. 2005) ........................................................................... 23

*Ziglar v. Abbasi*,
   137 S. Ct. 1843 (2017) ....................................................................................... 28

**U.S. Constitution**

Art. II, §§ 1, 2 .......................................................................................................... 28

U.S. Const. art. I, § 8 ............................................................................................... 28

**Statutes**

5 U.S.C. § 551 ............................................................................................................... 26

5 U.S.C. § 701 ............................................................................................................ 1, 22

5 U.S.C. § 704 ...................................................................................................... 2, 22, 26

5 U.S.C. § 706 ............................................................................................................... 26

5 U.S.C. §§ 702, 704 ..................................................................................................... 22

22 U.S.C. § 2304 ........................................................................................... 6, 7, 24, 30

22 U.S.C. § 2751 ........................................................................................... 1, 2, 3, 24

22 U.S.C. § 2752 ............................................................................................... 4, 23, 24

22 U.S.C. § 2753 .................................................................................................. passim

22 U.S.C. § 2754 ............................................................................................................. 3

22 U.S.C. § 2762 ........................................................................................................... 15

22 U.S.C. § 2776 ............................................................................................... 4, 5, 30

22 U.S.C. § 2778 ........................................................................................... 2, 5, 6, 25

22 U.S.C. § 2785 ..................................................................................................... 3, 26, 27

22 U.S.C. § 2791 ........................................................................................................... 25

28 U.S.C. § 1346 ................................................................................................... 31, 33

28 U.S.C. § 2401 ................................................................................................... 33, 34

28 U.S.C. § 2675 ........................................................................................................... 33

28 U.S.C. § 2680 ........................................................................................................... 34

**Rules**

Federal Rule of Civil Procedure 12 ............................................................................. 10

**Other Authorities**

38 Fed. Reg. 7211 (Mar. 19, 1973) .............................................................................. 8

Cong. Research Serv., RL31675, Arms Sales: Congressional Review Process (2022), Reports
RL31675,
     https://crsreports.congress.gov/product/pdf/RL/RL31675 ........................................ 5

Dep't of State, *End Use Monitoring of U.S.-Origin Defense Articles* (Jan. 20, 2021),
     https://www.state.gov/end-use-monitoring-of-u-s-origin-defense-articles/ ................. 6

Dep't of State, *U.S. Arms Sales and Defense Trade* (Jan. 20, 2021),
     https://www.state.gov/end-use-monitoring-of-u-s-origin-defense-articles/ ................. 3

Dep't of State, *U.S. Security Cooperation With the United Arab Emirates* (June 25, 2021),
     https://www.state.gov/u-s-security-cooperation-with-the-united-arab-emirates/ .......... 7

Dep't of State, *U.S. Security Cooperation With Saudi Arabia* (Jan. 20, 2021),

https://www.state.gov/u-s-security-cooperation-with-saudi-arabia/ ................................................ 7

DSCA, SAMM C2.1.6.2, *FMS Training*,
https://samm.dsca.mil/chapter/chapter-2 .......................................................................... 15

DSCA, SAMM C4.4.1, *Source of Supply*,
https://samm.dsca.mil/chapter/chapter-4 .......................................................................... 15

DSCA, Security Assistance Management Manual (SAMM) C4.1, *Who May Purchase Using the FMS Program*,
https://samm.dsca.mil/chapter/chapter-4 .......................................................................... 3

DSCA, Security Assistance Management Manual (SAMM) C8, *End Use Monitoring*,
*available at* https://samm.dsca.mil/chapter/chapter-8 ....................................................... 6

*Global Conflict Tracker: War in Yemen*, Council on Foreign Relations (Jul. 31, 2023),
https://www.cfr.org/global-conflict-tracker/conflict/war-yemen#RecentDevelopments-2 ..... 15

U.S. Dep't of State, Dubai Regional Hub, *Special Online Press Briefing with Tim Lenderking, U.S. Special Envoy for Yemen* (Aug. 23, 2023),
https://www.state.gov/special-online-press-briefing-with-tim-lenderking-u-s-special-envoy-for-yemen/ ................................................................................................................ 15

## INTRODUCTION

Plaintiffs, seven Yemeni citizens, allege that they were injured by airstrikes in Yemen in 2015 and 2016 carried out by a Coalition of nine countries, including the Kingdom of Saudi Arabia and the United Arab Emirates (UAE), supporting the Yemini government during the conflict in Yemen. Compl. ¶¶ 1-3. The Department of State and Department of Defense (DOD) have authorized arms sales to these two strategic partners under the foreign military sales provisions of the Arms Export Control Act (AECA), 22 U.S.C. § 2751, *et seq.* Plaintiffs claim that these arms sales, and an alleged failure by these agencies to monitor the end-use of those weapons, caused their injuries. As relief, Plaintiffs ask this Court to enjoin *all* future military sales of defense articles from the United States to both countries. Compl. ¶ 228. Plaintiffs also request an injunction compelling State and DOD to conduct "a full investigation" into the end-use of weapons sold to Saudi Arabia and the UAE, as well as Court-ordered "restrictions on future sales." *Id.* This relief is unavailable, and Plaintiffs' claims against the federal defendants, that is, the Secretaries of State and Defense, should be dismissed.

To begin, Plaintiffs lack Article III standing to challenge (1) the authorization of sales of defense articles and services to Saudi Arabia and the UAE; (2) and State's and DOD's end-use monitoring programs. Plaintiffs' assertions of harm—which according to the allegations in Plaintiffs' own Complaint, rely on the independent actions of Saudi Arabia, the UAE, and other Coalition countries not party to this lawsuit—are insufficient to demonstrate injury, causation, or redressability. Their allegations fail to demonstrate that Plaintiffs face an imminent risk of injury as a result of State's or DOD's actions; that Plaintiffs' injury was traceable to, much less caused by State or DOD; or that an order against State or DOD would redress any such injury.

More fundamentally, however, Plaintiffs ask this Court to substitute its judgment for that of the Executive Branch in determining whether to authorize the sale of arms to Saudi Arabia and the UAE, two of the United States' strategic partners in the Middle East, and how and whether to conduct end-use monitoring of weapons sold to these countries. The Court should not do so. Whether to approve arm sales is a decision "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and is therefore not subject to challenge under the Administrative Procedure Act (APA). And end-use

1

monitoring is not "final agency action," *id.* § 704, and so, similarly, is not subject to challenge under the APA.  Additionally, this Court lacks jurisdiction over Plaintiffs' negligent-supervision claim.

Plaintiffs' claims also raise nonjusticiable political questions. By requesting that the Court declare that the Government's sales authorizations were arbitrary and capricious and enjoin future sales, Plaintiffs effectively ask the Court to substitute its judgment for that of the Executive and Legislative Branches regarding the delicate decision of whether the United States should sell defense articles and services to Saudi Arabia and the UAE.  But such decisions rest on complex foreign policy and national security judgments; they are committed under the Constitution, and the AECA itself, to the political branches and are not justiciable.  The Court should therefore dismiss all claims against the federal defendants.

## STATUTORY BACKGROUND

The sale of U.S. military weapons to a foreign government involves a complex and delicate balance of frequently shifting national security and foreign policy concerns.  Reflecting these concerns, and the different branches' comparative advantages in addressing these concerns, the Arms Export Control Act (AECA) commits these decisions to the political branches.  Congress assigned primary responsibility over such a determination to the Executive Branch.  But that authority is far from unchecked: Congress retained for itself significant supervisory authority over foreign military sales and exports of weapons, including the power to "hold" or restrict any sales subject to the President's override in particular circumstances.

## I.    Sale of Defense Articles Under the Arms Export Control Act

### A.  Arms Export Control Act

The AECA provides the authority for the sale of defense articles and defense services from the United States government to certain foreign governments (otherwise known as "foreign military sales," "FMS," or "government to government sales").  *See* 22 U.S.C. § 2751, *et seq.*  The AECA also authorizes and provides for the regulation of direct commercial sales (DCS) from U.S. companies to foreign governments or foreign persons.  *Id.* § 2778.  Relevant here, the AECA requires that the "President shall establish" a program for the "end-use monitoring" (EUM) of defense articles sold

through foreign military sales and direct commercial sales. *Id.* § 2785. [1] This EUM program is intended to "improve accountability" of defense articles and serves sold or exported, *id.* § 2785(a)(1), and sets certain requirements "to the extent practicable" for end-use monitoring programs. *Id.* § 2785(a)(2).

The AECA recognizes the foreign policy and national security interests in permitting the United States to sell defense articles and services to certain friendly countries and international organizations in order "to facilitate the common defense . . . to achieve specific national defense requirements and objectives of mutual concern" and to ensure the "operational compatibility of [the United States'] defense equipment" with its allies. *Id.* § 2751. The AECA provides further that "[d]efense articles and defense services shall be sold or leased by the United States Government . . . . to friendly countries solely for internal security, for legitimate self-defense," for the purpose of enabling the recipient country to participate in collective security or U.N. requested missions, or for the purpose of the construction of public works. *Id.* § 2754.

### 1.    Foreign Military Sales

A foreign military sale is initiated from a request by a foreign government to purchase a particular defense article or service. As a prerequisite to any sale, the foreign country requesting such sale must have been subject to a Presidential determination that "the furnishing of defense articles and defense services to [that] country . . . will strengthen the security of the United States and promote world peace."[2] *Id.* § 2753(a)(1). If the foreign government meets that and other prerequisites in the AECA, *id.* § 2753(a)(2)–(4), the State Department, in coordination with the Defense Security Cooperation Agency (DSCA), reviews the foreign government's request. Congress charged the Secretary of State, or his designee, to determine whether there will be a foreign military sale, and, if

---

[1] *See also* Dep't of State, *U.S. Arms Sales and Defense Trade* (Jan. 20, 2021), https://www.state.gov/end-use-monitoring-of-u-s-origin-defense-articles/

[2] The AECA does not require the President to make a determination that each sale of specific defense articles or services to a foreign country will strengthen the security of the United States and promote world peace. Rather, the Act permits the sale of defense articles and services to a country once the President has made a determination that the prospective purchaser is eligible for such sale. *See* 22 U.S.C. § 2753(a); *see also* DSCA, Security Assistance Management Manual (SAMM) C4.1, *Who May Purchase Using the FMS Program*, https://samm.dsca.mil/chapter/chapter-4.

so, the amount of the sale, taking into account whether "the foreign policy of the United States would be best served thereby." *Id.* § 2752(b).

To ensure proper Legislative Branch oversight of such sales, the AECA requires that the Executive Branch notify Congress before entering into an agreement for the sale of certain defense articles or services. *Id.* § 2776(b). For example, for a foreign military sale of defense articles or services valued at $50 million or more to the government or Saudi Arabia or the UAE, Congress must be formally notified at least 30 calendar days before the sale can be finalized. *Id.* DSCA submits the required formal notification to the Chairperson of the Senate Foreign Relations Committee, the Speaker of the House of Representatives, and the House Foreign Affairs Committee, and that notification is also published in the Federal Register. *Id.* § 2776(b)(1), (f)(1). The congressional notification informs Congress of the prospective purchaser, the agency making the offer, any gifts or offsets, and the total estimated value of the sale and provides a description of and quantity of the defense articles or services involved in the prospective sale. *Id.* § 2776(b)(1) (referring to the provision of "information specified in clauses (i) through (iv) of subsection (a)"). The notification also "contain[s] an item, classified if necessary, identifying the sensitivity of the technology . . . and a detailed justification of the reasons necessitating the sale of such articles or services in view of the sensitivity of such technology." *Id.* Finally, if the sale is to be made to a country in the Middle East, the notification must include a determination that the sale of the defense articles or services "will not adversely affect Israel's qualitative military edge over military threats to Israel." *Id.* § 2776(h)(1). The Senate Committee on Foreign Relations or the House Committee on Foreign Affairs may "request" an additional report that contains, among other things, a Department of State evaluation of the manner in which the proposed sale would "contribute to an arms race," "support international terrorism," or "increase the possibility of an outbreak or escalation of conflict." *Id.* § 2776(b)(1). Absent a request from the appropriate committee, however, the AECA does not mandate such reports. *See id.*

Under the statutory scheme, Congress reserved for itself the authority to disapprove arms sales. Congress need not act to approve each sale; rather, Congress may "enact[] a joint resolution prohibiting the proposed sale[]." *Id.* § 2776(b)(1)(P). If Congress enacts such a joint resolution, the

Executive Branch may not proceed with the sale unless the President vetoes the joint resolution and Congress does not override the veto.  *Id.* § 2776(b)(1).  However, if Congress does not enact such a joint resolution to block the sale within 30 calendar days of receiving formal notice of the proposed sale, the Executive Branch may proceed with the sale.  *Id.*

If the congressional notification period runs without an enacted joint resolution of disapproval, DSCA may implement the sale.  If a sale proceeds, a representative from the foreign government and a representative from the Department of Defense sign a Letter of Offer and Acceptance (LOA), in which Executive Branch offers to sell defense articles or services to the foreign government under the terms specified in the LOA, and the foreign government accepts that offer. The actual sale and transfer of defense articles or services may not necessarily occur right away, or at all.  Congress can also request to be notified prior to the shipment of arms, *id.* § 2776(i), and, even after the 30-day statutory period, can enact separate legislation to block any sales.

In addition to the formal notification process described above, the State and Defense Departments informally engage with Congress prior to the formal statutory process.  The informal process, called "tiered review," provides information for the relevant committees between 20 and 40 days before receiving a formal notification, and if any member of those committees requests a "hold" on a sale, the formal notification will generally not proceed until the member's questions or concerns are addressed.[3]

### 2.     Direct Commercial Sales

The AECA also provides authority for the private commercial sale and export of defense articles and services from private companies in the United States to foreign governments or foreign persons (DCS).  AECA provides that "[i]n furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services," *id.* § 2778(a)(1), and provides further that no such articles or services designated by the President "may be exported . . . without a license for such export . . . issued in

---

[3] Cong. Research Serv., RL31675, Arms Sales: Congressional Review Process (2022), Reports RL31675, https://crsreports.congress.gov/product/pdf/RL/RL31675.

accordance with" the AECA and its implementing regulations. *Id.* § 2778(b)(2); *see id.* § 2778(a)(2) (setting forth criteria to be considered in issuing export licenses). Similar to the process described above, *see supra* at pages 4-5, Congress can place a "hold" on a proposed export during the informal tiered review process, or restrict direct commercial sales if it enacts a joint resolution after a formal congressional notification.

### B. End-Use Monitoring of U.S. Origin Defense Articles

The AECA directs the President to "establish a program which provides for the end-use monitoring" of defense articles and services sold, leased, or exported. *Id.* § 2785(a)(1).[4] "To the extent practicable" the end-use monitoring program "shall be designed to provide reasonable assurance that" the recipient of the arms complies with requirements imposed by the United States and that the articles and services are being used for the purposes they were provided. *Id.* § 2785(a)(2). Congress also directed the President to provide a report to Congress each year "describing the actions taken to implement" the end-use monitoring program, "including a detailed accounting of the costs and number of personnel associated with the monitoring program and the numbers, range, and findings of end-use monitoring of United States transfers of small arms and light weapons." *Id.* § 2785(c).

## II.     The Foreign Assistance Act

Section 502B of the Foreign Assistance Act of 1961 (codified at 22 U.S.C. § 2304), separately restricts "security assistance," (as it is defined in § 2304), to "any country the government of which engages in a consistent pattern of gross violations of internationally recognized human rights," subject to certain exceptions. 22 U.S.C. § 2304(a)(2). For example, a restriction on security assistance may

---

[4] Through the delegation by the President in Executive Order 13,637, the Executive Branch has established two end-use monitoring programs: (1) the Blue Lantern Program, which monitors Direct Commercial Sales between private companies in the United States and foreign governments administered by the State Department, and (2) the Golden Sentry Program, which monitors foreign military sales between the U.S. Government and foreign governments, administered by DOD. *See* DSCA, Security Assistance Management Manual (SAMM) C8, *End Use Monitoring, available at* https://samm.dsca.mil/chapter/chapter-8; *see also* Dep't of State, *End Use Monitoring of U.S.-Origin Defense Articles* (Jan. 20, 2021), https://www.state.gov/end-use-monitoring-of-u-s-origin-defense-articles/.

be lifted if "the President certifies" to Congress that "extraordinary circumstances exist warranting provision of such assistance." *Id.*[5]

"Security assistance," as it is defined in § 2304, includes foreign military sales under the AECA, *id.* § 2304(d)(2)(B); "assistance under part II (military assistance) or part IV (economic support fund) or part V (military education and training) or part VI (peacekeeping operations) or part VIII (antiterrorism assistance) of [subchapter II of Title 22], *id.* § 2304(d)(2)(A); and items licensed under the International Traffic in Arms Regulation or the Commerce Control List, *id.* § 2304(d)(2)(C). "Gross violations of internationally recognized human rights" is defined as "torture or cruel, inhuman, or degrading treatment or punishment, prolonged detention without charges and trial, causing the disappearance of persons by the abduction and clandestine detention of those persons, and other flagrant denial of the right to life, liberty, or the security of person." *Id.* § 2304(d)(1).

## FACTUAL BACKGROUND AND PROCEDURAL POSTURE

### I.   The State Department and DOD's authorizations to Sell Defense Articles to Saudi Arabia and the UAE.

Saudi Arabia and the UAE have long been significant security partners for the United States and the countries are "working collectively toward the common goal of a stable, secure, and prosperous Middle East." *See* Dep't of State, *U.S. Security Cooperation With Saudi Arabia* (Jan. 20, 2021), https://www.state.gov/u-s-security-cooperation-with-saudi-arabia/; *see also* Dep't of State, *U.S. Security Cooperation With the United Arab Emirates* (June 25, 2021), https://www.state.gov/u-s-security-cooperation-with-the-united-arab-emirates/. Saudi Arabia "is a vital U.S. partner on a wide range of regional security issues, and a founding member of the Global Coalition to Defeat ISIS." *Id.* In 2019, the United States and the UAE entered into a defense cooperation agreement, which underscored the two countries' "vital and longstanding collaboration in defeating terrorist groups, such as ISIS and al-Qa'ida, securing regional stability, and combatting threats against their common interests including terrorist financing." *Id.*

---

[5] Congress may request additional information about the human rights situation in a country receiving security assistance. 22 U.S.C. § 2304(c).

Foreign military sales to Saudi Arabia and the UAE have been a part of the countries' longstanding partnerships with the United States.[6]  Indeed, presidential authorization of foreign military sales to Saudi Arabia and the UAE dates back to 1973, when President Nixon issued, through a memorandum to the Secretary of State, a Presidential Determination concerning the sale of defense articles and services to these countries, as well as to other countries and organizations.  Presidential Determination No. 73-10, 38 Fed. Reg. 7211 (Mar. 19, 1973).  That Presidential Determination stated that, in accordance with the then-Secretary of State's recommendation, the sale of defense articles and services to Saudi Arabia and the UAE "will strengthen the security of the United States and promote world peace."  *Id.*  That Presidential Determination is still in effect today and continues to fulfill one of the prerequisites for foreign military sales to Saudi Arabia and the UAE.  *See* 22 U.S.C. § 2753(a).

## II.    This Lawsuit

On March 2, 2023, Plaintiffs, seven Yemeni citizens, filed a Complaint on behalf of themselves and others similarly situated, challenging the State Department (State) and DOD's authorization of all arms sales to Saudi Arabia and the UAE.  *See* Compl.[7]

Plaintiffs allege to be "representative victims among the Yemeni civilians" who have suffered "bodily harm and property loss" during the conflict in Yemen[8] "due to attacks by the Coalition on civilians with U.S.-made arms," and who were harmed by "the U.S. government's unlawful decision to approve arms sales contracts" to Saudi Arabia and the UAE. Compl. ¶¶ 5, 238.[9]  In particular, five of the Plaintiffs, Mr. Amin Allawi Ali, Mr. Ayman Mhamad Saleh Al Sanabani, Mr. Khaled Ali Salem

---

[6]  *See* DCSA, https://www.dsca.mil/search/node?keys=saudi (listing prior proposed foreign military sales to Saudi Arabia); *see also* DCSA, https://www.dsca.mil/search/node?keys=uae (listing prior proposed foreign military sales to the UAE).

[7]  Plaintiffs also bring claims against Raytheon, Lockheed Martin, General Dynamics, and certain officials of Saudi Arabia and the UAE.

[8]  As described in the Complaint, the conflict in Yemen is between the Coalition, including the Yemini government, and the Houthi rebels. Compl. ¶¶ 1-3.

[9]  The Coalition includes the UAE, Saudi Arabia, Bahrain, Egypt, Jordan, Kuwait, Morocco, Senegal, and Sudan. Compl. ¶ 2.

Chaib, Ms. Fatima Mhamad Al Bayahi AL Kharabi, and Ms. Yousra Abd El Aziz Mhamad Aamad, allege they are "victims of the horrific bombing of a wedding in the village of Sanaban on October 7, 2015," *id.* ¶ 11, carried out pursuant to the commands and strategies of "Saudi Arabian and UAE military leaders," in Yemen, *id.* ¶ 37. The other two Plaintiffs, Mr. Ali Ahmad Ali Abad Al Roweishan and Mr. Mhamad Ali Hamoud Al Roweishan, allege they are "representative victims of horrific bombing of a funeral in Sana'a on October 8, 2016," *id.* ¶ 12, carried out pursuant to the commands and strategies of "Saudi Arabian and UAE military leaders," in Yemen, *id.* ¶ 37. Plaintiffs have sued Secretary of State Antony Blinken and Secretary of Defense Lloyd Austin III, in their official capacities.

Plaintiffs bring three claims against State and DOD, and ultimately seek an injunction from this Court to prevent all future arms sales to Saudi Arabia and the UAE. First, Plaintiffs allege that State and DOD's approvals of arms sales are arbitrary and capricious under the Administrative Procedure Act (APA). *Id.* ¶ 6 (Count 5). Second, Plaintiffs also appear to challenge under the APA the State Department and DOD's alleged failure to "sufficiently investigate[] the end-use of U.S.-made arms." *Id.* ¶ 228; *see also id.* ¶ 227 (alleging that the departments "have not fully determined the extent to which U.S. military support provided to Saudi Arabia and UAE has contributed to civilian harm in Yemen") (Count 5). Third, Plaintiffs bring a tort claim, alleging that "[t]he State Department and the Department of Defense… had the duty and ability to cease operations until such time as the violations alleged [in the Complaint] were stopped and/or prevented," and their failure to do so amounted to "negligent supervision." *Id.* ¶¶ 238-40 (Count 7).

As relief for the APA claims, Plaintiffs request that the Court enter an injunction requiring that "State and DOD cease all further military sales to the Coalition parties." *Id.* ¶ 228. Plaintiffs also request an injunction compelling State and DOD to conduct "a full investigation … to determine whether prior sales were in violation of the law," as well as Court-ordered "restrictions on future sales to require full compliance with the law." *Id.* As for the negligent-supervision claim, Plaintiffs contend they are entitled "to damages in amounts to be ascertained at trial." *Id.* ¶ 240.

## LEGAL STANDARD

Plaintiffs bear the burden of demonstrating the Court possesses jurisdiction and they have standing to invoke that jurisdiction.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  It is "presume[d] that federal courts lack jurisdiction unless the contrary appears affirmatively from the record."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (citation omitted).  Defendants move to dismiss the Complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  On such motions, the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction."  *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

Defendants also move to dismiss the Complaint under Rule 12(b)(6).  To avoid dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim crosses from conceivable to plausible when it contains factual allegations that, if proved, would 'allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (alteration omitted) (quoting *Iqbal*, 556 U.S. at 678).

"[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," however, and "courts are not obligated to accept as true a legal conclusion couched as a factual allegation."  *Joorabi v. Pompeo*, 464 F. Supp. 3d 93, 98–99 (D.D.C. 2020) (quotation omitted); *see also Presidential Bank, FSB v. 1733 27th St. SE LLC*, 271 F. Supp. 3d 163, 169 (D.D.C. 2017) ("The court need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations." (citation omitted)).  Courts "may consider 'the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint,' or 'documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss.'"  *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 54–55 (D.D.C. 2016) (quoting *Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C. 2011)).  Courts may also take judicial

notice of "factual content found on official public websites of government agencies." *Bega v. Jaddou*, 2022 WL 17403123, at *3 (D.D.C. Dec. 2, 2022) (collecting cases).

## ARGUMENT

### I.    Plaintiffs Lack Article III Standing to Challenge the State Department's and DOD's Decisions to Authorize Sales of Defense Articles and Services to Saudi Arabia and the UAE.

"[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). Standing is a fundamental element of this limitation that is "built on separation-of-powers principles" and "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id.*

Plaintiffs bear the burden of establishing the three elements that constitute the "irreducible constitutional minimum of standing," *Lujan*, 504 U.S. at 560—namely, that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "[S]tanding is 'substantially more difficult to establish' where, as here, the parties invoking federal jurisdiction are not 'the object of the government action or inaction' they challenge." *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1289 (D.C. Cir. 2007) (Kavanaugh, J.) (quoting *Lujan*, 504 U.S. at 562). Furthermore, a claim for "injunctive relief" carries "a significantly more rigorous burden to establish standing." *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015). Courts are "particularly reluctant to find standing where the third party upon whose conduct redressability depends is a foreign sovereign." *Cierco v. Mnuchin,* 857 F.3d 407, 419 (D.C. Cir. 2017); *see also Clapper,* 568 U.S. at 409 ("[W]e have often found a lack of standing in cases in which the Judiciary has been requested to review actions of the political branches in the field of intelligence gathering and foreign affairs.").

Plaintiffs fall far short of demonstrating Article III standing to challenge either the authorization of sales of defense articles and services to Saudi Arabia and the UAE or to challenge State and DOD's end-use monitoring programs. The Plaintiffs, who allege that they suffered injuries

"due to attacks by the Coalition," assert that their harm stems from "the U.S. Government's unlawful decision to approve arms sales contracts to the Saudi-led coalition," Compl. ¶ 5, and an alleged failure to "adopt monitoring standards," including end-use monitoring of weapons sold to Saudi Arabia and the UAE. *Id.* ¶ 164.

But Plaintiffs' claimed injuries flow from the independent actions in Yemen of Saudi Arabia, the UAE, and other Coalition countries not party to this lawsuit. Such allegations in Yemen are insufficient to establish standing as a matter of law and fail to demonstrate that Plaintiffs face an imminent risk of injury as a result of State or DOD's actions; that Plaintiffs' injury was traceable to, much less caused by State or DOD; or that an order against State or DOD would redress any such injury.

## A. Plaintiffs' allegations of past injuries are insufficient to support prospective relief.

As an initial matter, Plaintiffs' allegations of injuries that occurred in 2015 and 2016 based on military action carried out by Nations other than the United States cannot support any claim for prospective relief against the United States. Plaintiffs allege that they "suffered significant bodily harm and property loss due to attacks by the Coalition" in 2015 and 2016, Compl. ¶¶ 5, 13-25, and argue that "restrictions on future sales" and a "full investigation" into Saudi and the UAE uses of weapons are required to avoid the risk of a future attack. *Id.* ¶ 228. But a plaintiff who "'seeks prospective [ ] injunctive relief,' … may not rest on past injury" and instead "must rely on concrete and particular current or future injuries-in-fact to establish standing." *Williams v. Lew*, 819 F.3d 466, 472 (D.C. Cir. 2016) (quoting *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015)); *see also Biafra v. Blinken*, 639 F. Supp. 3d 79, 85 (D.D.C. Oct. 31, 2022) ("Although past injuries may provide some evidence of 'a real and immediate threat of repeated injury,' allegations of past harm are not enough, without more, to establish future injury." (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 109–10 (1983))); *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011) (where "plaintiffs seek declaratory and injunctive relief, past injuries alone are insufficient to establish standing"). Plaintiffs must allege more than a "possible future injury" caused by the United States to establish standing for prospective relief. *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). Indeed, Plaintiffs' speculated future injuries are even more

attenuated from their past injuries than those the Supreme Court rejected in *Lyons*:  In *Lyons*, the plaintiff had himself been subject to the challenged conduct by the defendants themselves.  Here, by contrast, the U.S. government is several steps removed from both their past injury and any speculated future injury: both the past and future injury turn on the actions of sovereign third-party Nations.

Indeed, an injury must be "'certainly impending,'" or there must be "a 'substantial risk' that the harm will occur."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper*, 568 U.S. at 409, 414 n.5).  When a plaintiff asserts an increased-risk-of-harm by the defendant's actions, a court must "consider the ultimate alleged harm," such as death or bodily injury, "as the concrete and particularized injury and then . . . determine whether the increased risk of such harm makes injury to an individual citizen sufficiently 'imminent' for standing purposes."  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 915 (D.C. Cir. 2015).  A plaintiff can satisfy that requirement only by establishing "*both* (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account."  *Pub. Citizen*, 489 F.3d at 1295.  Consequently, although the D.C. Circuit "does not completely bar increased-risk-of-harm claims," the "constitutional requirement of imminence . . . necessarily compels a very strict understanding of what increases in risk and overall risk levels can count as 'substantial.'"  *Id.* at 1296.

To satisfy the increased-risk-of-harm test here, Plaintiffs would have to show both that (1) the United States' future sales of weapons will substantially increase the risk that Plaintiffs suffer future injuries; and (2) with that increase taken into account, there is a substantial probability that Plaintiffs will suffer future injuries.  Plaintiffs cannot make either showing.  To begin, Plaintiffs have not alleged, in more than a conclusory fashion, that U.S. weapons sales were responsible for their injuries in 2015 and 2016, much less that future U.S. weapons sales or U.S.-supplied weapons, will substantially increase their risk of injury in the future.  *See Kareem v. Haspel*, 986 F.3d 859, 865 (D.C. Cir. 2021) (holding plaintiff lacked standing because the "Complaint fails to allege a sufficient factual basis to create a plausible inference that the described missile attacks were attributable to the United States and specifically targeted" the plaintiff).  Similarly, Plaintiffs offer nothing more than conclusory allegations that, had State and DOD adopted different end-use monitoring standards, these agencies

13

"would have affirmatively denied [ ] arms sales" and "thus prevented civilian deaths." Compl. ¶ 164 Plaintiffs also rely on these same past alleged harms to support Plaintiffs' assertion that "restrictions on future sales" and a "full investigation" into Saudi and UAE uses of weapons are required to avoid the risk of a future attack. *Id.* ¶ 228.

Such a conclusory presumption that an investigation or future sales between the United States and Saudi Arabia or the UAE will result in further harm to these Plaintiffs is not sufficient to establish standing against the United States. *See Biafra*, 639 F. Supp. 3d at 85 (holding that the U.S. government's delivery of an aircraft sold through FMS to the Nigerian government was not enough to demonstrate a "substantially increased risk of harm" to Plaintiffs previously harmed in Nigeran attacks) (citation omitted); *Conf. of State Bank Supervisors v. Off. of Comptroller of Currency*, 313 F. Supp. 3d 285, 296 (D.D.C. 2018) (finding that "speculative and conclusive language like 'significant risks'" was insufficient to establish standing).

Second, Plaintiffs have not made any plausible allegations that future sales will result in an increased risk of harm to civilians in Yemen. *See Pub. Emps. For Env't Resp. v. Bernhardt*, No. 18-cv-1547-JDB, 2020 WL 601783, at *7 (D.D.C. Feb. 7, 2020) ("Without crucial facts about the 'current risk' or increased risk resulting from [the agency action], plaintiffs have not established imminence, and therefore have not established injury in fact."); *Elec. Privacy Info. Ctr. v. Dep't of Educ.*, 48 F. Supp. 3d 1, 11 (D.D.C. 2014) ("[P]laintiffs provide no evidence—not even any allegations—about how much more likely they are to be the victims of identity fraud now than before the passage of the Final Rule, and they provide absolutely no information about the absolute risk that their information will be used improperly."); *Carik v. Dep't of Health & Human Servs.*, 4 F. Supp. 3d 41, 53 (D.D.C. 2013) (Plaintiffs failed to show a substantial increase in risk where they had "not attempted to quantify the increased risk of physical injury from [the agency action.]").

Plaintiffs have failed to demonstrate they remain subject to an increased risk of harm, particularly because "allegations of past harm are not enough, without more, to establish future injury." *Biafra*, 639 F. Supp. 3d at 85 (citing *Lyons*, 461 U.S. at 102). And if anything, reports from the ground suggest that the risk of future harm is decreasing. In April 2022, the United Nations brokered

a truce between the parties to the conflict in Yemen. *Global Conflict Tracker: War in Yemen*, Council on Foreign Relations (Jul. 31, 2023), https://www.cfr.org/global-conflict-tracker/conflict/war-yemen#RecentDevelopments-2.[10]  Peace talks have been ongoing since April 2023, *id.*, and as of August 2023, "Yemen has witnessed the longest period of de-escalation since the war began."  U.S. Dep't of State, Dubai Regional Hub, *Special Online Press Briefing with Tim Lenderking, U.S. Special Envoy for Yemen* (Aug. 23, 2023), https://www.state.gov/special-online-press-briefing-with-tim-lenderking-u-s-special-envoy-for-yemen/.  Of particular relevance to Plaintiffs' claims, "airstrikes have stopped." *Id.*

Additionally, for the reasons discussed below, Plaintiffs' allegation of an imminent threat of future injury caused by State and DOD's approval of arms sales to Saudi Arabia and the UAE is highly attenuated and speculative.  For any harm to occur, the defense articles first would have to be shipped to Saudi Arabia and the UAE, which could take a significant amount of time, if it even happened at all given, *inter alia*, congressional oversight regarding such sales.[11]  *See McConnell v. FEC*, 540 U.S. 93, 226 (2003) (finding that a more than four-year gap between challenge and alleged injury was "too remote temporally to satisfy Article III"), *overruled on other grounds by Citizens United v. FEC*, 558 U.S. 310 (2010).  The Plaintiffs' claim of imminent injury then depends on whether the conflict in Yemen remains ongoing when the defense articles arrive, and, if so, whether Saudi Arabian or UAE officials decide to use those particular defense articles in Yemen during an ongoing period of de-escalation, and, if they do, that Coalition forces attack areas in which Plaintiffs live and cause harm to the Plaintiffs.  It likewise assumes that Saudi Arabia and the UAE will not be able to obtain similar

---

[10] The Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." *Jerome Stevens Pharms.*, 402 F.3d at 1253.

[11] The actual delivery of the defense articles could take several years because funds must be received from the Coalition before any defense articles are delivered.  *See* 22 U.S.C. § 2762.  With a signed and funded LOA, the U.S. Government then must enter into contract negotiations with suppliers.  *See* DSCA, SAMM C4.4.1, *Source of Supply*, https://samm.dsca.mil/chapter/chapter-4.  If the suppliers do not have the defense articles in stock, or if the article must be modified to meet exportability requirements, the contractors must manufacture the articles, which, depending on the complexity of the article, could take years.  Finally, even once the articles are delivered, the Coalition must be trained to use certain articles.  *See* DSCA, SAMM C2.1.6.2, *FMS Training*, https://samm.dsca.mil/chapter/chapter-2.

weapons from other countries; that they do not have numerous weapons already in their arsenal; and that the other members of the Coalition, who are not party to this lawsuit, also do not have these weapons. These types of "allegations of *possible* future injury," *Clapper*, 568 U.S. at 409 (quoting *Whitmore*, 495 U.S. at 158 (emphasis in original)), premised on a "highly attenuated chain of possibilities" are insufficient to establish standing, *id.* at 410; *see also Arpaio*, 797 F.3d at 21; *Elec. Privacy Info. Ctr. v. Fed. Aviation Admin.*, 892 F.3d 1249, 1255 (D.C. Cir. 2018) (concluding that the "highly attenuated chain of causation presented by [the plaintiff] dooms any attempt to establish probabilistic standing").

Here, because future harm to the Plaintiffs could only occur through a series of highly speculative events that may not take place for years, if ever, and because any future harm would not arise unless third-party sovereign Nations take a series of independent actions having nothing to do with the United States, the Plaintiffs cannot show that their alleged injury is "imminent," as required to establish standing to seek prospective injunctive relief. *See Clapper*, 568 U.S. at 410–14 (concluding that the plaintiffs lacked standing because any injury would occur only after a series of independent actors exercised their judgment in a certain way).

### B. The State Department and DOD did not cause Plaintiffs' alleged injuries.

Causation requires "a causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. The harm alleged must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Bennett v. Spear*, 520 U.S. 154, 167 (1997); *see also Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) ("Causation, or traceability, examines whether it is substantially probable that the challenged acts of the defendant, not of some absent third party, will cause the particularized injury of the plaintiff."). Where, as here, "'the alleged injury flows not directly from the challenged agency action, but rather from independent actions of third parties,'" Plaintiffs must show "that 'the agency action is at least a substantial factor motivating the third parties' actions.'" *Am. Freedom L. Ctr. v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016) (quoting *Tozzi v. Dep't of Health & Human Servs.*, 271 F.3d 301, 308 (D.C. Cir. 2001)). "The more attenuated or indirect the chain of causation between the government's

conduct and the plaintiff's injury, the less likely the plaintiff will be able to establish a causal link sufficient for standing." *Ctr. for Bio. Diversity v. Dep't of Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009).

For this reason, the D.C. Circuit requires courts to "rigorously review allegations by plaintiffs who seek to invoke the subject matter jurisdiction of the federal courts based on the projected response of independent third parties to a challenged government action," *Arpaio*, 797 F.3d at 25, and has "repeatedly held that litigants cannot establish an Article III injury based on the independent actions of some third party," *Am. Lung Ass'n v. Env't Prot. Agency*, 985 F.3d 914, 990 (D.C. Cir. 2021) (quoting *Turlock Irr. Dist. v. FERC*, 786 F.3d 18, 25 (D.C. Cir. 2015)). This is because such theories of harm, which require Court "to anticipate future actions of various third parties," would "stack[] speculation upon hypothetical speculation" rather than establish an imminent injury. *Am. Lung Ass'n*, 985 F.3d at 990–91. And there can be no better example of an "independent third party" than that of a separate, sovereign Nation.

It bears emphasis that Plaintiffs ground this chain of events on speculation over the actions of third-party military officials of Saudi Arabia and the UAE military officials. *See, e.g.*, Compl. ¶ 37 ("But for the command given by and the military strategies *formulated by the named Saudi Arabian and UAE military leaders*, [Plaintiff] would not have suffered those injuries." (emphasis added)). Indeed, Plaintiffs' alleged injuries, and the future injuries Plaintiffs predict, are the direct result of airstrikes that Plaintiffs assert were ordered or will be taken by Saudi Arabia, the UAE, and the Coalition, not by the State Department or DOD. *See id.*; *see also id.* ¶¶ 5, 13-25 (allegation that Plaintiffs injuries were "due to attacks *by the Coalition*") (emphasis added). As another district court in this Circuit concluded in the face of similar allegations, Plaintiffs cannot show causation necessary to support standing where their "alleged injury does not flow directly from the [U.S. Government's] delivery of the aircraft, but from the actions of the Nigerian Government." *Biafra*, 639 F. Supp. 3d at 86.

In the foreign affairs sphere, courts have repeatedly held that Plaintiffs lack standing to challenge an action by the U.S. Government where a foreign government engaged in the alleged injurious conduct. *See, e.g.*, *id.*; *Abulhawa v. Dep't of Treasury*, 239 F. Supp. 3d 24, 35 (D.D.C. 2017) (dismissing for lack of standing because "Plaintiffs' theory of causation is based on speculation upon

17

speculation about how third parties might act" if the Department of the Treasury revoked the tax-exempt status of certain groups that support Israeli settlement expansion (citing *Allen v. Wright*, 468 U.S. 737, 757–59 (1984))); *Bernstein v. Kerry*, 962 F. Supp. 2d 122, 128–29 (D.D.C. 2013) (holding that the plaintiffs' fear of future terrorist attacks was not fairly traceable to the provision of foreign aid to the Palestinian Authority because it required the Court to "speculate on whether defendants' funding policies were in fact aiding terrorists, whether the terrorists were using these funds for activities intended to harm plaintiffs, and whether these activities [were] leading to a 'certainly impending' injury for plaintiffs"), *aff'd*, 584 F. App'x 7 (D.C. Cir. 2014).  Here, too, Plaintiffs ask this Court to speculate on how Saudi Arabia and the UAE may use defense articles procured from future sales from the United States.  But "[f]ederal courts are simply 'not well-suited to draw the types of inferences regarding foreign affairs and international responses to U.S. policy that Plaintiffs' theory of causation posits.'"  *Fryshman v. U.S. Comm'n for Pres. of Am.'s Heritage Abroad*, 422 F. Supp. 3d 1, 8 (D.D.C. 2019) (quoting *Siegel v. Dep't of Treasury*, 304 F. Supp. 3d 45, 55 (D.D.C. 2018)); *see Biafra*, 639 F. Supp. 3d at 85 (holding that plaintiffs could not trace their injury to the U.S. government's decision to sell the Nigerian government military aircraft because "[t]he Court is not well-suited to… speculation [on the decisions of third parties] in the realm of foreign affairs").

Plaintiffs' Complaint, which sometimes attributes their injuries to the entire Coalition and at other times attributes their injuries to Saudi Arabia and the UAE, "'only further demonstrates that numerous factors' and independent actors outside the [State Department's and DOD's] control" would play a role in any potential actions by Saudi Arabia and the UAE in the future.  *Fryshman*, 422 F. Supp. 3d at 8 (quoting *Siegel*, 304 F. Supp. 3d at 55).  Either way, Plaintiffs admit that their past harms were caused *by the Coalition*, and not by the United States: they allege that they have "suffered significant bodily harm… due to attacks by the Coalition on civilians."  Compl. ¶ 5.  Simply put, there are no plausible allegations in the Complaint to suggest that the State Department's authorizations of sales were, are, or will be "a substantial factor motivating" Saudi Arabia or UAE actions in the future.  *See Am. Freedom L. Ctr.*, 821 F.3d at 49; *see also Fed. Forest Res. Coal. v. Vilsack*, 100 F. Supp. 3d 21, 39–40 (D.D.C. 2015) (Brown Jackson, J.) (finding that "a pre-existing trend toward declining timber-

harvest levels clearly undermines Plaintiffs' economic injury standing argument rather than bolstering it, because that fact nullifies any assertion that the [rule] is itself the cause of the decline and the resulting economic injury").

In these circumstances, attributing the alleged harm of the Plaintiffs to the actions of the U.S. Government in authorizing arm sales to Saudi Arabia and the UAE involves an attenuated chain of causation involving the independent actions by multiple third parties. Plaintiffs allege that the State Department approved sales to Saudi Arabia and the UAE through the FMS program.  Compl. ¶ 59. DOD then "administered sales of… defense articles and defense services… to Saudi Arabia and UAE." *Id.* ¶ 57.  Independent of these arms sales, Saudi Arabia and the UAE formed a coalition with seven other countries to "take military action" in Yemen.  *Id.* ¶ 2.  The Complaint alleges that on October 7, 2015, and October 8, 2016, Plaintiffs were injured by Coalition bombs.  *Id.* ¶¶ 13-25. Plaintiffs do not include any facts supporting their allegation that the weapons used in these attacks were U.S-made and purchased with U.S. government approval through the FMS program. *Id.* ¶ 164. Plaintiffs do not allege that State or DOD were involved in any of the strategic decisions that lead to the two tragic bombings in 2015 and 2016.  Instead, Plaintiffs claim that Defendants' facilitation of arms sales to Saudi and the UAE means that Defendants are responsible for the specific harm that the Coalition inflicted on the Plaintiffs in two discrete attacks in 2015 and 2016.  *See id.*  This lengthy chain of events—which relies heavily on the decisions and actions of third parties—is "too attenuated" to support a finding that the Defendant's decisions to authorize and facilitate arms sales to Saudi Arabia and the UAE is the cause of Plaintiffs' injury.  *See Am. Freedom L. Ctr.*, 821 F.3d at 49 ("The greater number of uncertain links in a causal chain, the less likely it is that the entire chain will hold true."); *Elec. Privacy Info. Ctr.*, 48 F. Supp. 3d at 20 (finding that because plaintiffs would not suffer identity fraud unless their universities chose to disclose their personal information to third-party entities and those entities fraudulently used or disclosed that information, plaintiffs failed to show that a regulation was the cause of their injuries).

And "[e]ven assuming that the Court could find standing based on such an attenuated chain of causation … the Complaint is silent as to the capabilities of the" U.S.-provided weapons "as

compared to those already in" the Coalition's arsenal, and specifically, in the arsenal of Saudi Arabia and the UAE "or why the [Coalition] would be likely to use those [weapons] to conduct raids… in the regions where the [Plaintiffs] reside." *See Biafra*, 639 F. Supp. 3d at 85. Plaintiffs make "no allegations to support [their] conclusions" that the harm would not have befallen them if the Coalition had not purchased arms from U.S. sources. *Id.*

**C. The requested relief will not redress Plaintiffs' alleged injury.**

For similar reasons, Plaintiffs' alleged injuries are not redressable through the relief sought against Defendants. Redressability requires that it "be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561. "As with the causation analysis, when redressability 'depends on the unfettered choices made by independent actors not before the court[ ] and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict, it becomes substantially more difficult to establish standing.'" *Abulhawa*, 239 F. Supp. 3d at 36 (quoting *Scenic Am., Inc. v. Dep't of Transp.*, 836 F.3d 42, 50 (D.C. Cir. 2016)). "'Courts do not lightly speculate how independent actors not before them might' act, and, '[w]hen conjecture is necessary, redressability is lacking.'" *Id.* (quoting *West v. Lynch*, 845 F.3d 1228, 1237 (D.C. Cir. 2017)).

Even if this Court were to order Defendants to stop authorizing sales of defense articles to the UAE and Saudi Arabia—setting aside that such a remedy is not available here, *see infra*, Parts II, III—ample speculation would be required to conclude that individuals and sovereign Nations would change their behavior in response to an order from this Court against the United States, let alone change their behavior in a way that had any effect on Plaintiffs. To begin, even though Plaintiffs' Complaint alleges that their injuries were caused by the Coalition, the relief they seek against the United States would enjoin arms sales to only two of the Coalition countries. And Plaintiffs' allegations of a regional conflict stretching back to 2015, Compl. ¶ 2, make plain that even if the U.S. Government's authorizations of sales could conceivably be deemed a substantial factor in causing the alleged harm, "the undoing of the governmental action will not undo the harm, because the new status quo is held in place by other forces," namely, the independent actions by Saudi Arabia, the UAE, and

other countries who are part of the Coalition, *Renal Physicians Ass'n v. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1278 (D.C. Cir. 2007). Redressing Plaintiffs' alleged injuries therefore depends upon the actions of third parties that the court "cannot presume either to control or to predict," *Lujan*, 504 U.S. at 562, which is fatal under the redressability prong of the standing inquiry, *see Afifi v. Lynch*, 101 F. Supp. 3d 90, 110 (D.D.C. 2015).

Indeed, courts in this Circuit have repeatedly recognized that an order directing the U.S. Government to take certain actions in the foreign relations sphere would not redress a plaintiff's injuries because it is entirely speculative how foreign governments or organizations would react. *See, e.g., Biafra*, 639 F. Supp. 3d at 87 (holding that plaintiffs' injury was not redressable because the court "[could not] conclude that preventing (or even undoing) the delivery of the aircraft [to the Nigerian government] would prevent" the Nigerian government from harming the plaintiffs). For example, in *Bernstein*, the Court rejected a theory of standing advanced by American citizens residing in Israel, who sought to end U.S. aid to the Palestinian Authority after they allegedly suffered injuries at the hands of terrorists supported by the Palestinian Authority. 962 F. Supp. 2d at 130. In finding that they lacked standing, the Court characterized the "Plaintiffs' disagreement with this policy and their belief that a change in policy would reduce the threat of terrorism" as "at best, mere speculation." *Id.* The D.C. Circuit has reached similar conclusions on other occasions. *See, e.g., Talenti v. Clinton*, 102 F.3d 573, 575–78 (D.C. Cir. 1996) (finding that uncertainty as to how Italy would react to the withholding of foreign assistance precluded a finding that the plaintiff's injury would be redressed); *Siegel*, 304 F. Supp. 3d at 53–55 (concluding that plaintiffs whose property was seized by Israeli settlors lacked standing to enjoin the United States from providing aid to Israel because the attenuated chain of events "involved numerous third parties," whose actions and reactions were impossible to predict); *Nyambal v. Mnuchin*, 245 F. Supp. 3d 217, 224 (D.D.C. 2017), *aff'd*, No. 17-5072, 2017 WL 5664980 (D.C. Cir. Nov. 8, 2017) (finding that "there is considerable uncertainty as to whether the actions that Mr. Nyambal suggests the Secretary could take to coerce the IMF into implementing best practices for the protection of whistleblowers would aid [him]"); *Atl. Tele-Network, Inc. v. Inter-Am. Dev. Bank*, 251 F. Supp. 2d 126, 129 (D.D.C. 2003) (finding that blocking a loan to Guyana to build a competing

telecommunications company would not redress the company's economic harm because Guyana could "borrow[] money for the same purpose elsewhere" or "fund[] the competing telecommunications system project itself"); *Aerotrade Inc. v. Agency for Int'l Dev.*, 387 F. Supp. 974, 975 (D.D.C. 1974) (finding "considerable uncertainty" as to whether suspension of aid to Haiti "would aid plaintiff in collecting its debt or would tend to drive Haiti into even greater intransigence"). Because it is entirely speculative how the Coalition would react to an order from this Court enjoining future arms sales, it is not "likely" that any injury would be redressed by a favorable decision. *Lujan*, 504 U.S. at 561.

## II.    Plaintiffs' APA claims fail at inception and must be dismissed.

In Count 5, Plaintiffs allege that the State Department and DOD have violated the APA (1) by their "decision to approve" and "to continue to approve the arm sales," to Saudi Arabia and the UAE, Compl. ¶¶ 219, 226, and (2) by failing to include specific elements in their end-use monitoring programs and sufficiently investigate the end use of arms by those countries, *id.* ¶ 227.

Both claims fail. The decision to approve arm sales is one "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and is therefore not subject to challenge under the APA. And implementation of end-use monitoring is both committed to agency discretion and also not "final agency action," *id.* § 704, and so similarly is not subject to challenge under the APA.

### A.    Approval of arms sales is committed to agency discretion.

The APA provides a cause of action generally to challenge "final agency action" and waives sovereign immunity for suits seeking non-monetary relief. *See* 5 U.S.C. §§ 702, 704; *see also Trudeau v. FTC*, 456 F.3d 178, 185, 188 (D.C. Cir. 2006). But the provisions for judicial review—including the waiver of sovereign immunity in § 702 and the cause of action itself—are available "except to the extent that," *inter alia*, the challenged action "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see Heckler v. Chaney*, 470 U.S. 821, 828 (1985). The approval of the sale of arms to foreign countries is fraught with political and foreign affairs considerations, not always publicly known, and Congress has committed those determinations, subject to congressional reporting and review requirements, to the Executive's discretion.

An agency action is committed to agency discretion and unreviewable when, as here, there are "no judicially manageable standards" by which to assess the action. *Heckler*, 470 U.S. at 830. To determine whether there are manageable standards for judicial evaluation of the State Department's decision to authorize foreign military sales, the Court must consider the statutory language and structure as well as the nature of the agency decision. *See id.* at 831-32 (explaining that nature of nonenforcement decisions made them "unsuitabl[e] for judicial review"); *see also Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002); *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 104 F.3d 1349, 1353 (D.C. Cir. 1997).

Here, the statutory language provides broad deference to the Executive and no meaningful standard by which a court might judge the Secretary's decision. In the AECA, Congress specified that the Secretary of State, under the direction of the President, shall decide "whether there will be a sale" to a country "to the end that sales . . . will be integrated with other United States activities and to the end that the foreign policy of the United States would be best served thereby." 22 U.S.C. § 2752(b)(1). This statute commits the decision whether to approve a sale to the Secretary's discretion: whether a sale would "best serve[]" the "foreign policy of the United States," *id.*, involves a "complicated balancing of a number of factors which are peculiarly within [the Secretary's] expertise," *Heckler*, 470 U.S. at 831. Statutes using similar language have been interpreted to commit an action to the discretion of the agency and to preclude APA review. In *Webster v. Doe*, for example, the Supreme Court held that a statute authorizing the Director of Central Intelligence to fire an employee when he determined doing so was "necessary or advisable in the interests of the United States" committed the decision to the Director's discretion and thereby precluded APA review. 486 U.S. 592, 600 (1988). The D.C. Circuit reached the same conclusion in *Zhu v. Gonzales*, assessing a statute that authorized the Attorney General to take certain actions when he determined them to be in the "national interest." 411 F.3d 292, 295 (D.C. Cir. 2005). Put simply, there are no judicially manageable standards to assess whether a particular military sale would serve U.S. foreign policy.

The nature of the decision, too, counsels against judicial review. *Cf. infra* section III (discussing political question doctrine). The D.C. Circuit has held that when review of an agency decision would

require judicial "judgments on questions of foreign policy and national interest," the issue is not "fit for judicial involvement," and is not reviewable under the APA.  *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n v. Mar. Admin.*, 215 F.3d 37, 42 (D.C. Cir. 2000); *see also Legal Assistance for Vietnamese Asylum Seekers*, 104 F.3d at 1353 ("By long-standing tradition, courts have been wary of second-guessing executive branch decisions involving complicated foreign policy matters.").  The nature of the decisions at issue in this case—authorizations of the sale or export of defense articles to a foreign government—undoubtedly implicates judgments on the foreign affairs and national security of the United States.  *See* 22 U.S.C. § 2752(b)(1).  Congress emphasized this point with its express language: "It is the sense of the Congress that all such sales be approved only when they are consistent with the foreign policy interests of the United States."  22 U.S.C. § 2751.  The sale and export of military equipment to foreign countries based on a determination that the sale or export would "serve[]" U.S. "foreign policy," *id.* § 2752(b)(1), directly implicates foreign policy.  Those decisions are therefore "committed to agency discretion by law," and not "fit for judicial involvement."  *Mar. Admin.*, 215 F.3d at 42.

Plaintiffs nevertheless contend that the approval of arms sales here is contrary to law because Saudi Arabia and the UAE have allegedly engaged in "a consistent pattern of gross violations of internationally recognized human rights."  Compl. ¶ 226, *see* 22 U.S.C. § 2304(a)(2).  But such a judgment is committed to the Executive Branch, not to Plaintiffs or to the judiciary.  *See* 22 U.S.C. § 2304(a)(4).  And as relevant here, no such decision has been made with respect to either Saudi Arabia or the UAE. The Secretary of State may therefore approve individual arms sales to "eligible countries" (*i.e.*, those already approved by the President or made eligible by statute)[12] based on the Secretary's assessment that the sale "will be integrated with other United States activities and to the end that the

_____

[12] A Presidential determination regarding country eligibility is required before individual arms sales can be approved by the Secretary of State.  *See* 22 U.S.C. § 2753(a)(1) (requiring Presidential finding that sales to a country "will strengthen the security of the United States and promote world peace").  Plaintiffs cannot (and do not) challenge the President's arms sales eligibility determination under the APA because the President is not an "agency" subject to suit under the APA.  *See Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992); *Dalton v. Spencer*, 511 U.S. 462, 470 (1994) ("actions of the President . . . are not reviewable under the APA").

foreign policy of the United States would be best served thereby." *See id.* § 2752(b) (setting out Secretary's responsibilities for foreign military sales and exports).[13]  As set out above, the Secretary's individualized determination under § 2752(b) that a particular sale or export is warranted is committed to his discretion and therefore not reviewable under the APA.

**B.  End-use monitoring is not challengeable under the APA.**

Plaintiffs also appear to challenge the State Department and DOD's alleged failure to "sufficiently investigate[] the end-use of U.S.-made arms."  Compl. ¶ 228; *see also id.* ¶ 227 (alleging that the departments "have not fully determined the extent to which U.S. military support provided to Saudi Arabia and UAE has contributed to civilian harm in Yemen").   The conduct of an investigation is a prototypical example of a decision "committed to agency discretion by law," where the judiciary has no meaningful standard to apply to assess the agency's actions.  Investigations, like the enforcement decisions at issue in *Heckler v. Chaney*, "share[] to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict."  470 U.S. at 832.  Investigations require inherently discretionary judgments about which leads to pursue and which methods to use in pursuing them.  Whether to use a certain investigative tool or to pursue a particular angle "involves a complicated balancing of a number of factors which are peculiarly within its expertise," such as "whether agency resources are best spent" pursuing this lead in this way or another, whether method "is likely to succeed" if it is used, and "whether the agency has enough resources to undertake the action at all."  *Id.*  Just as an agency "generally cannot act against each technical violation of the statute it is charged with enforcing," it cannot pursue every investigative lead or use every investigative method.  *Id.*  In such circumstances, as in *Heckler*, the design and course of an investigation is not subject to challenge under the APA.  *Cf. United States v. Texas*, 599 U.S. 670 (2023) (no standing to challenge agency's failure to take enforcement action against a third party).

---

[13] The Secretary of Defense provides personnel to assist the Secretary of State in his assessments, 22 U.S.C. § 2778(g)(8) (provision of support to State Department), and independently makes determinations about the U.S. military's needs, *id.* § 2791(d)(1) (setting out Secretary of Defense's responsibilities for sales).

Further, it is doubtful that an "investigation" even constitutes "agency action" within the meaning of the APA.  *See* 5 U.S.C. § 551(13) (defining "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act").  Regardless, it certainly is not "final" agency action that is reviewable under the APA.  5 U.S.C. § 704.  To constitute final agency action, the challenged action must be the "consummation of the agency's decisionmaking process" and must also determine "rights and obligations" or generate "legal consequences."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997).  An investigation is inherently "of a merely tentative or interlocutory nature," that is neither the consummation of any decisionmaking process nor determinative of rights or obligations.  *Id.*; *see Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731–32 (D.C. Cir. 2003) (agency's investigation was not "final agency action" and could not be challenged under the APA).  End-use monitoring is a tool to assess programs; their purpose is to inform possible later action by the Executive Branch or Congress.  *See* 22 U.S.C. § 2785(c) (President must report "findings" of end-use monitoring programs to Congress).  Plaintiff's APA claim must be dismissed to the extent it challenges the Departments' end-use monitoring investigations under 5 U.S.C. § 706(2).

And insofar as Plaintiffs intend to assert that the State Department and DOD have "unlawfully withheld or unreasonably delayed" agency action, 5 U.S.C. § 706(1), by not having yet "fully determined" the effect of aid on civilians in Yemen, Compl. ¶ 227, such a claim also fails.  Plaintiffs concede that each department has an end-use monitoring program in place—that is, Plaintiffs concede that each department has fulfilled its basic statutory obligation—but merely suggest that those programs should be structured differently.  *Id.* ¶¶ 155-64, 227.  But a claim under § 706(1) seeking to compel agency action can succeed "only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take.*"  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis in original).  Plaintiffs point to no statutory text that unambiguously requires end-use monitoring to take a certain form or use specific investigatory tools; nor can they.  *See generally* 22 U.S.C. § 2785 (requiring Executive to establish programs that ensure "[t]o the extent practicable" that arms are not misdirected or misused).  Rather, Plaintiffs seek precisely the kind of "broad

programmatic" relief—here, various changes to end-use monitoring that Plaintiffs assert will improve

the program—that the Supreme Court held unavailable under either § 706(1) or § 706(2). *See id.* (such

relief unavailable under § 706(1)); *Lujan v. National Wildlife Federation,* 497 U.S. 871, 891 (1990) (such

relief unavailable under § 706(2)). The Court is powerless to compel "even discrete agency action that

is not demanded by law"; even if the Executive is required to establish an end-use monitoring program,

"the manner of its action is left to the agency's discretion" and so the Court "has no power to specify

what the action must be." *Norton*, 542 U.S. at 65.

Because Plaintiff cannot challenge allegedly incomplete investigations under the APA, and

cannot compel any particular form of monitoring under the APA, the Court should dismiss this claim

as well.

## III.    Plaintiffs' claims raise non-justiciable political questions.

The Court should also dismiss Plaintiffs' claims against the federal government because they

raise a non-justiciable political question. *See, e.g.*, *Abusharar v. Hagel*, 77 F. Supp. 3d 1005, 1007 (C.D.

Cal. 2014) ("[C]hoosing which nations to support is a decision of grave significance. . . . But these

difficult questions are left to the political branches, not to the courts. If Plaintiff seeks to change

foreign policy, he must prove the worthiness of his cause in the political arena."). "Like standing, the

political question doctrine is an aspect of 'the concept of justiciability, which expresses the

jurisdictional limitations imposed on the federal courts by the case or controversy requirement of

Article III of the Constitution.'" *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 44 (D.D.C. 2010) (quoting

*Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 215 (1974)); *cf. Am. Jewish Cong. v. Vance*,

575 F.2d 939, 943 (D.C. Cir. 1978) (noting that when both standing and political question issues are

before the Court, it is more prudent to determine the question of standing first). "The political

question doctrine is 'essentially a function of the separation of powers,' and 'excludes from judicial

review those controversies which revolve around policy choices and value determinations

constitutionally committed for resolution to the halls of Congress or the confines of the Executive

Branch.'" *El–Shifa Pharma. Indus. Co. v. United States*, 607 F.3d 836, 840 (D.C. Cir. 2010) (quoting *Baker

v. Carr*, 369 U.S. 186, 217 (1962) & *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986)).

Although "[t]he precise 'contours' of the political question doctrine remain 'murky and unsettled,'" *Al-Aulaqi*, 727 F. Supp. 2d at 44 (quoting *Harbury v. Hayden*, 522 F.3d 413, 418 (D.C. Cir. 2008)), the textually demonstrable constitutional commitment of the issue to a coordinate political branch and the lack of judicially discoverable and manageable standards for resolving the issue are two factors that likely render an issue unfit for judicial review. *See Al-Tamimi v. Adelson*, 916 F.3d 1, 12 (D.C. Cir. 2019) (noting that the first two factors set out in *Baker* are most significant).[14]

There is "no doubt that decision-making in the fields of foreign policy and national security is textually committed to the political branches of government." *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005) (discussing the "[d]irect allocation[s]" in the Constitution of those responsibilities to the legislative and executive branches). "Indeed, the Supreme Court has described the President as possessing 'plenary and exclusive power' in the international arena and 'as the sole organ of the federal government in the field of international relations.'" *Id.* at 195 (quoting *United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 320 (1936). And "[n]ational-security policy is the prerogative of the Congress and President." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1861 (2017) (citing U.S. Const. art. I, § 8; art. II, §§ 1, 2).

Allowing this case to proceed would entangle the Court in precisely the type of policy determinations the Constitution, and AECA itself, entrusts to the political branches. *See Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 983 (9th Cir. 2007) ("Whether to grant military or other aid to a foreign nation is a political decision inherently entangled with the conduct of foreign relations."). As set out above, there are no judicially manageable standards for assessing whether a given arms sale advances the foreign policy interests of the United States. *See supra* section II.A. "Judicial restraint in the area of foreign affairs is often appropriate because such cases 'frequently turn on standards that defy judicial application[.]'" *Harbury*, 522 F.3d at 419 (quoting *Baker*, 369 U.S. at 211). By requesting that

---

[14] Other relevant considerations include: "[3] the impossibility of deciding [an issue] without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment of multifarious pronouncements by various departments on one question." *Baker*, 369 U.S. at 217.

the Court declare that the State Department's sales authorizations were arbitrary and capricious, Plaintiffs effectively ask the Court to substitute its judgment for that of the Executive and Legislative Branches as to whether the United States should sell defense articles and services to Saudi Arabia and the United Arab Emirates. But these decisions rest on complex foreign policy and national security judgments; they are committed under the Constitution to the political branches and are not justiciable in court. *See Corrie*, 503 F.3d at 983 (refusing to decide a challenge to a defense contractor's sales under the AECA because doing so would require the court to "intrude into our government's decision to grant military assistance to Israel"); *Mobarez v. Kerry*, 187 F. Supp. 3d 85, 93 (D.D.C. 2016) (Brown Jackson, J.) (finding that because the evaluation of plaintiffs' "contention that the Executive Branch has abused its discretion—in APA terms—in refusing to evacuate U.S. citizens from Yemen . . . would necessarily involve second-guessing the 'wisdom' of [the State and Defense Departments'] discretionary determinations," the claim posed a non-justiciable political question).[15] And the D.C. Circuit, sitting en banc, has squarely rejected the possibility of litigating tort claims, such as Plaintiffs' negligent-supervision claim, that turn on past foreign policy decisions: "[C]ourts are not a forum for reconsidering the wisdom of discretionary decisions made by the political branches in the realm of foreign policy or national security. . . . Accordingly, we have declined to adjudicate claims seeking only a 'determination[ ] whether the alleged conduct *should* have occurred.'" *El-Shifa*, 607 F.3d at 842 (quoting *Harbury*, 522 F.3d at 420).

The other relevant considerations under the political question doctrine, many of which are closely related to the first two, also counsel against judicial involvement. The Court would not be able to decide this case "without an initial policy determination of a kind clearly for nonjudicial discretion."

---

[15] *See also See Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) (stating that foreign policy decisions are "delicate, complex, and involve large elements of prophecy" and are "of a kind for which the Judiciary has neither the aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry"); *Schneider*, 412 F.3d at 195 ("'[T]he 'nuances' of 'the foreign policy of the United States are much more the province of the Executive Branch and Congress than of this Court.'" (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 386 (2000)); *Spacil v. Crowe*, 489 F.2d 614, 619 (5th Cir. 1974) ("[I]n the chess game that is diplomacy only the executive has a view of the entire board and an understanding of the relationship between isolated moves.").

*Baker*, 369 U.S. at 217.  Plaintiffs challenge the Secretary of State's determination that arms sales and exports to two countries advance U.S. foreign policy.  And to the extent that they seek to challenge the President's determination that these countries are eligible for military sales, the Court would first have to determine whether these foreign sovereigns are engaged in a "consistent pattern of gross violations of internationally recognized human rights."  22 U.S.C. § 2304(a)(2).  Such a decree might have serious foreign relations repercussions standing alone, which is why Congress assigned responsibility for making such a determination to the Executive.  *Id.* § 2304(a)(4).  The Executive has not made such a finding, and the Court must reject Plaintiffs' invitation to do so in the first instance.  And any associated injunctive relief, such as a court order to cease arms sales that the Secretary of State has determined advance the United States' foreign policy interests, would almost certainly engender serious foreign relations repercussions.

A court order disagreeing with the President on this matter would express a lack of respect for a coordinate branch of government and his role as the nation's chief diplomat and "sole organ of the nation in its external relations," *Curtiss-Wright*, 299 U.S. at 319, and also to Congress, which plays an important statutory role in reviewing, and potentially blocking, these arms sales. *See* 22 U.S.C. § 2776(b)(1); *see also Aerotrade*, 387 F. Supp. at 977 (dismissing a claim that the President's failure to terminate aid to Haiti violated various statutes because "it is for Congress, not this Court, to reexamine the President's position" if necessary and noting that Congress had heard testimony on the issue and did not act); *Dickson v. Ford*, 521 F.2d 234, 236 (5th Cir. 1975) (finding that both Congress and the President had approved aid).  Congress has established a robust and elaborate system to enable it, as a coordinate *political* branch, to provide input on foreign arms sales. As described above, the statute requires that the Executive formally notify Congress, and for members to request additional information, in advance of an arms sale to permit Congress to override the proposed sale.  22 U.S.C. § 2776(b)(1).  Moreover, there is a nearly fifty-year practice of informal consultation with Congress that permits individual members to place a hold on a proposed sale before it is formally noticed.  *See* CRS Report RL31675.  Finally, the Court could not resolve this case without risking "multifarious pronouncements" from coordinate branches with respect to the sale of arms to Saudi Arabia and the

UAE.  *Baker*, 369 U.S. at 217.  The Executive Branch has determined that selling certain defense articles and services to the UAE and Saudi Arabia is appropriate, and Congress has not exercised its prerogative to block those sales.  Plaintiffs would have the Court second-guess those determinations, at a potentially considerable cost to the United States' foreign relations.  *See Talenti*, 102 F.3d at 578 ("The suspension of foreign assistance is a contentious act that may threaten diplomatic relations and undermine American influence abroad."); *Campbell v. Clinton*, 203 F.3d 19, 28 (D.C. Cir. 2000) (Silberman, J., concurring) ("A pronouncement by another branch of the U.S. government that U.S. participation in Kosovo was 'unjustified' would no doubt cause strains within NATO.").  For all these reasons, the political question doctrine affords another ground for dismissal of this case.

## IV.     Plaintiffs' Negligent-Supervision Claim Must be Dismissed.

In Count 7, Plaintiffs allege that because "[t]he State Department and the Department of Defense… had the duty and ability to cease operations until such time as the violations alleged [in the Complaint] were stopped and/or prevented," their failure to do so amounted to "negligent supervision."  *See* Compl. ¶¶ 238-240.  Since "[i]t is axiomatic that the United States may not be sued without its consent," *United States v. Mitchell*, 463 U.S. 206, 212 (1983), the Plaintiffs must bring their negligent-supervision claim under a statute that waives the United States' sovereign immunity.  *See Franklin-Mason v. Mabus*, 742 F.3d 1051, 1054 (D.C. Cir. 2014) ("To bring a claim against the United States, a plaintiff must identify an unequivocal waiver of sovereign immunity.").  Although Plaintiffs fail to allege the statute on which they rely for their negligent-supervision claim, *see generally,* Compl. ¶¶ 237-241, to the extent that Plaintiffs rely on the Alien Tort Statute (ATS), this claim must be dismissed for lack of jurisdiction because the ATS does not waive the United States' sovereign immunity.  To the extent that Plaintiffs wish to rely on the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b), §§ 2671-2680, that claim too fails on jurisdictional grounds under several statutory exceptions to the FTCA's waiver of sovereign immunity.

### A. Plaintiffs' tort claim cannot arise under the ATS because that statute does not waive the United States' sovereign immunity.

As a preliminary matter, the Plaintiffs' tort claim against the United States cannot arise under the ATS. As the Supreme Court established, "the ATS is a jurisdictional statute creating no new causes of action." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004); *see also Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1397 (2018) ("The ATS is 'strictly jurisdictional' and does not by its own terms provide or delineate the definition of a cause of action for violations of international law"). And even if the ATS *did* provide a cause of action through which to sue, it does not waive the United States' sovereign immunity. Only Congress can waive the Government's sovereign immunity, and it must do so expressly. *See, e.g., FAA v. Cooper*, 566 U.S. 284, 290 (2012) ("a waiver of sovereign immunity must be 'unequivocally expressed' in statutory text") (quoting *Lane v. Pena*, 518 U.S. 187, 192 (1996)); *United States v. Mitchell*, 445 U.S. 535, 538 (1980). "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). In the D.C. Circuit, "[t]he Alien Tort Statute itself is not a waiver of sovereign immunity," and thus the United States is immune from suit under the statute over any torts, including *jus cogens* violations. *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 207 (D.C. Cir. 1985); *see also Industria Panificadora, S.A. v. United States,* 957 F.2d 886, 886-887 (D.C. Cir. 1992); *Perez v. United States*, 8 F.4th 1095, 1101-1102 (9th Cir. 2021) (holding that the ATS does not waive sovereign immunity for any torts, including *jus cogens* violations); *Smith v. Scalia,* 44 F. Supp. 3d 28, 39 (D.D.C. 2014) (holding that the government does not waive sovereign immunity when it commits *jus cogens* violations). Thus, to the extent that Plaintiffs rely on the ATS as a cause of action for their negligent-supervision claim, the claim must be dismissed for lack of jurisdiction.

### B. Plaintiffs' negligent-supervision claim also fails under the FTCA.

Because Plaintiffs have sued Secretaries Blinken and Austin in their official capacities, this is a suit against the United States. *See Marshall v. Reno*, 915 F. Supp. 426, 434 (D.D.C. 1996). Thus, to the extent that Plaintiffs wish to rely on the FTCA as a cause of action for their negligent-supervision claim (assuming, *arguendo*, that negligent supervision is a tort claim that can be brought under the FTCA), their claim must nonetheless be dismissed for lack of jurisdiction under several statutory

exceptions to the FTCA's waiver of sovereign immunity.  In particular, Plaintiffs' claim is barred because they failed to administratively exhaust, their claim falls within the foreign-country and discretionary-functions exceptions, and their claim is time-barred.

Under the FTCA, district courts have jurisdiction over certain tort actions against the United States "for money damages."  28 U.S.C. § 1346(b).  However, "Congress specifically did not authorize the courts to grant injunctive relief under the FTCA."  *Mac'Avoy v. Smithsonian Inst.*, 757 F. Supp. 60, 70 (D.D.C. 1991); *Westbay Steel, Inc. v. United States,* 970 F.2d 648, 651 (9th Cir. 1992) (holding that the FTCA does not authorize equitable relief).  Although the FTCA contains an express waiver of the United States' sovereign immunity for claims arising out of certain torts committed by federal employees, that waiver is conditioned on strict adherence to the statute's requirements for administrative exhaustion.  *See* 28 U.S.C. § 2675(a); *McNeil v. United States*, 508 U.S. 106, 113 (1993) ("The FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies.").  To satisfy the FTCA's exhaustion requirement, any "tort claim against the United States" must be "presented in writing to the appropriate Federal agency within two years after such claim accrues."  28 U.S.C. § 2401(b).  A prospective plaintiff cannot bring their tort claim in court until they receive "notice of final denial of the claim by the agency," or, if the agency fails to respond, until "six months after the date" that they presented their claim to the agency.  *Id.*

Because this exhaustion requirement is "'a jurisdictional perquisite' to maintaining a tort claim against the United States," *Hildreth v. Obama*, 950 F. Supp. 2d 63, 67 (D.D.C. 2013) (quoting *GAF Corp. v. United States*, 818 F.2d 901, 904 (D.C. Cir. 1987)), it cannot be waived.  *See Vacek v. U.S. Postal Serv.*, 447 F.3d 1248, 1250-51 (9th Cir. 2006) (the FTCA's "exhaustion requirement is jurisdictional in nature and must be interpreted strictly…  Any such waiver must be strictly construed in favor of the United States."); *Gregory v. Mitchell,* 634 F.2d 199, 204 (5th Cir. 1981).

Plaintiffs' failure to satisfy the exhaustion requirement is fatal to their negligent-supervision claim.  To begin, the Complaint lacks allegations that Plaintiffs complied with the claim presentment procedures of the FTCA.  There is no allegation that Plaintiffs notified either DOD or State about their claims at least six months in advance of bringing their suit and otherwise no allegation that

Plaintiffs exhausted their administrative remedies. *See generally* Compl. ¶¶ 237-41; *See Hildreth*, 950 F. Supp. at 67 (since the Plaintiff's "complaint [did] not contain any affirmative showing that he ha[d] exhausted his administrative remedies… the federal government enjoy[ed] immunity from any tort claims [Plaintiff sought] to assert."); *Epps v. Howes*, 2007 WL 2248072, *4 (D.D.C. Jul. 31, 2007) (dismissing plaintiff's negligence claims against the United States because plaintiff "ha[d] not demonstrated that he ha[d] exhausted his administrative remedies"). As such, Plaintiffs' negligent-supervision claim against Defendants is barred.

Even if Plaintiffs had fulfilled the FTCA's presentment and exhaustion requirements, their claim would still be barred by the FTCA's foreign-country exception, 28 U.S.C. § 2680(k), because the alleged injury was "suffered in a foreign country." *Sosa*, 542 U.S. at 712; *see, e.g., Harbury*, 522 F.3d at 416 (holding that a widow could not bring a negligent supervision suit against the CIA because the harm to her husband occurred outside of the United States).[16]  Finally, Plaintiffs' claim is also time barred.  The FTCA requires a claim to be presented to the relevant agency "within two years after such claim accrues."  28 U.S.C. § 2401(b).  Plaintiffs allege their injuries took place in 2015 and 2016, and have been time barred since 2017 and 2018, respectively.

For all these reasons, this Court should dismiss Plaintiffs negligent-supervision claim for lack of jurisdiction.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss.

Dated: October 5, 2023                                      Respectfully submitted,

---

[16] This claim would also be barred by the discretionary-functions exception, 28 U.S.C. § 2680(a), for the reasons explained, *supra* section II, namely because the approval of arms sales and any investigation into the use of such arms is committed to agency discretion by law.

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director
Federal Programs Branch

TERRY M. HENRY
Assistant Branch Director
Federal Programs Branch

*/s/ Lisa Newman*
LISA NEWMAN (TX Bar No. 24107878)
MICHAEL KNAPP
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 514-5578
lisa.n.newman@usdoj.gov

*Counsel for Federal Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2023, I electronically filed the foregoing Motion to Dismiss

using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated:  October 5, 2023

*/s/ Lisa Newman*
LISA NEWMAN
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
Telephone: (202) 514-5578
Email: lisa.n.newman@usdoj.gov

*Counsel for Federal Defendants*