**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| Amin Allawi Ali, *et al.,* |
| *Plaintiffs,* |
| v. |
| Mohamed Ben Zayed Al-Nahyan, *et al.*, |
| *Defendants*. |

Civil Action No. 1:23-cv-576 (RDM)

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF THE**
**RTX AND LOCKHEED MARTIN DEFENDANTS' MOTION TO DISMISS**

**COVINGTON & BURLING LLP**

Daniel L. Russell Jr.
Raymond B. Biagini (*pro hac vice*)
One CityCenter
850 Tenth Street, NW
Washington, DC 20001

*Counsel for Defendants RTX Corporation*
*and Gregory J. Hayes*

**WILLIAMS & CONNOLLY LLP**

Joseph G. Petrosinelli
Christopher N. Manning
680 Maine Avenue, SW
Washington, D.C. 20024

*Counsel for Defendants Lockheed Martin*
*Corporation and James D. Taiclet*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

FACTUAL BACKGROUND ....................................................................................................... 6

    A.    For Over Eight Decades, the United States Has Provided Military Support
         to Saudi Arabia in Furtherance of a Strategic Alliance. ........................................ 6

    B.    Since the Outbreak of the Yemeni Civil War, the United States Has
         Supported the Saudi-Led Coalition in Opposition to the Houthi
         Insurgency. ............................................................................................................. 8

STATUTORY BACKGROUND ................................................................................................ 10

PROCEDURAL POSTURE ...................................................................................................... 11

LEGAL STANDARD ............................................................................................................... 13

ARGUMENT ............................................................................................................................ 14

I.      PLAINTIFFS' CLAIMS ARE BARRED BY THE POLITICAL QUESTION
       DOCTRINE. .................................................................................................................. 14

    A.    Courts Lack Jurisdiction To Resolve Cases that Implicate Political
         Questions .............................................................................................................. 14

    B.    This Suit Inherently Challenges Foreign Policy and Military Affairs
         Decisions that are Constitutionally Committed to the Political Branches. ........... 15

    C.    There Are No Judicially Manageable Standards for Resolving this Suit. ........... 19

    D.    Allowing this Suit To Proceed Would Show a Lack of Due Respect and
         Risk Multifarious Pronouncements by the Coordinate Branches—an
         Especially Troubling Outcome Given the Ongoing, Volatile Crisis in
         Yemen that Is Being Actively Managed by the Political Branches. ..................... 21

II.     PLAINTIFFS LACK ARTICLE III STANDING BECAUSE THEIR CLAIMS
       FLOW FROM INDEPENDENT ACTIONS OF GOVERNMENT ACTORS. .............. 22

III.    PLAINTIFFS' CLAIMS ARE BARRED BY THE ACT OF STATE
       DOCTRINE. .................................................................................................................. 23

    A.    The Act of State Doctrine Prevents Courts from Inquiring into the Validity
         of Acts Taken by Foreign Sovereigns on Foreign Soil. ....................................... 23

    B.    Plaintiffs' Claims Challenge Public Acts Taken by Foreign Sovereigns on
         Foreign Soil, and Therefore Fall Squarely Within the Act of State
         Doctrine ............................................................................................................... 24

IV.     PLAINTIFFS' CLAIMS ARE BARRED BY THE DOCTRINE OF DERIVATIVE SOVEREIGN IMMUNITY. ....................................................................... 27

V.     THE COMPLAINT FAILS TO STATE A CLAIM AGAINST THE CONTRACTOR DEFENDANTS. ................................................................... 30

     A.     Count III Fails To State a Claim Under the Alien Tort Statute. ........................... 30

          1.     Plaintiffs' Extraterritorial Application of the ATS Is Foreclosed by Supreme Court Precedent. ........................................................................ 30

          2.     Plaintiffs' ATS Claim Is Contrary to *Sosa* and Would Pose Serious Collateral Consequences for U.S. Foreign Policy and National Security. ................................................................................................... 32

     B.     Plaintiffs' Common-Law Causes of Action (Counts VI, VII & VIII) also Fail To State a Claim. .......................................................................................... 39

VI.     THE COMPLAINT FAILS TO STATE A CLAIM AGAINST THE CEO DEFENDANTS. ....................................................................................................... 41

CONCLUSION ...................................................................................................................... 44

## TABLE OF AUTHORITIES

**Page**

### CASES

*Ackerson v. Bean Dredging LLC*,
589 F.3d 196 (5th Cir. 2009) ....................................................................................13

*Adkisson v. Jacobs Engineering Group, Inc.*,
790 F.3d 641 (6th Cir. 2015) ....................................................................................13

*Al-Aulaqi v. Obama*,
727 F. Supp. 2d 1 (D.D.C. 2010) ............................................................................20

*Al-Tamimi v. Adelson*,
916 F.3d 1 (D.C. Cir. 2019) ......................................................................................14

*American Jewish Congress v. Vance*,
575 F.2d 939 (D.C. Cir. 1978) ................................................................................22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................................................................................................43

*Baker v. Carr*,
369 U.S. 186 (1962) ............................................................................................14, 15

*Banco Nacional de Cuba v. Sabbatino*,
376 U.S. 398 (1964) ............................................................................................24, 26

*Bancoult v. McNamara*,
445 F.3d 427 (D.C. Cir. 2006) ................................................................................16

*Barry v. Islamic Republic of Iran*,
437 F. Supp. 3d 15 (D.D.C. 2020) ......................................................................41, 44

*Bega v. Jaddou*,
Civil Action No. 22-02171(BAH), 2022 WL 17403123 (D.D.C. Dec. 2, 2022)...........6, 13

*Bell Atlantic Corporation v. Twombly*,
550 U.S. 544 (2007) ....................................................................................................43

*Bentzlin v. Hughes Aircraft*,
833 F. Supp. 1486 (C.D. Cal. 1993) ......................................................................19

*Boyle v. United Technologies Corp.*,
487 U.S. 500 (1988) ............................................................................................28, 36

*Brady v. Roosevelt Steamship Co.*,
   317 U.S. 575 (1943) .................................................................................28

*Brown v. Argenbright Security, Inc.*,
   782 A.2d 752 (D.C. 2001) ........................................................................41

*Busby v. Capital One, N.A.*,
   772 F. Supp. 2d 268 (D.D.C. 2011) ............................................ 40-41, 44

*Butters v. Vance International, Inc.*,
   225 F.3d 462 (4th Cir. 2000) ...............................................................28, 29

*Callejo v. Bancomer, S.A.*,
   764 F.2d 1101 (5th Cir. 1985) .............................................................26, 27

*Campbell v. Clinton*,
   203 F.3d 19 (D.C. Cir. 2000) ...................................................................20

*Campbell-Ewald Co. v. Gomez*,
   577 U.S. 153 (2016) ..................................................................................28

*Carmichael v. Kellogg, Brown & Root Services, Inc.*,
   572 F.3d 1271 (11th Cir. 2009) ................................................................19

*Cierco v. Mnuchin*,
   857 F.3d 407 (D.C. Cir. 2017) ..................................................................23

*Committee of United States Citizens Living in Nicaragua v. Reagan*,
   859 F.2d 929 (D.C. Cir. 1988) ...................................................................5

*Corrie v. Caterpillar, Inc.*,
   403 F. Supp. 2d 1019 (W.D. Wash. 2005)........................................ 4, 23-24
   503 F.3d 974 (9th Cir. 2007) ...........................................15, 17, 21, 24

*Crockett v. Reagan*,
   720 F.2d 1355 (D.C. Cir. 1983) ................................................................15

*Cunningham v. General Dynamics Information Technology, Inc.*,
   888 F.3d 640 (4th Cir. 2018) ...............................................................13, 29

*Dickson v. Ford*,
   521 F.2d 234 (5th Cir. 1975) ................................................................4, 15

*DKT Memorial Fund Ltd. v. AID*,
   887 F.2d 27 (D.C. Cir. 1989) ....................................................................21

*Doe I v. Exxon Mobil Corporation*,
    No. 01-1357(RCL), 2015 WL 5042118 (D.D.C. July 6, 2015) ................................. 37, 38
    391 F. Supp. 3d 76 (D.D.C. 2019) ........................................................................ 34, 35, 36

*Doe VIII v. Exxon Mobil Corporation*,
    654 F.3d 11 (D.C. Cir. 2011) ................................................................................. 34
    527 F. App'x 7 (D.C. Cir. 2013) ............................................................................ 34

*Doe v. Israel*,
    No. 1:02-cv-1431-JDB, Mem. Op., ECF 42 (D.D.C. Oct. 3, 2003) ........ 3-4, 15, 17, 19, 22

*Doe I v. Israel*,
    400 F. Supp. 2d 86 (D.D.C. 2005) ...................................................... 4, 19-20, 23, 25-26

*El-Shifa Pharmaceutical Industries Co. v. U.S.*,
    607 F.3d 836 (D.C. Cir. 2010) .............................................................................. 18

*Endeley v. United States Department of Defense*,
    268 F. Supp. 3d 166 (D.D.C. 2017) ...................................................................... 18

*Federal Republic of Germany v. Philipp*,
    141 S. Ct. 703 (2021) ........................................................................................... 24

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015) .............................................................................. 13

*Fritz v. Islamic Republic of Iran*,
    320 F. Supp. 3d 48 (D.D.C. 2018) ........................................................................ 39

*Fryshman v. U.S. Commission for Preservation of America's Heritage Abroad*,
    422 F. Supp. 3d 1 (D.D.C. 2019) .......................................................................... 23

*Gonzalez-Vera v. Kissinger*,
    449 F.3d 1260 (D.C. Cir. 2006) ............................................................................ 18

*Gutrejman v. United States*,
    596 F. Supp. 3d 1 (D.D.C. 2022) ......................................................................... 4, 16

*Harbury v. Hayden*,
    444 F. Supp. 2d 19 (D.D.C. 2006) ........................................................................ 42

*Heroth v. Kingdom of Saudi Arabia*,
    565 F. Supp. 2d 59 (D.D.C. 2008) ........................................................................ 29

*Hourani v. Mirtchev*,
    796 F.3d 1 (D.C. Cir. 2015) ............................................................................. 23, 26

*Metzgar v. KBR, Inc. (In re KBR, Inc.)*,
    893 F.3d 241 (4th Cir. 2018) ......................................................................19

*In re Series 7 Broker Qualification Exam Scoring Litigation*,
    510 F. Supp. 2d 35 (D.D.C. 2007) ..............................................................29

*Jaber v. United States*,
    861 F.3d 241 (D.C. Cir. 2017) ...............................................................14, 18

*Japan Whaling Association v. American Cetacean Society*,
    478 U.S. 221 (1986) ....................................................................................14

*Jesner v. Arab Bank, PLC*,
    138 S. Ct. 1386 (2018) ................................................................................41

*Johnson v. Long Beach Mortgage Loan Trust 2001-4*,
    451 F. Supp. 2d 16 (D.D.C. 2006) ..............................................................40

*Kadic v. Karadžić*,
    70 F.3d 232 (2d Cir. 1995)...........................................................................42

*Karn v. Department of State*,
    925 F. Supp. 1 (D.D.C. 1996) .....................................................................15

*Kaspersky Lab, Inc. v. U.S. Department of Homeland Security*,
    909 F.3d 446 (D.C. Cir. 2018) ....................................................................13

*Kiobel v. Royal Dutch Petroleum Co.*,
    569 U.S. 108 (2013)................................................................................30-31

*Loquasto v. Fluor Corporation, Inc.*,
    512 F. Supp. 3d 728 (N.D. Tex. 2021) ........................................................19

*Luftig v. McNamara*,
    373 F.2d 664 (D.C. Cir. 1967) ....................................................................16

*Mahorner v. Bush*,
    224 F. Supp. 2d 48 (D.D.C. 2002) ..........................................................15, 16

*Malewicz v. City of Amsterdam*,
    517 F. Supp. 2d 322 (D.D.C. 2007) .............................................................13

*Manoharan v. Rajapaksa*,
    711 F.3d 178 (D.C. Cir. 2013) ....................................................................44

*Mastafa v. Australian Wheat Board Limited*,
  No. 07 Civ. 7955(GEL), 2008 WL 4378443 (S.D.N.Y. Sept. 25, 2008) .........................38

*McKethean v. Washington Metropolitan Area Transportation Authority*,
  588 A.2d 708 (D.C. 1991) ............................................................................5

*Munitions Carriers Conference, Inc. v. United States*,
  147 F.3d 1027 (D.C. Cir. 1998).............................................................. 28-29

*Nader v. Democratic National Committee*,
  567 F.3d 692 (D.C. Cir. 2009) .....................................................................38

*Nejad v. United States*,
  724 F. Supp. 753 (C.D. Cal. 1989) ...............................................................19

*Nestlé USA, Inc. v. Doe*,
  141 S. Ct. 1931 (2021)............................................................... 31, 33-34

*News World Communications, Inc. v. Thompsen*,
  878 A.2d 1218 (D.C. 2005) ..........................................................................40

*Oetjen v. Central Leather Co.*,
  246 U.S. 297 (1918)....................................................................................25

*Ofisi v. BNP Paribas, Inc., S.A.*,
  278 F. Supp. 3d 84 (D.D.C. 2017)...........................................................37, 38
  285 F. Supp. 3d 240 (D.D.C. 2018)...............................................................37
  77 F.4th 667 (D.C. Cir. 2023)......................................................................37

*Owens v. Republic of Sudan*,
  374 F. Supp. 2d 1 (D.D.C. 2005) ..................................................................23

*Pauling v. McNamara*,
  331 F.2d 796 (D.C. Cir. 1963) .....................................................................16

*Powell v. McCormack*,
  395 U.S. 486 (1969).....................................................................................14

*Price v. Socialist People's Libyan Arab Jamahiriya*,
  294 F.3d 82 (D.C. Cir. 2002) .......................................................................26

*Rendall–Speranza v. Nassim*,
  107 F.3d 913 (D.C. Cir. 1997) .....................................................................40

*Ricaud v. American Metal Co.*,
  246 U.S. 304 (1918)....................................................................................25

*Roe v. Unocal Corporation*,
    70 F. Supp. 2d 1073 (C.D. Cal. 1999) .........................................................................5, 25

*Saleh v. Titan Corporation*,
    580 F.3d 1 (D.C. Cir. 2009) ...................................................................................35, 42

*Sanchez-Espinoza v. Reagan*,
    770 F.2d 202 (D.C. Cir. 1985) .......................................................................................22

*Schieber v. United States*,
    77 F.4th 806 (D.C. Cir. 2023) .......................................................................................22

*Schneider v. Kissinger*,
    412 F.3d 190 (D.C. Cir. 2005) ..........................................................................13, 16, 21

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004) ............................................................ 30, 32-33, 34, 35, 36, 37

*Spectrum Stores, Inc. v. Citgo Petroleum Corporation*,
    632 F.3d 938 (5th Cir. 2011) ....................................................................................19, 26

*Taylor v. Kellogg Brown & Root Services, Inc.*,
    658 F.3d 402 (4th Cir. 2011) .........................................................................................19

*Tel-Oren v. Libyan Arab Republic*,
    726 F.2d 774 (D.C. Cir. 1984) .......................................................................................16

*Thomas v. News World Communications*,
    681 F. Supp. 55 (D.D.C. 1988) .....................................................................................40

*Underhill v. Hernandez*,
    168 U.S. 250 (1897) .......................................................................................................25

*United States v. Martinez*,
    904 F.2d 601 (11th Cir. 1990) .......................................................................................15

*United States v. Munoz-Flores*,
    495 U.S. 385 (1990) .......................................................................................................19

*United States v. Sum of $70,990,605*,
    234 F. Supp. 3d 212 (D.D.C. 2017) ..............................................................................23

*Venetian Casino Resort, L.L.C. v. National Labor Relations Board*,
    793 F.3d 85 (D.C. Cir. 2015) .........................................................................................38

*Westfall v. Ervin,*
    484 U.S. 292 (1988)................................................................................................29

*W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corporation, International,*
    493 U.S. 400 (1990)........................................................................................23, 24

*Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme,*
    433 F.3d 1199 (9th Cir. 2006) ..............................................................................27

*Yearsley v. W.A. Ross Construction Co.,*
    309 U.S. 18 (1940)...........................................................................5, 13, 27, 28

*Zuckerbraun v. General Dynamics Corporation,*
    755 F. Supp. 1134 (D. Conn. 1990)......................................................................19

## U.S. CONSTITUTION AND STATUTES

U.S. Constitution
    Article I ................................................................................................................16
    Article II ...............................................................................................................16
    Article III ...............................................................................................4, 14, 22
    Amendment 1 .................................................................................................. 37-38

Alien Tort Statute............................................................... 5, 11, 18, 30-39, 41, 44
    28 U.S.C. § 1350............................................................................................11, 30

Arms Export Control Act..............................................................10, 11, 17, 20, 29
    22 U.S.C. § 2776...................................................................................................10
    22 U.S.C. § 2778...................................................................................................10

Foreign Assistance Act ...............................................................10, 11, 17, 20
    22 U.S.C. § 2304.............................................................................................11, 36
    22 U.S.C. § 2311...................................................................................................11

Torture Victim Protection Act ...................................... 12, 41, 42, 43-44
    106 Stat. 73, note following 28 U.S.C. § 1350 ....................................12, 41, 42
    § 2(a) ............................................................................................................. 43-44

War Powers Resolution...................................................................................32
    50 U.S.C. 1543......................................................................................................32

42 U.S.C. § 1983..........................................................................................................44

Federal Rules of Civil Procedure
    Rule 8 .................................................................................................43
    Rule 12(b)(1) ...............................................................................1, 13
    Rule 12(b)(6) ...............................................................................1, 13

D.C. Code Ann. § 12-301 ...............................................................................40

## LEGISLATIVE BRANCH MATERIALS

S. Rep. No. 102-249 ..........................................................................................44

S. Con. Res. 86, 95th Congress (1978), https://www.congress.gov/bill/95th-congress/senate-concurrent-resolution/86 ........................................................................7

S. J. Res. 316, 99th Congress (1986), https://www.congress.gov/bill/99th-congress/senate-joint-resolution/316 ...................................................................7

Veto-S. J. Res. 316, *Message from the President of the United States* (May 21, 1986), https://www.senate.gov/reference/Legislation/Vetoes/Messages/ReaganR/SJRes316-Sdoc-99-30.pdf..............................................................................7

Christopher M. Blanchard, Cong. Rsch. Serv., RL33533, Saudi Arabia: Background and U.S. Relations (2023), https://crsreports.congress.gov/product/pdf/RL/RL33533 ...................7

## EXECUTIVE BRANCH MATERIALS

White House, Remarks by President Biden on America's Place in the World (Feb. 4, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/02/04/remarks-by-president-biden-on-americas-place-in-the-world/..............................................9

*Secretary Blinken's Meeting with UN Special Envoy for Yemen Grundberg*, U.S. Dep't of State (Oct. 12, 2023), https://www.state.gov/secretary-blinkens-meeting-with-un-special-envoy-for-yemen-grundberg-2/...............................................................9

Statement, White House, The Jeddah Communique: A Joint Statement Between the United States of America and the Kingdom of Saudi Arabia (July 15, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/07/15/the-jeddah-communique-a-joint-statement-between-the-united-states-and-the-kingdom-of-saudi-arabia/ ...............................................................................6

U.S. Dep't of State, U.S. Treaties & Other International Agreements (vol. 2, pt. 2) (1951), https://tile.loc.gov/storage-services/service/ll/lltreaties//lltreaties-2-2/lltreaties-2-2.pdf ....7

*U.S. Relations With Yemen*, U.S. Dep't of State (Jun. 8, 2022), https://www.state.gov/u-s-relations-with-yemen/ .............................................................................................................8

*U.S.-Saudi Arabia Relationship: Eight Decades of Partnership*, U.S. Dep't of State (June 6, 2023), https://www.state.gov/united-states-saudi-arabia-relationship-eight-decades-of-partnership/ .............................................................................................................6, 8

*U.S.-United Arab Emirates Relations*, U.S. Dep't of State, https://www.state.gov/countries-areas/united-arab-emirates/ .............................................................................................................8

Defendants RTX Corporation and Lockheed Martin Corporation (the "Contractor Defendants"), and Gregory J. Hayes and James D. Taiclet[1] (the "CEO Defendants") respectfully move the Court to dismiss Plaintiffs' Complaint against them pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[2]

## INTRODUCTION

In their 98-page, 248-paragraph Complaint, Plaintiffs allege injuries caused by military attacks carried out by foreign allies of the United States amidst an ongoing geopolitical conflict in Yemen. While ostensibly couched as statutory and tort claims, in reality Plaintiffs' lawsuit asks this Court to undermine longstanding U.S. foreign policy objectives; to entangle the judiciary in the quintessential political judgment to supply military aid to foreign allies; and to countermand determinations of national defense interests made by the coordinate branches of government. Plaintiffs demand a wholesale reversal of the U.S. policy of providing "support for members of the [Saudi-led] Coalition through arms transfers," which Plaintiffs acknowledge are carried out under a federal aid program designed to effect policy objectives around the globe. ECF 1 ¶ 98; *see also id.* ¶¶ 55-61, 73. And Plaintiffs ask the Court to intervene in military strategy and security decisions made by foreign allies operating within their own sovereign territory, as Plaintiffs allege that Saudi and UAE commanders failed to utilize "means and methods of warfare" commensurate with those of a "reasonable military commander." *Id.* ¶¶ 168-170, 176-177.

Regarding the Contractor and CEO Defendants, the essence of Plaintiffs' claims is that they "aided and abetted" unlawful military attacks ordered by foreign commanders by selling

---

[1]  Mr. Taiclet's name is misspelled as "Taicley." ECF 1 ¶¶ 44, 91, 205, 206, 209, 210, 213, 215.

[2] Plaintiffs also assert claims against contractor General Dynamics and its CEO, Phebe Novakovic, as well as two other groups of Defendants: the Secretary of State and Secretary of Defense in their official capacity (the "Federal Defendants"); and current and former military leaders and commanders of Saudi Arabia and the United Arab Emirates ("UAE") (the "Foreign Defendants").

weapons "with the support and approval of the U.S. government" when they "should have known" the weapons would be used for illegal purposes. *Id.* ¶¶ 3, 199. All of Plaintiffs' liability theories hinge on their predicate contentions that: (i) the Foreign Defendants—"the direct perpetrators of the injuries," *id.* ¶ 177—committed unlawful airstrikes; and, (ii) the Federal Defendants, charged with overseeing and administering the federal aid programs at issue, should not have authorized sales of weapons to the Saudi-led coalition.

As such, even assuming Plaintiffs' allegations are true, this is a *political* case with a *political* agenda that seeks to effect *political* change—which can only be addressed to the *political* branches. This case does not belong in any court. For many reasons, it should be dismissed.

***First***, Plaintiffs' claims are barred by the political question doctrine. Indeed, the Court need go no further because this doctrine provides a standalone, threshold basis for dismissal of this suit in its entirety. As the Federal Defendants emphasize in their motion to dismiss: "The Executive Branch has determined that selling certain defense articles and services to the UAE and Saudi Arabia is appropriate, and Congress has not exercised its prerogative to block those sales. Plaintiffs would have the Court second-guess those determinations, at a potentially considerable cost to the United States' foreign relations." *See* ECF 31-1 at 31. Thus, as the Federal Defendants explain, the political question doctrine is grounds for "dismissal of this case." *Id.* at 31.

Resolving Plaintiffs' claims would inject the Court into the following determinations:

- the Executive's policy of supporting the Saudi-led coalition against the Houthi insurrection;

- "the Secretary of State's determination that arms sales and exports to two countries advance U.S. foreign policy," *id.* at 30;

- "the President's determination that these countries are eligible for military sales" and that the nations had *not* carried out unlawful practices worthy of disqualification from such sales, *id.*;

- Congress's appropriation of funding under the Foreign Military Sales ("FMS") program;

- the President's selection of defense articles on the United States Munitions List; and

- Executive Branch determinations regarding "how and whether to conduct end-use monitoring of weapons sold to these countries." *Id.* at 1.

These are political choices. As the Federal Defendants explain, "[t]he approval of the sale of arms to foreign countries is fraught with political and foreign affairs considerations, not always publicly known, and Congress has committed those determinations, subject to congressional reporting and review requirements, to the Executive's discretion." ECF 31-1 at 22. The judiciary has no role in regulating these matters. Beyond that, allowing Plaintiffs' claims to proceed could have lasting, deleterious impacts on U.S. foreign policy objectives because "Plaintiffs effectively ask the Court to substitute its judgment for that of the Executive and Legislative Branches regarding the delicate decision of whether the United States should sell defense articles and services to Saudi Arabia and the UAE." *Id.* at 2.

Consistent with the Federal Defendants' position, this Court and others have dismissed claims challenging the provision of military aid to foreign countries under the political question doctrine. Two decades ago, in *Doe v. Israel*, this Court addressed nearly identical claims involving arms sales by U.S. contractors to Israel, carried out—as here—with the approval of the U.S. Government in furtherance of U.S. policy objectives in the Middle East. Recognizing that "the role of defense contractors in producing and selling arms … is tightly intertwined with United States foreign policy," this Court dismissed the claims as nonjusticiable, explaining:

> It is difficult to conceive of a more sensitive and volatile foreign policy context – one that cries out for unyielding deference to the political branches – than [foreign] citizens appealing to United States courts to stop or delay military and financial aid to [a foreign country]…. Because arms sales are an integral part of foreign policy, the government's authorization of sales by defense contractors as a means to execute foreign policy cannot be challenged in the courts….Judicial intervention into foreign policy decisions reflected in arms sales by the United States to a country in such a volatile region of the world would intrude into delicate and complex political considerations.

No. 1:02-cv-1431-JDB, ECF 42, at 13-18 (D.D.C. Oct. 3, 2003) ("*Doe* Op."). Other courts have similarly refused to "intrude into our government's decision to grant military assistance to [a foreign nation], even indirectly by deciding [a] challenge to a defense contractor's sales." *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 982-83 (9th Cir. 2007) (dismissing claims against contractor because "[a]llowing this action to proceed would necessarily require the judicial branch of our government to question the political branches' decision to grant extensive military aid to Israel"); *Dickson v. Ford*, 521 F.2d 234, 236 (5th Cir. 1975) (per curiam) ("[W]hether foreign aid to Israel is necessary at this particular time is a question uniquely demand(ing) single-voiced statement of the Government's views … a decision of a kind for which the Judiciary has neither aptitude, facilities nor responsibility.") (alteration, citations and internal quotation marks omitted); *see also Gutrejman v. United States*, 596 F. Supp. 3d 1, 13 (D.D.C. 2022) (Moss, J.) ("In the field of foreign affairs, the political branches are allowed (subject to constitutional limitations not implicated here) to adopt purely diplomatic solutions for international disputes, and the courts must respect those decisions."), *aff'd*, 77 F.4th 806 (D.C. Cir. 2023).

   **Second**, Plaintiffs lack Article III standing for reasons set forth in the Federal Defendants' motion to dismiss. *See* ECF 31-1 at 11-22. In particular, Plaintiffs' claims against the Contractor and CEO Defendants hinge on an attenuated chain of causation involving independent actions by the U.S. Government—which authorizes and approves all foreign weapons sales—and by Saudi and UAE military commanders—who allegedly carried out unlawful attacks.

   **Third,** Plaintiffs' claims are barred by the act of state doctrine, "a close cousin of the political question doctrine." *See Doe I v. Israel*, 400 F. Supp. 2d 86, 113 (D.D.C. 2005). All of Plaintiffs' claims are premised on alleged conduct by Saudi and UAE commanders. *See* ECF 1 ¶ 177; *id.* ¶¶ 37-42 ("But for the command given by and the military strategies formulated by the

named Saudi Arabian and UAE military leaders, [Plaintiffs] would not have suffered those injuries."). But "an order given by a military officer has traditionally been viewed as an official act of a sovereign for purposes of the act of state doctrine," and "if the lawsuit turns on a challenge to the officer's order, then the act of state doctrine bars adjudication of the matter." *See Roe v. Unocal Corp.*, 70 F. Supp. 2d 1073, 1079 (C.D. Cal. 1999) (citing Supreme Court cases).

**Fourth**, Plaintiffs' claims are barred by the doctrine of derivative sovereign immunity. Plaintiffs' theory of liability is premised on the Contractor Defendants' performance of their respective foreign military sales ("FMS") contracts "with the support and approval of the U.S. Government." ECF 1 ¶ 3; *see id.* ¶ 73. But under longstanding precedent, contractors working on behalf of the Government and within the scope of their delegated authority are immune. *See Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 20-21 (1940).

**Finally**, Plaintiffs' allegations against the Contractor and CEO Defendants fail to state viable claims. In particular, Plaintiffs' proposed Alien Tort Statute ("ATS") claim is contrary to Supreme Court precedent. And even if Plaintiffs could pursue such claims, their threadbare and conclusory allegations still fail.[3]

---

[3] In addition to the grounds for dismissal relied on in this motion, there are many other reasons why this suit could never proceed through litigation and trial. For example, the purported causal link between the Contractor and CEO Defendants' alleged conduct and the alleged harm is far too attenuated to establish proximate causation. *See, e.g.*, *McKethean v. WMATA*, 588 A.2d 708, 716-17 (D.C. 1991) (holding defendant cannot be liable for subsequent independent conduct of third party); *cf. Comm. of U.S. Citizens Living in Nicar. v. Reagan*, 859 F.2d 929, 946 (D.C. Cir. 1988) (holding United States cannot be liable for independent military actions of Nicaraguan Contras). As another example, any attempt to litigate the claims would almost certainly trigger the protections of the state secrets doctrine. Plaintiffs directly challenge the rules of engagement employed by the Saudi-led coalition, including the acts of "verifying that targets are military objectives," "selecting the target which may be expected to cause the least danger to civilian lives," and "giving effective advance warning of attacks which may affect the civilian population." ECF 1 ¶ 175. Even if all relevant foreign nations were parties to this suit and subject to discovery (they are not), governments routinely (and understandably) refuse to release such highly sensitive (continued…)

## FACTUAL BACKGROUND[4]

**A.     For Over Eight Decades, the United States Has Provided Military Support to Saudi Arabia in Furtherance of a Strategic Alliance.**

At the center of this suit is the United States' provision of military aid to the Saudi-led coalition following the outbreak of the Yemeni civil war. *See* ECF 1 ¶¶ 1-4. This support is part of a deeply-rooted, decades-long "strategic partnership" between the United States and Saudi Arabia, which focuses on "political, security, counterterrorism, economic, and energy issues," and a "common vision for a more peaceful, secure, prosperous, and stable Middle East."[5]

For more than 80 years, a key element of the U.S.-Saudi alliance has been the United States' provision of military aid.[6] In 1951, the two nations signed their first formal defense agreement, which confirmed that the transfer of military supplies and equipment to Saudi Arabia

_____

information. The mere act of seeking such evidence could harm U.S. foreign policy interests. This suit also directly challenges how the U.S. Government evaluates the security needs and capabilities of foreign partners, as well as the U.S. Government's efforts to monitor other nations' use of weapons. Delving into these matters implicates U.S. intelligence-gathering efforts and other classified matters. *See, e.g.*, ECF 31-1 at 22 (noting that "approval of the sale of arms to foreign countries is fraught with political and foreign affairs considerations, not always publicly known").

[4] As noted *infra*, the Court may consider facts outside the pleadings in resolving this motion. *See, e.g.*, *Bega v. Jaddou*, No. 22-0217(BAH), 2022 WL 17403123, at *3 (D.D.C. Dec. 2, 2022) (noting courts may take judicial notice of "factual content found on official public websites of government agencies"), *aff'd sub nom. Da Costa v. Immigr. Inv. Program Off.*, 80 F.4th 330 (D.C. Cir. 2023).

[5] *U.S.-Saudi Arabia Relationship: Eight Decades of Partnership*, U.S. Dep't of State (June 6, 2023), https://www.state.gov/united-states-saudi-arabia-relationship-eight-decades-of-partnership/.

[6] *See* Statement, White House, The Jeddah Communique: A Joint Statement Between the U.S. and the Kingdom of Saudi Arabia (July 15, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/07/15/the-jeddah-communique-a-joint-statement-between-the-united-states-of-america-and-the-kingdom-of-saudi-arabia/.

was deemed "by executive decision of the President of the United States" (President Truman) to be "important to the security of the United States."[7]

In the years since, the U.S.-Saudi partnership has remained strong despite numerous crises and challenges, including contentious disputes between Congress and the President related to military aid. For example, in 1976, faced with Congressional opposition to the sale of Sidewinder and Maverick missiles to Saudi Arabia, President Ford was forced to reduce the number of missiles in the agreement.[8] In the 1980s, President Reagan vetoed an attempt by Congress to block passage of a Saudi military-aid package, though he cut the number of Stinger missiles sold in order to avoid a veto override.[9] In his message to Congress justifying his veto, President Reagan emphasized that "[t]he U.S. defense relationship with Saudi Arabia was started by President Roosevelt in 1943 and endorsed by every President since," and he implored Congress not to "dismantle this long-standing policy, damage our vital strategic, political and economic interests in the Middle East and undermine our balanced policy in that region."[10] More recently, following the 9/11 attacks, Congress sought to curtail foreign assistance to Saudi Arabia, but the George W. Bush and Obama administrations each issued national security waivers enabling the assistance to continue.[11]

[7] *See* U.S. Dep't of State, U.S. Treaties & Other International Agreements (vol. 2, pt. 2), at 1460 (1951), https://tile.loc.gov/storage-services/service/ll/lltreaties//lltreaties-2-2/lltreaties-2-2.pdf.

[8] *See* S. Con. Res. 86, 95th Cong. (1978), https://www.congress.gov/bill/95th-congress/senate-concurrent-resolution/86.

[9] *See* S. J. Res. 316, 99th Cong. (1986), https://www.congress.gov/bill/99th-congress/senate-joint-resolution/316.

[10] *See* Veto-S. J. Res. 316, Message from the President of the United States 1 (May 21, 1986), https://www.senate.gov/reference/Legislation/Vetoes/Messages/ReaganR/SJRes316-Sdoc-99-30.pdf.

[11] *See* Christopher M. Blanchard, Cong. Rsch. Serv., RL33533, Saudi Arabia: Background and U.S. Relations, 24 n. 126 (2023), https://crsreports.congress.gov/product/pdf/RL/RL33533.

Today, as the Federal Defendants note, Saudi Arabia and the UAE remain "two of the United States' strategic partners in the Middle East." ECF 31-1 at 1.[12] According to the State Department, the United States is "committed to advancing our security partnership with Saudi Arabia through defense sales that will support a more integrated and regionally networked air and missile defense architecture, participating in joint military exercises, and countering the proliferation of unmanned aerial systems and missiles to non-state actors that threaten the peace and security of the region." *Id.*[13]

**B.    Since the Outbreak of the Yemeni Civil War, the United States Has Supported the Saudi-Led Coalition in Opposition to the Houthi Insurgency.**

In the fall of 2014, rebel Houthi forces backed by Iran invaded the Yemen capital and seized control, forcing the elected president into exile in Saudi Arabia. *See* ECF 1 ¶¶ 1-4. Thereafter, a Saudi-led coalition of ten member states launched an air campaign in March 2015 in support of the ousted Yemeni leader, and years of hostilities ensued. *Id.* In December 2018, the United Nations brokered a partial ceasefire.[14] But fighting continued, and Houthi forces "launched multiple rocket and ballistic missile attacks into the territory of the Kingdom of Saudi Arabia and the UAE and toward Red Sea shipping lanes, further increasing tensions in the region." *Id.*

Since 2014, across three Presidential administrations, the United States has consistently supported the Saudi-led coalition. *See* ECF 1 ¶ 232. Yet, political support for the coalition has not been unanimous. As in prior decades, the President and Congress have clashed over policy towards

---

[12] Since its formation in 1971, the UAE has been "a key partner for the United States," and the two countries "work together to promote peace and security, support economic growth, and improve educational opportunities in the region and around the world." *See U.S.-United Arab Emirates Relations*, U.S. Dep't of State, https://www.state.gov/countries-areas/united-arab-emirates/.

[13] *See U.S.-Saudi Arabia Relationship: Eight Decades of Partnership*, *supra* note 5.

[14] *See U.S. Relations with Yemen*, U.S. Dep't of State (Jun. 8, 2022) https://www.state.gov/u-s-relations-with-yemen/.

Saudi Arabia, including the provision of military aid. "The State Department's policy of approving arms sales to the [Saudi-led] Coalition has been rebuffed by other branches of the U.S. government," and "Congress has passed several resolutions to halt the sales." *Id.* ¶ 150. In 2019, Congress passed three joint resolutions aimed at curbing weapon sales to Saudi Arabia and the UAE, but President Trump vetoed all three, and the Senate sustained each veto. *See id.* ¶ 167. After the 2020 election, President Biden promised to "step[] up our diplomacy to end the war in Yemen" by "ending all American support for offensive operations in the war in Yemen, including relevant arms sales."[15] At the same time, he acknowledged that "Saudi Arabia faces missile attacks, UAV strikes, and other threats from Iranian-supplied forces in multiple countries," and he pledged to "help Saudi Arabia defend its sovereignty and its territorial integrity and its people." *Id.*

In April 2022, the United Nations brokered a truce that decreased hostilities and eliminated cross-border attacks. *See* ECF 31-1 at 14-15 (citing government reports). Although the truce was initially set to expire in two months, it remains intact to this day—over 18 months later—thanks to ongoing diplomatic efforts by the international community, including the United States. *Id.*

At present, efforts to achieve peace in the region are facing new challenges in the wake of the unprecedented surprise attack by Hamas on Israel. Just last week, the Secretary of State met with the United Nations Special Envoy for Yemen to discuss "the steps required to end the Yemen conflict as soon as possible," and to do so "even and especially as the Middle East region faces other challenges."[16]

---

[15] *See* White House, Remarks by President Biden on America's Place in the World (Feb. 4, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/02/04/remarks-by-president-biden-on-americas-place-in-the-world/; *see also* ECF 1 ¶ 227 ("In 2021, the United States vowed to end support of the coalition's offensive operations, including through arms sales.").

[16] *See Secretary Blinken's Meeting with UN Special Envoy for Yemen Grundberg*, U.S. Dep't of State (Oct. 12, 2023), https://www.state.gov/secretary-blinkens-meeting-with-un-special-envoy-for-yemen-grundberg-2/.

## STATUTORY BACKGROUND

The sale of U.S.-made weapons to foreign nations is heavily regulated by federal law, including the Arms Export Control Act ("AECA") and the Foreign Assistance Act ("FAA"). *See* ECF 1 ¶ 226; *id.* ¶¶ 55-57 ("State and DOD's review and approval of arms sales must be conducted in accordance with two major laws."). The relevant statutory background is outlined in the Federal Defendants' motion to dismiss. *See* ECF 31-1 at 2-7. We will not duplicate that detailed background here, but simply highlight below several aspects of particular relevance to this motion:

- Under the AECA and FAA, the transfer of weapons to foreign governments is an integral component of U.S. foreign policy, and any decision to approve such sales requires consideration of inherently political factors. *See*, *e.g.*, ECF 1 ¶ 215 (citing "factors considered by the U.S. executive branch in approving arms sales to foreign nations"); ECF 31-1 at 2 ("The sale of U.S. military weapons to a foreign government involves a complex and delicate balance of frequently shifting national security and foreign policy concerns.").

- The statutory scheme establishes complementary roles and responsibilities for the Executive and Legislative Branches, and no role for the Judicial Branch, thereby ensuring that the political branches retain exclusive authority over these foreign affairs matters. *See* ECF 31-1 at 4 ("Under the statutory scheme, Congress reserved for itself the authority to disapprove arms."); *see also, e.g.*, 22 U.S.C. § 2776(b) (outlining formal Congressional review process); ECF 31-1 at 5 (describing informal "tiered review" process).

- Under the AECA, there are two primary methods for the sale and export of U.S.-made weapons: (i) FMS transactions, which involve the Government as a direct party to the contract, and which are alleged here (*see* ECF 1 ¶ 73); and (ii) Direct Commercial Sales ("DCS") transactions. For both, the President must notify Congress, and Congress can block the transactions. *See* ECF 31-1 at 2-6; *see also* ECF 1 ¶ 60.

- The AECA authorizes the President to compile the "United States Munitions List" and prohibits the export of listed weapons without a license, which requires gaining Executive Branch approval through a process similar to FMS. 22 U.S.C. § 2778(a)(1)-(2), (b)(2). The listing of items on the Munitions List is explicitly exempt from judicial review. *Id.* § 2778(h).

- For all U.S. defense articles sold or exported under the AECA, the President is required to establish an end-use monitoring program. *See* ECF 31-1 at 6; *see also* ECF 1 ¶ 154. "To the extent practicable," end-use monitoring must be designed to provide "reasonable assurances" that the recipient government is complying with U.S. laws and requirements. *Id.*

- The FAA authorizes the President to "furnish military assistance, on such terms and conditions as he may determine, to any friendly country," but prohibits assistance to "any country the government of which engages in a consistent pattern of gross violations of internationally

recognized human rights," subject to exceptions. 22 U.S.C. §§ 2304(a)(2), 2311(a). One such exception is if "the President certifies" to Congress that "extraordinary circumstances exist warranting provision of such assistance." 22 U.S.C. § 2304(a)(2).

- According to the Complaint, the Contractor Defendants carried out "sales to the Coalition countries (Saudi Arabia, United Arab Emirates, and Kuwait)…through the Foreign Military Sales ("FMS") program," ECF 1 ¶ 73, "with the support and approval of the U.S. government." *Id.* ¶ 3. Thus, under the applicable statutory regime, for each and every instance in which coalition nations acquired any weapons manufactured by the Contractor Defendants, such acquisitions were reviewed, authorized, and approved by the U.S. Government. Among other things, for any and all such sales, the Government approved the precise configuration of the weaponry; the provision of any related training or other services; the volume of weapons; and the recipient nation. *See* ECF 31-1 at 4.

## PROCEDURAL POSTURE

Plaintiffs assert five counts, enumerated as Counts III, IV, VI, VII and VIII, against the Contractor Defendants and/or the CEO Defendants.

In Count III, Plaintiffs assert that the Contractor and CEO Defendants are liable for "aiding and abetting" under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, based on alleged "war crimes" committed by the Foreign Defendants. *See* ECF 1 ¶¶ 196-205. This theory is premised on Plaintiffs' allegations that: (i) "[t]he military leaders of Saudi Arabia and the UAE committed war crimes, extrajudicial killings, and torture against the Plaintiffs, in violation of international law," *id.* ¶ 198; (ii) the Contractor Defendants "aided and abetted … indiscriminate airstrikes in violation of international law" through "commercial sales to the Coalition countries … made through the Foreign Military Sales ('FMS') program," *id.* ¶ 73 (cleaned up); and (iii) the arms sales were unlawfully approved by the Federal Defendants, *id.* ¶¶ 204, 226 (alleging bombs were sold "with the approval of State and DOD" and that "the U.S. government's decision to continue to approve the arms sales has violated both FAA and AECA").[17]

---

[17] Plaintiffs also allege the Contractor Defendants "cultivated relationships with Congress members by lobbying," and "the weapons industry" spent "millions of dollars influencing elections and lobbying for more arms sales." *Id.* ¶ 199. Plaintiffs acknowledge that foreign weapon sales are (continued…)

In Count IV, Plaintiffs assert a claim against the CEO Defendants for "aiding and abetting" under the Torture Victim Protection Act, 106 Stat. 73, notes following 28 U.S.C. § 1350. ECF 1 ¶ 206. Again, their theory is premised on alleged unlawful conduct of the Foreign and Federal Defendants. *Id.* ¶¶ 208, 214.

In Count VI, Plaintiffs assert a claim for unjust enrichment against the Contractor Defendants. *Id.* ¶¶ 229-236. Citing sales authorized and approved by the U.S. Government, Plaintiffs allege that the Contractor Defendants "have been unjustly enriched by selling at huge profits the weapons that were misused by the Saudi and UAE military officials, causing Plaintiffs' injuries." *Id.* ¶ 230. Plaintiffs seek damages for harms caused "by the alleged indiscriminate airstrikes" carried out by the Foreign Defendants. *Id.* ¶ 234.

In Count VII, Plaintiffs assert a claim for negligent supervision against all Defendants. *Id.* ¶¶ 237-241. Plaintiffs allege that "Defendants had the authority to supervise, prohibit, control, and/or regulate the purchase/ sale, as well as the use of weapons." *Id.* ¶ 238.

In Count VIII, Plaintiffs assert a claim for intentional infliction of emotional distress against the Foreign Defendants, the Contractor Defendants, and the CEO Defendants, citing "Defendants' joint actions and participation in the sales of weapons that have been used to commit the crimes as alleged in this Complaint." *Id.* ¶¶ 242-246.

---

interwoven with policy decisions by elected Executive and Legislative Branch officials. They allege that "foreign military sales, facilitated by the U.S. government, rose sharply after Mr. Trump became president," *id.* ¶ 75, and cite a "policy shift" after the "2020 U.S. presidential election." *Id.* ¶ 33; *see also id.* ¶ 149 ("President Trump's aggressive arms sale policies were met with alarm by some in the State Department"); *id.* ¶ 150 ("The State Department's policy of approving arms sales to the Coalition has been rebuffed by other branches of the U.S. government.").

## LEGAL STANDARD

The legal standard applicable to this motion is set forth in the Federal Defendants' motion. *See* ECF 31-1 at 10-11. Like the Federal Defendants' motion, this motion is brought under Rules 12(b)(1) and 12(b)(6). The Court addresses the political question doctrine and standing under Rule 12(b)(1). *See Schneider v. Kissinger*, 412 F.3d 190, 191 (D.C. Cir. 2005) ("courts lack jurisdiction over nonjusticiable questions…[and] we affirm the grant of dismissal pursuant to Rule 12(b)(1)"); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) ("we must evaluate whether they have established standing under the standard applicable pursuant to [Rule] 12(b)(1)"). The Court addresses the act of state doctrine and failure-to-state-a-claim arguments under Rule 12(b)(6). *See Malewicz v. City of Amsterdam*, 517 F. Supp. 2d 322, 337 (D.D.C. 2007) ("a motion to dismiss based on the act of state doctrine is properly considered under Rule 12(b)(6)").[18] Under both rules, the Court is permitted to consider certain matters outside the pleadings, such as basic factual content in official government reports. *See* ECF 31-1 at 10-11 (citing case); *see also Kaspersky Lab, Inc. v. U.S. DHS*, 909 F.3d 446, 464 (D.C. Cir. 2018) ("Among the information a court may consider on a motion to dismiss are public records subject to judicial notice.") (internal quotation marks omitted); *Bega v. Jaddou*, No. 22-02171(BAH), 2022 WL 17403123, at *3 (D.D.C. Dec. 2, 2022) (noting courts may take judicial notice of "factual

---

[18] The D.C. Circuit has not addressed whether derivative sovereign immunity constitutes a jurisdictional defense under Rule 12(b)(1) or a defense to liability under Rule 12(b)(6), and other appellate courts have reached conflicting conclusions. *Compare Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 650 (4th Cir. 2018) (holding that "the *Yearsley* doctrine operates as a jurisdictional bar to suit and not as a merits defense to liability"); *with Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 647 (6th Cir. 2015) (holding that "*Yearsley* immunity is not jurisdictional" and "motion to dismiss should have been considered under Rule 12(b)(6)"); *and Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 208 (5th Cir. 2009) (holding "that concluding *Yearsley* is applicable does not deny the court of subject-matter jurisdiction"). Here, the standard is immaterial, as the motion should be granted under either rule.

content found on official public websites of government agencies"), *aff'd sub nom. Da Costa v. Immigr. Inv. Program Off.*, 80 F.4th 330 (D.C. Cir. 2023).

## ARGUMENT

## I.   PLAINTIFFS' CLAIMS ARE BARRED BY THE POLITICAL QUESTION DOCTRINE.

### A.   Courts Lack Jurisdiction To Resolve Cases that Implicate Political Questions.

The political question doctrine implicates the subject-matter jurisdiction of Article III courts. *Jaber v. United States*, 861 F.3d 241, 245 (D.C. Cir. 2017); *Al-Tamimi v. Adelson*, 916 F.3d 1, 7–8 (D.C. Cir. 2019). The doctrine derives from the separation of powers and limits of federal courts to hear "Cases" and "Controversies." *See Powell v. McCormack*, 395 U.S. 486, 518 (1969); *Baker v. Carr*, 369 U.S. 186, 210 (1962). "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).

In *Baker*, the Supreme Court set forth six "factors" relevant to determining whether a particular dispute raises nonjusticiable political questions:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 396 U.S. at 217. The presence of *any one* of these factors renders a dispute nonjusticiable under the political question doctrine. *Baker*, 369 U.S. at 217.

As the Federal Defendants explain (*see* ECF 31-1 at 27-31), and as this Court and others

have held when dismissing similar suits seeking to challenge foreign military sales and provision

of military aid to foreign governments, this suit implicates *all* of the *Baker* factors. *See, e.g.*, *Doe*

Op. at 11 (holding that "challenges to military aid to other countries raise nonjusticiable political

questions … lawsuits over foreign aid are especially political in nature"); *Crockett v. Reagan*, 720

F.2d 1355, 1356-57 (D.C. Cir. 1983) (per curiam) (dismissing challenge to legality of U.S. military

aid to El Salvador on political question grounds); *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 983

(9th Cir. 2007) ("Whether to grant military or other aid to a foreign nation is a political decision

inherently entangled with the conduct of foreign relations."); *Dickson v. Ford*, 521 F.2d 234, 236

(5th Cir. 1975) (per curiam) (noting that "a determination of whether foreign aid to Israel is

necessary at this particular time is a question uniquely demand(ing) single-voiced statement of the

Government's views, and a decision of a kind for which the Judiciary has neither aptitude, facilities

nor responsibility") (alteration, citations and internal quotation marks omitted); *Mahorner v. Bush*,

224 F. Supp. 2d 48, 49-53 (D.D.C. 2002) (dismissing claims *sua sponte* as nonjusticiable based on

rationale in *Dickson v. Ford*), *aff'd*, 2003 WL 349713 (D.C. Cir. Feb. 12, 2003).[19]

### B.  This Suit Inherently Challenges Foreign Policy and Military Affairs Decisions that are Constitutionally Committed to the Political Branches.

This suit seeks to insert the judiciary into two areas that are constitutionally committed to

the political branches: foreign policy and military affairs. As the D.C. Circuit has explained, there

---

[19] *See also United States v. Martinez*, 904 F.2d 601, 602 (11th Cir. 1990) (dismissing as nonjusticiable challenge to designation of item on Munitions List, noting: "The question whether a particular item should have been placed on the Munitions List possesses nearly every trait that the Supreme Court has enumerated traditionally renders a question 'political.'"); *Karn v. Dep't of State*, 925 F. Supp. 1, 2 (D.D.C. 1996) (same) ("This case presents a classic example of how the courts today, particularly the federal courts, can become needlessly invoked, whether in the national interest or not, in litigation involving policy decisions made within the power of the President or another branch of the government.").

is "an extensive list of constitutional provisions that entrust[] foreign affairs and national security powers to the political branches." *Bancoult v. McNamara*, 445 F.3d 427, 433 (D.C. Cir. 2006). "The fundamental division of authority and power established by the Constitution precludes judges from overseeing the conduct of foreign policy or the use and disposition of military power; these matters are plainly the exclusive province of Congress and the Executive." *Luftig v. McNamara*, 373 F.2d 664, 665–66 (D.C. Cir. 1967) (per curiam). "Questions touching on the foreign relations of the United States make up what is likely the largest class of questions to which the political question doctrine has been applied." *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 803 (D.C. Cir. 1984); *accord Gutrejman v. United States*, 596 F. Supp. 3d 1, 13 (D.D.C. 2022), *aff'd*, 77 F.4th 806 (D.C. Cir. 2023). As a result, "[c]ourts have developed through a long line of cases that matters involving foreign policy and military decisions are political in nature, and not within the province of the judicial branch." *Mahorner*, 224 F. Supp. 2d at 52.[20]

Plaintiffs' Complaint directly challenges, and places at issue, numerous foreign policy and military matters that fall exclusively within the authority of the political branches. Most notably:

- All claims are based on weapons sales carried out "with the support and approval of the U.S. government." *See* ECF 1 ¶ 3.

- All claims are based on Plaintiffs' contention that the U.S. government *should have* deemed members of the Saudi-led coalition as *ineligible* to receive foreign aid—even though "[t]he Executive has not made such a finding," and any such judicial decree could "have serious foreign relations repercussions standing alone." *See* ECF 31-1 at 30.

- All claims are based on the allegation that Executive Branch agencies, including the State Department and Department of Defense, failed to "sufficiently investigate[] the end-use of U.S.-made arms" following provision of military aid to foreign partners. *See* ECF 1 ¶ 228.

---

[20] *See also Schneider v. Kissinger*, 412 F.3d 190, 195 (D.C. Cir. 2005) ("Just as Article I of the Constitution evinces a clear textual allocation to the legislative branch, Article II likewise provides allocation of foreign relations and national security powers to the President, the unitary chief executive."); *Pauling v. McNamara*, 331 F.2d 796, 799 (D.C. Cir. 1963) ("In framing policies relating to the great issues of national defense and security, the people are and must be, in a sense, at the mercy of their elected representatives.").

- All claims are predicated on the allegation that Saudi and UAE military commanders, acting in their official capacity, carried out unlawful airstrikes and failed to take appropriate "precautions in the choice of means and methods of warfare." *Id.* ¶ 175.

Adjudicating such matters would run headlong into political questions. To begin with, all foreign military sales challenged by Plaintiffs are themselves *a part of* U.S. foreign policy, as all such transactions are vetted by the political branches to ensure national defense and other interests are given due consideration. As this Court explained: "Because arms sales are an integral part of foreign policy, the government's authorization of sales by defense contractors as a means to execute foreign policy cannot be challenged in the courts." *Doe* Op. at 16-17 ("Issues involving AECA directly impact, if not challenge, United States foreign policy, an area that is hardly the proper province of the courts."). Courts "cannot intrude into our government's decision to grant military assistance to [a foreign nation], even indirectly by deciding this challenge to a defense contractor's sales," *Corrie*, 503 F.3d at 983, because the judiciary has no role in evaluating whether and when it is prudent or in our national interests to provide aid to foreign allies. *Doe* Op. at 10 ("Clearly, issues directly impacting United States foreign and military aid to other countries are distinctly the province of the political branches.").

The judiciary lacks authority to police the manner in which the political branches choose to carry out foreign policy objectives via weapons sales, end-use monitoring and related diplomatic activities. *Doe* Op. at 7 ("Not only do AECA and FAA lack any distinct provision allowing causes of action, both statutes also manifest Congress's intent that the complex issues surrounding the reporting provisions should be resolved between Congress and the Executive Branch—not by the courts."). It is of no consequence that Plaintiffs believe the political branches should have acted differently, or failed to consider certain facts when making inherently-political judgments. The political question doctrine precludes courts from "mimic[ing] the constitutional role of the political branches by guessing how they would have conducted the nation's foreign policy had they been

17

better informed," and "[u]ndertaking a counterfactual inquiry into how the political branches would have exercised their discretion had they known the facts alleged in the plaintiffs' complaint would be to make a political judgment, not a legal one." *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 845 (D.C. Cir. 2010) (en banc); *see also Gonzalez-Vera v. Kissinger*, 449 F.3d 1260, 1263 (D.C. Cir. 2006) (dismissing ATS claims as nonjusticiable and explaining: "The plaintiffs have alleged and challenged drastic measures taken by the United States and Kissinger in order to implement United States policy with respect to Chile. For the court to evaluate the legal validity of those measures would require us to delve into questions of policy textually committed to a coordinate branch of government." (internal quotation marks omitted)).

Nor does the judiciary have any role in making findings or determinations regarding the nature and appropriateness of the actions of foreign allies in defending their sovereign interests abroad amidst an ongoing conflict. *See*, *e.g.*, *Endeley v. U.S. Dep't of Def.*, 268 F. Supp. 3d 166, 177 (D.D.C. 2017) (Moss, J.) ("In speculating about what the Syrian government *might* do and how the President *might* respond, the Court could not avoid injecting itself into the most sensitive issues of foreign affairs and national security; … avoid inserting itself into the policy-making process; and … avoid the risk that its pronouncements might prove both unnecessary and at odds with the judgments of those charged with speaking for the United States in foreign affairs.").

The judiciary has no role in deciding whether the military actions undertaken by foreign allies are in the interests of the United States. *See Jaber*, 861 F.3d at 247 (dismissing claims under ATS challenging drone strike in Yemen and noting: "Put simply, it is not the role of the Judiciary to second-guess the determination of the Executive, in coordination with the Legislature, that the interests of the U.S. call for a particular military action in the ongoing War on Terror."). To adjudicate Plaintiffs' claims, the Court would need to make predicate findings regarding the

18

propriety of military operations by U.S. allies amidst an ongoing conflict. But that issue "is certainly a political question"—it is "a foreign relations determination to be made by the Executive or Legislative Branches"—and, as such, the Court "would usurp the roles of those coordinate branches if it were to intrude." *Doe I v. Israel*, 400 F. Supp. 2d 86, 112 (D.D.C. 2005).

Finally, the fact that Plaintiffs' claims are asserted against private entities, rather than government actors, is of no consequence to the justiciability analysis. The Supreme Court has explained that the political question doctrine "is designed to restrain the Judiciary from inappropriate interference in the business of the other branches of Government; the identity of the *litigant* is immaterial to the presence of these concerns in a particular case." *United States v. Munoz-Flores*, 495 U.S. 385, 394 (1990). Numerous courts, including this Court in *Doe I v. Israel*, have dismissed claims against private litigants based on the political question doctrine.[21]

### C.      There Are No Judicially Manageable Standards for Resolving this Suit.

"Judicial intervention into foreign policy decisions reflected in arms sales by the United States to a country in such a volatile region of the world would intrude into delicate and complex political considerations." *Doe* Op. at 18. As the Federal Defendants note, there are no judicial standards for such an inquiry. *See* ECF 31-1 at 23 ("there are no judicially manageable standards to assess whether a particular military sale would serve U.S. foreign policy"); *id*. at 25 ("the judiciary has no meaningful standard to apply to assess the agency's actions").

---

[21] *See, e.g.*, *Metzgar v. KBR, Inc. (In re KBR, Inc.)*, 893 F.3d 241, 264 (4th Cir. 2018); *Spectrum Stores, Inc. v. Citgo Petrol. Corp.*, 632 F.3d 938, 956 (5th Cir. 2011); *Taylor v. Kellogg Brown & Root Servs., Inc.*, 658 F.3d 402, 403 (4th Cir. 2011); *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1275 (11th Cir. 2009); *Loquasto v. Fluor Corp.*, 512 F. Supp. 3d 728 (N.D. Tex. 2021); *Bentzlin v. Hughes Aircraft*, 833 F. Supp. 1486, 1497 (C.D. Cal. 1993); *Zuckerbraun v. Gen. Dynamics Corp.*, 755 F. Supp. 1134, 1141-42 (D. Conn. 1990), *aff'd on alternate grounds*, 935 F.2d 544 (2d Cir. 1991); *Nejad v. United States*, 724 F. Supp. 753, 755 (C.D. Cal. 1989).

Under the applicable statutory regime, the "factors considered by the U.S. executive branch in approving arms sales to foreign nations are 'political, military, economic, arms control, and human rights conditions.'" *See* ECF 1 ¶ 219. Plaintiffs allege that "the primary motivation for approving the sales appears to [be] economic growth." *Id*. But there are no precise standards under the statutory regime for assessing whether the Executive Branch "correctly" balances policy objectives. Rather, the AECA and FAA—by design—grant discretion to the Executive Branch, with Legislative Branch oversight. *See* ECF 31-1 at 23 (explaining that "the statutory language provides broad deference to the Executive and no meaningful standard by which a court might judge the Secretary's decision."). Courts are decidedly ill-equipped to enter the fray and make determinations as to the "proper" weight to assign to such factors, which inherently require the exercise of political judgments. *See Campbell v. Clinton*, 203 F.3d 19, 25 (D.C. Cir. 2000) (Silberman, J., concurring) (citing cases) (noting that the statutory "standard is not precise enough and too obviously calls for a political judgment to be one suitable for judicial determinations").

Beyond that, courts lack standards to assess whether and how U.S and foreign military commanders should use military force to protect sovereign interests. *See Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 47 (D.D.C. 2010) (finding that "there are no judicially manageable standards by which courts can endeavor to assess the President's interpretation of military intelligence and his resulting decision—based on that intelligence—whether to use military force against a terrorist target overseas"). As this Court explained in *Doe I*:

> At first blush, it might appear that plaintiffs only seek redress for suffering or some other vindication of their rights, but "[t]his argument begs the question." The legality or propriety of the Israeli defendants' actions in the West Bank directly weighs on whether plaintiffs' injuries are redressable under the law. Again, this would require the Court to characterize the ongoing armed conflict in the West Bank as either "genocide," Compl. at 112, or self-defense, *see* Fed. Def.'s Mot. Dismiss at 37-39. Such a predicate policy determination is plainly reserved to the

20

> political branches of government, and the Court is simply not equipped
> with "judicially discoverable [or] manageable standards" for resolving a
> question of this nature.

*Doe I*, 400 F. Supp. 2d at 112-13 (quoting *Schneider v. Kissinger*, 310 F. Supp. 2d 251, 260-63

(D.D.C. 2004), *aff'd*, 412 F.3d 190 (D.C. Cir. 2005)). The same rationale applies here, where

Plaintiffs' claims require the Court to make a "predicate policy determination" regarding the

propriety of military actions undertaken by coalition allies. *Id. See, e.g.*, ECF 1 ¶¶ 198, 208.

> **D.      Allowing this Suit To Proceed Would Show a Lack of Due Respect and Risk
> Multifarious Pronouncements by the Coordinate Branches—an Especially
> Troubling Outcome Given the Ongoing, Volatile Crisis in Yemen that Is Being
> Actively Managed by the Political Branches.**

"Plaintiffs' action also runs head-on into the fourth, fifth, and sixth *Baker* tests because

whether to support [the Saudi-led coalition] with military aid is not only a decision committed to

the political branches, but a decision those branches have already made." *See Corrie*, 503 F.3d at

983. Indeed, it "is difficult to conceive of a more sensitive and volatile foreign policy context --

one that cries out for unyielding deference to the political branches – than [foreign] citizens

appealing to United States courts to stop or delay military and financial aid to [a foreign country]."

*Doe* Op. at 13; *see also Corrie*, 503 F.3d at 984 ("It is not the role of the courts to indirectly indict

[a foreign ally] for violating international law with military equipment the United States

government provided and continues to provide. Any such policy condemning [a foreign

government receiving U.S. aid] must first emanate from the political branches." (internal quotation

marks omitted)).

Foreign affairs is "an area in which … the Executive receives its greatest deference, and in

which [courts] must recognize the necessity for the nation to speak with a single voice." *DKT*

*Mem'l Fund Ltd. v. AID*, 887 F.2d 27, 291 (D.C. Cir. 1989). Here, as the Federal Defendants

explain, the Executive Branch has already spoken:

> The Executive Branch has determined that selling certain defense articles and services to the UAE and Saudi Arabia is appropriate, and Congress has not exercised its prerogative to block those sales. Plaintiffs would have the Court second-guess those determinations, at a potentially considerable cost to the United States' foreign relations.

ECF 31-1 at 31. This lawsuit invites the very "multifarious pronouncements" that the political question doctrine forbids. And the risk of interfering with the political branches is heightened, as the situation in Yemen remains highly dynamic and the subject of intense diplomatic efforts. As then-Judge Scalia noted, addressing analogous claims: "Whether or not the present litigation is motivated by considerations of geopolitics rather than personal harm, we think that as a general matter the danger of foreign citizens' using the courts … to obstruct the foreign policy of our government is sufficiently acute that we must leave to Congress the judgment whether a damage remedy should exist." *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 209 (D.C. Cir. 1985), *abrogated on other grounds by Schieber v. United States*, 77 F.4th 806, 809 (D.C. Cir. 2023).

## II. PLAINTIFFS LACK ARTICLE III STANDING BECAUSE THEIR CLAIMS FLOW FROM INDEPENDENT ACTIONS OF GOVERNMENT ACTORS.[22]

For the reasons set forth in the Federal Defendants' motion to dismiss, *see* ECF 31-1 at 11-22, Plaintiffs lack standing to pursue claims against the Contractor and CEO Defendants. In fact, the allegations against the Contractor and CEO Defendants are even more attenuated than those against the Federal Defendants. Whereas "the U.S. government is several steps removed" from

---

[22] The D.C. Circuit has held that, when both standing and political questions issues are raised, courts should typically resolve standing first unless application of one of the doctrines "has been resolved definitively in a context readily applicable to the case presented." *Am. Jewish Cong. v. Vance*, 575 F.2d 939, 943 (D.C. Cir. 1978). Here, the Court may choose to resolve the political question doctrine first—as this Court did in *Doe v. Israel*—given the well-established precedent that definitively establishes the nonjusticiability of this suit. *See Doe* Op. at 8 n.4 (explaining that "the Court doubts plaintiffs would have standing to raise their claims … However, because the Court resolves the federal defendants' motion on lack of jurisdiction and justiciability grounds, it is not necessary to resolve the standing issue as well.").

Plaintiffs' alleged injuries because the injuries "turn on the actions of sovereign third-party Nations," *id.* at 13, the Contractor and CEO Defendants are *an additional step* removed because the alleged injuries turn on *both* the actions of sovereign third-party nations (carrying out military attacks) *and* the actions of the U.S. Government (approving military sales). Plaintiffs' failure to establish standing is an independent basis for dismissal. *See Cierco v. Mnuchin*, 857 F.3d 407, 419 (D.C. Cir. 2017) ("We have been particularly reluctant to find standing where the third party upon whose conduct redressability depends is a foreign sovereign."); *Fryshman v. U.S. Comm'n for Pres. of Am.'s Heritage Abroad*, 422 F. Supp. 3d 1, 8 (D.D.C. 2019) ("Federal courts are simply not well-suited to draw the types of inferences regarding foreign affairs and international responses to U.S. policy that Plaintiffs' theory of causation posits." (internal quotation marks omitted)).

## III. PLAINTIFFS' CLAIMS ARE BARRED BY THE ACT OF STATE DOCTRINE.

### A. The Act of State Doctrine Prevents Courts from Inquiring into the Validity of Acts Taken by Foreign Sovereigns on Foreign Soil.

The act of state doctrine is "a close cousin of the political question doctrine," *Doe*, 400 F. Supp. 2d at 113, although it "operates as a rule of judicial restraint in decisionmaking, not a jurisdictional limitation like the political question doctrine," *Hourani v. Mirtchev*, 796 F.3d 1, 12 (D.C. Cir. 2015). Although "the doctrine is narrow in scope," it applies "when the case turns on the validity or invalidity of a foreign official act." *United States v. Sum of $70,990,605*, 234 F. Supp. 3d 212, 238 (D.D.C. 2017) (citation omitted); *see also W.S. Kirkpatrick & Co., Inc. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 406-09 (1990) (doctrine is "rule of decision" which "requires that, in the process of deciding [the case], the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid"); *Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 26 (D.D.C. 2005) (finding that doctrine applies "when the outcome [of the case] turns upon the legality or illegality … of official action by a foreign sovereign performed within its own territory"); *Corrie*

*v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1032 (W.D. Wash. 2005) ("This lawsuit challenges the official acts of an existing government in a region where diplomacy is delicate and U.S. interests are great." (citation omitted)), *aff'd on alternate grounds*, 503 F.3d 974 (9th Cir. 2007).

The Supreme Court has described the act of state doctrine "as a consequence of domestic separation of powers, reflecting the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder the conduct of foreign affairs." *W.S. Kirkpatrick*, 493 U.S. at 404 (internal quotation marks omitted). It rests on "international comity, respect for the sovereignty of foreign nations on their own territory, and the avoidance of embarrassment to the Executive Branch in its conduct of foreign relations." *Id.* at 408.

The act of state doctrine does *not* turn on whether, accepting the allegations are true, the ostensible acts by the foreign sovereign or its representatives would comply with international standards or laws of the foreign state. Rather, the Supreme Court has held that it applies even if, as here, it is claimed that an act of state violated international law. In resolving whether to apply the doctrine to preclude litigation, the issue is whether adjudicating claims of such wrongs would disrupt foreign relations. *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 422 (1964) ("If international law does not prescribe use of the doctrine, neither does it forbid application of the rule even if it is claimed that the act of state in question violated international law."), *superseded by statute on other grounds as stated in Fed. Rep. of Germ. v. Philipp*, 141 S. Ct. 703, 711 (2021).

**B.  Plaintiffs' Claims Challenge Public Acts Taken by Foreign Sovereigns on Foreign Soil, and Therefore Fall Squarely Within the Act of State Doctrine.**

This suit seeks to challenge sensitive decisions made by foreign military officials on foreign soil, including the means and methods by which sovereign nations chose to implement military strategy in their own self-defense. In particular:

- Plaintiffs challenge "the command given by and the military strategies formulated by the named Saudi Arabian and UAE military leaders." ECF 1 ¶¶ 37-42.

- Plaintiffs allege that these military operations were carried out as official actions of the foreign sovereigns. *Id.* ¶190 (alleging "the defendants are individuals who acted with actual or apparent authority, or color of law, of the Saudi/UAE governments").

- Plaintiffs challenge "the choice of means and methods of warfare" carried out by foreign sovereigns acting on foreign soil, including the acts of "verifying that targets are military objectives; undertaking appropriate proportionality analyses; selecting the target which may be expected to cause the least danger to civilian lives and objects where there is a choice of military objectives with similar military advantage; suspending an attack if it becomes apparent that the target is not a military objective or that it would be a disproportionate attack; and giving effective advance warning of attacks which may affect the civilian population (unless the circumstances do not permit such warning)." *Id.* ¶ 175; and

-  Plaintiffs seek to impose U.S. tort law standards on foreign military operations. *E.g.*, *id.* ¶ 176 ("From the perspective of a 'reasonable military commander,' the named Defendants apparently did not take all feasible precautions to avoid and minimize harm to civilians and civilian objects arising from military operations.").

These decisions are inherently *governmental*. They constitute official actions carried out inside sovereign territory, and they concern national security and defense—the cornerstones of any nation's sovereignty. Under longstanding precedent, "an order given by a military officer has traditionally been viewed as an official act of a sovereign for purposes of the act of state doctrine." *Roe v. Unocal Corp.*, 70 F. Supp. 2d 1073, 1079 (C.D. Cal. 1999); *accord Ricaud v. Am. Metal Co.*, 246 U.S. 304, 306 (1918) (holding that order of military officer "in his capacity as a commanding officer" was barred from adjudication by act of state doctrine); *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 303 (1918) (same; order of a "duly commissioned military commander … when conducting active independent operations"); *Underhill v. Hernandez*, 168 U.S. 250, 254 (1897) (same) ("The acts complained of were the acts of a military commander representing the authority of the revolutionary party[.]"). "[T]hese cases establish that if a court determines the military officer acted on behalf of a recognized government and if the lawsuit turns on a challenge to the officer's order, then the act of state doctrine bars adjudication of the matter." *Roe*, 70 F. Supp. 2d at 1079. Thus, as this Court has held, the military actions of Middle East allies are "classic acts of state," and resolving Plaintiffs' claims challenging such actions "would require

the Court to adjudicate sensitive issues of a political nature that would offend notions of international comity." *See Doe I*, 400 F. Supp. 2d at 113-14. Indeed, adjudication of Plaintiffs' claims would directly inject private litigants and the judiciary into thorny foreign-policy matters related to an ongoing geopolitical crisis, which would have untold but lasting consequences. *See* Argument, Section I, *supra*. Allowing this suit to proceed would do more than "hinder" the conduct of foreign affairs. *See Banco Nacional de Cuba*, 376 U.S. at 423.

Finally, it is irrelevant that Plaintiffs have asserted claims against private entities, as the act of state doctrine turns on *what* must be litigated, not *who* is involved in the litigation, and the core question is whether the official actions of a foreign sovereign are at issue in the litigation:

> In the act of state context, even if the defendant is a private party, not an instrumentality of a foreign state, and even if the suit is not based specifically on a sovereign act, we nevertheless decline to decide the merits of the case if in doing so we would need to judge the validity of the public acts of a sovereign state performed within its own territory.

*Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1113 (5th Cir. 1985), *superseded by statute on other grounds as stated in Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 90 (D.C. Cir. 2002); *see also Hourani*, 796 F.3d at 15 ("That the Houranis do not directly sue the Kazakh government or seek damages from it is beside the point. The Act of State doctrine turns on what must be adjudicated, and having intertwined the Ambassador, the Embassy, and Mirtchev in 'active' collaboration and joint publication of the defamation, the Houranis' complaint requires that the defamatory content—the 'legality'—of that published and official foreign government speech be adjudicated." (citation omitted)); *see also Spectrum Stores, Inc. v. Citgo Petrol. Corp.*, 632 F.3d 938, 954, 956 (5th Cir. 2011) (dismissing suit involving private litigants, noting act of state doctrine "overlaps in many respects with the political question doctrine," and holding: "The constitutional concerns that inform our declination of jurisdiction under the political question doctrine similarly persuade us that adjudication of Appellants' claims is precluded by the act of

state doctrine."). Even if Plaintiffs had not separately named foreign defendants, their claims would nonetheless be barred by the act of state doctrine because the claims necessarily challenge the legality and validity of sovereign actions carried out on their own soil, and litigating this suit would undermine U.S. foreign affairs.[23]

## IV.   PLAINTIFFS' CLAIMS ARE BARRED BY THE DOCTRINE OF DERIVATIVE SOVEREIGN IMMUNITY.

For over 80 years, federal courts have found that, where the U.S. Government enjoys sovereign immunity, contractors working on its behalf and within the scope of their delegated authority are entitled to derivative sovereign immunity. *See Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 20–21 (1940). In other words, if a contractor is performing "the act[s] of the government," it rightly has the immunity of the government as well. *Id.* at 20-21 (citation omitted).

Plaintiffs' claims against the Contractor Defendants and CEO Defendants are barred by the doctrine of derivative sovereign immunity because they are based upon foreign military sales ("FMS") contracts with the U.S. Government. Specifically, the Complaint alleges that the Contractor Defendants "aided and abetted … indiscriminate airstrikes in violation of international law" through "commercial sales to the Coalition countries (Saudi Arabia, United Arab Emirates,

---

[23] Plaintiffs challenge "the command given by and the military strategies formulated by the named Saudi Arabian and UAE military leaders," ECF 1 ¶¶ 37-42, which are by nature types of conduct carried out by commanders within their own territory. To the extent Plaintiffs also challenge conduct that occurred outside of the Saudi or UAE borders, that is of no moment. First, as explained herein, the act of state doctrine applies because the Court cannot resolve this suit without passing on the validity of core military strategy decisions carried out on sovereign land. Beyond that, as the D.C. Circuit has explained, "as a general rule, the Act of State doctrine applies to foreign government activities undertaken within its own territory," but "that factor is not so inflexible as to overlook the quintessentially sovereign nature of foreign governmental action." *Hourani*, 796 F.3d at 13 (internal quotation marks omitted). "Even when an act of a foreign state affects property outside of its territory," the "considerations underlying the act of state doctrine may still be present." *Callejo*, 764 F.2d at 1121 n. 29; *see also Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*, 433 F.3d 1199, 1226 (9th Cir. 2006) (noting act of state doctrine can apply to actions extending beyond borders if "governmental" in nature (citation omitted)).

and Kuwait) … made through the Foreign Military Sales ('FMS') program." ECF 1 ¶ 73 (cleaned up). But, "government contractors obtain certain immunity in connection with work which they do pursuant to their contractual undertaking[s] with the United States." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166 (2016) (alteration omitted) (quoting *Brady v. Roosevelt S.S. Co.*, 317 U.S. 575, 583 (1943)). As the Fourth Circuit has recognized, "[i]mposing liability on private agents of the government would directly impede the significant governmental interest in the completion of its work …. 'particularly in light of the government's unquestioned need to delegate government functions.'" *Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 466 (4th Cir. 2000) (citations omitted). In evaluating whether a contractor is entitled to derivative sovereign immunity, courts do not delve into how the contractor performed the contract, so long as the contractor was acting within the scope of authority "delegate[d] … down the chain of command" to the contractor. *Id.* "[I]f [the] authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will." *Yearsley*, 309 U.S. at 20-21. "The federal interest justifying this holding surely exists as much in procurement contracts as in performance contracts; we see no basis for a distinction." *Boyle v. United Technologies Corp.*, 487 U.S. 500, 505-06 (1988).

In an FMS contract, the U.S. Government contracts with U.S. companies to procure defense articles that the U.S. Government then, in turn, sells to its foreign government partners. *See* ECF 1 ¶ 59 ("In the context of U.S. arms sales, FMS is the U.S. government's program for transferring defense articles, services, and training to its international partners and international organizations…. Under FMS, the U.S. Government uses DOD's acquisition system to procure defense articles and services on behalf of its partners."); *Munitions Carriers Conf., Inc. v. United States*, 147 F.3d 1027, 1028 (D.C. Cir. 1998) (FMS "are military goods sold by the United States

to foreign governments.”). “Thus, for defense articles procured under the FMS Program, there are contractual relationships between the United States and the foreign government and between the United States and the defense contractor. *Notably, there is no contract between the foreign government and the defense contractor*.” *Heroth v. Kingdom of Saudi Arabia*, 565 F. Supp. 2d 59, 62 (D.D.C. 2008) (emphasis added), *aff'd*, 331 F. App'x 1 (D.C. Cir. 2009).

Thus, Plaintiffs seek to impose liability on the Contractor Defendants and CEO Defendants because the Contractor Defendants performed their obligations under their respective FMS contracts with the U.S. Government—i.e., delivering the defense articles that the United States purchased and then sold to its foreign allies. Derivative sovereign immunity precludes such claims. *See Butters*, 225 F.3d at 466; *see also Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 646–49 (4th Cir. 2018) (granting immunity when contractor followed contract scope of work); *Westfall v. Ervin*, 484 U.S. 292, 295–98, 296 n.3 (1988); *In re Series 7 Broker Qual. Exam Scoring Litig.*, 510 F. Supp. 2d 35, 45 (D.D.C. 2007), *aff'd*, 548 F.3d 110 (D.C. Cir. 2008). Accordingly, the claims against the Contractor Defendants and CEO Defendants must be dismissed.[24]

---

[24] While the Complaint mentions in passing that "[i]nternational partners can also obtain U.S. defense articles and services through Direct Commercial Sales (DCS)," ECF 1 ¶ 60, it expressly states that Plaintiffs' claims against the Contractor Defendants and CEO Defendants are predicated on sales "made through the [FMS] program," *id.* ¶ 73. Even if Plaintiffs had alleged claims based on DCS contracts, the doctrine of derivative sovereign immunity would still bar such claims. As both the Complaint and the Federal Defendants' motion to dismiss make clear, DCS sales are governed by the same statutory and regulatory framework as FMS sales; they are subject to the same strict U.S. Government controls, approvals, Congressional review, and end use monitoring as FMS sales; and, like FMS sales, DCS sales are conducted in furtherance of the United States' national security and foreign policy objectives pursuant to statutory authorization conferred in the AECA. *See, e.g.*, ECF 1 ¶¶ 55-60; ECF 31-1 at 2-3, 5-6. Thus, in both DCS and FMS transactions, the Government "authorized and directed" the contractor's actions, and its authority to do so was "validly conferred." *Yearsley*, 309 U.S. at 20-21.

## V. THE COMPLAINT FAILS TO STATE A CLAIM AGAINST THE CONTRACTOR DEFENDANTS.[25]

### A. Count III Fails To State a Claim Under the Alien Tort Statute.

Count III asserts a claim under the Alien Tort Statute ("ATS"), which authorizes suit "by an alien for a tort … committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. In *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), the Supreme Court explained that "the ATS is a jurisdictional statute creating no new causes of action," and held that courts should exercise "judicial caution" in exercising common-law authority to recognize any private rights of action under the ATS beyond the three offenses that the First Congress had in mind at the time of the ATS's enactment in 1789: violation of safe conducts, infringement of the rights of ambassadors, and piracy. *Id.* at 724-25 ("[W]e have found no basis to suspect Congress had any examples in mind beyond those torts corresponding to Blackstone's three primary offenses[.]"). *Sosa* held that "courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized." *Id.* at 725. Among other reasons, the Court noted that "a decision to create a private right of action is one better left to legislative judgment in the great majority of cases," and "the possible collateral consequences of making international rules privately actionable argue for judicial caution." *Id.* at 727.

### 1. Plaintiffs' Extraterritorial Application of the ATS Is Foreclosed by Supreme Court Precedent.

It is well settled that the ATS does not apply extraterritorially. *See Kiobel v. Royal Dutch Petrol. Co.*, 569 U.S. 108, 124-25 (2013). Thus, where "all the relevant conduct took place outside

---

[25] In addition to the arguments set forth in Section VI, *infra*, the CEO Defendants join in the arguments set forth in this section supporting dismissal of Counts III, VII and VIII, which are pleaded against both the Contractor Defendants and the CEO Defendants.

the United States," an ATS claim is properly dismissed. *Id.* at 124 ("[P]etitioners' case seeking relief for violations of the law of nations occurring outside the United States is barred"). "Even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application." *Id.* at 124-25.

Here, the relevant conduct—the two alleged bombings by Coalition military forces—occurred outside the United States. *See, e.g.*, ECF 1 ¶¶ 11-13, 22. The only domestic conduct pleaded as to the Contractor Defendants and CEO Defendants consists of allegations of general corporate activities like contracting, lobbying, political contributions, corporate policies, decisionmaking, and executive compensation—all of which are many steps removed from either of the alleged bombings and, thus, an insufficient domestic nexus for an ATS claim. *See, e.g.*, ECF 1 ¶¶ 46-48, 74-82 (allegations regarding RTX Corporation); *id.* ¶¶ 49-50, 83-91 (allegations regarding Lockheed Martin). (There are no well-pleaded allegations to support a claim against the CEO Defendants. *See* Argument, Section VI, *infra*.) As the Supreme Court has made clear, "allegations of general corporate activity—like decisionmaking—cannot alone establish domestic application of the ATS." *Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931, 1937 (2021) (plurality op.). "Because making 'operational decisions' is an activity common to most corporations, generic allegations of this sort do not draw a sufficient connection between the cause of action respondents seek—aiding and abetting forced labor overseas—and domestic conduct." *Id.* Because the ATS claims here are based on similar allegations, they too fail to establish a sufficient connection between bombings overseas and domestic conduct. Therefore, Count III is properly dismissed on this basis.

2.      **Plaintiffs' ATS Claim Is Contrary to *Sosa* and Would Pose Serious Collateral Consequences for U.S. Foreign Policy and National Security.**

Count III also fails because it asks the Court to recognize a private right of action that flies past the guardrails imposed in *Sosa*. Count III seeks to advance an aiding and abetting theory of liability under the ATS against defense contractors for selling defense articles that foreign governments ultimately used in connection with a military conflict abroad. Plaintiffs characterize this as "aiding and abetting … indiscriminate airstrikes," ECF 1 ¶ 44, but the Complaint acknowledges that the United States itself "has been intervening in the hostilities between the Coalition and the Houthis in Yemen" since March 2015, including by "conducting [roughly 165] direct strikes by the U.S. military" and "by providing lethal aid to the Coalition," *id.* ¶ 3. Plaintiffs also admit that Congress has determined that the conflict in Yemen "is within the meaning of section 4(a)(1) of the War Powers Resolution (50 U.S.C. 1543(a)(1)) because United States Armed Forces are either involved in hostilities or their involvement in hostilities is imminent." *Id.* And Plaintiffs allege that "[t]he ongoing war in Yemen could not be sustained without military support from the United States," *id.* ¶ 148, "including through arms transfers" to the Coalition, *id.* ¶ 149, and that the U.S. "State [Department] and [Department of Defense] approved the sale of lethal weapons to the Coalition that eventually led to the Plaintiffs' injuries." *Id.* ¶ 164. Plaintiffs even allege that this aid was provided while "the U.S. Government has had indications that U.S.-origin defense articles may have been used in strikes against civilians." *Id.* ¶ 227. The Complaint also makes clear that the military conflict in Yemen has been the subject of significant debate within the political branches and within international organizations. *See, e.g.*, *id.* ¶¶ 149, 150, 152.

The Court should decline Plaintiffs' invitation to recognize an ATS claim on these allegations. In *Sosa*, the Supreme Court held that when determining whether an international law norm should be recognized and enforced through a private right of action under the ATS, the

principle at issue must be both "accepted by the civilized world" and defined with "specificity," and in both respects the norms must be "comparable to the features of the 18th-century paradigms," i.e., violation of "safe conducts, infringement of the rights of ambassadors, and piracy." *Sosa*, 542 U.S. at 720, 724-25. The Court identified many reasons for this "judicial caution:" (i) "the prevailing conception of the common law has changed since 1789 in a way that counsels restraint in judicially applying internationally generated norms," *id.* at 725; (ii) "the general practice has been to look for legislative guidance before exercising innovative authority over substantive law," and "[i]t would be remarkable to take a more aggressive role in exercising a jurisdiction that remained largely in shadow for much of the prior two centuries," *id.* at 726; (iii) "a decision to create a private right of action is one better left to legislative judgment in the great majority of cases," particularly given "the possible collateral consequences of making international rules privately actionable," *id.* at 727; (iv) "the potential implications for the foreign relations of the United States of recognizing such causes should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs," *id.*; and (v) "[w]e have no congressional mandate to seek out and define new and debatable violations of the law of nations, and modern indications of congressional understanding of the judicial role in the field have not affirmatively encouraged greater judicial creativity." *Id.* at 728.

In the Supreme Court's recent decision in *Nestlé USA, Inc.*, four justices expressed support for the proposition that courts should strictly limit judicial recognition of private rights of action under the ATS to the three 18th-century torts identified in *Sosa*. *See* 141 S. Ct. at 1939 (plurality op.) ("[F]ederal courts should not recognize private rights of action for violations of international law beyond the three historical torts identified in *Sosa*."); *id.* at 1940-43 (Gorsuch, J., concurring) ("[T]he time has come to jettison the misguided notion that courts have discretion to create new

causes of action under the ATS."); *id.* at 1951 (Alito, J., dissenting) (observing that the plurality and concurring opinions "make strong arguments that federal courts should never recognize new claims under the ATS"). Thus, there is good reason to believe that the current Supreme Court would reject an ATS claim untethered to those three 18th-century torts.

And, in *Doe I v. Exxon Mobil Corp.*, this Court dismissed an ATS claim against a U.S. corporation for allegedly aiding and abetting acts of extrajudicial killing and torture by Indonesian military forces. 391 F. Supp. 3d 76 (D.D.C. 2019). There, the Court applied *Sosa*'s "two-part test" to find that "there is not a specific, universal, and obligatory norm of corporate liability under currently prevailing international law as required by *Sosa* for ATS cases," *id.* at 90, and that "[s]eparation of powers and foreign relations concerns lead the Court to decline to recognize domestic corporate liability under the ATS in circumstances where, as here, the claims have caused significant diplomatic strife," *id.* at 85.[26]

Here, as in *Exxon Mobil Corporation*, the proposed ATS claim runs afoul of *Sosa*'s threshold requirements. Under *Sosa*'s first step, "[t]he Court must determine whether plaintiffs can demonstrate that the alleged violation is a specific, universal, and obligatory international norm." *Exxon Mobil Corp.*, 391 F. Supp. 3d at 87. This requires the Court to consider "whether international law extends the scope of liability for a violation of a given norm *to the perpetrator being sued*." *Sosa*, 542 U.S. at 732 & n.20 (emphasis added). Thus, it is not enough to ask whether aiding and abetting liability might be available in the abstract, or in a different context. Rather, the Court must determine whether there is an international norm for civil aiding and abetting liability

---

[26] Although the D.C. Circuit initially recognized the ATS claim in *Doe VIII v. Exxon Mobil Corp.*, 654 F.3d 11, 28-30 (D.C. Cir. 2011), the court subsequently vacated its decision, *see* 527 F. App'x 7 (D.C. Cir. 2013), "based on intervening changes in the law governing the extraterritorial reach of the ATS and the standard for aiding and abetting liability," *Doe I v. Exxon Mobil Corp.*, 391 F. Supp. 3d 76, 79 (D.D.C. 2019).

based on the facts as alleged here—i.e., whether defense contractors are liable for the use of their defense articles by sovereign nations in a military conflict—that is defined with a "specificity" comparable to the "18th-century paradigms" identified in *Sosa*. 542 U.S. at 725. No such international norm exists. "There is not a specific, universal, and obligatory norm of corporate liability under currently prevailing international law as required by *Sosa* for ATS cases," *Exxon Mobil Corp.*, 391 F. Supp. 3d at 90, let alone one that extends to private contractors based on the sale of defense articles used in a military conflict. Accordingly, the Court would be called upon not only to recognize a claim for aiding and abetting liability by defense contractors, but also to decide a host of other issues not addressed by international law, such as the elements of this "defense contractor liability," the standard of causation, available defenses, and the allocation of liability among multiple alleged tortfeasors. *Sosa* precludes this kind of judicial law-making.

"Under the second part of *Sosa*'s test, the Court must determine whether allowing the case to proceed under the ATS is a proper exercise of judicial discretion." *Exxon Mobil Corp.*, 391 F. Supp. 3d at 91. Here, it is plainly not. To the contrary, "[t]he judicial restraint required by *Sosa* is particularly appropriate where, as here, a court's reliance on supposed international law would impinge on the foreign policy prerogatives of our legislative and executive branches." *Saleh v. Titan Corp.*, 580 F.3d 1, 16 (D.C. Cir. 2009). There would be grave "collateral consequences," *Sosa*, 542 U.S. at 727, if the Court were to recognize a private right of action against defense contractors for providing defense articles that were ultimately used by foreign allies of the U.S. Government in a military conflict—particularly one in which the United States is directly involved, *see, e.g.*, ECF 1 ¶¶ 3, 148, 149. As the Complaint makes clear, the United States made a foreign policy determination to provide military assistance and defense articles to its foreign allies in connection with a military conflict recognized by both the Executive and Legislative Branches,

and it entered into FMS contracts with the Contractor Defendants precisely so it could provide their respective defense articles to those allies. *See* ECF 1 ¶¶ 3, 56-59, 73. But, Count III asks the Court to find that "[t]he military leaders of Saudi Arabia and the UAE committed war crimes, extrajudicial killings, and torture against the Plaintiffs, in violation of international law." ECF 1 ¶ 198. As the Federal Defendants correctly note, a determination that "these foreign sovereigns are engaged in a 'consistent pattern of gross violations of internationally recognized human rights' …. might have serious foreign relations repercussions standing alone." ECF 31-1 at 41 (quoting 22 U.S.C. § 2304(a)(2)). Thus, the Judicial Branch's recognition of an ATS claim here risks threatening relations that are the product of "a complex and delicate balance of frequently shifting national security and foreign policy concerns" committed to the political branches. ECF 31-1 at 2. *See Exxon Mobil Corp.*, 391 F. Supp. 3d at 87 (dismissing ATS claim that "caused significant diplomatic strife" and implicated "the type of foreign relations tension the First Congress sought to avoid when passing the ATS").

Moreover, recognition of an ATS claim here would have a chilling effect on contractors' willingness to provide products and services to the United States or its allies, for fear that they could be subjected to civil litigation any time that a product or service is alleged to have been used in connection with a controversial military conflict. *See Boyle*, 487 U.S. at 507 ("The imposition of liability on Government contractors will directly affect the terms of Government contracts: either the contractor will decline to manufacture the design specified by the Government, or it will raise its price. Either way, the interests of the United States will be directly affected."). It was for precisely these sorts of reasons that *Sosa* warned that courts should be "particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs" by recognizing private rights of action. 542 U.S. at 727.

36

Even apart from *Sosa*, the allegations here "are insufficient to establish either the actus reus or mens rea elements of aiding and abetting liability under customary international law." *Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84, 109 (D.D.C. 2017) (dismissing ATS aiding and abetting claim against bank), *vacated in non-relevant part by* 285 F. Supp. 3d 240, 245-46 (2018), *and aff'd in relevant part by* 77 F.4th 667 (D.C. Cir. 2023).[27] "Actus reus for aiding and abetting under customary international law must consist of 'practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime.'" *Id.* at 108 (citing *Doe I v. Exxon Mobil Corp.*, No. 01-1357(RCL), 2015 WL 5042118, at *9 (D.D.C. July 6, 2015)). But here, the Complaint makes clear that the Contractor Defendants and their CEOs did not encourage or "participate in the attacks," *Ofisi*, 278 F. Supp. 3d at 109, nor have an advisory, supervisory or decisionmaking role in either of the bombings attributed to Coalition military forces. Instead, the Complaint alleges that the Contractor Defendants sold their respective defense articles pursuant to FMS contracts to the U.S. Government, which in turn provided them to its Coalition allies, *see* Argument, Section IV, *supra*. The provision of defense articles to the United States for the benefit of its foreign allies, "which is the only conduct pled in non-conclusory terms—is too tenuous to establish aiding and abetting liability." *Ofisi*, 278 F. Supp. 3d at 109. Similarly, the other conduct pleaded—lobbying, political contributions, corporate policies, and executive compensation—is many steps removed from either of the alleged bombings. *See, e.g.*, ECF 1 ¶¶ 46-48, 74-82 (RTX Corporation); *id.* ¶¶ 49-50, 83-91 (Lockheed Martin). Nor can allegations of lobbying and political contributions support a claim without violating the First Amendment. "When 'a person petitions

---

[27] The 2018 decision in *Ofisi* vacated the portion of the initial 2017 decision that dismissed claims against a different defendant. "The parts of the September 29 [2017] Order granting [the defendant bank's] motion to dismiss are not affected by this Order," *Ofisi v. BNP Paribas, S.A.*, 285 F. Supp. 3d 240, 245 (D.D.C. 2018), *vacated in non-relevant part by* 285 F. Supp. 3d 245-46 (2018), and were subsequently affirmed by the D.C. Circuit earlier this year, *see* 77 F.4th 667.

the government' in good faith, 'the First Amendment prohibits any sanction on that action.'"
*Venetian Casino Resort, L.L.C. v. Nat'l Lab. Rels. Bd.*, 793 F.3d 85, 89 (D.C. Cir. 2015) (quoting
*Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 696 (D.C. Cir. 2009)).

As to mens rea, the Complaint fails to plausibly allege that the Contractor Defendants or
their CEOs had actual knowledge that their respective defense articles were being used to target
civilians in Yemen. Instead, Count III expressly pleads "*constructive* knowledge of the defense
contractors because numerous news and official reports have documented the war crimes
committed by the Saudi-led coalition, and therefore the defense contractors *should have known*
that its [sic] conduct would assist the underlying violations." ECF 1 ¶ 199 (emphases added). But,
"[a]llegations that [a defendant] 'should have known' will not suffice in this context." *Ofisi*, 278
F. Supp. 3d at 109 (quoting *Mastafa v. Austl. Wheat Bd. Ltd.*, No. 07 Civ. 7955(GEL), 2008 WL
4378443, at *4-5 (S.D.N.Y. Sept. 25, 2008). "The knowledge element of aiding and abetting
requires that a defendant have 'actual knowledge' that it is assisting in the tortious conduct."
*Mastafa*, 2008 WL 4378443, at *5. Similarly, mens rea requires "that the defendant know the
intent of the principal." *Ofisi*, 278 F. Supp. 3d at 109 (quoting *Exxon Mobil Corp.*, 2015 WL
5042118, at *10). The Complaint includes no such allegations.

Indeed, while Plaintiffs refer generically to "arms sales" (*e.g.*, ECF 1 ¶¶ 5, 6, 80, 98), the
Complaint does not identify any specific transactions nor attempt to tie any specific transaction to
any specific misuse of a defense article that allegedly caused injury. This is not a minor pleading
deficiency. As the Federal Defendants note, the U.S. Government's process of review, approval,
and "actual delivery of the defense articles could take several years." ECF 31-1 at 15, n.11. Thus,
even if a defense article manufactured by a U.S. contractor was involved in one of the two alleged
bombings (*e.g.*, in 2015 and 2016), the U.S. Government may have approved such sale many years

prior, long before the crisis in Yemen. It is thus facially implausible that anyone involved in such sales, predating the Saudi-led coalition's existence, could have had the requisite mens rea.

At bottom, Plaintiffs' ATS claim is contrary to *Sosa*, and the Court should independently dismiss Count III on this basis.

**B.      Plaintiffs' Common-Law Causes of Action (Counts VI, VII & VIII) also Fail To State a Claim.**

The Complaint alleges common-law claims for unjust enrichment against the Contractor Defendants (Count VI), negligent supervision against all defendants (Count VII), and intentional infliction of emotional distress ("IIED") against the Contractor Defendants, the CEO Defendants, and other defendants (Count VIII). Even if these Counts were not subject to dismissal based on the arguments discussed *supra* (they are), they should be dismissed on the independent ground that they fail to state a claim on the merits.

As an initial matter, Plaintiffs do not expressly state which jurisdiction's law they contend applies to their "state law claims." ECF 1 ¶ 8. Applying the choice of law rules of the District of Columbia, the forum state, the most likely potential sources are the District of Columbia or Yemen.[28] Plaintiffs do not contend that Yemen law applies. Moreover, there are strong grounds to apply the law of the District of Columbia, as both (i) the forum state and (ii) the seat of the federal government, which executed and approved the contracts at issue, has an interest in the certainty, predictability and uniformity of results in cases involving U.S. officials and contractors, and has Federal Defendant officials named as defendants in Count VII.

---

[28] As this Court has explained, "[t]he District of Columbia uses a choice-of-law rule that blends a governmental interest analysis with a most significant relationship test." *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 89 (D.D.C. 2018) (Moss, J.) (alteration, citation and internal quotation marks omitted).

Applying District of Columbia law, it is clear that Plaintiffs' common law claims are defective in multiple respects:

1.      Each of Plaintiffs' common-law claims is time-barred. Claims for unjust enrichment, negligence, and IIED are generally subject to the District of Columbia's three-year residual limitations period (D.C. Code § 12-301(8)), unless they are "intertwined with" (i.e., completely dependent upon, or essentially the same as) a claim for assault, battery or wounding, in which case the District's one-year statute of limitations for the latter category of claims would apply (D.C. Code § 12-301(4)). *See Rendall–Speranza v. Nassim*, 107 F.3d 913, 920 (D.C. Cir. 1997); *Johnson v. Long Beach Mortg. Loan Tr. 2001-4*, 451 F. Supp. 2d 16, 48-49 (D.D.C. 2006); *Thomas v. News World Commc'ns*, 681 F. Supp. 55, 73 (D.D.C. 1988). The Court need not resolve whether the shorter limitations period applies because Plaintiffs' alleged injuries occurred in October 2015 and October 2016, long before this lawsuit was filed in March 2023, and thus are untimely even under the residual three-year limitations period. ECF ¶¶ 11-13, 22. Therefore, Counts VI, VII and VIII are properly dismissed on statute of limitations grounds.

2.      The Complaint also fails to plead the requisite elements of each claim. Unjust enrichment, for example, is a species of quasi-contract that "occurs when: (i) the plaintiff conferred a benefit on the defendant; (ii) the defendant retains the benefit; and (iii) under the circumstances, the defendant's retention of the benefit is unjust." *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005). But, here, the Complaint does not (and cannot) allege that there was any relationship between the Plaintiffs and the Contractor Defendants, let alone one in which the Plaintiffs conferred a benefit on the Contractor Defendants. Similarly, "[t]o establish a claim of negligent supervision, the plaintiff must establish that (i) the employee behaved in a dangerous or otherwise incompetent manner, (ii) the employer knew or should have known of its employee's

dangerous or incompetent behavior and (iii) the employer, 'armed with that actual or constructive knowledge, failed to adequately supervise the employee.'" *Busby v. Cap. One, N.A.*, 772 F. Supp. 2d 268, 284 (D.D.C. 2011) (quoting *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 760 (D.C. 2001) (citation omitted)). But, here, the Complaint contains no well-pleaded allegations of any "dangerous or incompetent behavior" by a Contractor Defendant employee. *Id.* Nor does the Complaint allege that any Contractor Defendant or CEO Defendant committed "an extreme or outrageous act that is intended to cause severe emotional distress," as necessary for an IIED claim, *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 45 (D.D.C. 2020) (citations omitted). Instead, the Complaint alleges only general corporate activities that are many steps removed from actual involvement or a decisionmaking role in either of the alleged bombings. *See, e.g.*, ECF 1 ¶¶ 46-48, 74-82 (RTX Corporation); *id.* ¶¶ 49-50, 83-91 (Lockheed Martin). This is an independent basis to dismiss Counts VI, VII and VIII.

## VI.   THE COMPLAINT FAILS TO STATE A CLAIM AGAINST THE CEO DEFENDANTS.

The Complaint names the CEO Defendants in four causes of action: (i) Count III, alleging violation of the ATS; (ii) Count IV, alleging that the CEO Defendants violated the Torture Victim Protection Act of 1991 ("TVPA");[29] (iii) Count VII, alleging negligent supervision; and (iv) Count VIII, alleging IIED. These claims should be dismissed for multiple reasons:

1.     The ATS, negligent supervision, and IIED claims are properly dismissed against the CEO Defendants for the same reasons as the Contractor Defendants. *See* note 25, *supra*.

---

[29] Count IV is asserted only against the CEO Defendants. The TVPA authorizes a cause of action against an "individual" for acts of torture and extrajudicial killing committed under authority or color of law of a foreign nation. 106 Stat. 73, notes following 28 U.S.C. § 1350. Corporations are not subject to suit under the TVPA. *See Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1404 (2018).

2.      Plaintiffs' TVPA claim (Count IV) fails for the independent reason that the TVPA extends liability only to individuals who act under "actual or apparent authority, or color of law, of any foreign nation." 106 Stat. 73, notes following 28 U.S.C. § 1350 ("TVPA"), § 2(a); *see Harbury v. Hayden*, 444 F. Supp. 2d 19, 41 (D.D.C. 2006) ("[T]he plain language of the TVPA limits liability to those acting under color of law of a foreign nation."). The Complaint contains no allegations, nor could Plaintiffs plausibly allege, that the CEO Defendants engaged in conduct pursuant to the authority or color of law of a foreign nation. Rather, Count IV makes clear that the CEO Defendants are being sued solely based on their corporate position and their respective employers' FMS contracts to provide defense articles to the U.S. Government for use by its coalition allies. *See* ECF 1 ¶¶ 206, 209, 210, 212, 213, 215. This is insufficient. *See Saleh*, 580 F.3d at 16 ("[W]e must assume that [it] was a deliberate decision [for Congress not to] include as possible [TVPA] defendants either American government officers or private U.S. persons, whether or not acting in concert with government employees."). And, while the Second Circuit has held that a private individual can act under color of law within the meaning of the TVPA by acting in concert with state officials, *see Kadic v. Karadžić*, 70 F.3d 232, 245 (2d Cir. 1995), the D.C. Circuit has stated that this "holding is not so broad," because "a quasi-state entity such as Radovan Karãdzíc's [sic] militia is easily distinguishable from a private actor such as [a government contractor]." *Saleh*, 580 F.3d at 14. More importantly, the Complaint contains no allegations remotely approaching those in *Kadic*. This, too, is fatal to Count IV.

3.      Indeed, all of the claims may be dismissed for the independent reason that there are no well-pleaded allegations to support a claim against either CEO Defendant. Instead, the Complaint offers only conclusory and threadbare allegations that (i) the CEO Defendants "had much greater access to information related to the illegal use of arms in Yemen" than is publicly

available, ECF 1 ¶¶ 82, 91; (ii) the CEO Defendants are "[e]qually liable," *id.* ¶ 44, "responsible for their own acts and for wrongdoing committed by employees under their command and control," *id.*, and "complicit in the Coalition leaders' commission of war crimes, extrajudicial killing, and torture against the Plaintiffs," *id.* ¶ 205; (iii) the Contractor Defendants "act[ed] through" the CEO Defendants to "'purposefully' cultivate relationships with Congress members" and "market[]" their respective defense articles, *id.* ¶ 209; and (iv) one of the CEO Defendants "has personally been receiving a sizable share of the company's profits from military action, including the war in Yemen," *id.* ¶ 48. None of these is sufficient to state a claim that either individual aided and abetted the alleged bombings. Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Complaint fails this well-settled standard.

The only specific allegation pleaded as to either CEO Defendant is that one defendant, during a January 2022 investor call, allegedly referred to "military actions involving the United Arab Republics (part of the Saudi-led coalition killing Yemenis)," and also referred to "the Middle East" as "an area where we'll continue to see solid growth.'" ECF 1 ¶ 199. This does not remotely support a cause of action. Nor could it, because as the Complaint makes clear, the CEO Defendants did not advise, encourage or participate in the bombings attributed to coalition military forces, nor did they have a supervisory or decisionmaking role in connection with either bombing.

This is fatal to Plaintiffs' claims. Using Count IV as an example, the TVPA provides that "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation—(1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for

wrongful death." TVPA § 2(a). To "subject" an individual to torture or an extrajudicial killing under the TVPA, one must act with the mens rea required to engage in torture or extrajudicial killing—i.e., deliberateness. Courts' application of 42 U.S.C. § 1983, the "most analogous statute" to the TVPA, provides guidance. *Manoharan v. Rajapaksa*, 711 F.3d 178, 180 (D.C. Cir. 2013) (per curiam). Congress patterned the TVPA after section 1983 and encouraged courts to "look to principles of liability" under that statute. S. Rep. No. 102-249, at 8; *see also* 42 U.S.C. § 1983 (imposing civil liability on a person who "subjects, or causes [a victim] to be subjected" to a deprivation of rights). But, here, the Complaint includes no well-pleaded allegations regarding either CEO Defendant that would satisfy this deliberateness requirement. Thus, Count IV is properly dismissed as to the CEO Defendants. The Complaint similarly lacks well-pleaded allegations to support the actus reus and mens rea elements of an ATS aiding and abetting claim, *see* Argument, Section V.A.2, *supra*, "an extreme or outrageous act that is intended to cause severe emotional distress," as necessary for an IIED claim, *Barry*, 437 F. Supp. 3d at 45, or any element of a negligent supervision claim, *see Busby*, 772 F. Supp. 2d at 284. Therefore, Counts III, VII and VIII are properly dismissed against the CEO Defendants on this basis as well.

## CONCLUSION

For the aforementioned reasons, the Court should dismiss all claims against the Contractor Defendants and the CEO Defendants.

Dated: October 19, 2023

Respectfully submitted,

**COVINGTON & BURLING LLP**

/s/ Daniel L. Russell Jr.
Daniel L. Russell Jr. (D.C. Bar No. 419655)
Raymond B. Biagini
    (D.C. Bar No. 388572) (*pro hac vice*)
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-5420
(202) 778-5420 (fax)
DRussell@cov.com
RBiagini@cov.com

*Counsel for Defendants RTX Corporation
  and Gregory J. Hayes*

**WILLIAMS & CONNOLLY LLP**

/s/ Christopher N. Manning
Christopher N. Manning (D.C. Bar No. 464069)
Joseph G. Petrosinelli (D.C. Bar 434280)
680 Maine Avenue, SW
Washington, D.C. 20024
(202) 434-5000
(202) 434-5029 (fax)
CManning@wc.com
JPetrosinelli@wc.com

*Counsel for Defendants Lockheed Martin
  Corporation and James D. Taiclet*