**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Amin Allawi Ali, *et al*. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action 1:23-cv-00576-RDM |
| | ) | |
| Mohamed Ben Zayed Al-Nahyan, *et al*. | ) | |
| | ) | |
| Defendants. | ) | |

**STATEMENT OF POINTS AND AUTHORITIES**
**IN SUPPORT OF GENERAL DYNAMICS CORPORATION'S**
**AND PHEBE NOVAKOVIC'S MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ..................................................................................................... 1

FACTUAL BACKGROUND ....................................................................................... 4

I.      SALES OF DEFENSE ARTICLES TO FOREIGN ENTITIES ....................................... 4

II.     YEMEN'S CIVIL WAR ................................................................................... 8

III.    PLAINTIFFS' ALLEGATIONS ........................................................................... 9

LEGAL STANDARDS ............................................................................................. 11

ARGUMENT .......................................................................................................... 12

I.      THE POLITICAL QUESTION DOCTRINE BARS PLAINTIFFS' CLAIMS.............. 12

        A.      The Political Question Doctrine Bars Adjudication of Claims Requiring
                an Assessment of Military or Foreign Policy Determinations............................. 13

        B.      Plaintiffs' Claims Fall in the Heartland of the Political Question Doctrine
                and Must Be Dismissed. ................................................................................. 15

II.     DERIVATIVE SOVEREIGN IMMUNITY BARS PLAINTIFFS' CLAIMS................ 16

III.    PLAINTIFFS LACK STANDING TO PURSUE THEIR CLAIMS. ........................... 18

IV.     THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE ATS........................ 21

        A.      The ATS Does Not Provide a Cause of Action Against Non-State Actors
                for the Torts Alleged Here. ............................................................................. 22

                1.      The ATS Permits Only a Very Narrow Set of Claims............................ 22

                2.      Plaintiffs Have No Cause of Action Under the ATS. ........................... 23

        B.      The Complaint Alleges an Improper Extraterritorial Application of the
                ATS................................................................................................................. 25

        C.      Even If Plaintiffs Could Pursue an Aiding and Abetting Claim Under the
                ATS, They Have Failed to Sufficiently Allege It. .............................................. 26

V.      THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE TVPA..................... 27

VI.     PLAINTIFFS' COMMON LAW CLAIMS FAIL AS A MATTER OF LAW................ 29

A.     Plaintiffs' Unjust Enrichment Claim Fails as a Matter of Law. ........................... 29

B.     Plaintiffs' Negligent Supervision Claim Fails as a Matter of Law. ...................... 30

C.     Plaintiffs' Intentional Infliction of Emotional Distress Claim Fails as a Matter of Law. ................................................................................................... 30

CONCLUSION ................................................................................................................ 31

# TABLE OF AUTHORITIES*

CASES

*Abulhawa v. United States Department of the Treasury*, 239 F. Supp. 3d 24 (D.D.C. 2017) ....................................................................................................................19, 20

*Air Excursions LLC v. Yellen*, 66 F.4th 272 (D.C. Cir. 2023) ...............................20–21

*Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1 (D.D.C. 2010)......................................................13

*Ali Shafi v. Palestinian Authority*, 642 F.3d 1088 (D.C. Cir. 2011) ...............................23

*American National Insurance Co. v. FDIC*, 642 F.3d 1137 (D.C. Cir. 2011)..............................11

*Arias v. Dyncorp*, 738 F. Supp. 2d 46 (D.D.C. 2010)......................................................18

*Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015) ..........................................................19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......................................................................12

*Aston v. Johnson & Johnson*, 248 F. Supp. 3d 43 (D.D.C. 2017) ..................................29

*Aziz v. Alcolac, Inc.*, 658 F.3d 388 (4th Cir. 2011)......................................................26

*Bega v. Jaddou*, No. CV 22-02171, 2022 WL 17403123 (D.D.C. Dec. 2, 2022) ..........................4

*Blenheim Capital Holdings Ltd. v. Lockheed Martin Corp.*, 53 F.4th 286 (4th Cir. 2022) .........................................................................................................6, 7

*Boyd v. Kilpatrick Townsend & Stockton, LLP*, 79 F. Supp. 3d 153 (D.D.C. 2015)....................29

*Broidy Capital Management LLC v. Muzin*, 12 F.4th 789 (D.C. Cir. 2021) ................................11

*Busby v. Capital One, NA*, 772 F. Supp. 2d 268 (D.D.C. 2011)......................................30

*Carmichael v. Kellogg, Brown & Root Services, Inc.*, 572 F.3d 1271 (11th Cir. 2009) .........................................................................................................15

*Clean Label Project Foundation v. Garden of Life, LLC*, No. CV 20-3229, 2021 WL 4318099 (D.D.C. Sept. 23, 2021) .....................................................................11

*Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019 (W.D. Wash. 2005) ........................27

*Corrie v. Caterpillar, Inc.*, 503 F.3d 974 (9th Cir. 2007).............................14, 15, 16

---

* Authorities upon which we chiefly rely are marked with an asterisk.

*Cunningham v. General Dynamics Information Technology, Inc.*, 888 F.3d 640 (4th
Cir. 2018) ......................................................................................................17–18

*\*Doe I v. Apple Inc.*, No. 19-CV-03737, 2021 WL 5774224 (D.D.C. Nov. 2, 2021)
......................................................................................................19–20, 31

*Doe I v. Unocal Corp.*, 395 F.3d 932 (9th Cir. 2002) ..................................................25

*Doe v. Exxon Mobil Corp.*, 654 F.3d 11 (D.C. Cir. 2011) ..........................................24

*EEOC v. St. Francis Xavier Parochial School*, 117 F.3d 621 (D.C. Cir. 1997) ............................4

*\*El-Shifa Pharmaceutical Industries Co. v. United States*, 607 F.3d 836 (D.C. Cir.
2010) ............................................................................................................13, 14

*Enahoro v. Abubakar*, 408 F.3d 877 (7th Cir. 2005) ..................................................25

*Gallagher v. Eat to the Beat, Inc.*, 480 F. Supp. 3d 79 (D.D.C. 2020) ........................11

*Gutrejman v. United States*, 596 F. Supp. 3d 1 (D.D.C. 2022) ....................................13

*Haig v. Agee*, 453 U.S. 280 (1981) ........................................................................13–14

*Harbury v. Hayden*, 444 F. Supp. 2d 19 (D.D.C. 2006) ............................................27

*Indigenous People of Biafra v. Sheehan*, No. CV 21-2743, 2022 WL 17338098
(D.D.C. Nov. 30, 2022) ..................................................................................11

*Jaber v. United States*, 861 F.3d 241 (D.C. Cir. 2017) ..............................................16

*Jam v. International Finance Corp.*, 3 F.4th 405 (D.C. Cir. 2021) ..............................26

*Japan Whaling Association v. American Cetacean Society*, 478 U.S. 221 (1986) ......................13

*\*Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386 (2018) ............................................22, 25

*Johnson v. Paragon Systems, Inc.*, 195 F. Supp. 3d 96 (D.D.C. 2016) ..................30–31

*Kareem v. Haspel*, 986 F.3d 859 (D.C. Cir. 2021) ....................................................21

*In re: KBR, Inc.*, 893 F.3d 241 (4th Cir. 2018) ..........................................................15

*In re KBR, Inc., Burn Pit Litigation*, 744 F.3d 326 (4th Cir. 2014) ..............................17

*Lamb v. Millennium Challenge Corp.*, 573 F. Supp. 3d 346 (D.D.C. 2021) ................12

*Leach v. National Railroad Passenger Corp.*, 128 F. Supp. 3d 146 (D.D.C. 2015) ..................30

*Levine v. American Psychological Association (In re APA Assessment Fee Litigation)*, 766 F.3d 39 (D.C. Cir. 2014) ................................................................29

*Estate of Manook v. Research Triangle Institute, International & Unity Research Group, L.L.C.*, 693 F. Supp. 2d 4 (D.D.C. 2010) ...................................................24

*Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437 (2007) .................................................25

*Mohamad v. Palestinian Authority*, 566 U.S. 449 (2012) ...........................................24

*National Treasury Employees Union v. Office of Personnel Management (In re United States Office of Personnel Management Data Security Breach Litigation)*, 928 F.3d 42 (D.C. Cir. 2019) .................................................................17

*\*Nestle USA, Inc. v. Doe*, 141 S. Ct. 1931 (2021) .........................................22, 25–26

*\*Saldana v. Occidental Petroleum Corp.*, 774 F.3d 544 (9th Cir. 2014) ..............15, 16

*Saleh v. Titan Corp.*, 436 F. Supp. 2d 55 (D.D.C. 2006).............................................23

*\*Saleh v. Titan Corp.*, 580 F.3d 1 (D.C. Cir. 2009)......................................23, 24, 28

*Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005)........................................14, 16

*\*Siegel v. United States Department of Treasury*, 304 F. Supp. 3d 45 (D.D.C. 2018) ..............................................................................................18–19, 20, 21

*Sinochem International Co. Ltd. v. Malaysia International Shipping Corp.*, 549 U.S. 422 (2007)....................................................................................................12

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).........................................................22

*Thompson v. Jasas Corp.*, 212 F. Supp. 2d 21 (D.D.C. 2002) ....................................31

*Venetian Casino Resort, L.L.C. v. NLRB*, 793 F.3d 85 (D.C. Cir. 2015) ....................27

*Whiting v. AARP*, 701 F. Supp. 2d 21 (D.D.C. 2010)..............................................29–30

*Woods v. District of Columbia*, No. CV 20-0782, 2020 WL 6392775 (D.D.C. Nov. 2, 2020) .......................................................................................................30

*\*Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940) ....................................17

## STATUTES AND REGULATIONS

22 U.S.C. § 2304(a)(2)....................................................................................................8

22 U.S.C. § 2304(a)(4)....................................................................................................8

22 U.S.C. § 2751, *et seq.* ........................................................................................5

22 U.S.C. § 2752(b) .........................................................................5, 15–16

22 U.S.C. § 2753(a)(1) ..........................................................................5

22 U.S.C. § 2761 ....................................................................................6

22 U.S.C. § 2762 ....................................................................................6

22 U.S.C. § 2762(a) ..............................................................................6

22 U.S.C. § 2776(b) ..............................................................................5

22 U.S.C. § 2776(b)(1) .........................................................................6

22 U.S.C. § 2776(b)(1)(P) ....................................................................6

22 U.S.C. § 2778(a)(1–2) ......................................................................5

28 U.S.C. § 1350 .................................................................................22

28 U.S.C. § 1350 note .........................................................................27

28 U.S.C. § 2680(a) ............................................................................18

22 C.F.R. § 130.7 ..................................................................................6

## LEGISLATIVE MATERIALS

*Statement by President Bush upon Signing H.R.2092*, 28 Weekly Comp. Pres. Doc. 465 (Mar. 12, 1992) ................................................................................28

## OTHER AUTHORITIES

Press Release, U.S. Department of Defense, *Department of Defense Unveils Comprehensive Recommendations to Strengthen Foreign Military Sales* (June 13, 2023), https://www.defense.gov/News/Releases/Release/Article/3425963/ department-of-defense-unveils-comprehensive-recommendations-to-strength en-forei/ ..............................................................................................5

Press Release, White House, *Presidential Policy Directive—United States Conventional Arms Transfer Policy* (Jan. 15, 2014), https://obamawhite house.archives.gov/the-press-office/2014/01/15/presidential-policy-directive-united-states-conventional-arms-transfer-p ..........................................7, 8

Donald J. Trump, *National Security Presidential Memorandum Regarding U.S. Conventional Arms Transfer Policy* (Apr. 19, 2018), https://trumpwhite house.archives.gov/presidential-actions/national-security-presidential-memora ndum-regarding-u-s-conventional-arms-transfer-policy/ .........................................................8

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), General Dynamics Corporation and its Chairman and CEO Phebe Novakovic (collectively, "GD") respectfully move to dismiss Plaintiffs' claims against GD.

## INTRODUCTION

Controlling law forecloses Plaintiffs' claims against GD in their entirety.  They should be dismissed.  After Iran-backed militants deposed Yemen's President in 2015, two successive presidential administrations made the national security judgment to provide military support to a coalition of nations ("Coalition") seeking to restore the deposed government.  The United States provided that support by facilitating the transfer of weapons, including GD manufactured weapons, to Coalition countries.  As required by statute, the Executive Branch certified that each transfer would "best serve[]" "the foreign policy of the United States."  Plaintiffs now demand that this Court second-guess the Executive's foreign policy judgments and hold GD liable for supplying weapons after the United States expressly approved those transfers as serving the national interest.

The political question doctrine squarely bars those claims.  Plaintiffs allege that Coalition countries injured them using GD weapons.  But successive Presidential administrations specifically considered the various and serious consequences of transferring weapons to the Coalition, including assessing both the benefits of defeating a terrorist group as well as the risks of misuse of the weapons and resulting human rights implications.  That assessment was a quintessential policy judgment, and if the political question doctrine means anything, it is that parties may not use the judicial system to litigate policy judgments involving foreign policy and national security determinations.  The Constitution commits those judgments to the political branches; this Court has no manageable standard for evaluating those judgments; and this Court could not evaluate those judgments and adjudicate Plaintiffs' claims without questioning the correctness of the political branches' decisions.  That is why the D.C. Circuit has consistently held

that claims premised on the correctness of the political branches' national security determinations are nonjusticiable.  Plaintiffs' claims fail under that binding precedent.

The Court need go no further than the political question doctrine to dismiss the claims against GD.  But several other blackletter law doctrines independently bar Plaintiffs' claims.

***Derivative Sovereign Immunity Bars Plaintiffs' Claims.***  The Supreme Court has long held that where the government is immune, a government contractor cannot be sued for damages for carrying out a valid government directive.  Yet that is precisely what Plaintiffs seek to do: the very premise of the Complaint is that GD is liable *because* it provided the weapons that the United States approved for use by Coalition countries.  Had the government produced and supplied those weapons itself, it would be immune from a damages claim.  The government's decision to authorize the procurement of those weapons from GD does not allow Plaintiffs to sidestep that immunity.  Derivative sovereign immunity bars all of Plaintiffs' claims.

***Plaintiffs Lack Standing.***  Standing is another threshold doctrine that bars Plaintiffs' claims.  As this Court has explained, standing requires the plaintiffs to establish causation; that is, that *defendants'* actions, and not those of another party, injured them.  Here, GD's conduct is doubly removed from Plaintiffs' alleged injuries.  First, Plaintiffs' alleged injuries arose from Coalition attacks—attacks that Plaintiffs do not and cannot allege that GD authorized, directed, or otherwise participated in.  Plaintiffs cannot pursue claims against GD based on the independent conduct of entities that GD does not control.  And second, Plaintiffs fail to adequately allege that GD-supplied products injured them.  Plaintiffs' allegations against GD are limited to (1) a general and conclusory assertion that GD products caused them injury and (2) an admittedly unverified assertion that a bomb supplied by someone else, and that Plaintiffs do not allege injured them, contained GD parts.  As this Court and others have recognized, Article III causation requires more.

***Plaintiffs Fail to State a Claim Under the ATS.***  Plaintiffs assert a claim against GD under the Alien Tort Statute ("ATS").  The ATS has been the subject of numerous recent opinions from the Supreme Court and the D.C. Circuit that foreclose Plaintiffs' claim here.  First, the ATS permits only an extremely limited scope of claims, and the D.C. Circuit has held that the ATS cannot be used to bring claims for torts such as war crimes, whether directly or under an aiding and abetting theory, against *non-state* actors such as GD.  Second, as the Supreme Court recently held, the ATS does not apply extraterritorially to fundamentally foreign conduct like the Yemen bombings alleged here.  Plaintiffs cannot avoid that prohibition by asserting that an American company aided and abetted foreign conduct through general domestic corporate activity, such as entering into contracts here in the United States.  Third, even if Plaintiffs could pursue their ATS claim against GD (and they cannot), Plaintiffs fail to adequately allege it.  As Plaintiffs acknowledge, aiding and abetting requires *intent* to facilitate the tort in question, and the Complaint does not allege that GD intended its weapons to be used to facilitate unlawful killings.

***Plaintiffs Fail to State a Claim Under the TVPA.***  Plaintiffs' parallel aiding and abetting claim against Ms. Novakovic under the Torture Victims Protection Act ("TVPA") is legally meritless.  That statute by its plain terms reaches only conduct under color of *foreign* law, a requirement which, as the D.C. Circuit has observed, was not intended to permit liability against an American citizen such as Ms. Novakovic.  And regardless, Plaintiffs do not allege Ms. Novakovic acted under color of foreign law; nor could they given that the Complaint contends that she facilitated the provision of weapons through a *U.S.* company under a *federal* program.  Moreover, as with the ATS claim, Plaintiffs' aiding and abetting allegations are legally deficient because they fail to allege intent.

***Plaintiffs' Common Law Claims Fail as a Matter of Law.***  Finally, Plaintiffs' common law claims fail as a matter of law because they omit necessary elements and rely on conclusory boilerplate allegations.  Among other legal defects, Plaintiffs' unjust enrichment claim fails because the Complaint does not and cannot allege that Plaintiffs conferred a benefit on GD that GD inequitably retained.  Their negligent supervision claim, which lumps together all Defendants (private, U.S. government, and foreign government) in a single undifferentiated allegation, is precisely the kind of conclusory assertion that is subject to dismissal.  And their claim of intentional infliction of emotional distress fails as a matter of law because Plaintiffs do not and cannot allege that GD intentionally sought to inflict emotional distress on Plaintiffs, and because it is not outrageous conduct to perform under a government contract.[1]

For these reasons, the Court should dismiss Plaintiffs' claims against GD.

## FACTUAL BACKGROUND[2]

## I.    SALES OF DEFENSE ARTICLES TO FOREIGN ENTITIES.

U.S. law forbids the sale of defense articles and services to foreign entities absent an express Executive Branch determination that the sale is in the national interest—an inquiry that expressly accounts for the foreign entity's human rights record and the risk of misuse of the weapons.  Plaintiffs allege that GD's "commercial sales to the Coalition countries (Saudi Arabia, United Arab Emirates, and Kuwait) are made through the Foreign Military Sales ('FMS') program."  Dkt. 1 at 33 (Compl. ¶ 73).  The United States Department of Defense ("DoD")

---

[1] The other government contractor defendants have moved to dismiss under the act of state doctrine.  Dkt. 36-1 at 35–39 (RTX & Lockheed Martin Defs. Mem., § III).  GD adopts that argument.

[2] The facts described in this Section are either taken from the Complaint, matters of public record, or otherwise subject to judicial notice.  *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *Bega v. Jaddou*, No. CV 22-02171, 2022 WL 17403123, at *3 (D.D.C. Dec. 2, 2022) (courts may take judicial notice of material found on public government websites).

describes the FMS program as a "fundamental tool of U.S. foreign policy and national security."[3] When an FMS transaction takes place, the U.S. government contracts directly with U.S. firms to procure defense articles it intends to transfer, and later determines whether, when, and how to sell or export those articles to our foreign partners.[4]  *See generally id.* at 26–27 (Compl. ¶ 59).

Unsurprisingly, FMS transactions implicate complex and consequential national security considerations.  The Arms Export Control Act ("AECA"), 22 U.S.C. § 2751, *et seq.*, requires that before an FMS sale may take place, the President must find that transferring defense articles to the foreign country "will strengthen the security of the United States and promote world peace," *id.* § 2753(a)(1).  If the President makes that finding, the State Department and DoD's Defense Security Cooperation Agency ("DSCA") will jointly review the foreign government's request.  At the direction of the President, the Secretary of State then determines "whether there shall be a sale" to a foreign country.  *Id.* § 2752(b).  To make that determination, the Secretary evaluates whether "the foreign policy of the United States would be best served" by the sale.  *Id.*

If, after conducting this review, the State Department approves the sale, Congress must be notified 30 days before transactions above a certain dollar value can be finalized.  *Id.* § 2776(b).

---

[3] Press Release, U.S. Dep't of Def., *Department of Defense Unveils Comprehensive Recommendations to Strengthen Foreign Military Sales* (June 13, 2023), https://www.defense. gov/News/Releases/Release/Article/3425963/department-of-defense-unveils-comprehensive-recommendations-to-strengthen-forei/.

[4] The Complaint also contains a general allegation that "[i]nternational partners can [] obtain U.S. defense articles and services through Direct Commercial Sales (DCS)," Dkt. 1 at 27 (Compl. ¶ 60), but does not allege that any such articles or services were sold to the Coalition countries through DCS.  This motion thus focuses on FMS sales, but the method of transfer makes no difference to the analysis.  Regardless whether a sale is made through FMS or DCS, the Executive Branch must make the same national interest findings, taking into account national security, foreign policy, humanitarian, and other factors, before any defense article or service may be exported to a foreign end-user.  *See* 22 U.S.C. §§ 2752(b), 2778(a)(1–2); Dkt. 1 at 27 (Compl. ¶ 60) (acknowledging that government "approval is required before exporting a defense article or providing a defense service to a foreign end-user" via DCS); *see also* Dkt. 31-1 at 16–17 (Fed. Defs. Mem., Stat. Background at § I(A)(2)) (describing DCS program).

Congress may reject any transaction by enacting "a joint resolution prohibiting the proposed sale[.]"  *Id.* § 2776(b)(1)(P).  That joint resolution may be overridden by a Presidential veto.  *Id.* § 2776(b)(1).

Upon approval, the government may "enter into contracts for the procurement of defense articles" with defense contractors on behalf of the foreign country.  *Id.* § 2762(a); 22 C.F.R. § 130.7 (defining supplier in the FMS context as "any person who enters into a contract with the Department of Defense for the sale of defense articles"); *see also* Dkt. 1 at 26–27 (Compl. ¶ 59) ("Under FMS, the U.S. Government uses DOD's acquisition system to procure defense articles and services on behalf of its [international] partners.").  The FMS customer pays the U.S. government for the weapons, which are then transferred to the customer either from existing government stock or a new procurement.  22 U.S.C. §§ 2761–2762.

This statutory and regulatory framework reveals three important truths.  *First*, FMS transactions are by "nature … subject to plenary U.S. government control" by both the Executive and Legislative branches.  *Blenheim Cap. Holdings Ltd. v. Lockheed Martin Corp.*, 53 F.4th 286, 295 (4th Cir. 2022), *petition for cert. filed*, 91 U.S.L.W. 3237 (U.S. Mar. 15, 2023) (No. 22-886).  Transfers to a foreign government occur if, and only if, the Executive Branch approves, and Congress does not block, the transaction.

*Second*, FMS transfers compel the Executive Branch to undertake careful assessments that balance difficult national security and foreign policy considerations.  Such transfers "reflect[] the national security interests of the United States" as they may be made "only in furtherance of U.S. public policy and mutual military cooperation between countries."  *Id.* (quoting *Sec'y of State for Def. v. Trimble Navigation Ltd.*, 484 F.3d 700, 707 (4th Cir. 2007)).  The inherent consequences of defense article transfers demand multiple levels of Executive and Congressional review by those

6

with sufficient subject matter knowledge and expertise.  *See id.*  at 295 (describing FMS transfers as being directed and influenced "by the President's and Congress's judgment on national security concerns").

*Third*, FMS decisions are, by design, steeped in Executive discretion to assess whether the open-ended statutory standards are satisfied.  Presidential Policy Directives and Memoranda illuminate how that discretion is exercised.  These multi-factor directives supply additional guidance that the Executive considers when evaluating proposed foreign arms transfers.  The standards may change from one administration to the next, but national security concerns have remained at the forefront even as the administration also accounts for potential harms from the transfer.

For example, President Obama's January 2014 directive—in place at the time of the October 2015 and 2016 incidents underlying Plaintiffs' Complaint—outlined 13 mandatory factors for consideration.  They include: whether the "transfer supports U.S. strategic, foreign policy, and defense interests through increased access and influence, allied burden sharing, and interoperability"; the "[a]ppropriateness of the transfer in responding to legitimate U.S. and recipient security needs"; and "[c]onsistency with U.S. regional stability interests."[5]  These factors expressly encompass the "human rights, democratization, counterterrorism, counterproliferation, and nonproliferation record of the recipient" and require consideration of "the potential for misuse of the export in question."[6]  The Presidential directive further provides that the United States "will not authorize any transfer if it has actual knowledge at the time of authorization that the transferred

---

[5] Press Release, White House, *Presidential Policy Directive—United States Conventional Arms Transfer Policy* (Jan. 15, 2014), https://obamawhitehouse.archives.gov/the-press-office/2014/01/15/presidential-policy-directive-united-states-conventional-arms-transfer-p.
[6] *Id.*

arms will be used to commit … attacks directed against civilian objects or civilians who are legally protected from attack or other war crimes as defined in 18 U.S.C. § 2441."[7]   The Trump administration's 2018 Presidential Memorandum subsequently set forth 16 mandatory criteria that considered the same basic factors and included a similar prohibition on transferring weapons where the United States has actual knowledge that the articles will be used in civilian attacks.[8]

The Foreign Assistance Act, which supplements the Executive inquiry, charges the President with assessing whether a foreign sovereign has engaged in a "consistent pattern of gross violations of internationally recognized human rights," and bars any transfer if the President so determines (absent a further Presidential certification to Congress that an exception is warranted). 22 U.S.C. § 2304(a)(2), (4); *see also* Dkt. 31-1 at 17–18, 41 (Fed. Defs. Mem., Stat. Background at § II, Argument at § III).

In short, if the government approves the transfer of a defense article to a foreign end-user, the Executive Branch has necessarily assessed the risks and benefits to America's national security and foreign policy interests, including humanitarian risks and benefits, and concluded that they justify the transfer, and Congress has not exercised its authority to veto the sale.

## II.   YEMEN'S CIVIL WAR.

For nearly a decade, the United States has supported efforts in Yemen to restore the government of President Abd-Rabbu Mansour Hadi in the wake of a coup conducted by an Iran-aligned group known as the Houthis.   In 2014, Houthi insurgents captured Sana'a, Yemen's capital.   Dkt. 1 at 3 (Compl. ¶ 1).   The insurgents placed President Hadi on house arrest and he

---

[7] *Id.*

[8] Donald J. Trump, *National Security Presidential Memorandum Regarding U.S. Conventional Arms Transfer Policy* (Apr. 19, 2018), https://trumpwhitehouse.archives.gov/presidential-actions/national-security-presidential-memorandum-regarding-u-s-conventional-arms-transfer-policy/.

"resigned" as President in January 2015. *Id.* (Compl. ¶ 2). In February 2015, the Houthis took control of the Yemeni government. Following the Houthi takeover, President Hadi rescinded his resignation, declared himself the legitimate President of Yemen, deemed the Houthi takeover a coup, and escaped to Saudi Arabia. *Id.* at 3, 16 (Compl. ¶¶ 2, 32).

As the Government recounts, "Saudi Arabia and the UAE have long been significant security partners for the United States and the countries are 'working collectively toward the common goal of a stable, secure, and prosperous Middle East.'" Dkt. 31-1 at 18 (Fed. Defs. Mem., Factual Background at § I. That partnership has included "foreign military sales" ever since President Nixon issued a Presidential Determination in 1973 finding that sales of defense articles to Saudi Arabia and the UAE "will strengthen the security of the United States and promote world peace." *Id.* at 19 (quoting Presidential Determination No. 73-10, 38 Fed. Reg. 7211 (Mar. 19, 1973)).

In the aftermath of the Houthi takeover, the United States authorized the provision of weapons to Saudi Arabia and the UAE beginning in 2015 for use in the Yemen conflict. Dkt. 1 at 3–4 (Compl. ¶ 3). GD and other contractors continued to provide weapons to the United States through the FMS program during the Trump administration. *Id.* at 25–26, 33–34 (Compl. ¶¶ 57, 73, 74, 75).

In 2021, President Biden revoked the Houthis' foreign terrorist organization designation, declared an end to U.S. support for the Coalition's offensive operations, announced support for the UN-led peace process, and provided assurances to Saudi Arabia regarding the defense of its territory. *Id.* at 93 (Compl. ¶ 227 n.92).

## III.   PLAINTIFFS' ALLEGATIONS.

Plaintiffs' Complaint asserts claims against General Dynamics Corporation and Ms. Novakovic, other defense contractors and their Chief Executive Officers, the United States

Secretaries of State and Defense, and Saudi Arabian and United Arab Emirates military officials. Plaintiffs, who are Yemeni civilians, allege "significant bodily harm and property loss due to attacks by the Coalition on civilians" in connection with Yemen's civil war. *Id.* at 4–5 (Compl. ¶ 5). Notwithstanding that "strikes carried out by the Coalition military forces" caused Plaintiffs' injuries, the Complaint seeks to hold the United States liable for having "approve[d] arms sales contracts to the Saudi-led coalition." *Id.* And it seeks to hold GD and other defense contractors liable for "manufacturing and supplying arms to the Coalition" with the supposed knowledge that the weapons could be used illegally by the Coalition. *Id.* Plaintiffs bring their claims as a putative class action on behalf of all similarly situated Yemeni civilians. *Id.*

The Complaint alleges that GD and the other contractors provided weapons to the United States, which then transferred those weapons to Coalition countries via the FMS program. *Id.* at 25–26, 33 (Compl. ¶¶ 57–58, 73). The Complaint contains very few allegations against GD specifically. For example, while the Complaint generally alleges that "[a] major portion of [GD's] sales to Saudi Arabia are weapons used in the attacks on Yemen, including those that injured Plaintiffs," *e.g.*, *id.* at 24, 43–44 (Compl. ¶¶ 53, 92), it does not identify any GD weapon found at the sites of the 2015 and 2016 bombings underlying the Complaint or even allege that GD weapons were used in those bombings, *id.* at 8–14 (Compl. ¶¶ 13–25).

The lone specific allegation concerning a GD product is that an organization "received photographs and videos of munitions remnants" that were "claimed" to be from the site of a bus bombing in 2018. *Id.* at 23 (Compl. ¶ 51). The Complaint does not allege that Plaintiffs themselves were injured in this incident, and it acknowledges that an entity other than GD "produced" the bomb. *Id.* Although the Complaint alleges that the remnants included two "guidance fin[s]" with markings indicating that they were produced at a "General Dynamics Corporation facility in

10

Garland, Texas," *id.*, it admits that the organization in possession of the photographs and video "could not confirm that the remnants were found at the site" of this bombing, *id.*

Plaintiffs bring two sets of claims against GD and the other defense contractors. Their "primary" claims, *id.* at 6 (Compl. ¶ 8), arise under the ATS and TVPA and contend that GD's sale of weapons via the FMS program and its "lobbying" in favor of arms sales "aided and abetted" war crimes, extra-judicial killings, and torture by the Coalition countries. The Complaint also asserts a variety of common law claims. Plaintiffs seek damages against GD for their injuries.

## LEGAL STANDARDS

In evaluating a motion to dismiss, the Court must "assume the truth of all material factual allegations in the complaint." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011). However, "the Court need not accept inferences drawn by the plaintiff[s] if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept [plaintiffs'] legal conclusions." *Gallagher v. Eat to the Beat, Inc.*, 480 F. Supp. 3d 79, 82 (D.D.C. 2020) (citations omitted). "[B]ecause subject matter jurisdiction focuses on the court's power to [] hear the claim, a court is to apply closer scrutiny when resolving a Rule 12(b)(1) motion compared to a Rule 12(b)(6) motion for failure to state a claim." *Clean Label Project Found. v. Garden of Life, LLC*, No. CV 20-3229, 2021 WL 4318099, at *2 (D.D.C. Sept. 23, 2021) (citing authority).

On a Rule 12(b)(1) motion, "because it is to be presumed that a cause lies outside the Court's limited jurisdiction, the plaintiff bears the burden of proving that the Court has jurisdiction over the plaintiff's claims." *Indigenous People of Biafra v. Sheehan*, No. CV 21-2743, 2022 WL 17338098, at *2 (D.D.C. Nov. 30, 2022) (internal quotation marks and alteration omitted). Where "a defendant claim[s] sovereign immunity in a motion to dismiss[,]" the defendant "'bears the burden of proving' they qualify for it." *Broidy Cap. Mgmt. LLC v. Muzin*, 12 F.4th 789, 796 (D.C. Cir. 2021) (quoting *Lewis v. Mutond*, 918 F.3d 142, 145 (D.C. Cir. 2019)).

11

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted); *see also Lamb v. Millennium Challenge Corp.*, 573 F. Supp. 3d 346, 350 (D.D.C. 2021). The requirement to "accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," however. *Iqbal*, 556 U.S. at 678 (citation omitted). In assessing a Rule 12(b)(6) motion, a court may consider "the facts contained within the four corners of the complaint, along with any documents attached to or incorporated into the complaint, matters of which the court may take judicial notice, and matters of public record." *Lamb*, 573 F. Supp. 3d at 350 (internal citations and quotations omitted).

## ARGUMENT

### I.    THE POLITICAL QUESTION DOCTRINE BARS PLAINTIFFS' CLAIMS.

The political question doctrine bars all of Plaintiffs' claims against GD because adjudicating those claims would necessarily enmesh this Court in second-guessing national security and foreign policy determinations committed to the political branches of government; namely, the decision to provide military support to Coalition countries. The political branches already assessed whether transferring those defense articles was in the interest of the United States, including considering the risk of misuse and the human rights records of Coalition Defendants. As case after case from the D.C. Circuit and elsewhere has held, claims premised on the validity of national security and foreign policy determinations are non-justiciable and must be dismissed.[9]

---

[9] Where a complaint is subject to dismissal on multiple jurisdictional grounds, the court may address them in any order. *See Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007). GD respectfully submits that the political question doctrine is the most appropriate means of disposing of the Complaint given its foreign policy and national security implications.

A.      **The Political Question Doctrine Bars Adjudication of Claims Requiring an Assessment of Military or Foreign Policy Determinations.**

The political question doctrine safeguards the careful "separation of powers" created by the Constitution. *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 840 (D.C. Cir. 2010) (en banc). The doctrine is jurisdictional in nature, *see Gutrejman v. United States*, 596 F. Supp. 3d 1, 7 (D.D.C. 2022) (Moss, J.), and "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch," as "courts are fundamentally underequipped" to evaluate them, *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986) (quoting *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1379 (D.C. Cir. 1981)).

In *Baker v. Carr*, the Supreme Court identified "six hallmarks" of nonjusticiable political questions:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Gutrejman*, 596 F. Supp. 3d at 8 (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)). If even "one factor is present," a claim is nonjusticiable. *Id.* at 9 (quoting *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005)).

Questions of "national security, military matters[,] and foreign relations are 'quintessential sources of political questions,'" that routinely implicate one or more of the *Baker* factors and are excluded from judicial review. *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 45 (D.D.C. 2010) (quoting *El-Shifa*, 607 F.3d at 841); *see also Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately

13

related to foreign policy and national security are rarely proper subjects for judicial intervention."). As the en banc D.C. Circuit has recognized, "disputes involving foreign relations" implicate "issues that 'frequently turn on standards that defy judicial application' or 'involve the exercise of a discretion demonstrably committed to the executive or legislature.'" *El-Shifa*, 607 F.3d at 841 (quoting *Baker*, 369 U.S. at 211); *see also Schneider*, 412 F.3d at 197 ("[R]ecasting foreign policy and national security questions in tort terms does not provide standards for making or reviewing foreign policy judgments.").

The political question doctrine applies where the United States exercises its judgment to provide military support through military contractors. For example, in *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 983 (9th Cir. 2007), the Ninth Circuit affirmed the dismissal of ATS claims against a military contractor that supplied bulldozers to the Israeli military at the U.S. government's direction. Plaintiffs sought to hold the contractor liable for the Israeli military's alleged misuse of those bulldozers. *Id.* The court explained that the judiciary "cannot intrude into our government's decision to grant military assistance to Israel, even indirectly by deciding this challenge to a defense contractor's sales." *Id.* As the court elaborated,

> Plaintiffs' claims can succeed only if a court ultimately decides that Caterpillar should not have sold its bulldozers to the IDF. Because that foreign policy decision is committed under the Constitution to the legislative and executive branches, we hold that plaintiffs' claims are nonjusticiable under the first *Baker* test.

*Id.* The court also emphasized that adjudicating the claims would "run[] head-on into the fourth, fifth, and sixth" *Baker* factors "because whether to support Israel with military aid is not only a decision committed to the political branches, but a decision those branches have already made." *Id.* Because "[a] court could not find in favor of the plaintiffs without implicitly questioning, and even condemning, United States foreign policy toward Israel," plaintiffs' claims were nonjusticiable. *Id.*

14

Similar examples abound.  In *Saldana v. Occidental Petroleum Corp.*, the court dismissed an ATS suit against a company building a pipeline in Colombia that the United States considered to be of great strategic importance.  774 F.3d 544, 545–46 (9th Cir. 2014).  Both the United States and the defendant company provided funds to the Colombian military to protect the pipeline project.  *Id.*  The plaintiffs (represented by Plaintiffs' counsel here) alleged that the military committed human rights abuses and sued the defendant company on an aiding and abetting theory for having funded the military.  *Id.*  The Ninth Circuit dismissed the claims on political question grounds because they necessarily implicated the United States' own foreign policy judgment to provide similar funding.  As the court put it, those claims "are beyond the jurisdiction of our courts" because they are "inextricably bound to an inherently political question—the propriety of the United States' decision to [support the Colombian military]."  *Id.* at 552; *see also, e.g.*, *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1283 (11th Cir. 2009) (dismissing negligence claim against contractor on political question grounds where "military judgments governed the planning and execution" of contractor's activities); *In re: KBR, Inc.*, 893 F.3d 241, 259–60 (4th Cir. 2018) (similar).

### B.       Plaintiffs' Claims Fall in the Heartland of the Political Question Doctrine and Must Be Dismissed.

The political question doctrine squarely forecloses Plaintiffs' claims.  The Complaint contends that by providing weapons through the FMS program, GD enabled the Coalition Defendants' misuse of those weapons and contributed to a "humanitarian crisis" that injured the Plaintiffs.  Dkt. 1 at 79 (Compl. ¶ 202).

That contention "runs head-on into" the *Baker* factors.  *Corrie*, 503 F.3d at 983.  Providing military support to the Coalition Defendants "is not only a decision committed to the political branches, but a decision those branches have already made."  *Id.*  By law, every one of the sales

that Plaintiffs allege harmed them took place only because the Executive Branch determined those sales "best served" "the foreign policy of the United States." 22 U.S.C. § 2752(b). In making those determinations, each administration specifically considered the risk of the weapons' misuse and the humanitarian record of the purchasing countries. *See supra* pp. 7–8. Nor did Congress, which was notified of the sales, exercise its statutory power to block them. Put simply, the political branches comprehensively assessed whether to provide defense support to the Coalition Defendants and concluded that the interests of the United States justified that support.

Plaintiffs' suit, which alleges that GD acted unlawfully by carrying out the United States' decision to provide military support, is therefore "inextricably bound to an inherently political question," namely, "the propriety of the United States' decision" to provide that support. *Saldana*, 774 F.3d at 552. That judgment is "committed" to the political branches, and this Court has no "standards for making or reviewing" their determination. *Schneider*, 412 F.3d at 197. Nor could the Court "find in favor of the [P]laintiffs without implicitly questioning, and even condemning, United States foreign policy toward [Yemen]." *Corrie*, 503 F.3d at 983. As the D.C. Circuit put it in *Jaber v. United States*, 861 F.3d 241, 246 (D.C. Cir. 2017), Plaintiffs cannot "call for a court to pass judgment on the wisdom of [the] Executive's decision to [support] military action— mistaken or not—against a foreign target."

Plaintiffs' suit necessarily asks this Court to pass judgment on the wisdom of the Executive's decision to provide military support to the Coalition Defendants and Congress's prerogative to allow them. Accordingly, the Court should dismiss Plaintiffs' Complaint as raising a nonjusticiable political question.

## II.  DERIVATIVE SOVEREIGN IMMUNITY BARS PLAINTIFFS' CLAIMS.

Derivative sovereign immunity independently bars all of Plaintiffs' claims against GD. The U.S. government enjoys sovereign immunity and is immune from suit unless it waives

immunity or consents to a suit.  Derivative sovereign immunity extends that protection to government contractors where: "[1] a contractor takes actions that are 'authorized and directed by the Government of the United States', and [2] 'performed pursuant to the Act of Congress' authorizing the agency's activity."  *Nat'l Treasury Emps. Union v. Off. Of Pers. Mgmt. (In re U.S. Off. Of Pers. Mgmt. Data Sec. Breach Litig.)*, 928 F.3d 42, 69 (D.C. Cir. 2019) (quoting *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166–67 (2016)); *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 20–21 (1940).

Accordingly, where the United States has sovereign immunity against a claim for a particular activity, a contractor who carries out that activity at the behest of the United States is also immune.  "Derivative sovereign immunity ensures that there is no liability on the part of the contractor who simply performed as the Government directed."  *In re U.S. Off.*, 928 F.3d at 69 (citations and internal quotation marks omitted).  Derivative sovereign immunity benefits the government by incentivizing contractors to provide needed goods and services to the government. *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 344 (4th Cir. 2014).  And as with the government's sovereign immunity, derivative sovereign immunity "operates as a jurisdictional bar to suit" and is amenable to resolution on a Rule 12(b)(1) motion to dismiss.  *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 650 (4th Cir. 2018).

For example, in *Yearsley* itself, the plaintiff landowner sued a government contractor alleging that the contractor's work on a dam damaged the landowner's property.  The Supreme Court dismissed the action against the contractor explaining "it is clear that[,] if this authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will." *Yearsley*, 309 U.S. at 20–21.  And in *Cunningham*, the Fourth Circuit upheld the dismissal of a

17

claim against a government contractor because it had "performed exactly as [the government agency] directed." 888 F.3d at 647.

The same reasons warrant dismissal here. Plaintiffs seek damages for injuries allegedly resulting from weapons supplied by GD to the Coalition. Plaintiffs do not allege that the United States is unauthorized to approve weapons transfers; nor do they allege that GD failed to provide the weapons the government approved for transfer. On the contrary, the very premise of their claims is that GD is liable *because* it carried out those government decisions. The government has immunity for damages claims arising out of the discretionary decision to provide military support to a foreign entity (which is presumably why Plaintiffs seek only injunctive relief against the United States). *See* 28 U.S.C. § 2680(a). GD accordingly has derivative sovereign immunity for supplying weapons at the federal government's direction.

## III.    PLAINTIFFS LACK STANDING TO PURSUE THEIR CLAIMS.

Another threshold issue bars Plaintiffs' Complaint: they cannot establish standing because the Complaint fails to adequately allege a causal link between GD and Plaintiffs' alleged injuries. By Plaintiffs' own account, GD is two levels removed from their injuries. To start, Plaintiffs' injuries are entirely dependent on the alleged intervening actions of *other* entities who used the weapons. There is no allegation, nor could there be, that GD had any control whatsoever over the military decisions of the Coalition Defendants that allegedly harmed Plaintiffs. On top of that, Plaintiffs do not even allege, save for an inadequate conclusory allegation, that GD supplied the weapons others used to injure them.

That is insufficient to meet Article III's justiciability requirements. Article III standing requires (1) injury in fact, (2) causation, and (3) redressability. *Arias v. Dyncorp*, 738 F. Supp. 2d 46, 49 (D.D.C. 2010), *aff'd*, 752 F.3d 1011 (D.C. Cir. 2014). As this Court has explained, the causation requirement demands "a causal connection between the injury and the conduct

18

complained of that is attributable to the defendant[.]"  *Siegel v. U.S. Dep't of Treasury*, 304 F. Supp. 3d 45, 49–50 (D.D.C. 2018) (Moss, J.) (quoting *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015)).  And where standing "turns on third-party conduct[,]" "the D.C. Circuit has required 'substantial evidence of a causal relationship between the [defendants' actions] and the third-party conduct, leaving little doubt as to causation.'"  *Abulhawa v. U.S. Dep't of the Treasury*, 239 F. Supp. 3d 24, 35 (D.D.C. 2017) (Moss, J.) (quoting *Arpaio*, 797 F.3d at 20).  In other words, even if a defendant's conduct is alleged to be a link in a causal chain leading to injury, "the presence of an independent variable between … the harm and the conduct makes causation sufficiently tenuous that standing should be denied."  *Arpaio*, 797 F.3d at 20 (quoting *Mideast Sys. & China Civil Const. Saipan Joint Venture, Inc. v. Hodel*, 792 F.2d 1172, 1178 (D.C. Cir. 1986)).

This basic requirement has led courts to find Article III causation lacking where a claimed injury results from a third party's intervening decisions.  For example, in *Siegel*, this Court dismissed an aiding and abetting claim against U.S. government defendants where plaintiffs alleged that government financial and military aid assisted the Israeli army in seizing the plaintiffs' property.  304 F. Supp. 3d at 48.  The claims against the U.S. defendants failed because plaintiffs' injury "flow[ed] from the responses of third parties," namely the Israeli army, which was the entity that actually seized the property in question.  *Id.* at 54.  This Court also emphasized the lack of causation because other private sources—beyond U.S. aid—supported the Israeli army and thus contributed to the deprivation of plaintiffs' property.  *Id.* at 52–56.

Likewise, in *Doe I v. Apple Inc.*, No. 19-CV-03737, 2021 WL 5774224 (D.D.C. Nov. 2, 2021), foreign plaintiffs (represented by Plaintiffs' counsel here) brought claims against Apple and other technology companies for injuries sustained mining cobalt that was used in batteries for the defendants' products.  Plaintiffs alleged that the defendants were "in a venture with [the cobalt]

mining companies [that was] responsible for the injuries suffered by [p]laintiffs" and that the defendants propped up demand for cobalt by purchasing it generally.  *Id.* at \*1–4, 6.  Plaintiffs' allegations were insufficient because they failed to show that "[d]efendants … *controlled* the mines or conditions that led to [p]laintiffs' injuries."  *Id.* at \*6 (emphasis added).  Instead, plaintiffs' injuries were the product of "the actions of several independent third parties."  *Id.* at \*7.

Plaintiffs' claims fail for the same reasons.  All of Plaintiffs' allegations of injury "flow from the responses of third parties."  *Siegel*, 304 F. Supp. 3d at 54.  GD did not decide how or where to use the weapons; Coalition members made those decisions.  Dkt. 1 at 15, 17–19 (Compl. ¶¶ 29, 37–43).  As the Complaint acknowledges "[b]ut for the command given by and the military strategies *formulated by the named Saudi Arabian and UAE military leaders, [Plaintiffs] would not have suffered those injuries.*"  *Id.* at 17–18 (Compl. ¶ 37) (emphasis added).

Plaintiffs' causation allegations are deficient in another respect.  Their Complaint fails to plausibly allege that they were injured by *GD-produced* weapons.  Plaintiffs do not allege that any GD weapon was used in the 2015 and 2016 bombings that they claim caused their injuries.  *Id.* at 8–14 (Compl. ¶¶ 13–25).  Instead, the Complaint contains variants of a sole, general conclusory allegation that "[a] major portion of [GD's] sales to Saudi Arabia are weapons used in the attacks on Yemen, including those that injured Plaintiffs and killed their relatives, friends[,] and members of their communities."  *Id.* at 24 (Compl. ¶ 53); *see also id.* at 79, 95, 97 (Compl. ¶¶ 200, 230, 236) (repeating general allegations).  That kind of "[t]hreadbare recital[] of the elements of standing, supported by mere conclusory statements, will not suffice."  *Abulhawa*, 239 F. Supp. 3d at 31; *Air Excursions LLC v. Yellen*, 66 F.4th 272, 279 (D.C. Cir. 2023) ("We disregard such 'naked assertion[s]' devoid of 'further factual enhancement' in evaluating whether the complaint

20

establishes a causal link between the challenged action and the alleged injury." (quoting *Iqbal*, 556 U.S. at 678)); *Kareem v. Haspel*, 986 F.3d 859, 867 (D.C. Cir. 2021) (similar).

The *only* specific reference to any GD product in the Complaint is Plaintiffs' allegation that two "remnants" of bombs, alleged to have been produced by another entity, contained two GD guidance fins discovered after a *different* bombing in 2018.  Dkt. 1 at 23 (Compl. ¶ 51).  Not only does the Complaint acknowledge that those weapons were "produced" by someone other than GD, but it further admits that the allegation that the fins were found at the site "could not [be] confirm[ed]."  *Id.*  These unverified allegations—that a different contractor provided a weapon whose presence at the site of a different bombing could not be confirmed—do not remotely carry Plaintiffs' Article III burden.  *Siegel*, 304 F. Supp. 3d at 54 ("[P]laintiffs' own allegations [] contradict[ed]" other "conclusory" statements in the complaint); *Air Excursions*, 66 F.4th at 279 (same where "complaint undermine[d] the inference" of causation necessary for standing).

Again, Article III requires more.  Because Plaintiffs have failed to allege facts sufficient to establish causation, this Court should dismiss their claims.

## IV.   THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE ATS.

Plaintiffs' ATS claim fails as a matter of law on numerous grounds.  *First*, Supreme Court and Circuit law preclude using the ATS to pursue claims of war crimes and similar offenses— whether styled as aiding and abetting or otherwise—against private actors, such as GD.  *Second*, the ATS does not apply extraterritorially and the crux of the allegations here—the misuse of weapons in Yemen—requires an impermissible extraterritorial application of the statute.  *Third*, even if the ATS could apply (and it does not), Plaintiffs' allegations of aiding and abetting fail to meet the demanding mens rea standard: acting with the *specific purpose* to facilitate the violation.

A.   **The ATS Does Not Provide a Cause of Action Against Non-State Actors for the Torts Alleged Here.**

Plaintiffs' ATS claim against GD fails at the first step: Plaintiffs have no cause of action.

1.   **The ATS Permits Only a Very Narrow Set of Claims.**

The ATS states that federal courts shall have "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. That provision is a purely *jurisdictional* statute that does not, by itself, provide a *cause of action* for claims alleging violations of the law of nations or U.S. treaties. *See, e.g.*, *Nestle USA, Inc. v. Doe*, 141 S. Ct. 1931, 1937 (2021) (plurality opinion) ("[T]he statute on its own does not empower aliens to sue."); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004) ("[T]he ATS is a jurisdictional statute creating no new causes of action…."). Thus, to sue under the ATS, a plaintiff must identify an independent cause of action.

Congress, of course, is free to create causes of action to enforce the "law of nations," but where it has not done so, the Supreme Court has warned that courts must exercise "great caution" in implying their own causes of action. *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1403 (2018) (majority opinion). Only violations of "universal norms" can justify creating an implied cause of action—a standard the Supreme Court has, to date, recognized for just "three historical torts: 'violation of safe conducts, infringement of the rights of ambassadors, and piracy.'" *Nestle*, 141 S. Ct. at 1938 (plurality opinion) (quoting *Sosa*, 542 U.S. at 724). Indeed, "[i]n light of the foreign-policy and separation-of-powers concerns inherent in ATS litigation," the Supreme Court has suggested that courts may be "preclude[d]" from "*ever* recognizing any new causes of action under the ATS." *Jesner*, 138 S. Ct. at 1403 (majority opinion) (emphasis added).

## 2. Plaintiffs Have No Cause of Action Under the ATS.

Plaintiffs' ATS claim alleges that GD aided and abetted torture, extrajudicial killings, and war crimes. Dkt. 1 at 5 (Compl. ¶ 6). But, consistent with the Supreme Court's admonition against implying causes of action in the ATS context, the D.C. Circuit has held that there is no cause of action under the ATS to pursue torture or war crimes claims against *private* actors, whether under an aiding and abetting theory or otherwise. Instead, the D.C. Circuit has recognized that although the "law of nations" may permit a cause of action to pursue such claims against a "state," the same "cannot be said of private actors" because there is "no consensus" that the law of nations permits those claims against private parties. *Saleh v. Titan Corp.*, 580 F.3d 1, 15 (D.C. Cir. 2009); *Ali Shafi v. Palestinian Auth.*, 642 F.3d 1088, 1095 (D.C. Cir. 2011) ("[T]here is clearly no sufficiently universal norm of international law supporting such a concept to support the creation of an ATS cause of action for torture against a nonstate actor….").

*Saleh* is directly on point. In *Saleh*, the plaintiffs brought ATS claims against employees of a government contractor alleging that the employees directly committed war crimes and torture, and aided and abetted government officials in committing those torts in the Abu Ghraib prison in Iraq. *Saleh v. Titan Corp.*, 436 F. Supp. 2d 55, 56–58 (D.D.C. 2006), *aff'd*, 580 F.3d 1 (D.C. Cir. 2009). Although the district court allowed an ATS claim to proceed against the *government* officials, it dismissed the claims as to the private contractors, holding such torts by "private parties" were not traditional violations "of the law of nations," and thus not cognizable under the ATS. *Id.* at 57–58. In so holding, the district court "rejected" plaintiffs' argument that they had greater latitude to pursue those torts against private parties on an aiding and abetting theory, noting that "there is no middle ground between private action and government action, at least for purposes of the Alien Tort Statute." *Id.*

23

On appeal, the D.C. Circuit had "little difficulty [] affirming the district judge's dismissal of the ATS claim[.]"  *Saleh*, 580 F.3d at 15.  It explained that torture and war crimes by "private actors," such as the government contractor defendants, are not recognized violations of a "settled international norm."  *Id.*  The Court emphasized that creating a cause of action would circumvent Congress's "deliberate decision" in TVPA, where Congress "provided a cause of action whereby U.S. residents could sue foreign states for torture, but did not … include as possible defendants … private U.S. persons, whether or not acting in concert with government employees."  *Id.* at 16; *see also Mohamad v. Palestinian Auth.*, 566 U.S. 449, 452 (2012) (holding that the TVPA does not provide a cause of action against corporations).  *Saleh* forecloses Plaintiffs' war-crime-based and-torture-based ATS claims against GD.

*Saleh* also compels rejection of Plaintiffs' extra-judicial killing claim against GD.  As with torture and war crimes, there is no consensus under the law of nations that an extra-judicial killing claim may be brought against a private actor, or indeed perhaps any actor.  *Estate of Manook v. Rsch. Triangle Inst., Int'l & Unity Rsch. Grp., L.L.C.*, 693 F. Supp. 2d 4, 18–19 (D.D.C. 2010) (rejecting ATS claim for extra-judicial killings because "[d]efendants were private, rather than official actors"); *see also Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 73 n.2 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (expressing "doubt[]" that "extrajudicial killing … would be cognizable in an ATS suit against any defendant" because such claims are not violative of "customary international law norms"), *majority opinion vacated*, 527 F. App'x 7 (D.C. Cir. 2013).[10]  And, again, Congress has been active in this area.  The TVPA provides a cause of action

---

[10] In *Doe*, a divided panel found, without discussing *Saleh*, that courts may imply an aiding and abetting ATS claim against private corporations for torts such as extra-judicial killings.  654 F.3d at 17–18.  That opinion predates the Supreme Court's later opinions further emphasizing the impropriety of implying ATS causes of action, and the en banc Court subsequently vacated it.  *See* 527 F. App'x at 7.

for extra-judicial killings as well as torture, but not against private U.S. defendants.  As the Seventh Circuit put it, "[i]t is hard to imagine that the [Supreme] Court would approve of common law claims based on … extrajudicial killing when Congress has specifically provided a cause of action for those violations and has set out how those claims must proceed."  *Enahoro v. Abubakar*, 408 F.3d 877, 866 (7th Cir. 2005).

Plaintiffs' purportedly contrary, and out-of-Circuit, cases do not help them.  *See* Dkt. 1 at 76 (Compl. ¶ 196).  The Ninth Circuit vacated Plaintiffs' first case.  *See Doe I v. Unocal Corp.*, 395 F.3d 932 (9th Cir. 2002), *granting en banc review*, 395 F.3d 978 (9th Cir. 2003), *granting stipulated dismissal*, 403 F.3d 708 (9th Cir. 2005).  The others long predate the Supreme Court's recent observation that "a proper application of *Sosa*" and concerns about interference with "foreign policy" may "preclude courts from *ever* recognizing any new causes of action under the ATS."  *Jesner*, 138 S. Ct. at 1403 (majority opinion) (emphasis added).  None of Plaintiffs' authority is good law even on its own terms, and in any case is not controlling in this Circuit.

### B.    The Complaint Alleges an Improper Extraterritorial Application of the ATS.

This Court should also dismiss Plaintiffs' ATS claim because Plaintiffs seek an improper extraterritorial application of that statute.  "United States law … does not rule the world" and the ATS is no exception.  *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 445 (2007).  The ATS does not have an "extraterritorial reach" and applies only where "the conduct relevant to the [ATS's] focus occurred in the United States."  *Nestle*, 141 S. Ct. at 1936 (majority opinion) (quoting *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 337 (2016)).

The Supreme Court's recent decision in *Nestle* forecloses Plaintiffs' ATS claim.  Here, the alleged injuries—harm to Yemenis—all occurred in Yemen, not the United States.  Dkt. 1 at 3, 5, 7–15, 24, 77–79 (Compl. ¶¶ 2, 6, 11–25, 28, 29, 53, 199).  As the Supreme Court has explained, where injuries occur "entirely overseas," a plaintiff cannot escape the bar on extraterritorial claims

by alleging that the defendant aided and abetted foreign conduct through domestic "general corporate activity" or "operational decisions." *Nestle*, 141 S. Ct. at 1935, 1937.

The domestic conduct underlying Plaintiffs' Complaint—GD's provision of inventory from its product line—is core general corporate activity and operational decision-making. Dkt. 1 at 3–5, 24, 26–27, 33 (Compl. ¶¶ 3, 5, 53, 59, 60, 73). Thus, the Complaint "do[es] not draw a sufficient connection between … aiding and abetting [the alleged torts] overseas" and the alleged "domestic conduct" to provide a basis for litigating GD's alleged extraterritorial activities. *Nestle*, 141 S. Ct. at 1937; *cf. Jam v. Int'l Fin. Corp.*, 3 F.4th 405, 412 (D.C. Cir. 2021) (Randolph, J., concurring) ("Like the *Nestle* plaintiffs, Jam alleged that general corporate activity (loan decision-making and oversight) occurred at the defendant's headquarters, so the suit is 'based upon' conduct in the United States. That is not enough [because] all of the conduct that allegedly harmed Jam occurred in India."). This Court should dismiss the ATS claim on extraterritoriality grounds.

### C.   Even If Plaintiffs Could Pursue an Aiding and Abetting Claim Under the ATS, They Have Failed to Sufficiently Allege It.

Finally, even if Plaintiffs could pursue an ATS claim, they have not adequately alleged it. Plaintiffs allege two sets of conduct: GD's sale of weapons pursuant to the FMS program, and GD's "lobbying" in support of weapons sales. Dkt. 1 at 5, 33, 77–80 (Compl. ¶¶ 6, 73, 199, 203, 204). Neither supports a legally sufficient aiding and abetting claim.

GD's sales to the United States government through the FMS program do not rise to the level of aiding and abetting to sustain Plaintiffs' ATS claims. Aiding and abetting liability requires action "with the *[specific] purpose* of facilitating the [violation]." *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 396 (4th Cir. 2011) (emphasis added). Plaintiffs acknowledge this standard. *See* Dkt. 1 at 77 (Compl. ¶ 197) ("Under U.S. law, the requirement for establishing aiding and abetting is: … (2)

the defendant knew of the specific violation, and the defendant *specifically directed his acts to assist* in the specific violation…." (emphasis added)).

Plaintiffs' Complaint does not satisfy this standard.[11] Plaintiffs never claim that GD intended to assist war crimes or the other alleged torts. Simply selling goods is not aiding and abetting "even if the seller knows that the buyer is likely to use the goods unlawfully, because the seller does not share the specific intent to further the buyer's venture." *Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1027 (W.D. Wash. 2005). In addition, the First Amendment protects the second set of conduct, lobbying. *See, e.g.*, *Venetian Casino Resort, L.L.C. v. NLRB*, 793 F.3d 85, 89 (D.C. Cir. 2015) (the "First Amendment prohibits any sanction" on lobbying efforts conducted in good faith). Because neither set of conduct supports liability, the ATS claim must be dismissed.

## V.     THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE TVPA.

Plaintiffs separately assert a claim against Ms. Novakovic under the TVPA. The statute's plain language and governing case law foreclose that claim. The TVPA provides a cause of action against "[a]n individual who, under actual or apparent authority, or color of law, *of any foreign nation*" subjects another individual to "torture" or "extra-judicial killing." 28 U.S.C. § 1350 note (emphasis added). Plaintiffs' claim fails because they do not and cannot allege that Ms. Novakovic was acting under the authority or color of law of a foreign nation, which requires that the defendant "possessed authority by virtue of the laws of [a foreign country], or [was] somehow clothed with the authority of [foreign] law." *Harbury v. Hayden*, 444 F. Supp. 2d 19, 43 (D.D.C. 2006) (internal quotation marks omitted), *aff'd*, 522 F.3d 413 (D.C. Cir. 2008).

---

[11] With respect to "specific purpose," the Complaint alleges only that defense contractors "'purposefully' cultivated relationships with Congress members by lobbying," Dkt. 1 at 77–79 (Compl. ¶ 199), but that allegation is plainly insufficient to establish that the defense contractors directed their conduct to "assist in the specific violation" at issue (*e.g.*, war crimes).

As discussed above, the D.C. Circuit has indicated that "under color of foreign law" means that the TVPA never applies to "American government officers or private U.S. persons."  *Saleh*, 580 F.3d at 16 ("Congress provided a cause of action [in the TVPA] whereby U.S. residents could sue foreign states for torture, but did not—and we must assume that was a deliberate decision— include as possible defendants either American government officers or private U.S. persons, whether or not acting in concert with government employees.").  The TVPA's legislative history supports that interpretation.  President Bush's TVPA signing statement explained that "[t]his legislation concerns acts of torture and extrajudicial killing committed overseas by *foreign individuals*."  *Statement by President Bush upon Signing H.R.2092*, 28 Weekly Comp. Pres. Doc. 465 (Mar. 12, 1992) (emphasis added).  President Bush went on to explain that "the Act does not permit suits for alleged human rights violations in the context of United States military operations abroad … which are always carried out under the authority of United States law."  *Id.*  United States military operations do not fall within the TVPA's "color of foreign law requirement," and weapons sales providing military aid pursuant to a federal program do not either.

In any case, the Complaint does not allege that Ms. Novakovic exercised power "by virtue of [foreign] law" or that she was "clothed in the authority of [foreign] law."  It alleges the opposite: that Ms. Novakovic carried out commercial sales through an *American* company via a *federal* program, Dkt. 1 at 33 (Compl. ¶ 73).  Plaintiffs' TVPA claim also fails because the aiding and abetting allegations are legally insufficient.  Plaintiffs' allegations against Ms. Novakovic are the same as those against the company, *id.* at 81–83 (Compl. ¶ 209), and fail for the same reasons. There is no allegation, nor could there be, that Ms. Novakovic intended to further illegal activity. Nor can lobbying efforts serve as the basis for an aiding and abetting claim.  *See supra*.

## VI.   PLAINTIFFS' COMMON LAW CLAIMS FAIL AS A MATTER OF LAW.

Plaintiffs' common law claims also fail to state a claim.  These claims fail to allege required elements, rest on conclusory allegations, or both.[12]

### A.    Plaintiffs' Unjust Enrichment Claim Fails as a Matter of Law.

Unjust enrichment is an equitable quasi-contract claim "based on a contract implied in law." *Levine v. Am. Psych. Ass'n (In re APA Assessment Fee Litig.)*, 766 F.3d 39, 45 (D.C. Cir. 2014).  Unjust enrichment occurs when: (1) a plaintiff confers a benefit on a defendant; (2) the defendant retains the benefit; and (3) the defendant's retention of the benefit is unjust.  *Id.*  A person confers a benefit if he or she "performs services beneficial to or at the request of the other." *Boyd v. Kilpatrick Townsend & Stockton, LLP*, 79 F. Supp. 3d 153, 158 (D.D.C. 2015).

The Complaint does not and cannot allege that Plaintiffs "conferred a benefit" on GD, let alone that GD "retain[ed]" that benefit in an "unjust" manner.  *In re APA*, 766 F.3d at 45.  The Complaint alleges only that "it would be unjust for [] Defendants to retain the benefits attained by their wrongful actions."  Dkt. 1 at 95 (Compl. ¶ 230).  That allegation is conclusory, but in any case, it does not contend that "Plaintiffs" provided the relevant benefit to GD.  Instead, it refers to the payments GD received for providing weapons pursuant to a federal government contract.  *Id.* at 33, 77–79, 95–96 (Compl. ¶¶ 73, 199, 232).  The claim thus fails because Plaintiffs do not allege "that *they* conferred a benefit on" GD.  *Aston v. Johnson & Johnson*, 248 F. Supp. 3d 43, 56 (D.D.C. 2017) (emphasis added).  The claim also fails because Plaintiffs do not allege that GD was paid for something it did not provide; they allege that it was unjust for GD to be paid for what

---

[12] Plaintiffs bring these claims under "state" law, Dkt. 1 at 6 (Compl. ¶ 8), but do not specify which state's law.  Because the laws of the potential jurisdictions are materially identical for purposes of this motion, GD cites D.C. law.  The other government contractor defendants also move to dismiss these claims as time-barred.  Dkt. 36-1 at 52 (RTX & Lockheed Martin Defs. Mem., § V(B)).  GD adopts that argument.

it *did* provide.  *See Whiting v. AARP*, 701 F. Supp. 2d 21, 31–32 (D.D.C. 2010) (dismissing claim for unjust enrichment where defendant received payments for services rendered).

### B.     Plaintiffs' Negligent Supervision Claim Fails as a Matter of Law.

Plaintiffs likewise fail to plead a legally viable negligent supervision claim.  The elements of negligent supervision are: (1) the employee behaved in a dangerous manner; (2) the employer knew or should have known of its employee's dangerous behavior; and (3) the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee.  *Leach v. Nat'l R.R. Passenger Corp.*, 128 F. Supp. 3d 146, 156 (D.D.C. 2015).

Plaintiffs' negligent supervision claim fails to address any of these elements as to GD.  The Complaint neither identifies a GD employee who was negligently supervised nor alleges how GD failed to supervise that employee.  Instead, Plaintiffs indiscriminately allege that all Defendants "failed to exercise due care by failing to supervise … their agents and similarly failed to make appropriate investigations into the possible negative impact on Plaintiffs."  Dkt. 1 at 98 (Compl. ¶ 240).  Such allegations are insufficient.  *E.g.*, *Busby v. Cap. One, NA*, 772 F. Supp. 2d 268, 284 (D.D.C. 2011) (dismissing negligent supervision claim where "plaintiff [] provided no indication as to how [defendant's] employees [acted] improperly … against the plaintiff"); *Woods v. District of Columbia*, No. CV 20-0782, 2020 WL 6392775, at *6 (D.D.C. Nov. 2, 2020).  Moreover, GD employees fulfilling a contract authorized by the Executive Branch certainly does not qualify as "dangerous or incompetent behavior."  *See Leach*, 128 F. Supp. 3d at 156.

### C.     Plaintiffs' Intentional Infliction of Emotional Distress Claim Fails as a Matter of Law.

A claim for intentional infliction of emotional distress ("IIED") must allege: (1) extreme and outrageous conduct on the part of the defendant, which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress.  *Johnson v. Paragon Sys., Inc.*, 195 F. Supp. 3d 96,

98–99 (D.D.C. 2016).  The conduct must be so outrageous in character as to go beyond all possible bounds of decency.  *Thompson v. Jasas Corp.*, 212 F. Supp. 2d 21, 27–28 (D.D.C. 2002).

The Complaint alleges that GD "intentionally and continuously participat[ed] in a venture that profits from Plaintiffs' suffering and injuries."  Dkt. 1 at 99 (Compl. ¶ 243).  That conclusory statement does not even allege that GD intentionally caused Plaintiffs' emotional distress.  The claim also fails because Plaintiffs' alleged injuries were the product of third parties and not outrageous conduct by GD.  *See Apple*, 2021 WL 5774224 at *17 (dismissing IIED claim because plaintiffs failed to plead "nonconclusory facts" showing that defendants, rather than others, were the cause of plaintiffs' alleged injuries).  Moreover, it is "normal … practice" and not "outrageous" behavior to perform a government contract (particularly one that the government determined to be in the best interests of United States national security).  *Johnson*, 195 F. Supp 3d at 98.

## CONCLUSION

For the foregoing reasons, GD respectfully requests that Plaintiffs' claims against GD be dismissed in their entirety and with prejudice.

Dated: October 19, 2023                          Respectfully submitted,

                                                 */s/ Matthew S. Hellman*

                                                 Matthew S. Hellman (DC Bar #484132)
                                                 JENNER & BLOCK LLP
                                                 1099 New York Avenue, NW
                                                 Washington, DC 20001-4412
                                                 Telephone: (202) 639-6861
                                                 mhellman@jenner.com

                                                 Michael A. Doornweerd (*pro hac vice*)
                                                 Andrew F. Merrick (*pro hac vice*)
                                                 JENNER & BLOCK LLP
                                                 353 N. Clark Street
                                                 Chicago, IL 60654-3456
                                                 Telephone: (312) 923-2631
                                                 mdoornweerd@jenner.com

amerrick@jenner.com

*Counsel for Defendants General Dynamics*
*Corporation and Phebe Novakovic*