# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Amin Allawi Ali, *et al.* | |
| Plaintiffs, | |
| v. | |
| Mohamed Ben Zayed Al-Nahyan, *et al.* | |
| Defendants. | Case No. 1:23-cv-00576-RDM |

## PLAINTIFFS' OPPOSITION TO UNITED STATES GOVERNMENT DEFENDANTS' MOTION TO DISMISS

Terrence P. Collingsworth
(DC Bar # 471830)
INTERNATIONAL RIGHTS ADVOCATES
621 Maryland Avenue NE
Washington, D.C. 20002
Tel.: (202) 543-5811
tc@iradvocates.org
**Counsel for Plaintiffs**

# <u>**TABLE OF CONTENTS**</u>

I.   INTRODUCTION AND SUMMARY OF ARGUMENT ................................................... 1

II.   FACTUAL BACKGROUND ................................................................................................. 3

III.  STANDARD OF REVIEW .................................................................................................. 5

IV.  ARGUMENT ......................................................................................................................... 6

    A.   The Govt. Defendants Acknowledge the Specific Textual Restrictions on FMS of AECA and FAA. ...................................................................................................................... 6

      Regarding restrictions on FMS, citing and quoting the AECA, the Govt. Defendants admit: 6

      Regarding restrictions on direct commercial sales of weapons by Defendants Raytheon Technologies Corporation, Lockheed Martin Corporation, and General Dynamics Corporation, the Govt. Defendants admit:................................................................................ 7

      Regarding restrictions in the FAA on FMS, the Govt. Defendants admit: ............................ 7

      Regarding "end-use monitoring" of FMS, Defendants admit:................................................ 7

    B.   The Govt. Defendants Violated the Textual Restrictions of the AECA and FAA When They Approved FMS to the Coalition and Failed to Perform Required End-Use Monitoring... 8

      1.   The Govt. Defendants provided lethal FMS to the Coalition despite overwhelming evidence that the weapons were killing innocent civilians: .................................................... 8

      2.   The Govt. Defendants admitted to GAO that they failed to conduct "end-use monitoring" of the use of weapons provided to the Coalition as required by section 2785 of the AECA: ................................................................................................................................. 11

    C.   None of the Govt. Defendants' Rationales for Precluding Judicial Review of their Statutory Violations Are Legitimate. ......................................................................................... 13

    1.   Plaintiffs have standing to sue. ........................................................................................ 13

      a. Plaintiffs' allegations of past injuries and reasonable likelihood of future injuries are sufficient to satisfy the injury-in-fact requirement for standing............................................. 13

      b. Plaintiffs' injuries are "fairly traceable" to or caused by the Govt. Defendants. .............. 18

      c. An order requiring the Govt. Defendants' compliance with the AECA and FAA would prevent future injuries to Plaintiffs and others similarly situated......................................... 20

    2.   Plaintiffs' APA claim is viable because the Govt. Defendants failed to comply with specific statutory requirements of the AECA and FAA........................................................... 22

      a.   The Govt. Defendants' approval of FMS to the Coalition in violation of the AECA and FAA is subject to judicial review. ........................................................................................ 25

b.    The Govt. Defendants' admitted failure to conduct end-use monitoring as required by the AECA is subject to judicial review. ................................................................................... 30

3.    Plaintiffs' claims do *not* raise non-justiciable political questions. ................................... 32

V.  CONCLUSION.................................................................................................................... 38

## TABLE OF AUTHORITIES

**CASES**

*Ashcroft v. Iqbal,*
 556 U.S. 662, 768 (2009) ............................................................................................. 5

*Abbott Labs. v. Gardner,*
 387 U.S. 136, 141 (1967). .......................................................................................... 27

*Al-Aulaqi v. Obama,*
 727 F.Supp.2d 1, 46 (D.D.C. 2010), ........................................................................ 37

*Al-Tamimi v. Adelson,*
 916 F.3d 1, 12 (D.C. Cir. 2019),.......................................................................... 33, 34

*ANA Int'l, Inc. v. Way,*
 393 F.3d 889, 890 (9th Cir. 2004)............................................................................ 22

*Anglers Conservation Network v. Pritzker,*
 809 F.3d 664, 671 (D.C. Cir. 2016) .......................................................................... 31

*Baker v. Carr,*
 369 U.S. 186 (1962) ............................................................... 33, 34, 36, 37, 38

*Banneker Ventures, LLC v. Graham,*
 798 F.3d 1119, 1129 (D.C. Cir. 2015), ..................................................................... 18

*Bar Bea Truck Leasing Co., Inc. v. United States,*
 4 C.I.T. 138, 140 (Ct. Intl. Trade 1982), ................................................................. 26

*Bennett v. Spear,*
 520 U.S. 154 (1997) ................................................................................................. 19

*Biological Diversity v. Trump,*
 435 F. Supp. 11, 39 (D.D.C. 2020). .......................................................................... 24

*Cahlin v. General Motors Acceptance Corp.,*
 936 F.2d 1151 (11th Cir. 1991)................................................................................. 17

*Citizens to Preserve Overton Park v. Volpe,*
 401 U.S. 402, 410 (1971) .......................................................................................... 26

*Cody v. Cox,*
 509 F.3d 606, 610 (D.C. Cir. 2007) .......................................................................... 26

*Cousin v. Trans Union Corp.,*
 246 F.3d 359 (5th Cir. 2001)..................................................................................... 17

*DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.,*
 810 F.2d 1236, 1238 (D.C. Cir. 1987) ...................................................................... 35

*Doe v. Princeton Univ.,*
 30 F.4th 335, 342 (3d Cir. 2022)............................................................................... 18

*El-Shifa Pharm. Indus. Co.,*
 607 F.3d at 841(2010) ......................................................................................... 35, 36

*Federation for American Immigration Reform, Inc. v. Reno,*
 897 F.Supp. 595 (D.D.C. 1995) ................................................................................ 35

*Goldstein v. United States Dep't of State,*
 153 F.Supp.3d 319, 338 (D.D.C. 2016) .................................................................... 36

*Gomez v. Biden,*
   No. 20-cv-01419, 2021 WL 3663535, at *15 (Aug. 17, 2021)................................................ 37

*Hamdi v. Rumsfeld,*
   U.S. 507, 536 (2004). .......................................................................................................... 37

*Heckler v. Mathews,*
   465 U.S. 728, 739–40 (1984) ............................................................................................... 23

*J. Andrew Lange, Inc., v. FAA,*
   208 F.3d 389, 391 (2d Cir. 2000)......................................................................................... 18

*Judulang v. Holder,*
   656 U.S. 42, 53 (2011) ......................................................................................................... 23

*Kelly v. United States,*
   34 F.Supp.2d 8, 14 (D.D.C. 1998) ....................................................................................... 37

*League of Women Voters v. Newby,*
   838 F. 3d, 1, 12) (D.C. Cir. 2016); ...................................................................................... 25

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*
   572 U.S. 118, 134 n.6 (2014); .............................................................................................. 19

*Levitt v. Merck & Company, Inc.,*
   914 F.3d 1169 (8th Cir. 2019) .............................................................................................. 18

*Local 1219, Am. Fed'n of Gov't Emps. v. Donovan,*
   683 F.2d 511, 515 (D.C. Cir. 1982). .........................................................................27-30, 32

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ....................................................................................................... 13, 21

*Luokong Tech. Corp. v. DOD.,*
   538 F. Supp. 3d 174 (2021) ............................................................................................ 23, 24

*Marbury v. Madison,*
   5 U.S. 137, 177 (1803).. ....................................................................................................... 24

*Massachusetts v. EPA,*
   549 U.S. 497 (2007) ....................................................................................................... 19, 21

*McCarthy v. Merit Sys. Prot. Bd.,*
   809 F.3d 1365 (2016), .......................................................................................................... 31

*Moghaddam v. Pompeo,*
   424 F.Supp.3d 104, 116 (D.D.C. 2020) ........................................................................... 26, 27

*N. Mariana Islands v. United States,*
   686 F. Supp. 2d 7, 21 (D.D.C. 2009) ................................................................................... 25

*Nat. Res. Def. Council, Inc., v. SEC,*
   606 F.2d 1031, 1044 (D.C. Cir. 1979) ................................................................................. 27

*Reno v. Catholic Soc. Serv., Inc.,*
   509 U.S. 43, 56-57 (1993)..................................................................................................... 22

*Reuters v. FCC,*
   781 F.2d 946, 951 (D.C. Cir. 1986). .................................................................................... 23

*Santor v. Morton,*
   383 F.Supp. 1265, 1267(1974)............................................................................................. 26

*Sierra Club v. Jackson,*

648 F.3d 848, 855 (D.C. Cir. 2011) ........................................................................ 26

*United States v. SCRAP,*
  412 U.S. 669 (1973) ........................................................................................ 17

*United States v. Texas,*
  599 U.S. at 684 (2023) ............................................................................... 40, 42

*Washington v. United States Dep't of State*,
  420 F.Supp.3d 1130, 1141-47 (W.D. Wash. 2019) ............................................. 35, 37

*Whitmore v. Arkansas,*
  495 U.S. 149, 158 (1990). ................................................................................ 16

*Xiaomi Corp. v. DOD*,
  No. 21-280 (RC), 2021 U.S. Dist. LEXIS 46496, at *36 (D.D.C. Mar. 12, 2021) ................. 25

*Zivotofsky* v. *Clinton,*
  566 U.S. at 195-96 (2012) ................................................................................. 37

## OTHER AUTHORITIES

U.S. Gov't Accountability Off., GAO-22-105988 ........................................................ passim

## RULES

Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) .............................................. 1

## STATUTES

Administrative Procedure Act ("APA"), 5 U.S.C. § 701 .................................................... passim
Foreign Assistance Act of 1961 ("FAA"), 22 U.S.C. § 2304 ........................................... …passim
Arms Export Control Act ("AECA"), 22 U.S.C. § 2751, § 2778, § 2785 ………………….passim

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

"*The accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny.*"
James Madison, **Federalist Papers**, No. 47

The United States Government Defendants, Antony Blinken, in his official capacity as the Secretary of State ("State"), and Lloyd J. Austin III, in his official capacity as the Secretary of Defense ("DOD") (collectively "Govt. Defendants"), have moved to dismiss Plaintiffs' Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (ECF No. 31). Plaintiffs oppose the Govt. Defendants' Motion (ECF No. 31-1, "MTD").

Plaintiffs seek relief against the Govt. Defendants under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et. seq*,[1] because they approved at least $54.2 billion in weapons sales from 2015-21 to "the Coalition," a group of countries led by Saudi Arabia and the United Arab Emirates ("UAE").[2]  With these weapons, the Coalition intervened in the civil conflict in Yemen, resulting in the deaths and injuries of thousands of innocent civilians, including Plaintiffs and their family members. *See, e.g.*, Complaint at ¶¶2, 3, 57. Plaintiffs allege that the arms sales resulting in civilian deaths and injuries in Yemen were done in violation of the conditions set by Congress in the Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq*., and the Foreign Assistance Act of 1961 ("FAA"), 22 U.S.C. § 2304 *et seq*. The APA allows challenges to Executive Branch failure to comply with a law of Congress as written and applies

---

[1] Plaintiffs concede that their negligent supervision claim against the Govt. Defendants should be dismissed. Plaintiffs will demonstrate that the claim remains viable against the Defense Contractor Defendants in Plaintiffs' separate opposition to their motions to dismiss, filed concurrently herewith.

[2] At the outset of the Govt. Defendants' provision of major weapons to them in 2015, the Coalition was led by Saudi Arabia and UAE, with Bahrain, Egypt, Jordan, Kuwait, Morocco, Senegal, and Sudan joining in support. Complaint at ¶ 2.

"according to the provisions thereof, except to the extent that (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(1)(2).

The Govt. Defendants defied clear statutory procedures required by the AECA and FAA by ignoring the limiting criteria imposed by the laws and failing to perform end-use monitoring required by AECA. The untenable position of the Govt. Defendants before this Court is that they have complete and total discretion to approve arms sales to anyone, anywhere, with no possibility of judicial review. This is simply not the law; and the mere prospect of giving total discretion to the Executive Branch to distribute lethal weapons around the world at will is terrifying. As Plaintiffs demonstrate, Congress passed the AECA and FAA with text that can only be reasonably read as placing specific limitations on Foreign Military Sales ("FMS") by the Executive Branch. The Govt. Defendants ignored these statutory conditions in authorizing FMS to the Coalition, and their mere general reciting of "foreign policy concerns" does not nullify the statutory limitations of the AECA and FAA set by Congress.

Plaintiffs will first demonstrate that the Govt. Defendants acknowledge in their MTD, as they must, the explicit limitations that AECA and FAA place on FMS to the Coalition. Plaintiffs will then show that in light of the massive civilian deaths and injuries attributable to the Coalition going back to 2015 when the Govt. Defendants began providing FMS, those limitations should have prevented the Govt. Defendants from providing further FMS to the Coalition. In addition, the Govt. Defendants admit their failure to conduct end-use monitoring required by the AECA. Finally, Plaintiffs will establish that the Govt. Defendants' attempt to claim complete immunity from judicial review based on lack of standing or the political question doctrine are baseless. Plaintiffs' allegations are more than sufficient to withstand the Govt. Defendants' MTD.

## II.     FACTUAL BACKGROUND

While this case will turn on questions of law, a brief (and almost entirely undisputed) factual

background puts the dispute in context. The most credible source for background facts is a

Government Accountability Office Report focused on FMS provided to the Coalition:

> The Saudi-led coalition—including Saudi Arabia and UAE—began military operations
> with U.S. military support in 2015 to restore the authority of the Republic of Yemen
> Government—which is officially recognized as a member of the UN—after an Iran-backed
> Houthi military offensive succeeded in overtaking Sana'a.[3] In mid-2020, the Houthis
> advanced towards Marib following a period of maintaining static positions on their eastern
> flank, according to DOD officials. In February 2021, the Houthi frontlines progressed to
> seize Marib amid reports of rockets and missiles that hit neighborhoods in Marib city and
> heavy airstrikes across the governorate, according to the Civilian Impact Monitoring
> Project. In response to Houthi gains, the Saudi-led coalition targeted airstrikes on Sana'a;
> the offensive killed hundreds of fighters and complicated peace processes, according to the
> Council on Foreign Relations. The collapse of Yemen's economy and stability as a result
> of this conflict has exacerbated Yemen's long-standing poor living conditions, according
> to a Congressional Research Service report. Yemen is considered one of the world's worst
> humanitarian crises, according to the UN Secretary General, the World Food Program, and
> the U.S. Agency for International Development, among others.

U.S. Gov't Accountability Off., GAO-22-105988, State and DOD Need Better
Information on Civilian Impacts of U.S. Military Support to Saudi Arabia and the
United Arab Emirates 41(2022) (GAO Report), at p. 5 (citations omitted).[4]

Further, the GAO stated, "[t]he UN estimates that from March 2015 to August 2021 there

were about 23,000 airstrikes by the Saudi-led coalition in Yemen, killing or injuring over 18,000

civilians. For example, in September 2018, the Saudi-led coalition admitted error and took

responsibility for an attack in Yemen that killed more than 40 children, according to a State

memo. *Id*. at 6." As noted in the Complaint, "[i]nternational experts believe that the real figure

[of civilian deaths] is much higher. The NGO Civilian Impact Monitoring, for example, has

---

[3] The capital of Yemen.
[4] Plaintiffs' Complaint relies heavily upon the GAO Report, which should be considered part of
the allegations of the Complaint. *See Feldman v. FDIC*, 879 F.3d 347, 351 (D.C. Cir. 2018). The
complete GAO Report is available at: https://www.gao.gov/assets/gao-22-105988.pdf.

documented 12,714 cases of civilians killed from December 2017 to September 2021 alone. Unfortunately, this horrific and ongoing human rights catastrophe was pushed to the very back pages of the world's attention when Russia invaded Ukraine." Complaint ¶ 4 (citation omitted). There is no dispute that the U.S. provided much of the military assistance to the Coalition that resulted in the deaths and injuries to these civilians, including at least $54.2 billion in weapons from 2015-21. *See, e.g.*, Complaint at ¶¶ 2, 3, 57.

Five of the Plaintiffs, Mr. Amin Allawi Ali, Mr. Ayman Mhamad Saleh Al Sanabani, Mr. Khaled AliSalem Chaib, Ms. Fatima Mhamad Al Bayahi AL Kharabi, and Ms. Yousra Abd El Aziz Mhamad Aamad, are representative victims of the horrific bombing of a wedding in the village of Sanaban on October 7, 2015. *Id*. ¶ 11. The other two Plaintiffs, Mr. Ali Ahmad Ali Abad Al Roweishan and Mr. Mhamad Ali Hamoud AlRoweishan, are representative victims of the bombing of a funeral in Sana'a on October 8, 2016. *Id*. ¶ 11. *See id*. at ¶¶ 13-25 for detailed accounts of these attacks on civilian social events by the Coalition with U.S.-supplied weapons.

A very recent report in the ***Washington Post*** revealed that because "the coalition's bombing campaign was killing large numbers of civilians and doing little to deter the Houthis," the UAE reached out to retired General Jim Mattis in 2015 to serve as a consultant to advise on conduct of the war. Mattis served until 2017, when he left to become Secretary of Defense in the Trump Administration. Mattis had to apply for permission to the U.S. Government to serve in this highly unusual position as an advisor to a foreign head of state, but because "U.S. officials were growing alarmed by the number of innocent Yemenis dying in coalition airstrikes . . . they swiftly approved Mattis's request." The Govt. Defendants fought for years to keep the Mattis arrangement secret, but ultimately produced relevant documents recently in response to the

Washington Post's FOIA request.[5] Among other things, this report conclusively establishes that as early as 2015, when the Govt. Defendants began to approve major FMS to the Coalition, they had specific knowledge that the Coalition bombings were killing large numbers of civilians in Yemen but nonetheless approved the sales.

The sole issue of this case is whether the FMS to the Coalition with devastating consequences to Plaintiffs and thousands of other innocent civilians were in violation of the AECA and FAA. Plaintiffs seek a very limited remedy and merely urge the Court to order the Govt. Defendants to comply with these statutes before approving any additional FMS.

### III.   STANDARD OF REVIEW

Under Rule 12(b), the court must accept all well-pleaded factual allegations as true and construe the facts in a light most favorable to Plaintiffs. *Ashcroft v. Iqbal*, 556 U.S. 662, 768 (2009). Thus, a Rule (12)(b)(6) motion to dismiss tests the legal sufficiency of the complaint. It neither assesses the truth of what is asserted nor determines whether evidence substantiates the allegations. Plaintiffs have stated plausible claims requiring the Govt. Defendants to comply with the mandatory provisions of the AECA and FAA, and their motion should be denied.

---

[5] C. Whitlock and N. Jones, *Mattis secretly advised Arab monarch on Yemen war, records show,* ***Washington Post*** (Feb 6, 2024), available at:
https://www.washingtonpost.com/investigations/2024/02/06/mattis-advised-uae-yemen-war/

## IV.   ARGUMENT

### A.  <u>The Govt. Defendants Acknowledge the Specific Textual Restrictions on FMS of AECA and FAA.</u>

In their MTD, the Govt. Defendants have no choice but to acknowledge that the AECA and FAA include specific textual restrictions on FMS to the Coalition. *See* MTD at 3-6.

**<u>Regarding restrictions on FMS, citing and quoting the AECA, the Govt. Defendants admit</u>:**

"[t]he AECA recognizes the foreign policy and national security interests in permitting the United States to sell defense articles and services to certain friendly countries and international organizations in order '***to facilitate the common defense*** . . . to achieve specific national defense requirements and objectives of mutual concern' and to ensure the 'operational compatibility of [the U.S.'] defense equipment' with its allies." MTD at 3 (quoting 22 U.S.C. § 2751) (emphasis added).

"The AECA provides further that '[d]efense articles and defense services shall be sold or leased by the United States Government . . . to friendly countries ***solely for internal security, for legitimate self-defense***, for the purpose of enabling the recipient country to participate in collective security or U.N. requested missions, or for the purpose of the construction of public works.'" MTD at 3 (quoting 22 U.S.C. § 2754) (emphasis added).

"'A foreign military sale is initiated from a request by a foreign government to purchase a particular defense article or service. As a prerequisite to any sale, the foreign country requesting ***such sale <u>must</u> have been subject to a Presidential determination that the furnishing of defense articles and defense services to [that] country . . . will strengthen the security of the United States and promote world peace***.'" MTD at 3 (quoting 22 U.S.C. § 2753(a)(1)) (emphasis added) (footnote omitted).

6

**Regarding restrictions on direct commercial sales of weapons by Defendants Raytheon Technologies Corporation, Lockheed Martin Corporation, and General Dynamics Corporation, the Govt. Defendants admit:**

"The AECA also provides authority for the private commercial sale and export of defense articles and services from private companies in the United States to foreign governments or foreign persons (DCS). AECA provides that *'[i]n furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services*,' [22 U.S.C. § ] § 2778(a)(1), and provides further that no such articles or services designated by the President 'may be exported . . . without a license for such export . . . issued in accordance with' the AECA and its implementing regulations." *Id*. § 2778(b)(2); *see id*. § 2778(a)(2) (setting forth criteria to be considered in issuing export licenses). MTD at 5-6 (quoting 22 U.S.C. § 2778) (emphasis added).

**Regarding restrictions in the FAA on FMS, the Govt. Defendants admit:**

"[Section 502B of the FAA] (codified at 22 U.S.C. § 2304), separately *restricts 'security assistance*,' (as it is defined in § 2304), *to 'any country the government of which engages in a consistent pattern of gross violations of internationally recognized human rights* . . .' subject to certain exceptions." MTD at 6 (quoting 22 U.S.C. § 2304(a)(2)) (emphasis added).

**Regarding "end-use monitoring" of FMS, Defendants admit:**

"The AECA *directs the President to 'establish a program which provides for the end-use monitoring of defense articles and services sold, leased, or exported*.' [22 U.S.C.] § 2785(a)(1). 'To the extent practicable' *the end-use monitoring program 'shall be designed to provide reasonable assurance that' the recipient of the arms complies with requirements imposed by the United States and that the articles and services are being used for the purposes they were provided. Id.* § 2785(a)(2). Congress also *directed the President to provide a report to Congress each year 'describing the actions taken to implement' the end-use monitoring*

*program*, 'including a detailed accounting of the costs and number of personnel associated with the monitoring program and the numbers, range, and findings of end-use monitoring of United States transfers of small arms and light weapons.' *Id.* § 2785(c)." MTD at 6 (emphasis added).

The Govt. Defendants thus acknowledge, as they must, that the AECA and FAA include specific textual restrictions on FMS to the Coalition. In the next section, Plaintiffs demonstrate that these restrictions were violated when the Govt. Defendants approved FMS to the Coalition.

**B.  The Govt. Defendants Violated the Textual Restrictions of the AECA and FAA When They Approved FMS to the Coalition and Failed to Perform Required End-Use Monitoring.**

Plaintiffs' Complaint provides detailed allegations that the Govt. Defendants violated the statutory restrictions on FMS in the AECA and FAA, and the GAO Report reinforces this conclusion. Indeed, the Govt. Defendants do not deny that they ignored the requirements of the AECA and FAA; their sole defense is that this Court is prohibited from reviewing their actions, a position Plaintiffs counter in subsection C, below. Among the clear violations of the AECA and FAA by the Govt. Defendants are:

1. **The Govt. Defendants provided lethal FMS to the Coalition despite overwhelming evidence that the weapons were killing innocent civilians:**

- The Govt. Defendants started providing FMS to the Coalition in 2015 and that year approved $10.5 billion in FMS. Each year thereafter, despite gruesome reports of massive civilian casualties, the Govt. Defendants continued to approve FMS and by 2021 had approved $54.2 billion in FMS. Complaint ¶¶ 58, 61-62. *See also* GAO Report at p. 7, 59 (Table 4).

- According to the GAO, accounting for the management of sales for agreements implemented in prior years yields a $126.6 billion total value of active FMS sales for Saudi Arabia and a $29.3 billion total value for the UAE as of June 2021.GAO Report at 12-13.

- Starting in the Fall of 2015 through Spring of 2016, Members of Congress raised concerns about FMS to Saudi Arabia due to reports of civilian casualties in Yemen. GAO Report at p. 9 (Figure 1). ***This provided early notice to the Govt. Defendants*** of likely violations of the conditions imposed by the AECA and FAA.

- "Year after year, the bombs fell — on wedding tents, funeral halls, fishing boats and a school bus – killing thousands of civilians and helping turn Yemen into the world's worst humanitarian crisis. Weapons supplied by U.S. companies through sales unlawfully approved by U.S. officials, allowed Saudi Arabia and the UAE through the named Defendant officials to pursue an indiscriminate and brutal bombing campaign. Since the war began, approximately 112,000 people have died in Yemen as a direct result of hostilities, of whom around 12,000 were civilians. The Office of the United Nations High Commissioner for Human Rights has documented at least 7,825 civilians killed (including at least 2,138 children and 933 women) and 12,416 civilians injured (including 2,898 children and 1,395 women) as a direct result of the conflict between March 2015 and June 2020." Complaint ¶ 62.

- "Despite numerous reports of airstrikes and other attacks by Saudi Arabia and the UAE on civilians in Yemen, DOD has not reported, and State could not provide evidence that it investigated any incidents of potential unauthorized use of equipment transferred to Saudi Arabia or the UAE." Complaint ¶ 61.

- "U.S.-made bombs dropped by the Coalition are regularly found at sites in Yemen where innocent civilians have been killed or injured. Without U.S. weapons, experts say the Coalition – which is for all practical purposes led by Saudi Arabia and the UAE – would be largely unable to wage its war. *As of 2017, three out of every five weapons used by the Coalition was U.S.-made*, according to the Stockholm International Peace Research Institute." Complaint ¶ 4 (footnote omitted; emphasis added).

- With respect to the civilian events at which Plaintiffs herein were injured and their family members killed, "the airstrike conducted on the wedding on October 7, 2015, killed forty-nine people, including 13 women and 22 children . . .. At least seventy-five people were injured in the attack, 34% of whom were children and 14% were women . . .. As for the airstrike conducted on the funeral on October 8, 2016, more than 140 people were killed and more than 525 wounded. Complaint ¶ 66.

- "According to the Yemen Data Project, since March 2015, Coalition bombing alone has killed 8,783 civilians (as of 10 November 2021). In addition to these direct victims, the bombings have indirectly cost the lives of many more civilians through the massive destruction of essential infrastructure in Yemen." Complaint ¶ 70.

- "According to a September 2020 report made by the Group of Eminent International and Regional Experts on Yemen (GEE), since the beginning of the conflict, approximately 112,000 people have died as a direct result of hostilities, of whom around 12,000 were civilians. The GEE found 'reasonable grounds to believe that the parties to the conflict have committed and continue to commit serious violations of international human rights and international humanitarian law. Some of which may amount to war crimes.' . . . GEE concluded that some of the airstrikes

9

conducted by the Coalition appear to have been undertaken without proper regard to principles of distinction, proportionality, and precaution to protect civilians and civilian objects." Complaint ¶ 94.

- At least some of the weapons provided to the Coalition through the Govt. Defendants approval of FMS were passed on to a terrorist organization aligned with the Coalition, Al-Qaeda in the Arabian Peninsula (AQAP). *See* Complaint ¶¶ 91-147.

As discussed in note 5, *supra*, and the accompanying text, the Govt. Defendants knew as early as 2015 that the Coalition bombings were killing large numbers of innocent civilians in Yemen, but they nonetheless approved billions in FMS to the Coalition without regard to the restrictions of the AECA and FAA imposed by Congress.

Based on these allegations in the Complaint, the FMS to the Coalition approved by the Govt. Defendants were in sharp contrast to the specified and required purposes of AECA and FAA. Such FMS were not "*[i]n furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services*." AECA, 22 U.S.C. § 2778(a)(1) (emphasis added). Nor were the weapons provided to the Coalition "*solely for internal security [or] for legitimate self-defense.*" *Id*. § 2754 (emphasis added). Finally, given the records of human rights abuses by the Coalition leaders, Saudi Arabia and UAE, both in the course of their attacks on Yemen and generally, the provision of FMS to them was in violation of the FAA, which prohibits providing weapons to "*any country the government of which engages in a consistent pattern of gross violations of internationally recognized human rights* . . . subject to certain exceptions." 22 U.S.C. § 2304(a)(2)(emphasis added). Per subsection (d), "gross violations" of human rights include "torture or cruel, inhuman, or degrading treatment or punishment … and other *flagrant denial of the right to life*, liberty, or the security of person." *Id.* § 2304(d) (emphasis added). In addition to Section 502(B)'s broad prohibition, the subsection also requires the Secretary of State to provide

"full and complete" annual Country Reports on Human Rights Practices that review "practices regarding the observance of and respect for internationally recognized human rights in each country proposed as a recipient of security assistance," including the "commission of war crimes [and] crimes against humanity." *Id.* § 2304(b). Country Reports for Saudi Arabia and the UAE since 2016 have described the human rights abuses perpetrated by Saudi and UAE forces in Yemen as a part of the Coalition; the most recent Country Report for Saudi Arabia establishes that members of the country's security forces caused "civilian casualties and damage to civilian infrastructure as a result of airstrikes in Yemen," which constituted a "significant" human rights violation. U.S. DEP'T OF STATE, SAUDI ARABIA 2022 HUMAN RIGHTS REPORT 1 (2022).

2. **The Govt. Defendants admitted to GAO that they failed to conduct "end-use monitoring" of the use of weapons provided to the Coalition as required by section 2785 of the AECA:**

- "State and DOD have made some efforts to understand civilian harm and the use of U.S.-origin defense articles in Yemen from fiscal years 2015 through 2021. However, during this time frame, DOD has not reported to relevant State officials nor could State provide evidence that it investigated indications that U.S.-origin equipment transferred to Saudi Arabia and UAE through FMS was used for unauthorized purposes or against anything other than legitimate military targets." GAO Rep. at 22; Complaint ¶ 162.

- "DOD has not reported and State could not provide evidence that it has investigated indications that U.S.-origin equipment transferred to [the Coalition] through FMS may have been used for unauthorized purposes or against anything other than legitimate military targets." GAO Rep. at 26; Complaint ¶ 162.

- "State officials could not provide evidence that they conducted any investigations to determine if or how U.S.-origin equipment was misused, and could not provide specific guidance for doing so. . .. Moreover, while the U.S. government has had indications that U.S.-origin defense articles may have been used in strikes that caused civilian harm, the agencies have not investigated these cases to determine if or how U.S.-origin equipment was used for unauthorized purposes, such as in violation of the agreements under which the defense articles were provided." GAO Rep. at 29; Complaint ¶¶ 155, 157, 162.

- "DOD officials told us that DOD lacks guidance on how security cooperation organizations should identify and report indications that U.S.-origin defense

articles are being used for unauthorized purposes or against anything other than legitimate military targets." GAO Rep. at 30, 39; Complaint ¶ 159.

- "According to DOD officials, they have not done so, in part, because they lack guidance for implementing EUM requirements related to reporting potential end-use violations after they receive allegations. The officials also told us they lack clarity on DOD roles and responsibilities for doing so. In addition, State officials could not provide evidence that they conducted any investigations of potential misuse or any specific guidance for doing so. As a result, DOD and State lack reasonable assurances that Saudi Arabia and UAE have only used U.S.-origin articles against legitimate military targets and for authorized purposes. Further, without such guidance they may be unable to assess the extent to which U.S.-origin equipment is being used in offensive operations in Yemen or whether it has contributed to civilian harm. In addition, DOD has not fully assessed the extent to which the advisory services and training provided to Saudi Arabia and UAE have helped reduce civilian harm in Yemen. Without such assessments, DOD cannot determine the extent to which its advisory and training support has helped facilitate civilian harm reduction in Yemen, as intended." GAO Rep. at 40; Complaint ¶¶ 155-59, 162.

- Both State and DOD failed to respond fully to GAO's inquiries about compliance with applicable laws, including AECA. Complaint ¶ 158.

Based on the GAO Report and allegations in the Complaint, it is clear that the Govt. Defendants failed to implement the end-use monitoring program required by the AECA to "'*provide reasonable assurance that' the recipient of the arms complies with requirements imposed by the United States and that the articles and services are being used for the purposes they were provided*." 22 U.S.C. § 2785(a)(2). As a result of the failures of the Govt. Defendants to respect the specific restrictions in the AECA and FAA on providing FMS to the Coalition and their failure to implement the required "end-use monitoring" program, Plaintiffs and thousands of other innocent civilians suffered death and serious injuries. As Plaintiffs allege in the Complaint at ¶ 164:

> [i]f State and DOD had adopted monitoring standards and procedures as outlined in the FAA and the AECA, they would have affirmatively denied the arms sales from the defense contractor Defendants to the Coalition, and thus prevented civilian deaths. Under the FAA and AECA, these agencies had a duty to implement the [FMS] program to provide

reasonable assurance that recipients complied with restrictions imposed by the U.S. government and should have fully determined the extent to which U.S. military support provided to Saudi Arabia and the UAE contributed to civilian harm in Yemen. Despite sufficient and specific knowledge that U.S.-made weapons would be used by the Coalition to commit war crimes, State and DOD approved the sale of lethal weapons to the Coalition that eventually led to the Plaintiffs' injuries.

**C.  None of the Govt. Defendants' Rationales for Precluding Judicial Review of their Statutory Violations Are Legitimate.**

1. **Plaintiffs have standing to sue**.

Constitutional standing requires that (1) the plaintiff has suffered an injury-in-fact, (2) which is fairly traceable to the challenged action of the defendant, and (3) which may be redressed by a favorable court decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs, who are seeking injunctive relief from the Govt. Defendants, have sufficiently alleged an injury-in-fact because they are at risk of future injuries from the ongoing systematic attacks on them by the Coalition, armed with weapons supplied by FMS approved by the Govt. Defendants. This injury is fairly traceable to the Govt. Defendants because most of the weapons the Coalition is using to attack innocent civilians in Yemen, such as Plaintiffs, were supplied by the U.S. Govt. Defendants. Finally, the potential injuries to Plaintiffs could be redressed if the U.S. Govt. Defendants comply with the statutory requirements of the AECA and FAA designed to require the Coalition governments to limit and prevent injuries to civilians, such as Plaintiffs.

**a. Plaintiffs' allegations of past injuries and reasonable likelihood of future injuries are sufficient to satisfy the injury-in-fact requirement for standing**.

As noted, the "[t]he UN estimates that from March 2015 to August 2021 there were about 23,000 airstrikes by the Saudi-led coalition in Yemen, killing or injuring over 18,000 civilians. In addition to the bombings that injured Plaintiffs, Complaint at ¶¶ 11-25, in September 2018, the Saudi-led coalition admitted error and took responsibility for an attack in Yemen that killed more than 40 children, according to a State memo." GAO Rep. at 6. According to the Govt.

Defendants, **none** of the 18,000 plus civilian victims of Coalition bombings, including Plaintiffs, would have standing to sue for injunctive relief because their injuries have already occurred. In other words, the Govt. Defendants' position is that injunctive relief could never be provided against a party engaging in highly dangerous, continuous, and systematic illegal activity unless a plaintiff could establish with certainty, they were going to be the next victim. *See* MTD at 12-16. That is not the law.

The Govt. Defendants cite numerous cases for the undisputed proposition that "[a]lthough past injuries may provide some evidence of 'a real and immediate threat of repeated injury,' allegations of past harm are not enough, without more, to establish future injury." *Biafra v. Blinken*, 639 F. Supp. 3d 79, 85 (D.D.C. Oct. 31, 2022) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 109–10 (1983)). MTD at 12.

Accepting this is the law, Plaintiffs' allegations and the GAO Report establish they face a reasonable risk of future injuries from ongoing Coalition attacks on civilian populations and the serious impacts on infrastructure and access by them to food, drinking water, and medical care attributable to the Coalition's attacks, as well as concrete emotional trauma from the attacks:

- As an initial matter, five Plaintiffs suffered serious injuries when a wedding they were attending was bombed by the Coalition and two Plaintiffs were injured while attending a funeral that was bombed by the Coalition. Complaint ¶¶ 11-25. These attacks on civilian gatherings are representative examples of indiscriminate and systematic attacks on civilian Yemeni populations by the Coalition. *Id.* ¶¶ 21, 25.

- Coalition forces have launched "an indiscriminate bombing campaign on the Yemeni people" described as "decisive storm" of aerial attacks. "[C]ivilian targets were knowingly attacked by Coalition aircraft from the very first days of the offensive, strongly demonstrating the Coalition's willingness to rely on the commission of war crimes to wipe out the civilian population of Yemen that was sympathetic to the Houthi insurgents." Complaint ¶ 28.

- "The conflict continues to take a brutal toll on innocent Yemeni civilians, making Yemen the world's worst humanitarian crisis. The UN estimates that 131,000 of the estimated 233,000 deaths in Yemen since 2015 are the result of indirect causes

of the conflict, such as food insecurity and lack of accessible health services. From March 2015 to June 2019, the UN identified at least 18,922 civilian casualties, with 7,292 killed and 11,630 injured in the conflict. International experts believe that the real figure is much higher. The NGO Civilian Impact Monitoring, for example, has documented 12,714 cases of civilians killed from December 2017 to September 2021 alone. Unfortunately, this horrific and ongoing human rights catastrophe was pushed to the very back pages of the world's attention when Russia invaded Ukraine." Complaint ¶ 4.

- "U.S.-made bombs dropped by the Coalition are regularly found at sites in Yemen where innocent civilians have been killed or injured. Without U.S. weapons, experts say the Coalition – which is for all practical purposes led by Saudi Arabia and the UAE – would be largely unable to wage its war. *As of 2017, three out of every five weapons used by the Coalition was U.S.-made,* according to the Stockholm International Peace Research Institute." Complaint ¶ 3 (emphasis added; footnote omitted).

- "In view of the number of bombings of exclusively civilian targets, including particularly sensitive targets such as hospitals, in the absence of any military target in the vicinity, the United Nations Group of Experts considers it 'very likely' that Coalition airstrikes do not meet the guiding principles of distinction and proportionality." Complaint ¶ 67.

- The Coalition is targeting civilian populations as enemies in areas held by the Houthis rebels, where Plaintiffs reside. "[I]n addition to the physical and psychological suffering directly caused to Yemeni civilians, the Coalition's bombing campaign has also deprived access to basic necessities such as food, drinking water, and medical care. . .. *According to the World Food Programme, in 2021 more than 16.2 million Yemenis were living in food insecurity, 47,000 of whom were suffering from famine. This situation is the result of the blockade imposed by the Coalition on imports combined with the bombing of essential infrastructure.*" Complaint ¶¶ 71-72 (emphasis added).

- "International observers have documented at least 730 bombings targeting farms and agricultural infrastructures, 228 bombings targeting food markets, sixty-four bombings targeting food storage sites, and 150 bombings targeting water and electricity infrastructure. According to Kamel Jendoubi, Chairman of the United Nations Panel of Experts, *'Civilians in Yemen are not starving, they are being starved by the parties to the conflict.' In other words, Coalition airstrikes not only kill civilians directly, but also indirectly through their destruction of essential infrastructure.*" Complaint ¶ 72 (emphasis added).

- "According to a September 2020 report made by the Group of Eminent International and Regional Experts on Yemen (GEE), since the beginning of the conflict, approximately 112,000 people have died as a direct result of hostilities, of whom around 12,000 were civilians. The GEE found 'reasonable grounds to

believe that the parties to the conflict have committed and continue to commit serious violations of international human rights and international humanitarian law. Some of which may amount to war crimes.'" Complaint ¶ 94.

- Plaintiffs are not only at a significant and ongoing risk of indiscriminate civilian bombings by the Coalition with weapons provided or approved by the U.S. Govt. Defendants, but the Coalition is providing . . . military support, including weapons supplied or approved by the U.S. Govt. Defendants, to a designated terrorist organization, Al-Qaeda in the Arabian Peninsula (AQAP). The terrorist activities being conducted in Yemen by AQAP substantially increase the risk of future harm to Plaintiffs. *See* Complaint ¶¶ 98-134. The U.S. Govt. Defendants have failed to meet their statutory duty to conduct end-use monitoring of weapons supplied to the Coalition, including whether the weapons are being used by AQAP or any other terrorist organization operating in Yemen. *Id*. ¶¶ 148-163.

- The impact of the conflict prosecuted by the Coalition with U.S. support is massive. "The United Nations (UN) has characterized the conflict in Yemen as one of the world's worst humanitarian crises, ***with almost 21 million people— 66 percent of the country's population—requiring emergency aid, including food, hygiene kits and water treatment supplies, and medical supplies, as of 2021***." GAO Report at 1 (emphasis added).

These allegations of "an indiscriminate bombing campaign on the Yemeni people" that amounts to a "decisive storm," with "***three out of every five weapons used by the Coalition was U.S.-made***" establish much more than a "possible future injury" found lacking in *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). *See* MTD at 12. Plaintiffs, who have already been hit by bombings once, are in the target population of civilians living in Houthi-controlled areas, where there have been 18,922 civilian casualties, 131,000 estimated deaths from indirect causes of the conflict, such as food insecurity and lack of accessible health services, and 16.2 million Yemenis were living in food insecurity attributable to the conflict. The latter impacts are an intentional strategy on the part of the Coalition to kill or injure the civilian population. Complaint ¶ 72. These allegations present a reasonable prospect of future harm to the Plaintiffs, much like in *United States v. SCRAP*, 412 U.S. 669 (1973). There, an environmental group challenged the Interstate Commerce Commission's approval of a surcharge on railroad freight rates, claiming

that the adverse environmental impact of the ICC's action on the Washington metropolitan area would cause the group's members to suffer "economic, recreational and aesthetic harm." *Id*. at 678. SCRAP specifically alleged that "a general rate increase would . . . cause increased use of nonrecyclable commodities . . . resulting in the need to use more natural resources to produce such goods, some of which resources might be taken from the Washington area, and resulting in more refuse that might be discarded in national parks in the Washington area." *Id*. at 688.

The Supreme Court found these allegations stated a specific and perceptible harm. Plaintiffs' allegations here are at least as specific in articulating a reasonable prospect of serious personal injury to them and others similarly situated. Large portions of the civilian population of Yemen living in Houthi-controlled areas are at great risk of injuries from ongoing bombings by Coalition forces and the impacts of such attacks, including lack of access to medical care, food, water, and infrastructure damaged by the attacks.

To the extent the question turns on the factual issue of whether the harm to Plaintiffs is reasonably likely, the issue of reasonableness is for the finder of fact, in this case the Court, to evaluate in weighing the facts and cannot be resolved on a motion to dismiss. *Cousin v. Trans Union Corp.*, 246 F.3d 359 (5th Cir. 2001) ("In the majority of cases, reasonableness is a question for the jury."); *Cahlin v. General Motors Acceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir. 1991) (stating that reasonableness "will be a jury question in the overwhelming majority of cases"); *Levitt v. Merck & Company, Inc.*, 914 F.3d 1169, 1172 (8th Cir. 2019) (same).

In addition to suffering a reasonable likelihood of future physical injuries from Coalition attacks, Plaintiffs are also suffering serious and ongoing mental harm due to the threatened and imminent destruction of their families and communities due to the ongoing brutal attacks on civilian populations by the Coalition with U.S.-supplied weapons. *See* Complaint ¶¶ 21, 25.

Experiencing actual or threatened emotional harm is a cognizable injury for purposes of standing. *See Heckler v. Mathews,* 465 U.S. 728, 739–40 (1984) (internal quotation omitted) (cognizable injury from "stigmatizing members of the disfavored group as 'innately inferior' and therefore as less worthy participants in the political community").

The Govt. Defendants factual denial that proper enforcement of the AECA and FAA, which by the Govt. Defendants' admission are laws enacted precisely to minimize civilian harm from FMS, would actually result in a reduction of civilian harm, is nonsensical and frivolous. *See* MTD at 13-15.  Further, the Govt. Defendants' effort to speculate factually as to when further arms sales could resume or even whether there would even be further arms sales, MTD at 15-16, is improper on a motion to dismiss. Factual disputes are for the finder of fact to resolve and are not properly raised or resolved on a motion to dismiss. *Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022) ("The proper place to resolve factual disputes is not on a motion to dismiss, but on a motion for summary judgment."). As the Court of Appeals for the D.C. Circuit held in *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015), "a complaint survives a motion to dismiss even '[i]f there are two alternative explanations, one advanced by [the] defendant and the other advanced by [the] plaintiff, both of which are plausible.'" *Id*. at 1129 (quoting *Starr v. Baca,* 652 F.3d 1202, 1216 (9th Cir. 2011)).

**b. Plaintiffs' injuries are "fairly traceable" to or caused by the Govt. Defendants.**

In an improper attack on the factual allegations of the Complaint and the realities of the conflict in Yemen, and relying on a selective presentation of Plaintiffs' allegations, the Govt. Defendants claim Plaintiffs cannot show that their injuries are fairly traceable to the Govt. Defendants because the injuries were caused by the acts of third parties, Saudi Arabia and UAE, the leaders of the Coalition. MTD at 16-20.

The Govt. Defendants grossly misstate the legal standard for establishing Plaintiffs' injuries are "fairly traceable" to their actions. *See* MTD at 16. In fact, the Supreme Court has made clear that a defendant's actions do not have to be "the very last step in the chain of causation" to satisfy the traceability requirement. *Bennett v. Spear,* 520 U.S. 154, 168-69 (1997). *See also Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 134 n.6 (2014) ("[p]roximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct"). Even when an injury is "the result of the independent action of some third party not before the court," traceability may be found when the injury has been "produced by determinative or coercive effect upon the action of someone else." *Bennett,* 520 U.S. at 167, 169. Even "tentative" and "small incremental step[s]" in the chain of causation are sufficient to satisfy the traceability requirement. *Massachusetts v. EPA,* 549 U.S. 497, 523-24 (2007) (finding EPA's failure to regulate carbon emissions was a fairly traceable cause of global warming-related injuries, even where independent sources substantially contribute to that injury). The allegations show that the Govt. Defendants' actions are not "tentative," "small" or "incremental;" their actions have been essential to the Coalition's massive attacks on civilians in Yemen.

Plaintiffs established in section IV.B, *supra*, the Govt. Defendants' massive, repeated, and unrepentant violations of the AECA and FAA that led to illegal FMS to the Coalition. Without the weapons transfers approved by the Govt. Defendants, the Coalition would not have the military capacity to conduct the attacks on the civilian population of Yemen. Among the key allegations of the Complaint establishing this are:

- The Govt. Defendants provided at least $54.2 billion in weapons from 2015-21 to the Coalition, which intervened in the civil conflict in Yemen, resulting in the deaths and injuries of thousands of innocent civilians, including Plaintiffs and their relatives. *See, e.g.*, Complaint at ¶¶ 2, 3, 57.

- "U.S.-made bombs dropped by the Coalition are regularly found at sites in Yemen where innocent civilians have been killed or injured. Without U.S. weapons, experts say the Coalition – which is for all practical purposes led by Saudi Arabia and the UAE – would be largely unable to wage its war. ***As of 2017, three out of every five weapons used by the Coalition was U.S.-made,*** according to the Stockholm International Peace Research Institute." Complaint ¶ 3 (emphasis added; footnote omitted).

- The Govt. Defendants started providing FMS to the Coalition in 2015 and that year approved $10.5 billion in FMS. Each year thereafter, despite gruesome reports of massive civilian casualties, the Govt. Defendants continued to approve FMS and by 2021 had approved $54.2 billion in FMS. Complaint ¶¶ 58, 61-62. *See also* GAO Report at p. 7, 59 (Table 4).

- "If State and DOD had adopted monitoring standards and procedures as outlined in the FAA and the AECA, they would have affirmatively denied the arms sales from the defense contractor Defendants to the Coalition, and thus prevented civilian deaths. Under the FAA and AECA, these agencies had a duty to implement the [FMS] program to provide reasonable assurance that recipients complied with restrictions imposed by the U.S. government and should have fully determined the extent to which U.S. military support provided to Saudi Arabia and the UAE contributed to civilian harm in Yemen. Despite sufficient and specific knowledge that U.S.-made weapons would be used by the Coalition to commit war crimes, State and DOD approved the sale of lethal weapons to the Coalition that eventually led to the Plaintiffs' injuries." Complaint ¶ 164.

These allegations, along with the other allegations detailed in section IV.B, *supra,* allow the inference that the Govt. Defendants' approval of FMS to the Coalition was a "substantial factor motivating the third parties' actions." *Am. Freedom L. Ctr.,* 821 F.3d at 49. The record in this case supports that the lethal weapons provided the Coalition by the Govt. Defendants were used to target innocent civilians, yet the Govt. Defendants continued to provide them and failed to perform end-use monitoring that should have led to termination of FMS to the Coalition.

**c. An order requiring the Govt. Defendants' compliance with the AECA and FAA would prevent future injuries to Plaintiffs and others similarly situated.**

The Govt. Defendants' redressability argument merely recycles its prior argument that questions whether Plaintiffs' have established they face a significant likelihood of future injury: "Redressability requires that it 'be likely, as opposed to merely speculative, that the injury will

be redressed by a favorable decision.' *Lujan*, 504 U.S. at 561." MTD at 20. However, a plaintiff need not demonstrate that the relief requested would completely remedy the harm, nor "relieve his every injury." *Massachusetts v. EPA*, 549 U.S. at 524-26 (quotation omitted). Removing the major source of weapons the Coalition is using to attack civilians in Yemen would obviously reduce the risk of further injury to Plaintiffs and others similarly situated.

The Govt. Defendants rely entirely on the irrelevant argument that it is merely speculative as to whether the Coalition governments would obey an order of this Court to stop using U.S. weapons to attack civilians. MTD at 20-21. Plaintiffs have established in section IV.C.1.a, *supra*, that there is a likelihood of future injury from Coalition attacks with FMS approved by Govt. Defendants in violation of the AECA and FAA restrictions. They are **not** asking this Court to order the Coalition governments to stop attacking civilians in Yemen (and it is ludicrous to assert they are).

The relief Plaintiffs request against the Govt. Defendants is an injunction that they perform the end-use monitoring/investigation of prior sales they were required to conduct by the AECA but didn't, see section 4.B.2, *supra*, and that the Court order the Govt. Defendants to comply with the AECA and FAA before approving any further FMS to the Coalition. *See, e.g.*, Complaint ¶ 228. This relief will redress Plaintiffs' injuries because either the Govt. Defendants' compliance with the AECA and FAA will prevent any further FMS to the Coalition, or the Govt. Defendants will impose harm reduction conditions required by AECA and FAA on the Coalition to prevent or at least reduce further injuries to Plaintiffs and other innocent civilians.[6]

---

[6] The Govt. Defendants appear to be attempting to create a factual ambiguity as to whether there will be further FMS to the Coalition. The Complaint acknowledges that the Biden Administration announced an intent to halt further "offensive" weapons sales, but there is nothing in the record to establish this was done, and there still could be the sale of "defensive" weapons that could be misused by the Coalition absent strict enforcement of the requirements of

This Court certainly has the authority to enjoin the Govt. Defendants and order them to comply with the requirements of the AECA and FAA to not allow FMS to the Coalition if the weapons would be used to attack civilians in Yemen. Such relief would redress Plaintiffs' claims by reducing or eliminating the risk that they will suffer further injuries from Coalition attacks and the impact of such attacks on food access, medical care, and destruction of infrastructure.

**2.  Plaintiffs' APA claim is viable because the Govt. Defendants failed to comply with specific statutory requirements of the AECA and FAA.**

Plaintiffs challenge the Govt. Defendants' acts under the APA, which applies "according to the provisions thereof, except to the extent that (1) statutes preclude judicial review, or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(1). The "default rule is that agency actions are reviewable . . . *even if no statute specifically authorizes judicial review.*" *ANA Int'l, Inc. v. Way*, 393 F.3d 889, 890 (9th Cir. 2004) (citing *Reno v. Catholic Soc. Serv., Inc.*, 509 U.S. 43, 56-57 (1993)) (emphasis added). Agency actions that fail to observe "procedure required by law must be held unlawful and set aside." *Washington v. United States Dep't of State*, 420 F. Supp. 3d 1130, 1143 (W.D. Wash. 2019); *see also* 5 U.S.C. § 706.

The Govt. Defendants contend that their decisions to approve FMS to the Coalition, regardless of statutory conditions imposed by the AECA and FAA, and their failure to conduct end-use monitoring required by the AECA, are "committed to agency discretion by law" and not subject to any form of judicial review. MTD at 22-27.[7] As Plaintiffs demonstrated in section

---

the AECA and FAA. *See, e.g.*, Complaint ¶¶ 227-28. Further, the Govt. Defendants have failed to clearly define the difference between "offensive" and "defensive" weapons. *Id*. ¶ 227.

[7] The Govt. Defendants do not and cannot assert Plaintiffs cannot challenge compliance with AECA and FAA because those statutes do not create a cause of action. Unlike the Plaintiffs in *Doe v. Israel*, No. 1:02-cv-1431-JDB (D.D.C. Oct. 3, 2003), Plaintiffs are challenging non-compliance with the AECA and FAA under the APA and do not argue the AECA or FAA provide for a direct cause of action.

IV.B, *supra*, the Govt. Defendants violated the AECA and FAA in repeatedly approving FMS to the Coalition despite overwhelming evidence that the weapons were being used to attack civilians in Yemen, and their admitted failure to conduct end-use monitoring. The rules established in the AECA and FAA are not optional. "Simply stated, rules are rules, and fidelity to the rules which have been properly promulgated, consistent with applicable statutory requirements, is required of those to whom Congress has entrusted the regulatory missions of modern life." *Reuters v. FCC,* 781 F.2d 946, 951 (D.C. Cir. 1986).

The APA requires courts to "set aside agency actions . . . that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. Sec. 706(2)(A), and "empowers a reviewing court to 'set aside' an agency action that exceeds its statutory . . . limitations." *Luokong Tech. Corp. v. DOD.*, 538 F. Supp. 3d 174, 182-83 (D.D.C. 2021) (quoting 5 U.S.C. 706(2)). While agency determinations in the context of foreign policy and national security may receive heightened deference, courts still "retain[] a role, and an important one, in ensuring that agencies have engaged in reasoned decision making." *Judulang v. Holder*, 656 U.S. 42, 53 (2011). "Reasoned decision-making mandates that an agency 'articulate a satisfactory explanation for its action' with a 'rational connection between the facts found and the choice made." *Luokong*, 538 F. Supp. at 183 (quoting *Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Here, Govt. Defendants identify no facts in the record indicating there was reasoned decision-making at all, much less that there was any effort to comply with the AECA and FAA.

The AECA and FAA's limitations on sales of U.S.-origin arms provides a "statutory reference point by which the [C]ourt is able to review the [agency's actions]." *Ctr. for Biological Diversity v. Trump*, 435 F. Supp. 11, 39 (D.D.C. 2020). By continuing to supply

weapons to the UAE and Saudi Arabia, the Govt. Defendants evaded clearly outlined statutory obligations to investigate, monitor, and oversee the use and sale of these weapons to prevent human rights abuses and certainly could not have permitted more sales until they fulfilled these statutory obligations. Unlike cases where there are no judicially manageable standards by which to judge an agency's actions, here, the AECA and FAA supply the applicable procedural standards that the Court can use to determine whether the agencies acted in an arbitrary and capricious manner. Plaintiffs' claims do not require the Court to second-guess *discretionary* judgments, but whether the Govt. Defendants' conduct violates the law. It is the duty of the judiciary "to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

Although the Court cannot venture into decisions about wise policymaking, it can determine whether the Govt. Defendants violated Congressional policy set by the AECA and FAA by contributing to civilian harm in Yemen despite knowing that U.S.-origin defense articles were used in airstrikes against civilians. Further, there is a "distinction between the court venturing into areas committed to agency discretion and the court applying statutory interpretation principles to determine whether [an agency's] actions follow Congress's dictates." *Biological Diversity*, 453 F. Supp. at 38-39.

In fact, the Govt. Defendants fail to cite a single case supporting their position that they are shielded from judicial review despite failing to adhere to the statutory provisions outlined in the FAA and the AECA. The Govt. Defendants contend that their decisions "rest on complex foreign policy and national security judgments," but they have not made the case that such interests are at stake here. *See* MTD at 2. Indeed, there is no indication in the record that the Govt. Defendants made any findings whatsoever to justify ignoring the limitations of the AECA and FAA. And even if there **were** some foreign policy or national security interests present, the

24

Court must still consider the "'substantial public interest' in having governmental agencies abide by federal laws that govern their existence and operations." *Xiaomi Corp. v. DOD*, No. 21-280 (RC), 2021 U.S. Dist. LEXIS 46496, at *36 (D.D.C. Mar. 12, 2021) (quoting *League of Women Voters v. Newby*, 838 F. 3d, 1, 12) (D.C. Cir. 2016)); *see also N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) ("[t]he public interest is served when administrative agencies comply with their obligations under the APA.").

In *Xiaomi*, for instance, shareholders sought an order enjoining the DOD from "enforcing its designation of Xiaomi as a Communist Chinese military company [(CCMC)]," which prevented individuals from purchasing or possessing Xiaomi's publicly traded securities. 2021 U.S. Dist. LEXIS 46496, at *2. Despite the inherent national security interests involved in DOD designations, the court held that DOD's designation was arbitrary and capricious because DOD failed to "explicitly identify [its] source of authority that governs the CCMC designation process," which did not "inspire confidence in the fastidiousness of the agency's decision-making process." *Id.* at *14. The *Xiaomi* defendants did "little more than "'parrot[]' the language of a statute . . . followed by a conclusory statement." *Id.* at 15. The Govt. Defendants here did not even do that; they completely ignored the statutory language.

### a. The Govt. Defendants' approval of FMS to the Coalition in violation of the AECA and FAA is subject to judicial review.

The Govt. Defendants argue that decisions to approve FMS are "committed to agency discretion by law" and therefore there are no "judicially manageable standards" for the Court to apply. MTD 22-23. The mere fact that there is some discretion permitted in any agency decision does not itself establish the decision "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This exception to the strong presumption of reviewability "has consistently been

recognized, in the Supreme Court, the D.C. Circuit, and elsewhere, as a "'very narrow exception'" that applies only in "rare instances where statutes are drawn in such broad terms that in a given case there is **no law to apply.**" *Moghaddam v. Pompeo*, 424 F.Supp.3d 104, 116 (D.D.C. 2020) (emphasis added) (quoting *Cody v. Cox*, 509 F.3d 606, 610 (D.C. Cir. 2007)); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1971); *see also Santor v. Morton*, 383 F.Supp. 1265, 1267 (D. Wyo. 1974) (holding that there was law to apply–the "statutes in question, the regulations implementing them, and other decisions of the courts and [agency at bar]"–and thus the agency action was not committed to agency discretion); *Bar Bea Truck Leasing Co., Inc. v. United States*, 4 C.I.T. 138, 140 (Ct. Intl. Trade 1982) (the mandatory language of the regulation limited the Director's discretion to ascertaining whether an applicant met the criteria, so the Director did not have unfettered discretion to reject applications).

Agency actions become unreviewable by virtue of "courts hav[ing] **no** legal norms pursuant to which to evaluate the challenged action, and thus no concrete limitations to impose on the agency's exercise of discretion." *Sierra Club v. Jackson*, 648 F.3d 848, 855 (D.C. Cir. 2011) (internal quotation marks omitted) (emphasis added). Indeed, the D.C. Circuit has recognized that, because courts may set aside agency actions as abuses of discretion under the APA, "the existence of agency discretion, in itself, hardly constitutes grounds for concluding that agency action is unreviewable." *Local 1219, Am. Fed'n of Gov't Emps. v. Donovan*, 683 F.2d 511, 515 (D.C. Cir. 1982). Rather, courts will foreclose judicial review under the APA "***only when*** 'the considerations in favor of nonreviewability…are sufficiently compelling to rebut the strong presumption of judicial review.'" *Id.* (quoting *Nat. Res. Def. Council, Inc., v. SEC*, 606 F.2d 1031, 1044 (D.C. Cir. 1979). Such considerations must constitute "'clear and convincing evidence' of a contrary legislative intent." *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967).

A key case directly applicable to the issues presented here is *Local 1219,* where the court rejected the government's argument that the Department of Labor's decision that a settlement agreement constituted "'appropriate remedial action'" in the context of the Civil Service Reform Act of 1978 (CSRA) was unreviewable. 683 F.2d at 514. The government argued that there was "no law to apply" because the CSRA (the alleged violation of which prompted the settlement negotiations) authorized the Assistant Secretary of Labor Management Relations to provide remedies "as he considers appropriate." *Id.* at 515. According to the government, this language afforded the Assistant Secretary unfettered discretion, barring review under the APA. *Id.*

The court disagreed and held that the government's interpretation of this section of the CSRA erroneously "***ignore[d] the full language of that section*** and its implementing regulations." *Id.* (emphasis added). Like here, where the Govt. Defendants are cherry-picking isolated portions of the AECA and FAA that include discretionary language, the court found that ***reading the CSRA as a whole***, the statute's enforcement scheme "di[d] not contemplate that the Director shall have complete discretion," but rather that they would have the "flexibility to pursue remedies…through either settlement or enforcement proceedings…as the circumstances warrant." *Id.* at 515-16; *see also Moghaddam v. Pompeo*, 424 F.Supp.3d 104, 116 (D.D.C. 2020) (finding "meaningful standards and law to apply" by supplying the general APA reasonableness standard, which governed a timeframe for waiver consideration despite "no strict timeframe set by the Proclamation or agency guidance for processing waivers").

In seeking judicial immunity and complete discretion to make crucial decisions regarding FMS, the Govt. Defendants ignore the specific provisions of the AECA and FAA that they have acknowledged as providing limitations on FMS. See section IV.A, *supra*. Considering the ***statutory scheme as a whole***, as the D.C. Circuit requires, *see Local 1219,* 683 F.2d at 515-16,

27

the Govt. Defendants fail to address the implications of their failure to follow clear statutory procedural requirements under the AECA and FAA. *See* MTD at 22-27. As established in section IV.A, *supra*, the AECA establishes a framework to control the sale of defense articles to other countries by creating eligibility prerequisite considerations, including whether the sale might "increase the possibility of outbreak or escalation of conflict." 22 U.S.C. § 2778(a)(1). The AECA further specifies that arms sales are permissible only under a limited set of circumstances. "Defense articles and defense services shall be sold or leased . . . to ***friendly countries solely for*** internal security, for legitimate self-defense, for preventing or hindering the proliferation of weapons of mass destruction . . . or measures consistent with the Charter of the United Nations." *Id*. at § 2754 (emphasis added). And if one statutory obligation is not enough, the FAA states that a "principal goal" of U.S. foreign policy "shall be to promote the increased observance of internationally recognized human rights by all countries." 22 U.S.C. § 2304(a)(1). In furtherance of this "principal goal", the FAA mandates that "***no security assistance may be provided to any country the government of which engages in a consistent pattern of gross violations of internationally recognized human rights***." *Id*. § 2304(a)(2) (emphasis added).

There is absolutely nothing in the record, including the Govt. Defendants' MTD, showing that that they even ***considered*** the clear restrictions on FMS in the AECA and FAA, let alone found the FMS to the Coalition ***met*** these standards. For example, there is no record that the Govt. Defendants made a finding that FMS to the Coalition satisfied the AECA requirement that the weapons were "***solely for*** internal security, for legitimate self-defense, for preventing or hindering the proliferation of weapons of mass destruction . . . or measures consistent with the Charter of the United Nations." 22 U.S.C. § 2754 (emphasis added). Likewise, there is no record of a finding that the Govt. Defendants determined under the FAA that the Coalition had not

engaged in a "***consistent pattern of gross violations of internationally recognized human rights.***" 22 U.S.C. § 2304(a)(2). Such findings would be impossible to make in good faith because the Complaint and the GAO Report are replete with examples that FMS to the Coalition resulted in horrific death and injury to civilians in Yemen. *See* section IV.B.1, *supra*.

Plaintiffs do not dispute that the Govt. Defendants were charged in the statutory scheme including the AECA and FAA to use their military and foreign policy expertise to make decisions regarding FMS, but they were not permitted to simply ignore the restrictions that were put in place by Congress to temper that discretion. Like the *Local 1219* court ruled that, despite the Director's "considerable experience" in a "special matter[] of agency expertise," it was "well-equipped" to "solely assess whether the Director's decision" violated the APA, this Court is well-equipped to confirm Saudi Arabia and the UAE's gross violations of human rights as detailed in State's FAA Country Reports and adjudicate whether State and DOD's decisions to continually approve arms transfers to the countries effectuated a purpose in the AECA or not, despite the agencies' unquestionable experience and expertise in this matter. *See Local 1219,* 683 F.2d at 516 (citing 5 U.S.C. § 706(2)(A)). That court's concern about "impart[ing]...far reaching immunity" to an agency is also worth emphasizing here; to the extent that State and DOD possess an "unchallengeable authority" to approve indeterminate volumes of arms transfers to foreign countries in any moment for any purpose, the checks and balances that undergird our country's governance are imminently jeopardized. *See Local 1219,* 683 F.2d at 518. As such, because Section 4 of the AECA and Section 502(B) of the FAA provide the requisite law to review the legality of State and DOD's decisions to approve billions of dollars of arms sales to Saudi Arabia and the UAE, this Court may adjudicate whether they have violated the APA.

At a minimum, the Govt. Defendants were required to "examin[e] relevant factors, and articulat[e] a satisfactory explanation for its actions." *J. Andrew Lange, Inc., v. FAA*, 208 F.3d 389, 391 (2d Cir. 2000). The Govt. Defendants instead just ignored the statutory restrictions, made no findings at all, and in clear contradiction of the statutes, approved FMS to arm the Coalition to defeat the Houthis *regardless of* whether innocent civilians were killed or injured and whether massive human rights violations were committed in the process. The AECA and FAA were enacted precisely to prevent such horrific acts with U.S. supplied weapons.

Plaintiffs are not "second-guessing" the Govt. Defendants' past decisions to supply FMS to the coalition; they are seeking injunctive relief requiring compliance with the AECA and FAA going forward. This means that no further FMS can be provided to the Coalition absent specific findings that the restrictions on FMS in the AECA and FAA have been satisfied.

### b. The Govt. Defendants' admitted failure to conduct end-use monitoring as required by the AECA is subject to judicial review.

The AECA contains a clear and unambiguous mandate that the President "*shall establish a program which provides for the end-use monitoring of [defense articles and services]*." 22 U.S.C. § 2785 (a)(1) (emphasis added). The AECA further requires the Govt. Defendants, following FMS approval, to establish an end-use monitoring program that "*shall be designed to provide reasonable assurance that . . . the recipient of the arms complies with requirements imposed by the United States and that the articles and services are being used for the purposes they were provided*." *Id*. § 2785(a)(2)(B). It is well-established that "'shall' indicates a mandatory duty." *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 671 (D.C. Cir. 2016).

There is no question the Govt. Defendants failed to conduct end-use monitoring as required by the AECA. *See* section IV.B.2, *supra*. Indeed, the Govt. Defendants admit this failure. *See, e.g.*, GAO Rep.at 22, 26, 29; Complaint ¶¶ 155-59, 162.

Based on the discussion in the preceding section, section 2785(a) of the AECA provides "law to apply." This mandatory requirement was added as an amendment to the AECA in 1996. Complaint ¶ 154. This Court can certainly assess whether this provision is a requirement of the law, which it plainly is, and determine that the Govt. Defendants violated the law by admittedly failing to conduct the required end-use monitoring.

The Govt. Defendants make the extraordinary assertion that Plaintiffs concede in ¶¶ 155-64 and 227 of their Complaint "that each department has fulfilled its basic statutory obligation—but merely suggest that those programs should be structured differently." MTD at 26. The Complaint speaks for itself, but those paragraphs, quite the opposite, refer to the Govt. Defendants' failure to comply with the law, as reinforced by the GAO Report at 22, 26, 29-30.

To the extent the Govt. Defendants rely on the challenges of complying with the statutory duty to conduct the required end-use monitoring, the "mere absence of a statute spelling out the details of how an agency should carry out a particular action" does not signify that the action is committed to agency discretion. *McCarthy v. Merit Sys. Prot. Bd.*, 809 F.3d 1365, 1372 (Fed. Cir. 2016). Accepting the Govt. Defendants' argument would "recogniz[e] an unchallengeable authority" . . . and the fact that Congress amended the AECA in 1996 to require end-use monitoring and provide more accountability indicates "no desire to impart such a far-reaching immunity." *Local 1219,* 683 F.2d at 518.

Finally, the Govt. Defendants attempt to create immunity from compliance with section 2785(a) of the AECA by pointing out the variables in determining what is an "investigation." MTD at 25. Here, where the Govt. Defendants admit they simply failed to conduct end-use monitoring, any debate about whether their investigation was adequate is premature. Plaintiffs are seeking an order from the Court that, going forward, the Govt. Defendants must conduct end-

use monitoring as required by AECA Section 2785(a)(2) before there can be any further FMS to the Coalition. Whether any future investigation is adequate is a fight for another day.

### 3.  **Plaintiffs' claims do _not_ raise non-justiciable political questions.**

The Govt. Defendants' "political question" argument reveals either a misunderstanding or a mischaracterization of Plaintiffs' claims and relief sought. It appears the Govt. Defendants have utilized their stock briefing on the political question doctrine without tailoring it to address the very limited relief of statutory interpretation and enforcement sought in this case. *See* MTD at 27-31. Contrary to the Govt. Defendants' assertion, Plaintiffs are not asking this Court to "second-guess" decisions regarding foreign policy or defense. Plaintiffs do not and cannot ask this Court to overturn the Govt. Defendants' prior decisions to provide FMS to the Coalition. Nor do they ask this Court to decide that no further FMS should go to the Coalition for its war in Yemen. Rather, Plaintiffs have established that the Govt. Defendants violated the AECA and the FAA in providing past FMS to the Coalition and in failing to conduct end-use monitoring as required by the AECA. *See* section IV.B, *supra*. Plaintiffs are merely seeking an injunction requiring the Govt. Defendants to comply with the court-clarified statutory restrictions of the AECA and FAA before providing any further FMS to the Coalition.

Thus, Plaintiffs are in no way seeking to interfere with any substantive decision regarding foreign relations or defense. They are asking the Court to enforce statutory provisions enacted by Congress that govern the process by which the Govt. Defendants **are permitted by Congress** to supply FMS to the Coalition. Courts have universally found it within their Article III mandate to review alleged Executive Branch violations of legal duties imposed by Congress by statute, even in the context of complex foreign policy situations. Alarmingly, the Govt. Defendants appear to be implying that if they do comply with the statutory restrictions of the AECA and

FAA, they will be prevented from providing FMS to the Coalition. If that is the case, then it would be the decision by Congress to impose those restrictions, not a decision by this Court to enforce the AECA and FAA, that would prevent further FMS to the Coalition.

In *Baker v. Carr*, 369 U.S. 186 (1962), the Supreme Court established a six-factor test to assess whether a legal issue presented to a court is a non-justiciable political question:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id*. at 210.

The Govt. Defendants concede that the D.C Circuit, in *Al-Tamimi v. Adelson,* 916 F.3d 1, 12 (D.C. Cir. 2019), held that the first two *Baker* factors are the most significant. MTD at 28. There, the D.C. Circuit reversed the district court's ruling that the case presented a nonjusticiable political question. *Al-Tamimi,* 916 F.3d at 13-14. The case was brought by Palestinians residing in disputed territories of the West Bank against various U.S.-based "high net worth individuals," banks, and construction companies alleging defendants were conspiring to commit genocide against them by violently driving them out of the disputed territories. *Id*. at 4. The genocide claim was brought under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350. *Id*.

The Court acknowledged whether the Palestinian Authority or Israel had sovereignty over the disputed territories of the West Bank was a "political question" because the Executive Branch had made a policy decision to remain neutral. However, with judicial precision, the Court noted that regardless of who had sovereignty over the territory in dispute, whether genocide was

being committed by defendants against the Palestinians is a "purely legal issue" and "not a jurisdiction-stripping political question." *Id*. at 11, 13. Thus, as to the first *Baker* factor, the Court found that it was the Constitutional mandate of the judiciary to determine the purely legal question of the scope of "genocide" in the context of a federal statute, the ATS.

As to the second *Baker* factor, the Court noted that genocide is within the scope of the "law of nations" language of the ATS, and "Genocide has a legal definition. . . . Thus, the ATS—by incorporating the law of nations and the definitions included therein—provides a judicially manageable standard to determine whether Israeli settlers are committing genocide." *Id*. at 11-12.

Similarly, in *Al Shimari v. CACI Premier Technology, Inc*., 840 F.3d 147, 158 (4th Cir. 2016), the Fourth Circuit, in deciding whether torture and war crimes claims were justiciable, found that the "separation of powers rationale underlying the political question doctrine" does not apply when challenged conduct is "contrary to settled international law or applicable criminal law."

The question in this case is much simpler than the D.C. Circuit deftly managed in *Al-Tamimi*. Contrary to the Govt. Defendants' assertion, this Court need not decide "which side to support" in the Yemen conflict, *see* MTD at 27; the sole issue is assessing the judicially manageable standards of the AECA and FAA to determine the legal contours of restrictions placed on the Govt. Defendants as a prerequisite to permitting them to provide future FMS to the Coalition.

The D.C. Circuit has repeatedly held that "claims alleging non-compliance with the law are justiciable, even though the limited review that the court undertakes may have an effect on foreign affairs." *DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*, 810 F.2d 1236, 1238 (D.C. Cir.

1987). Appling this principle, the court in *Federation for American Immigration Reform, Inc. v. Reno*, 897 F.Supp. 595 (D.D.C. 1995), determined that the plaintiff's allegation that the defendants violated federal immigration law by signing a joint agreement with Cuba to authorize a certain number of legal migrants did not "render an otherwise straightforward question" of law a nonjusticiable political question, as the court "***must not abrogate its responsibility*** to interpret the law of the land" with regard to the defendants' adherence. *Id*. at 599-603 (emphasis added). Similarly, in *Japan Whaling Association v. American Cetacean Society*, the Supreme Court held that the plaintiff's challenge to the Secretary's decision not to sanction Japan under certain statutes for exceeding mandatory whale quotas was justiciable, as the court could not "shirk" its responsibility of deciding the "nature and scope of the duty imposed upon the Secretary" by the statutes at bar "merely because [its] decision may have significant political overtones" impacting the U.S.'s "foreign relations" with Japan. 478 U.S. 221, 229-30 (1986).

Indeed, "*[t]he Supreme Court has never applied the political question doctrine in a case involving alleged statutory violations. Never*." *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 856 (D.C. Cir. 2010) (en banc) (Kavanaugh, J., concurring) (emphasis added); *see also United States v. Texas*, 599 U.S. 670, 684 (2023) ("the Federal Judiciary of course routinely and appropriately decides justiciable cases involving statutory requirements or prohibitions on the Executive").

To determine whether a claim affecting foreign affairs is justiciable, the court "must conduct 'a discriminating analysis of the particular question posed' in the 'specific case.'" *El-Shifa Pharm. Indus. Co.*, 607 F.3d at 841 (quoting *Baker v. Carr*, 369 U.S. 186, 211 (1962)). Multiple jurisdictions, including the D.C. Circuit, have adjudicated APA claims arising out of actions that agencies have taken pursuant to the AECA. *See Goldstein v. United States Dep't of*

*State*, 153 F.Supp.3d 319, 338 (D.D.C. 2016) (ruling that the plaintiff's APA claim concerning the scope of prohibited "brokering activities" under the AECA was justiciable with a more "fleshed-out factual setting"); *Washington v. United States Dep't of State*, 420 F.Supp.3d 1130, 1141-47 (W.D. Wash. 2019) (finding that the Department of State's "compliance with the standards furnished by the AECA, and the adequacy of the agency's analysis of and explanation for its decision" were reviewable under the APA and holding that the Department's act of delisting certain munitions that could threaten the U.S.' "security interests" and "foreign policy" in the wrong hands "failed to consider aspects of the problem which Congress deemed important," causing the court to set aside the action as "arbitrary and capricious").

Further, the D.C. Circuit has routinely held agency actions to be "not in accordance with law" in violation of Section 706(2)(A) of the APA. *See Am. Oceans Campaign v. Daley*, 183 F.Supp.2d 1, 19-20 (D.D.C. 2000) (holding that the government defendants' environmental assessments of certain amendments were not in accordance with law because no such assessments included the relevant information or addressed the statutory limitations pursuant to the agencies' approval of the amendments, despite the defendants' contention that they considered all the relevant factors and determined the risks or impacts of the amendments to be unknown or insignificant); *Kelly v. United States*, 34 F.Supp.2d 8, 14 (D.D.C. 1998) (ruling that certain Foreign Service Grievance Board decisions were not in accordance with law because the agency did not undergird them with the findings of fact required by "express congressional command"); *Gomez v. Biden*, No. 20-cv-01419, 2021 WL 3663535, at *15 (Aug. 17, 2021) (concluding that the government defendants were "wrong that the court must defer to their interpretation" of the State Department's No-Visa Policy because courts are '"not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem

inconsistent with a statutory mandate"') (quoting *Carlson v. Postal Regul. Comm'n*, 938 F.3d

337, 349 (D.C. Cir. 2019).

Accordingly, this case, seeking judicial review of the Govt. Defendants' failure to

comply with specific statutory mandates, is not within the "'narrow' category of 'carefully

defined' cases" within the political question doctrine. *Baker,* 369 U.S. at 211; *Al-Aulaqi v.

Obama*, 727 F.Supp.2d 1, 46 (D.D.C. 2010). Plaintiffs' claims that the Govt. Defendants violated

federal statutory restrictions on FMS and failed to conduct end-use monitoring, are

"straightforward," justiciable questions of law despite their "significant political overtones" and

"foreign relations" implications. The Supreme Court has long directed that it is just as important

to the separation of powers to carefully circumscribe its scope, lest courts use the doctrine to

abdicate their constitutional responsibility. *See, e.g., Zivotofsky*, 566 U.S. at 195-96; *United

States v. Texas*, 599 U.S. at 684. Notably, the Court has cautioned that even a "state of war is not

a blank check for the President." *Hamdi v. Rumsfeld*, U.S. 507, 536 (2004).

In summary, applying the first two *Baker* factors, there is overwhelming consensus that the

Courts have the Constitutional duty to interpret laws of Congress, and when as here, a statute

provides judicially manageable standards to assess compliance, regardless of any tangential impact

on foreign affairs, it is the province of the Courts to do so. This Court is thus Constitutionally

obligated to determine the statutory requirements of the AECA and FAA that must be met to allow

the Govt. Defendants to approve FMS to the Coalition going forward.

The Govt. Defendants' discussion of the other four, less significant, *Baker* factors merely

presumes, incorrectly, the first two factors applied to activate the political question doctrine. *See*

MTD at 29-31. Applying the clear and binding precedents, the Court acts well within the bounds of

separation of powers by assessing the scope of the AECA and FAA and requiring the Govt.

Defendants to comply with the specific conditions in those laws. In performing this basic judicial function, the Court need not wade into any policy determinations (factor 3) because Congress made the policy decisions in passing the AECA and FAA. As all the cases cited in this section implicitly agree, a Court does not show a lack of respect for a coordinate branch of government (factor 4) by faithfully interpreting the scope of a law of Congress. Further, the political decision already made (factor 5) was the passage of the AECA and FAA by Congress, which placed specific conditions on when the Govt. Defendants can approve FMS. The Executive Branch lacks the authority to overturn a law of Congress by violating the law; only the Courts can assess the validity of laws passed by Congress. Finally, the Court will not embarrass the Executive Branch (factor 6) by performing its Constitutional function to interpret laws of Congress. This is particularly true since the impact of the relief Plaintiffs seek is to require the Govt. Defendants' compliance with the AECA and FAA going forward; there will be no potentially embarrassing retroactive reversal of decisions already made by the Govt. Defendants should Plaintiffs prevail.

## V.  CONCLUSION

Plaintiffs' Complaint, complimented by the detailed facts of the GAO Report, makes clear that the Govt. Defendants have objectively violated the statutory provisions of the AECA and FAA. Plaintiffs have standing to sue to stop the ongoing statutory violations by the Govt. Defendants and prevent the risk of future harm to them and others similarly situated. The Govt. Defendants apparently hope that citing "foreign policy" and "national security" concerns within a stock "political question" doctrine argument will override the specific statutory restrictions placed on them by the AECA and FAA. The law is clear that the Court has the fundamental duty

under the APA to review alleged statutory violations even if the Court's decision may touch

upon political concerns.

Respectfully submitted on this 28th day of February 2024,

/s/ Terrence P. Collingsworth
Terrence P. Collingsworth
(DC Bar # 471830)
INTERNATIONAL RIGHTS ADVOCATES
621 Maryland Avenue NE
Washington, D.C. 20002
Tel.: (202) 543-5811
tc@iradvocates.org
**_Counsel for Plaintiffs_**

**CERTIFICATE OF SERVICE**

I hereby certify that on February 28, 2024, I electronically filed the foregoing with the United States Court District Court for the District of Columbia by using the CM/ECF system, which will send a notice of filing to all registered users, including counsel for all parties.

Date: February 28, 2024

/s/ Terrence P. Collingsworth
Terrence P. Collingsworth
(D.C. Bar No. 471830)
INTERNATIONAL RIGHTS ADVOCATES
621 Maryland Avenue, NE
Washington, D.C. 20002
Telephone: (202) 543-5811
tc@iradvocates.org

*Counsel for Plaintiffs*

40