## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Amin Allawi Ali, *et al.*

      Plaintiffs,

      v.

Mohamed Ben Zayed Al-Nahyan, *et al.*

      Defendants.

Case No. 1:23-cv-00576-RDM

## PLAINTIFFS' OPPOSITION TO CORPORATE
## DEFENDANTS' MOTION TO DISMISS

Terrence P. Collingsworth
(DC Bar # 471830)
INTERNATIONAL RIGHTS ADVOCATES
621 Maryland Avenue NE
Washington, D.C. 20002
Tel.: (202) 543-5811
tc@iradvocates.org
***Counsel for Plaintiff***

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION AND SUMMARY OF ARGUMENT……………………………1

II.     FACTUAL BACKGROUND………………………………………………………3

III.    STANDARD OF REVIEW………………………………………………………...3

IV.     ARGUMENT………………………………………………………………………3

        A.  <u>The Political Question Doctrine Has No Application to Plaintiffs' Claims Against the Corporate Defendants</u>……………………………………………………3

        B.  <u>Plaintiffs Have Standing to Sue the Corporate Defendants</u>………………………5

        C.  <u>The Act of State Doctrine Has No Application to this Case</u>……………………..11

        D.  <u>Plaintiffs' Claims Are Not Barred By Derivative Sovereign Immunity</u>…………14

        E.  <u>Plaintiffs' Allegations State a Claim for Liability Against the Corporate Defendants</u>………………………………………………………………………18

                1.  Plaintiffs State an ATS Claim Against the Corporate Defendants for Aiding and Abetting War Crimes, Extrajudicial Killings, and Torture………………………………………………………………18

                        a.  <u>Plaintiffs' ATS Claims that the Corporate Defendants Aided and Abetted War Crimes, Torture, and Extrajudicial Killings Satisfy Sosa's Two-Part Test</u>……………………………………………19

                                i.   Step one of the Sosa test…………………………………19

                                ii.  Step two of the Sosa test…………………………………20

                                iii. Applying the aiding and abetting standard to Plaintiffs' allegations…………………………………………………..23

                        b.  <u>The Focus of Plaintiffs' Claims Occurred in the United States</u>……………………………………………………………..28

                2.  Plaintiffs State a TVPA Claim Against the CEO Defendants for Aiding and Abetting Extrajudicial Killings and Torture……………………………………………………………32

3.  Plaintiffs Have Properly Stated Viable Claims Against the Corporate Defendants for Negligent Supervision, Unjust Enrichment, and Intentional Infliction of Emotional Distress…………………………...34

    a.  Plaintiffs Alleged a Viable Claim for Negligent Supervision……………………………………………………38

    b.  Plaintiffs Alleged a Viable Claim for Unjust Enrichment……….40

    c.  Plaintiffs Alleged a Viable Claim for Intentional Infliction of Emotional Distress………………………………………………42

F.  Plaintiffs Seek Leave to Amend if There Are Any Issues the Court Identifies As Requiring More Specificity……………………………………………………44

V.  CONCLUSION……………………………………………………………………45

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Al Shimari v. CACI Premier Tech., Inc.*,
    758 F.3d 516 (4th Cir. 2014)…………………………………………………………31

*Alfred Dunhill of London, Inc. v. Republic of Cuba*,
    425 U.S. 682, 691 (1976)…………………………………………………………...11

*Ali Shafi v. Palestinian Auth.*,
    642 F.3d 1088, 1095 (D.C. Cir. 2011)……………………………………………...19

*Almerfedi v. Obama*,
    654 F.3d 1 (D.C. Cir. 2011)……………………………………………………….9

*Arce v. Garcia*,
    400 F.3d 1340, 1358-65 (11th Cir. 2005)…………………………………………..36

*Ashcroft v. Iqbal*,
    556 U.S. 662……………………………………………………………………….3

*Ashland v. Ling-Temco-Vought, Inc.*,
    711 F.2d 1431 (9th Cir. 1983)……………………………………………………10

*Autolog Corp. v. Regan*,
    731 F.2d 25 (D.C. Cir. 1984)……………………………………………………..7

*Baker v. Carr*,
    369 U.S. 186 (1962)…………………………………………………………….3, 5

*Banco Nacional de Cuba v. Sabbatino*,
    376 U.S. 398 (1964)…………………………………………………………….13-14

*Bennett v. Spear*,
    520 U.S. 154 (1997)……………………………………………………………….6

*Boyle v. United Techs. Corp.*,
    487 U.S. 500 (1988)…………………………………………………………….16-17

*Brown v. Corr. Corp. of Am.*,
    603 F. Supp.2d 73 (D.D.C. 2009)………………………………………………… 40

*Byers v. Burleson*,
    713 F.2d 856 (D.C. Cir. 1983)…………………………………………………37-38

*Cabello v. Fernandez-Larios*,
    402 F.3d 1148 (11th Cir. 1988)……………………………………………………36

*Campbell-Ewald Co. v. Gomez*,
    577 U.S. 153 (2016)…………………………………………………………………...15

*Chapman v. Am. Cyanamid Co.*,
    861 F.2d 1515 (11th Cir. 1988)……………………………………………………10

*Chavez v. Carranza*,
    559 F.3d 486 (6th Cir. 2009)………………………………………………………36

*Chung v. United States DOJ*,
    333 F.3d 273 (D.C. Cir. 2003)……………………………………………………...35

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)…………………………………………………………………..8

*DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*,
    810 F.2d 1236 (D.C. Cir. 1987)……………………………………………………...4

*Doe I v. Apple Inc.*,
    No. 19-CV-03737, 2021 WL 5774224 (D.D.C. Nov. 2, 2021)……………………… 9

*Doe I v. Cisco Sys.*,
    73 F.4th 700 (9th Cir. 2023)………………………………………..18-25, 28-30, 32-33

*Doe v. Exxon Mobil Corp.*,
    654 F.3d 11 (D.C. Cir. 2011)……………………………………………………...20, 25

*Doe I v. Exxon Mobil Corp.*,
    391 F. Supp. 3d 76 (D.D.C. 2019)…………………………………………………20

*Doe v. Israel*,
    No. 1:02-cv-1431-JDB, 2003 U.S. Dist. LEXIS 29342 (D.D.C. Oct. 3, 2003)………......4

*Doe v. Saravia*,
    348 F. Supp. 2d 1112 (E.D. Cal. 2004)……………………………………………36-37

*Elliot v. Michael James Inc.*,
    507 F.2d 1179 (D.C. Cir. 1974)……………………………………………………...9

*Farris v. Compton*,
    652 A.2d 49 (D.C. 1994)……………………………………………………………...35

*Firestone v. Firestone*,

76 F.3d 1205 (D.C. Cir. 1996)……………………………………………………...44

*Foman v. Davis*,
371 U.S. 178 (1962)……………………………………………………………...44

*Ford ex rel. Estate of Ford v. Garcia*,
289 F.3d 1283 (11th Cir. 2002)……………………………………………………33

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000)……………………………………………………………….8

*Goldman v. Bequai*,
19 F.3d 666 (D.C. Cir. 1994)……………………………………………………37

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983)……………………………………………………..7

*Howard University v. Best*,
484 A.2d 958 (D.C. 1984)………………………………………………………42

*Harbury v. Hayden*,
444 F. Supp. 2d 19 (D.D.C. 2006)………………………………………………32

*In re Agent Orange Prod. Liab. Litig.*,
393 F. Supp. 2d 7 (E.D.N.Y. 2005)……………………………………………...17

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
478 U.S. 221 (1986)……………………………………………………………….5

*Jean v. Dorelien*,
431 F.3d 776 (11th Cir. 2005)…………………………………………………...36

*Kashef v. BNP Paribas S.A.*,
925 F.3d 53 (2d Cir. 2019)………………………………………………………12

*Kiobel v. Royal Dutch Petrol. Co.*,
569 U.S. 108 (2013)………………………………………………………….28-29

*Kiwanuka v. Bakilana*,
844 F. Supp. 2d 107 (D.D.C. 2012)……………………………………………...44

*Kramer Assocs., Inc. v. Ikam, Ltd.*,
888 A.2d 247 (D.C. 2005)………………………………………………………42

*Lexmark  Int'l, Inc.  v.  Static  Control Components, Inc.*,
572 U.S. 118 (2014)……………………………………………………………….6

*Liu v. Republic of China*,
  892 F.2d 1419 (9th Cir. 1989)………...……………………………………………14

*Lizarbe v. Rondon*,
  642 F. Supp. 2d 473 (D. Md. 2009)……………………………………………13, 36

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)………………………………………………………………….6

*M.A. v. Wyndham Hotels & Resorts, Inc.*,
  425 F. Supp. 3d 959 (S.D. OH 2019)…………………………………………...39-40

*Marshall v. Honeywell Tech. Sols., Inc.*,
  536 F. Supp. 2d 59 (D.D.C. 2008)…………………………………………………35

*Massachusetts v. EPA*,
  549 U.S. 497 (2007)…………………………………………………………………..6

*Mastafa v. Chevron Corp.*,
  770 F.3d 170 (2d Cir. 2014)…………………………………………………….....29

*Mazor v. Farrell*,
  186 A.3d 829 (D.C. 2018)………………………………………………………….40

*Menominee Indian Tribe of Wis. v. United States*,
  764 F.3d 51 (D.C. Cir. 2014)………………………………………………………34

*Merriam v. Demoulas*,
  No. 11-10577-RWZ, 2013 U.S. Dist. LEXIS 77600 (D. Mass. June 3, 2013)…………7

*Milam v. State Farm Mut. Auto. Ins. Co.*,
  972 F.2d 166 (7th Cir. 1992)………………………………………………………10

*Mohamad v. Palestinian Auth.*,
  566 U.S. 449 (2012)…………………………………………………………….19, 32

*Nader v. Democratic National Committee*,
  567 F.3d 692 (D.C. Cir. 2009)………………………………………………….....27

*Nestle USA, Inc. v. Doe*,
  141 S. Ct. 1931 (2021)…………………………………………………..18, 20, 28-29

*News World Commc'ns, Inc. v. Thompsen*,
  878 A.2d 1218(D.C. 2005)…………………………………………………...34, 40

*Ning Xianhua v. Oath Holdings, Inc.*,
    536 F. Supp. 3d 535 (N.D. Cal. 2021)……………………………………………..12-13

*Nutraceutical Corp. v. Von Eschenbach*,
    459 F.3d 1033 (10th Cir. 2006)……………………………………………………...9

*Ofisi v. BNP Paribas, S.A.*,
    278 F. Supp. 3d 84 (D.D.C. 2017)…………………………………………………24

*Pace v. DiGuglielmo*,
    544 U.S. 408 (2005)……………………………………………………………...34

*Parker v. District of Columbia*,
    478 F.3d 370 (D.C. Cir. 2007)……………………………………………………8

*Phelan v. City of Mount Rainier*,
    805 A.2d 930 (D.C. 2002)…………………………………………………………39

*Powell v. McCormack*,
    395 U.S. 486 (1969)………………………………………………………………3

*Purcell v. Thomas*,
    928 A.2d 699 (D.C. 2007)…………………………………………………………42

*Resolution Trust Corp. v. Gardner*,
    788 F. Supp. 26 (D.D.C. 1992)……………………………………………………35

*Richards v. Mileski*,
    662 F.2d 65 (D.C. Cir. 1981)…………………………………………………....37-38

*Riddell v. Riddell Washington Corp.*,
    866 F.2d 1480, 1484 (D.C. Cir. 1989)………………………………………..37-38

*Roe v. Wilson*,
    365 F. Supp. 3d 71 (D.D.C. 2019)………………………………………………35

*Sabbithi v. Al Saleh*,
    605 F. Supp. 2d 122 (D.D.C. 2009)……………………………………………...12

*Saleh v. Titan Corp.*,
    580 F.3d 1 (D.C. Cir. 2009)……………………………………………………...19

*Scott v. J.P. Morgan Chase & Co.*,
    296 F. Supp. 3d 98 (D.D.C. 2017)………………………………………………15

*Shields v. Eli Lilly & Co.*,
    895 F.2d 1463 (D.C. Cir. 1990)………………………………………………………10

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004)…………………………………………………...18-21, 23

*Tozzi v. U.S. Dep't of Health & Hum. Servs.*,
    271 F.3d 301 (D.C. Cir. 2001)…………………………………………………8

*United States v. Sum of $70,990,605*,
    234 F. Supp. 3d 212 (D.D.C. 2017)…………………………………...11

*W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*,
    493 U.S. 400 (1990)…………………………………………………11-12

*Warfaa v. Ali*,
    33 F.Supp. 3d 653 (E.D. Va. 2014)…………………………………12, 14

*Yearsley v. W.A. Ross Constr. Co.*,
    309 U.S. 18 (1940)…………………………………………………...15-17

*Young v. SEC*,
    956 F.3d 650 (D.C. Cir. 2020)…………………………………………...34

*Zakka v. Palladium Int'l, LLC*,
    298 A.3d 319 (D.C. 2023)…………………………………………………15-16

## STATUTES

22 U.S.C § 2304……………………………………………………………………...3

22 U.S.C § 2314……………………………………………………………………16

22 U.S.C § 2751……………………………………………………………………...3

22 U.S.C § 2753……………………………………………………………………16

28 U.S.C § 1350……………………………………………………………...2, 18, 32

## OTHER AUTHORITIES

10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2729 (4th ed. 1998)………………………………………………………………………………..28

C. Whitlock and N. Jones, *Mattis secretly advised Arab monarch on Yemen war, records show, Washington Post* (Feb 6, 2024)…………………………………………………..26

D.C. Code § 12-301…………………………………………………………………...34

Fed. R. Civ. P. 12……………………………………………………………………1, 3

Fed. R. Civ. P. 15…………………………………………………………………...44

M. LaForgia & W. Bogdanich, *Why Bombs Made in America Have Been Killing Civilians in Yemen*, N.Y. Times (May 16, 2020)……………………………………………………30

Prosser, The Law of Torts § 44 (2d ed. 1955)…………………………………………….9

*Situation of Human Rights in Yemen, Including Violations and Abuses Since September 2014, Detailed Findings of the Group of Eminent International and Regional Experts on Yemen* 1, UN Human Rights Council (Sep. 29, 2020)…………………………………………26-27

## I.      INTRODUCTION AND SUMMARY OF ARGUMENT

Defendants RTX Corporation[1] and Lockheed Martin Corporation and their respective CEOs Defendants Gregory J. Hayes and James D. Taiclet, filed a joint Memorandum in Support of Motion to Dismiss, ECF No. 36-1 ("RTX/LM MTD"). Defendant General Dynamics Corporation and its CEO Defendant Phebe Novakovic filed a separate Memorandum in Support of Motion to Dismiss, ECF No. 37-2 ("GD/MTD"). As the two MTDs raise identical issues, Plaintiffs will respond to them in this single Opposition, which will refer to the three corporate Defendants collectively as the "Defense Contractor Defendants," the three CEOs collectively as the "CEO Defendants," and all the Defendants collectively as the "Corporate Defendants." The Corporate Defendants have all moved to dismiss Plaintiffs' Complaint against them pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

The Corporate Defendants rely heavily on the Memorandum in Support of Motion to Dismiss filed by the Government Defendants ("Govt. Defendants"), ECF No. 31-1 ("Govt. MTD"). Plaintiffs file their Opposition to the Govt. MTD ("Pls Opp Govt. MTD") concurrently herewith. This Court's *rulings* on the Govt. MTD would have significant bearing on several issues raised by the Corporate Defendants, notably the political question doctrine, standing, and whether the weapons sales by the Corporate Defendants were properly authorized by law. It would thus further judicial economy for the Court to decide the Govt. MTD issues first.

With respect to the political question doctrine, the Corporate Defendants make an entirely derivative argument that because the Govt. Defendants themselves argue that the unlawful weapons sales issues raised by the Complaint are political questions, then they are. *See* RTX/LM MTD at 14-22; GD MTD at 12-16. However, as Plaintiffs establish, the Executive

---

[1] Referred to in the Complaint at ¶ 44 as Raytheon Technologies Corporation.

Branch is not above the law, and if Congress places specific constraints on approval of weapons sales by the Govt. Defendants, as in this case, there is a routine justiciable question of whether the Govt. Defendants complied with those constraints. *See* Pls Opp Govt. MTD at 32-38.

The Corporate Defendants also assert the "Act of State" doctrine, a defense ***not*** raised by the Govt. Defendants. The doctrine simply does not apply here. Plaintiffs do not allege that it was official state policy of any of the Coalition[2] partners to target and kill innocent Yemeni citizens, and the Corporate Defendants do not identify any "official act" of a Coalition government at issue. Further, if it was official policy of the Coalition partners to kill civilians, the act of state doctrine would not be available as a matter of law.

The Corporate Defendants do not have derivative sovereign immunity as the weapons they provided to the Coalition were not properly authorized by the Govt. Defendants, and the manner in which the weapons were used violated the law. Either of these are sufficient to prevent application of derivative sovereign immunity.

As Plaintiffs establish in detail below, their Complaint properly alleges the Corporate Defendants aided and abetted the governments of the Coalition by providing them weapons used to commit war crimes, torture, and extrajudicial killings by bombing innocent civilians, including Plaintiffs, in Yemen. These acts make the Corporate Defendants liable to Plaintiffs under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, and the CEO Defendants liable for torture and extrajudicial killings under the Torture Victim Protection Act of 1991 ("TVPA"), 28 U.S.C. § 1350 (note). In addition, the Corporate Defendants are liable for negligent supervision, unjust enrichment, and intentional infliction of emotional distress.

---

[2] "The Coalition" refers to a group of countries led by Saudi Arabia and the United Arab Emirates ("UAE"), which at the start of hostilities in Yemen, included Bahrain, Egypt, Jordan, Kuwait, Morocco, Senegal, and Sudan joining in support. Complaint at ¶ 2.

## II.      FACTUAL BACKGROUND

To avoid unnecessary duplication, Plaintiffs refer the Court to and incorporate by reference herein the Factual Statement in Pls Opp Govt. MTD at 3-5.

## III.      STANDARD OF REVIEW

Under Rule 12(b), the court must accept all well-pleaded factual allegations as true and construe the facts in a light most favorable to Plaintiffs. *Ashcroft v. Iqbal*, 556 U.S. 662, 768 (2009). Plaintiffs otherwise accept the Corporate Defendants' statement on the standards of review applicable to Rules (12)(b)(1) and (6). *See, e.g.*, RTX/LM MTD at 13-14.

## IV.      ARGUMENT

**A.  <u>The Political Question Doctrine Has No Application to Plaintiffs' Claims Against the Corporate Defendants.</u>**

As previously noted, Plaintiffs filed concurrently herewith their opposition to the Govt. Defendants' MTD, which included Plaintiffs' argument that there is no non-justiciable political question raised by their challenge to the Govt. Defendants' failure to comply with the statutory requirements of the Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq*., and the Foreign Assistance Act of 1961 ("FAA"), 22 U.S.C. § 2304 *et seq*., which set specific conditions on Foreign Military Sales ("FMS"). To avoid any unnecessary duplication, Plaintiffs refer to and incorporate by reference their opposition to the Govt. Defendants' political question argument at pages 32-38 of Pls Opp Govt. MTD as if fully set forth herein.

The political question doctrine is rooted in Constitutional separation of powers. *See Powell v. McCormack*, 395 U.S. 486, 518 (1969); *Baker v. Carr*, 369 U.S. 186, 210 (1962). Regardless of whether private parties may assert the political question doctrine, *see* RTX/LM MTD at 19 and n. 21, there is no case law, and the Corporate Defendants cite none, in which a

private party successfully raised a derivative political question issue when the impacted Executive Branch actors failed to establish a legitimate violation of separation of powers sufficient to invoke the political question doctrine.

Plaintiffs' case merely asks this Court to perform a quintessential judicial function – statutory interpretation of the AECA and FAA to clarify the scope of the statutory requirements placed on the Govt. Defendants in approving FMS and in conducting required end-use monitoring, and then decide whether the Govt. Defendants failed to comply with these requirements. *See, e.g.*, *DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*, 810 F.2d 1236, 1238 (D.C. Cir. 1987). This very limited and case-specific relief is a far cry from the sweeping cases cited by the Corporate Defendants that sought to halt foreign arms sales to Israel and ban all future sales and foreign aid. *See, e.g.*, RTX/LM MTD at 17-19. For example, in *Doe v. Israel*, No. 1:02-cv-1431-JDB, 2003 U.S. Dist. LEXIS 29342 (D.D.C. Oct. 3, 2003) (referred to by RTX/LM as "*Doe* Op."), Plaintiffs sought "compensatory and punitive damages for their alleged injuries, and [sought] to enjoin the federal defendants from providing any further military or economic aid to Israel and to halt military sales and weapons contracts between Israel and the defense contractors." *Id*. at *4.

Unlike the limited claim brought by Plaintiffs here under the APA to simply require future compliance with the AECA and FAA by the Govt. Defendants, the plaintiffs in *Doe* sought to create a private right of action under the AECA and FAA for broad damages and injunctive relief. *Id*. at *11-14. Further, they sought to stop all foreign aid to Israel, *id*. at *21, and if the Court granted the relief sought, it would have had to find that Israel was a "terrorist state" and that the U.S. was complicit in torture and aiding a terrorist state. *Id*. at * 23-24.

On these facts, the *Doe* Court found that the case presented nonjusticiable political questions. *Id*. at *24. In sharp contrast and applying the *Baker* Court's admonition that the specific facts and issues must be assessed in determining the application of the political question doctrine, 369 U.S. at 211-212, Plaintiffs here are merely seeking a statutory interpretation of the AECA and FAA under the APA. They acknowledge that future weapons sales to the Coalition could occur provided they are governed by the statutory restrictions of these Congressional statutes. The relief Plaintiffs seek requires no adverse pronouncements about any government, U.S. or foreign. A routine statutory interpretation of what the AECA and FAA require going forward will have no impact on foreign relations; it will be a judicial clarification of what a statute requires – the very province of the judicial branch. *See Japan Whaling Ass'n v. Am. Cetacean Soc'y,* 478 U.S. 221, 229-30 (1986).

**B.  Plaintiffs Have Standing to Sue the Corporate Defendants**.

The Defense Contractor Defendants largely mirror and rely on the standing argument made by the Govt. Defendants (ECF 31-1 at 11-22). *See* RTX/LM MTD at 22-23; GD MTD at 18-21. Plaintiffs refer to and incorporate by reference their argument in opposition to the Govt. Defendants' standing argument as if fully set forth herein. *See* Pls Opp Govt. MTD at 13-22. As Plaintiffs established, they have standing to sue the Govt. Defendants for ***approving*** FMS to the Coalition in violation of the AECA and FAA, and there is no reason to find they do not also have standing to sue the Corporate Defendants for knowingly ***supplying*** the weapons used by the Coalition to bomb innocent civilians in Yemen, including Plaintiffs.

The Defense Contractor Defendants primarily argue Plaintiffs lack standing to sue them because they did not cause the injuries[3] to Plaintiffs; these Defendants claim the decisions to bomb Yemeni civilians were made by Coalition commanders, not them. *See* RTX/LM MTD at 22-23; GD MTD at 18-20. As Plaintiffs established in their Opp Govt. MTD at 18-20, applying the proper legal standard at the motion to dismiss stage, Plaintiffs' allegations establish their injuries are "fairly traceable" to the Corporate Defendants' actions. The Supreme Court has made clear that a defendant's actions do not have to be "the very last step in the chain of causation" to satisfy the traceability requirement. *Bennett v. Spear,* 520 U.S. 154, 168-69 (1997). *See also Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 134 n.6 (2014) ("[p]roximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct").

Specific to the Defense Contractor Defendants' argument, even when an injury is "the result of the independent action of some third party not before the court," causation may be found when the injury has been "produced by determinative or coercive effect upon the action of someone else." *Bennett,* 520 U.S. at 167, 169. Even "tentative" and "small incremental step[s]" in the chain of causation are sufficient to satisfy the traceability requirement. *Massachusetts v. EPA,* 549 U.S. 497, 523-24 (2007) (finding EPA's failure to regulate carbon emissions was a fairly traceable cause of global warming-related injuries, even where independent sources substantially contribute to that injury).

Well beyond "tentative" or "incremental" actions in the chain of causation, the allegations here establish the Corporate Defendants were the ***major*** cause of the Coalition bombings that

---

[3] This is a challenge to the second element of the traditional three-part standing test, whether the injury is "fairly traceable" to the challenged action of the defendant. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

injured Plaintiffs and killed and injured thousands of other innocent civilians in Yemen: "Without U.S. weapons, experts say the Coalition . . . would be largely unable to wage its war. ***As of 2017, three out of every five weapons used by the Coalition was U.S.-made,*** according to the Stockholm International Peace Research Institute." Complaint ¶ 3 (emphasis added).

Supporting the Defense Contractor Defendants' major role in causing civilian atrocities in Yemen, Plaintiffs further allege:

- The U.S. approved $54.2 billion in FMS to the Coalition from 2015-21, most of which was supplied by the Corporate Defendants, that resulted in civilian atrocities in Yemen, including to the Plaintiffs. *See, e.g.*, Complaint at ¶¶ 2, 3, 47-54, 57.

- In addition to public reports of civilian casualties in Yemen from Coalition bombings, including the GAO Report,[4] the Corporate Defendants have their own sources of information of such atrocities they do not publicly disclose to continue to sell arms to the Coalition. *See id*. ¶¶ 76-79, 23-87, 91,93, 153-54, 162.

These allegations and the discussion in section IV.E.1, *infra*, establishing the Defense Contractor Defendants' ATS liability, make clear that these Defendants, as aiders and abettors of the wrongful acts that injured Plaintiffs, caused the injuries for Article III standing purposes. The D.C. Circuit has made clear that "a plaintiff has standing to challenge conduct that indirectly results in injury . . ." *Autolog Corp. v. Regan*, 731 F.2d 25, 31 (D.C. Cir. 1984). Aiders and abettors share vicarious liability with the direct actors causing harm. *See Merriam v. Demoulas*, No. 11-10577-RWZ, 2013 U.S. Dist. LEXIS 77600, at *10-11 (D. Mass. June 3, 2013). *See also*, *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), where causation for tort liability was premised solely on defendant's acts to aid and abet the direct perpetrator by knowingly providing substantial assistance. *Id*. at 477-83.

---

[4] The GAO Report is referenced extensively in the Complaint and in Pls Opp. Govt. MTD. The complete GAO Report is available at: https://www.gao.gov/assets/gao-22-105988.pdf.

If aiding and abetting satisfies causation for liability purposes, it necessarily does so for standing, as "the standing hurdle [cannot be] higher than the necessary showing for success on the merits." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). Indeed, the D.C. Circuit has "never applied a 'tort' standard of causation to the question of traceability." *Tozzi v. U.S. Dep't of Health & Hum. Servs.*, 271 F.3d 301, 308 (D.C. Cir. 2001).

Allegations of the Defense Contractor Defendants' aiding and abetting liability are sufficient to establish causation for purposes of standing. Even if Plaintiffs' substantive liability claims ultimately fail, for standing purposes, a plaintiff's claims **must be assumed to be meritorious**. *See, e.g.*, *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007), *aff'd sub nom.*, *District of Columbia v. Heller*, 554 U.S. 570 (2008).

Defendant GD makes an additional standing argument that there are no specific allegations linking its bombs and other lethal weapons to Plaintiffs' injuries. *See* GD MTD at 20-21. This argument raises a factual dispute on a motion to dismiss and should be disregarded. Plaintiffs' Complaint includes detailed allegations of GD's (and the other Defendants') major role in getting approval for and supplying weapons to the Coalition, which used them to target civilians, including Plaintiffs. *See, e.g.*, Complaint ¶¶ 57-58, 73, 92, 199, 203. This was a very successful effort. Between 2015-21, the U.S. approved $54.2 **billion** in FMS to the Coalition. *Id*. ¶¶ 57-58. GD, along with the other Defendants, through their lobbying specific to the Yemen conflict, received a major portion of the $54.2 billion. *See id*. ¶¶ 73, 92, 199, 203. Prior to discovery, Plaintiffs do not know precisely what portion of the $54.2 billion in weapons each of the Defendants sold to the Coalition, but each of them provided a substantial portion, sufficient to have aided and abetted the war crimes committed by the Coalition. *Id*. ¶¶ 199, 209, 213.

GD, in arguing for specific causation linked to it alone, misconstrues the actual
allegations of the Complaint, which must be taken as true. Plaintiffs allege that the Defense
Contractor Defendants acted in concert to aid and abet the war crimes and extrajudicial killings
of the Coalition. *Id.* ¶¶ 200-05, 209-15. Based on these allegations, the Defense Contractor
Defendants are jointly and severally liable, and it is more likely than not that they collectively
are responsible for any given bombing, including of the Plaintiffs.[5] *See, e.g.*, *Almerfedi v.
Obama*, 654 F.3d 1, 5 (D.C. Cir. 2011) (The civil preponderance of the evidence standard merely
requires the plaintiff "support its position [only] with the greater weight of the evidence.")
(quoting *Nutraceutical Corp. v. Von Eschenbach*, 459 F.3d 1033, 1040 (10th Cir. 2006)); *Elliot
v. Michael James Inc*., 507 F.2d 1179, 1184 (D.C. Cir. 1974) ("'it is enough that [plaintiff]
introduces evidence from which reasonable men may conclude that it is more probable that the
event was caused by the defendant than that it was not'") (*quoting* Prosser, The Law of Torts §
44, pp. 222-223 (2d ed. 1955)).

At this stage of the proceedings, the alleged fact that the Defense Contractor Defendants
are collectively responsible for a major portion of the bombs used to kill and injure civilians in
Yemen, including Plaintiffs, is sufficient to establish causation for standing purposes as to any
given Corporate Defendant. Causation need only be "fairly traceable," not precisely determined,

---

[5] General Dynamics' reliance on *Doe I v. Apple Inc*., No. 19-CV-03737, 2021 WL 5774224
(D.D.C. Nov. 2, 2021) is misplaced. *See* GD MTD at 19-20. There, the District Court found there
was no direct "commercial relationship" between the tech companies and cobalt mining
companies, so Plaintiffs' mining injuries could not be attributable to the tech defendants. That
erroneous legal standard and improper factual finding on a motion to dismiss are currently
pending on appeal, *Doe I* v. *Apple Inc.*, Case No.: 21-7135 (D.C. Cir.; argued December 8,
2022). Here, even if the *Apple* standard is correct, there is no question that each of the Corporate
Defendants had a direct commercial relationship with and sold weapons directly to the Coalition.
*See, e.g.*, Complaint ¶¶ 73, 92, 199, 203.

at the motion to dismiss stage. With this showing that causation is more likely than not, each Corporate Defendant could be found jointly and severally liable for Plaintiffs' injuries.

Statistical evidence or probability is widely accepted as circumstantial evidence of causation, and Plaintiffs need not establish causation with certainty. In *Shields v. Eli Lilly & Co.*, 895 F.2d 1463 (D.C. Cir. 1990), the D.C. Circuit reversed a summary judgement on the causation issue involving whether Lilly's product caused Plaintiff's cancer. The Court held that "in a world short of absolutes, the jury is called upon to process less than perfect evidence. Litigants may not offer speculations or slight possibilities in support of their claims; but neither are they limited to offering only the incontrovertible. The jury's function contemplates that evidence may be less than indubitable. . . . [The] evidence was significantly probative of exposure [to the Lilly drug]. Every conceivable alternative theory of causation need not be extirpated by a litigant seeking the jury's decision." *Id.* at 1467. *See also*, *Milam v. State Farm Mut. Auto. Ins. Co.*, 972 F.2d 166, 170 (7th Cir. 1992) ("[T]estimony and other forms of 'direct' evidence have no categorical epistemological claim to precedence over circumstantial or even explicitly statistical evidence."); *Ashland v. Ling-Temco-Vought,Inc.*, 711 F.2d 1431, 1439-40 (9th Cir. 1983) (in determining an aviation accident's cause, it was permissible to consider circumstantial evidence, such as statistics, suggesting the most frequent causes of such accidents); *Chapman v. Am. Cyanamid Co.*, 861 F.2d 1515, 1517-20 (11th Cir. 1988) (plaintiff had sufficient evidence to link their son's injury to defendant's vaccine, given that most or all of the vaccines in the doctor's office when and where plaintiff's son was given a shot were defendant's). Further, questions of sufficiency of evidence are not properly addressed in the context of a Motion to Dismiss.

**C.  The Act of State Doctrine Has No Application to this Case.**

The Defense Contractor Defendants necessarily concede that the act of state doctrine has limited applicability and may only be invoked "when a case turns on the validity or invalidity of a foreign official act." *United States v. Sum of $70,990,605*, 234 F. Supp. 3d 212, 238 (D.D.C. 2017). Accordingly, the doctrine is very narrow and precludes courts from declaring "invalid the official act of a foreign sovereign" in their own territory. *W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990). The Defense Contractor Defendants, having invoked the act of state doctrine, bear the burden of proving its applicability to the present case. *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 691 (1976).

The Defense Contractor Defendants fail to satisfy the threshold "official act" requirement for the act of state doctrine to apply. Plaintiffs make no claim that there was an established state policy among the Coalition partners to target and execute Yemeni citizens and certainly do not seek to invalidate "the official act of a foreign sovereign" in their own territory. *W.S. Kirkpatrick & Co.,* 493 U.S. at 405. The Defense Contractor Defendants themselves fail to identify any allegation by Plaintiffs challenging any "official act" of any Coalition government and merely rely on generalizations. *See* RX/GD MTD at 27-30. Indeed, Plaintiffs recently dismissed the government official Defendants from Saudi Arabia and U.A.E. to make clear that there is no direct challenge to foreign sovereign official acts presented in this case. *See* ECF No. 39.

Perhaps most telling, the Govt. Defendants themselves have not raised the act of state doctrine and certainly have not identified any "official act" of any Coalition government being challenged by this case. Unable to identify any challenged "official act," the Defense Contractor Defendants fail to meet their burden of proof that the act of state doctrine applies.

As the Supreme Court made clear, "[a]ct of state issues only arise when a court *must decide* -- that is, when the outcome of the case turns upon -- the effect of official action by a foreign sovereign. When that question is not in the case, neither is the act of state doctrine." *W.S. Kirkpatrick & Co.,* 493 U.S. at 405.

Even if the allegations of Plaintiffs' Complaint are stretched in contravention of the fundamental pleading rule that the allegations must be viewed in a light most favorable to Plaintiffs, and the Coalition's bombing of civilians in Yemen is found to be conducted in furtherance of  official state policy, such heinous acts amount to war crimes, extrajudicial killings, and torture and thus cannot, as a matter of law, be recognized as "official acts" under the act of state doctrine.

As established in section IV.E.1, *infra*, Plaintiffs ATS claims are based on credible allegations that the Coalition's bombings of civilians in Yemen, including the Plaintiffs, are war crimes, torture, and extrajudicial killings. When these fundamental international law violations are alleged, courts have refused to apply the act of state doctrine because serious human rights violations cannot be considered official state acts. *Kashef v. BNP Paribas S.A.,* 925 F.3d 53, 58 (2d Cir. 2019) (explaining that courts cannot deem atrocities that violate *jus cogens* norms[6] legitimate "official acts" because such acts "can never be the basis of a rule of decision capable of triggering the act of state doctrine"); *Warfaa v. Ali*, 33 F. Supp. 3d 653, 662 (E.D. Va. 2014) (holding that the act of state doctrine is inapplicable to claims of torture under the TVPA because such claims are violations of *jus cogens* norms and "cannot serve as a basis for the act of state doctrine"); *Ning Xianhua v. Oath Holdings, Inc.*, 536 F. Supp. 3d 535, 554 (N.D. Cal. 2021)

---

[6] *Sabbithi v. Al Saleh*, 605 F.Supp. 2d 122, 129 (D.D.C. 2009) ("*Jus cogen* norms are peremptory norms of international law which enjoy the highest status of international law and prevail over both customary international law and treaties.").

("Courts have held that an act that violates *jus cogens* is not an official act under the act of state doctrine."); *Lizarbe v. Rondon*, 642 F. Supp. 2d 473, 488 (D. Md. 2009) ("[T]he acts alleged in the Complaint violate universally agreed upon legal principles, involving, as they do, acts of torture, extrajudicial killing, and crimes against humanity. Such acts . . . are not deemed official acts for the purposes of the acts of state doctrine. The U.S. Senate, in passing the TVPA, specifically confirmed that torture and similar human rights abuses can never be "public acts" for the purpose of the acts of state doctrine.").

The war crimes, extrajudicial killings, and acts of torture alleged in the Complaint are *jus cogens* violations of international law and cannot qualify as acts of state. Accordingly, the act of state doctrine is inapplicable to the present case, and the Defense Contractor Defendants' attempt to invoke the doctrine fails as a matter of law.

The two fundamental legal hurdles to applying the act of state doctrine prevent its application in this case. There is no alleged "official act" and the international law violations alleged to have been committed by the Coalition can never be considered "official acts."

Even if the doctrine is applied despite the clear legal barriers, its application requires a balancing of interests, and such an assessment confirms that the doctrine is inappropriate in the present case. The Supreme Court has identified three factors that courts are to consider when determining whether to apply the act of state doctrine: (1) the degree of consensus concerning a particular area of international law; (2) the consequences for foreign relations; and (3) whether there has been a change in government. *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428 (1964). Applying these factors also compels the conclusion that the act of state doctrine is inapplicable to this case.

The first *Sabbatino* factor is identical to the previously discussed legal barrier that violations of well-accepted international law norms prevent application of the act of state doctrine to Plaintiffs' ATS and TVPA claims. There is a high level of international consensus against the alleged claims of war crimes, torture, and extrajudicial killings. *Warfaa v. Ali*, 33 F. Supp. 3d 653, 662 (4th Cir. 2016) (explaining that the act of state doctrine does not bar plaintiff's TVPA claims in part because "the consensus against extrajudicial killing and torture is foundational in international law"); *see also Liu v. Republic of China*, 892 F.2d 1419, 1433 (9th Cir. 1989) ("There is also international consensus condemning murder.").

The second *Sabbatino* factor does not support applying the act of state doctrine because this case will not implicate U.S. foreign affairs. In its opposition brief, the U.S. government has neither attempted to invoke the doctrine nor defended the Coalition's acts that clearly violate *jus cogens* norms. Further, the GAO Report has affirmed that the atrocities committed by the Coalition are in direct violation of U.S. law and policy.

Finally, the third *Sabbatino* factor is immaterial to the present case. None of the governments involved have undergone any changes, nor have they attempted to defend their assaults or claim that targeting civilians is legal under international law. Accordingly, all applicable factors weigh against applying the act of state doctrine in the present case.

### D.  Plaintiffs' Claims Are Not Barred By Derivative Sovereign Immunity.

The Defense Contractor Defendants argue that they have derivative sovereign immunity merely because they provided lethal FMS to the Coalition as approved by the Govt. Defendants. *See* RTX/LM MTD at 27-29; GD MTD at 16-18. Plaintiffs do not dispute that, in very limited circumstances, government contractors may be protected under derivative sovereign immunity

when carrying out their contractual duties. However, this limited immunity is not available in the present case. *See Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166 (2016).

As the Supreme Court established in *Yearsley*, derivative sovereign immunity is not available to the Defense Contractor Defendants if Plaintiffs allege their authority under the government contract was not validly conferred or that they exceeded their authority in carrying out their contracts. *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 20-21 (1940); *Zakka v. Palladium Int'l, LLC*, 298 A.3d 319, 327 (D.C. 2023); *Scott v. J.P. Morgan Chase & Co.*, 296 F. Supp. 3d 98, 107 (D.D.C. 2017). Plaintiffs here show both that the FMS provided to the Coalition by the Defense Contractor Defendants was not properly authorized by law and that the weapons at issue were used in a way that violated federal law or the government's instructions. *Campbell-Ewald*, 577 U.S. at 166 (refusing to apply *Yearsley* to a government contractor that "violate[d] both federal law and the Government's explicit instructions").

Defense Contractor Defendants were obligated to operate within the scope of their government contracts, which was subject to various restrictions under the AECA and FAA. They ***assume*** that their provision of FMS was "authorized," going so far as to incorrectly suggest that "Plaintiffs do not allege that the United States is unauthorized to approve weapons transfers . . ." *See, e.g.*, GD MTD at 18. However, the question of proper authorization is a key issue in dispute in this case. As alleged in the Complaint at ¶¶ 219, 204, 228, and as Plaintiffs demonstrate in detail in their Opp Govt. MTD at 8-13, the weapons supplied to the Coalition through FMS were transferred in direct conflict with the specific legal restrictions on FMS in the AECA and FAA. The record is clear the Coalition's military forces have used the Defense Contractor Defendants' weapons to execute indiscriminate and illegal bombings of innocent Yemini civilians, including Plaintiffs. The Coalition has even conveyed the Defense Contractor Defendants' weaponry to

combatants affiliated with terror organizations that continuously commit human rights violations in Yemen.[7] *See* Complaint ¶¶ 99-147, 151. These alleged atrocities do not comply with the Congressional restrictions imposed on FMS by the AECA and FAA. Thus, the Govt. Defendants lacked the statutory authority to approve FMS for the Defense Contractor Defendants for the purpose of transferring them to the Coalition. Opp. Govt. MTD at 8-13. Likewise, the Coalition used unlawfully authorized FMS provided by the Defense Contractor Defendants to bomb and kill innocent civilians in Yemen, which is in violation of federal law. Thus, under the well-accepted standard for derivative sovereign immunity established by *Yearsley*, there is, at a minimum, a factual question as to whether the FMS provided to the Coalition was properly authorized by law and whether the FMS provided by the Defense Contractor Defendants was used by the Coalition in violation of federal law.

The Defense Contractor Defendants cannot claim immunity by merely demonstrating that the Government Defendants authorized the FMS regardless of violations of the AECA and FAA. As the Court recognized in *Zakka,* "a defendant claiming *Yearsley* immunity must establish that the government authorized and directed the allegedly tortious conduct at issue. It is not enough for the defendant merely to show that the conduct did not violate the government's instructions and was undertaken as part of a government-approved program." *Zakka*, 298 A.3d at 332.

Notably, the Defense Contractor Defendants neglected to discuss that the Plaintiffs have also brought state law claims that may implicate the *Boyle* immunity standard. *See* Complaint Counts VI, VII, and VIII. The Court in *Boyle* extended *Yearsley's* immunity defense but did not establish a new, independent immunity doctrine. *Boyle v. United Techs. Corp.*, 487 U.S. 500

---

[7] Transferring Defense Contractor Defendants' weapons to the unauthorized fighters who commit gross human rights violations is expressly prohibited under the AECA and FAA. *See* 22 U.S.C. § 2753(a); 22 U.S.C. § 2314(a).

(1988). It is unclear whether *Boyle* extends *Yearsley* in all circumstances or only when government contractors seek to preempt state law. More specifically, it is unclear whether *Boyle* applies to claims that do not concern design or manufacturing defects.

Under *Boyle*, contractors who supply the government with military equipment may be immune from state-based tort claims arising from design defects if: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512.

Assuming *Boyle* applies to Plaintiffs' state law claims, then there are additional disputed factual questions concerning *Boyle's* third factor, and this would prevent the Defense Contractor Defendants from claiming immunity as a matter of law. The Defense Contractor Defendants had their own sources of information, and there is no indication that they adequately warned the U.S. government that the weapons provided to the Coalition were being used to unlawfully kill Yemini civilians. Instead, Plaintiffs allege that the Defense Contractor Defendants withheld as much information as possible regarding the civilian casualties in order to continue engaging in arms sales and to profit off supplying the Coalition. *See* Complaint ¶¶ 83-87, 153-154, 162.

The Defense Contractor Defendants are not immune simply from their contractual relationship with the Govt. Defendants, and factual questions exist that prevent the Defense Contractor Defendants from claiming immunity under *Yearsley* and *Boyle*. Moreover, it is essential to note that immunity should not be extended in cases like the present one, which involve allegations of international human rights violations. *See In re Agent Orange Prod. Liab. Litig.*, 393 F. Supp. 2d 7, 91 (E.D.N.Y. 2005) (explaining that the *Boyle* defense is unique to

United States law and is not applicable to international human rights violations). Accordingly, Plaintiffs' claims are not barred as a matter of law.

**E.   Plaintiffs' Allegations State a Claim for Liability Against the Corporate Defendants.**

**1.   Plaintiffs State an ATS Claim Against the Corporate Defendants for Aiding and Abetting War Crimes, Extrajudicial Killings, and Torture.**

The Defense Contractor Defendants challenge Plaintiffs' claim brought against them under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, citing numerous out of Circuit cases, but without mentioning *Doe I v. Cisco Sys.*, 73 F.4th 700 (9th Cir. 2023) ("*Cisco*") and the cases relied upon in that decision. This recent Court of Appeals decision is the first case to address the parameters of the ATS following the Supreme Court's ruling in *Nestle USA, Inc. v. Doe*, 141 S. Ct. 1931 (2021). *Cisco* closely resembles the facts of this case and raises very similar legal issues. If applied here, *Cisco* would allow Plaintiffs' ATS claim to proceed. Plaintiffs' allegations that the Corporate Defendants aided and abetted war crimes, torture, and extrajudicial killing present a relatively clear-cut case of a viable ATS claim.

Plaintiffs here allege that the Corporate Defendants aided and abetted the governments of the Coalition in their commission of war crimes, torture, and extrajudicial killings. The ATS has been subjected to numerous legal challenges in recent years, but there has emerged a consensus that for a claim involving a tort committed in violation of the "law of nations" to be viable today, the tort must first satisfy the two-part test of *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), regarding the definition and specificity of the action and the practical and foreign policy implications of its recognition. Then, if the claim is legally viable, Plaintiffs must satisfy the test confirmed in *Nestle USA, Inc.,* 141 S. Ct. 1931, and show that the claim is not extraterritorial

because the conduct relevant to the statute's focus occurred in the U.S. *See, e.g.*, *Cisco*, 73 F.4th at 715.

    a.   <u>Plaintiffs' ATS Claims that the Corporate Defendants Aided and Abetted War Crimes, Torture, and Extrajudicial Killings Satisfy *Sosa*'s Two-Part Test.</u>

    **i.**    **Step one of the *Sosa* test.**

Plaintiffs' ATS claim is that the Corporate Defendants are subject to aiding and abetting liability for the Coalition's use of the Corporate Defendants' weapons to bomb innocent civilians in Yemen. *See* Complaint, Count III, ¶¶ 196-205. Using the weapons supplied by the Corporate Defendants, the Coalition Governments committed war crimes, torture, and extrajudicial killings.[8] *See id.* Step one of the *Sosa* test requires Plaintiffs to show that aiding and abetting liability is a norm of customary international law with sufficient definition and universality to establish liability under the ATS. 542 U.S. at 733-34.

---

[8] None of the Corporate Defendants dispute Plaintiffs' position (*see* Complaint ¶¶ 169-86) that war crimes, torture, and extrajudicial killings, when committed by state actors such as the governments of the Coalition, are universally condemned law of nations violations. GD raises an argument irrelevant in this case as to whether a private party, as opposed to a government actor, can be liable under the ATS for extrajudicial killing. GD MTD at 23-25. Here, as discussed in the text, Plaintiffs' ATS claim is very different; they allege the Corporate Defendants aided and abetted government actors in committing war crimes, torture, and extrajudicial killings. While GD's argument is inapplicable, it bears noting that the authorities it relies on to argue that private parties cannot be liable for extrajudicial killing do not support its position. *Saleh v. Titan Corp.*, 580 F.3d 1, 15 (D.C. Cir. 2009) and *Ali Shafi v. Palestinian Auth.*, 642 F.3d 1088, 1095 (D.C. Cir. 2011), both cited in GD MTD at 23, stand for the unremarkable position that certain international crimes, including torture and extrajudicial killing, require "state action," an element present in this case. *Saleh* adds a wrinkle that the Plaintiffs in that case were reluctant to argue the contractor defendants were the equivalent of state actors because they would then be able to claim governmental immunity. 580 F.3d at 15-16. GD's citation to *Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012), GD MTD at 24, is puzzling. That case holds only that the TVPA by its specific language applies only to individuals and not corporations. *See* 566 U.S. at 452. GD's argument as to what parties can be liable for war crimes, torture, or extrajudicial killing does not dispute that they are well-accepted norms that violate the "law of nations."

Based on overwhelming case law, the *Cisco* Court, considering this precise question, concluded, "in agreement with every circuit to have considered the issue, that aiding and abetting liability is a norm of customary international law with sufficient definition and universality to establish liability under the ATS." *Cisco*, 73 F.4th at 717. The Court added that "[n]o circuit to consider the issue has held otherwise." *Id*. at 718. Indeed, as the *Cisco* Court noted, the D.C. Circuit was among the courts to recognize aiding and abetting liability as an ATS norm. *Id*. at 718, n. 11. In the case at issue, *Doe v. Exxon Mobil Corp*., 654 F.3d 11, 19 (D.C. Cir. 2011), vacated on other grounds, 527 Fed. Appx. 7 (D.C. Cir.2013), the D.C. Circuit stated, "[v]irtually every count to address the issue, before and after *Sosa*, has so held, recognizing secondary liability for violations of international law since the founding of the Republic."

Plaintiffs urge this Court to adopt the universally accepted position that aiding and abetting liability satisfies step one of the *Sosa* test for ATS recognition. This is particularly compelling as none of the Corporate Defendants address the issue, and certainly do not refute it. GD does not address it at all in its *Sosa* assessment. *See* GD MTD at 23-25. Relying entirely on *Doe I v. Exxon Mobil Corp*., 391 F. Supp. 3d 76 (D.D.C. 2019), RTX and LM merely argue that *corporations* should not be subject to aiding and abetting liability under the ATS. *See* RTX/LM MTD at 32-35. In *Nestle USA, Inc.,* a case not mentioned in this discussion by RTX and LM*,* five Justices of the Supreme Court put to rest the argument over whether corporations can be liable under the ATS. *See* 141 S. Ct. at 1941-42 (Gorsuch, J., concurring, joined by Alito, J.); *id*. at 1947 n.4 (Sotomayor, J., joined by Breyer, J. and Kagan, J.). Observing this, the *Cisco* Court held that corporations are subject to ATS liability for aiding and abetting. 73 F.4th at 715-16.

ii.      Step two of the *Sosa* test.

Plaintiffs' aiding and abetting claim under the ATS also satisfies the second part of the

*Sosa* test: federal courts must consider the foreign policy implications and general "practical

consequences of making [a] cause available to litigants in federal courts." *Sosa*, 542 U.S. at 732-

33. Further, in certain "case-specific" instances, federal courts should assess if there is a good

reason to defer to the views of the Executive Branch as to whether a given case should proceed.

*Id*. at 733, n. 21.

Here, as the *Cisco* Court observed, 73 F.4th at 720-21, recognizing aiding and abetting

liability generally would not trigger *Sosa*'s principal foreign policy concern—that courts would

allow ATS claims to impose liability on sovereign nations for behavior with respect to their own

citizens. 542 U.S. at 727. Historically, and in this specific case, aiding and abetting liability is

much more likely to be used to address the transgressions of nongovernmental actors than the

actions of foreign governments themselves.

"[A]iding and abetting liability is most likely to be alleged, as here, in suits against U.S.

citizens and corporations, not foreign governments. Further, recognizing aiding and abetting

liability, particularly for U.S. defendants, well serves the original goals of the ATS: to provide a

forum for violations of international law that, if lacking, could cause foreign relations strife or

'embarrass[ment]' to the United States." *Cisco*, 73 F.4th at 720.

The plaintiffs in *Cisco* alleged that defendant Cisco Systems designed a particularly

invasive surveillance program for the Chinese government referred to as the "Golden Shield,"

which was a "vast and multi-tiered surveillance system of a scale and capacity that could surveil

the entire country's Internet use for all Falun Gong believers." 73 F.4th at 710. Plaintiffs, Falun

Gong members, sued Cisco Systems under the ATS for, among other things, aiding and abetting

the Chinese government's use of the Golden Shield to identify them and torture them as part of a "reeducation" process. *Id*. at 710-12. Cisco Systems, like the Corporate Defendants here, raised a laundry list of hypothetical foreign policy issues with the Chinese government in an effort to have the case dismissed under the second step of *Sosa*. *Id*. at 721-24.

The *Cisco* Court ultimately found "we see no prudential reason to decline to recognize aiding or abetting liability or to bar this particular action from proceeding." *Id*. at 720. The main reasons given were that aiding and abetting liability against private actors like Cisco Systems does not generally trigger foreign policy disputes, neither the Chinese Government nor the U.S. Government had formally raised a specific foreign policy concern, and it was consistent with the original ATS goals to provide a forum to hold U.S. nationals accountable for acts the international community would likely condemn. *Id*. at 720-22.

Here, these same rationales apply even more strongly. First, Plaintiffs' ATS claim is based on aiding and abetting liability for U.S. nationals, both corporations and individuals, which makes it unlikely that the case will trigger foreign policy disputes. Plaintiffs recently voluntarily dismissed all foreign Defendants to ensure this remains the case. *See* ECF No. 39. Second, Plaintiffs' narrowly focused ATS aiding and abetting claim against the Corporate Defendants is within the original purpose of the ATS. Allowing the claim to go forward will be an important demonstration that the U.S. will hold its nationals accountable for acts the international community would likely condemn.

Third, it is important to note that the governments that received and used FMS sales from the Corporate Defendants, mainly Saudi Arabia and U.A.E., are significant global players, but they certainly do not pose the same risk of a major foreign policy incident as China did in the *Cisco* case. In any event, no such incident has occurred. There is nothing in the record to indicate

that any of the Coalition governments protested to the U.S. Government about the allegations in this case. Further, there has been no formal protest from the U.S. Government about the ATS claims brought against the Corporate Defendants. The Government Defendants in this case raised a *pro forma* political question doctrine defense to the claim brought ***against them*** under the APA, *see* Govt. MTD at 27-31, which Plaintiffs opposed (*see* Opp Govt. MTD at 32-38), but there is no report of any foreign affairs incident with any of the governments of the Coalition.

In fact, the U.S. Government has been publicly critical on several levels regarding the Coalition's use of FMS to bomb civilians in Yemen. "Starting in the Fall of 2015 through Spring of 2016, Members of Congress raised concerns about FMS to Saudi Arabia due to reports of civilian casualties in Yemen. GAO Report at p. 9 (Figure 1). Following these initial concerns, Congress placed holds on approved weapons sales to Saudi Arabia and U.A.E. Complaint ¶ 152. Further, the GAO Report is a veritable catalogue of U.S. Government criticism regarding the use of FMS by the Coalition. In addition, President Obama blocked some FMS sales to the Coalition in 2016 and President Biden came to office vowing in 2021 to end weapons sales to the Coalition. *Id*. ¶¶ 74, 227. In short, there are no identified foreign policy issues from any of the concerned governments attributable to Plaintiffs' ATS claims, and the Corporate Defendants did not manage to conjure any in their briefing. *See* RTX/LM MTD at 32-36; GD MTD at 22-25.

**iii.    Applying the aiding and abetting standard to Plaintiffs' allegations.**

There is clear agreement in the courts and relevant international tribunals that to establish a claim for aiding and abetting Plaintiffs must allege facts sufficient to demonstrate both *actus reus* and *mens rea*. *See, e.g*, *Cisco*, 73 F.4th at 724.

There is no dispute that the standard for *actus reus* for an aiding and abetting violation is the defendant must "provide[] assistance, encouragement, or moral support that has a substantial

effect on the crimes. *Id*. at 724-25 (citing cases). RTX and LM agree this is the standard, RTX/LM MTD at 37, while GD does not address *actus reus* at all in discussing the aiding and abetting standard. *See* GD MTD at 26-27

While RTX and LM quote the proper *actus reus* standard, without support they morph it to a significantly higher requirement that Plaintiffs must show the Corporate Defendants '"participate[d] in the attacks."' RTX/LM MTD at 37 (quoting, out of context, *Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84, 109 (D.D.C. 2017)). *Ofisi* said no such thing. While direct participation in bombing the Plaintiffs would certainly subject the Corporate Defendants to liability, aiding and abetting liability by its very essence does not require direct participation in the crime. Instead, as *Ofisi* actually held, "Courts have found substantial assistance **when a defendant provides 'the means by which a violation of the law is carried out**.'" *Id*. at 108 (emphasis added; citation omitted). The *Ofisi* court observed "there are no well-pled allegations that any funds processed by BNPP were used to carry out the embassy bombings." *Id*. at 109.

Here, there are ample allegations in the Complaint that the Corporate Defendants jointly provided most of the weapons that the Coalition used to bomb innocent civilians in Yemen, including the bombings of the social events where Plaintiffs and their families were bombed. Complaint ¶¶ 2.3.45-54,57-59,81,148,153,164. There is no dispute to this, and in any event, the Corporate Defendants cannot dispute Plaintiffs' factual allegations on a motion to dismiss.

In *Cisco*, the Court found "Plaintiffs have plausibly alleged that Cisco provided assistance with substantial effect on Chinese authorities' violations of international law." 73 F.4th at 728. This case is even more compelling – the Corporate Defendants' bombs were the ***essential means by which the illegal bombings were carried out*** in Yemen.

As to the *mens rea* standard, there are two views that split courts and international tribunals, with most authorities concluding that the intent required is merely ***knowledge*** that a defendant's actions will assist in the commission of an international law violation, while others require a defendant to ***act with the purpose of facilitating the crime***.[9] *See, e.g., Cisco*, 73 F.4th at 729. The *Cisco* Court conducted a lengthy analysis of the history and sources for these respective positions, *id*. at 729-34, and observed that the knowledge standard goes back to the Nuremberg Tribunals and that "[a]ll major international tribunals to try individuals for aiding and abetting liability for war crimes after World War II used the knowledge standard." *Id*. at 729. After this assessment, the *Cisco* Court concluded, "we agree with the D.C. Circuit's conclusion in *Doe v. Exxon*, 654 F.3d at 35-38,[10] that the arguments against adopting the Rome Statute's 'purpose' test as the definitive mens rea standard for aiding and abetting liability under the ATS are persuasive. ***We accordingly conclude that customary international law imposes aiding and abetting liability for knowing assistance***." *Cisco*, 73 F.4th at 734.

Applying the knowledge standard, the *Cisco* Court concluded "that Plaintiffs' allegations, accepted as true, are sufficient to state a plausible claim that Cisco provided essential technical assistance to the [persecution] of Falun Gong with awareness that the international law violations

---

[9] The Corporate Defendants do not address this split on the *mens rea* standard and instead argue that the binding standard is based on what Plaintiffs said it was in their Complaint. *See* RTX/LM MTD at 38 (citing Complaint ¶ 199 in which Plaintiffs alleged they could meet "both" *mens rea* tests, and arguing the standard is merely *not* "constructive knowledge"); GD MTD at 26-27 (citing Complaint ¶ 197 where Plaintiffs refer to both *mens rea* tests and arguing this binds Plaintiffs to the stricter purpose standard). Stating the obvious, Plaintiffs do not have the authority to set the *mens rea* standard in their Complaint; the standard is what this Court adopts from the cited cases and tribunals.

[10] As previously noted, the D.C. Circuit's *Exxon* decision was vacated on other grounds at 527 Fed. Appx. 7 (D.C. Cir.2013). While no longer binding, this is this Circuit's last pronouncement on the issue and the reasoning remains persuasive. *See Cisco*, 73 F.4th at 718, n. 11.

of torture, arbitrary detention, disappearance, and extrajudicial killing were substantially likely to take place." *Id*. at 735. The *Cisco* Court also noted that the allegations could ***also*** satisfy the purpose standard because where a defendant "supported" and "benefitted" from the commission of a violation, the purpose *mens rea* standard is met. *Id*. at 735, n. 22.

Here, the allegations of the Corporate Defendants' knowledge are much more direct. At the very outset of the Coalition's lethal intervention in the civil conflict in Yemen, there were public reports of massive civilian casualties in Yemen as a result of Coalition bombings with FMS supplied by the Corporate Defendants. "Starting in the Fall of 2015 through Spring of 2016, Members of Congress raised concerns about FMS to Saudi Arabia due to reports of civilian casualties in Yemen. GAO Report at p. 9 (Figure 1). If Congress had information in 2015 to raise concerns of civilian casualties, the Corporate Defendants certainly knew.

Indeed, the Corporate Defendants, with their deep contacts with the Coalition governments, particularly Saudi Arabia, had inside information on the atrocities in Yemen that they did not share with the public out of concern they would endanger future weapons sales. *See* Complaint ¶¶ 82, 91, 93. In addition, the Corporate Defendants had well-placed contacts in the U.S. Government that provided them with inside information. *See id*. ¶¶ 76-79, 91.

Among the participants in the FMS to the Coalition, from the very outset, it was widely known that the war in Yemen was not going well and that civilian casualties were mounting. The ***Washington Post*** recently reported that because "the coalition's bombing campaign was killing large numbers of civilians and doing little to deter the Houthis," the UAE reached out to retired General Jim Mattis ***in 2015*** to serve as a consultant to advise on the conduct of the war. Mattis served until 2017. Among other things, this report establishes that as early as 2015, when major FMS from the Corporate Defendants was being approved for sale to the Coalition, all concerned

had specific knowledge that the Coalition bombings were killing large numbers of civilians in Yemen but nonetheless went ahead with the sales.[11]

There were numerous public reports that catalogued atrocities against civilians in Yemen going back as early as 2014. *See, e.g.*, *Situation of Human Rights in Yemen, Including Violations and Abuses Since September 2014, Detailed Findings of the Group of Eminent International and Regional Experts on Yemen* 1, UN Human Rights Council (Sep. 29, 2020).

The Corporate Defendants faced shareholders who were concerned that the companies were profiting from the atrocities against civilians in Yemen. These concerns ultimately resulted in shareholder proposals seeking improved human rights compliance policies. *See* Complaint ¶¶ 54,84,90,92. As a whole, Plaintiffs' allegations strongly support that the Corporate Defendants knew their weapons sold to the Coalition were used to commit atrocities against civilians in Yemen. *See, e.g.*, *id*. ¶¶ 5,73,76-79,81-83,91-93, 153-54,162,199.

With this knowledge, the Corporate Defendants lobbied the U.S. Government to increase weapons sales to the Coalition for the Yemen conflict, aggressively marketed their weapons to the Coalition governments, and coordinated with the Coalition governments, particularly Saudi Arabia, to press the U.S. Government to approve FMS to the Coalition. *See* Complaint ¶¶ 35,45,50,53,73,76,79,80,92,199,203,209, and 213. This not only shows knowledge, but it also shows purpose. The Corporate Defendants were encouraging the sales of weapons to the Coalition that were responsible for atrocities against civilians so they could increase their profits from weapons sales. *See id*. ¶¶ 5,48,73,80,150,199,209,230.

---

[11] C. Whitlock and N. Jones, *Mattis secretly advised Arab monarch on Yemen war, records show,* ***Washington Post*** (Feb 6, 2024), available at: https://www.washingtonpost.com/investigations/2024/02/06/mattis-advised-uae-yemen-war/

The Corporate Defendants object to the use of their lobbying of the U.S. Government for weapons sales to the Coalition while there were widespread reports of civilian atrocities in Yemen to show knowledge of the use of their weapons to kill civilians in Yemen. *See* RTX/LM MTD at 37-38; GD MTD at 27. They claim that such lobbying is "protected" by the First Amendment. The Corporate Defendants are apparently attempting to invoke the "*Noerr-Pennington*" doctrine, which provides that when "a person petitions the government" in good faith, "the First Amendment prohibits any ***sanction*** on that action." *Nader v. Democratic National Committee*, 567 F.3d 692, 696 (D.C. Cir. 2009) (emphasis added).

As an initial matter, much of the "lobbying" the companies did was simply marketing weapons sales using their cronies in government. *See, e.g.*, Complaint ¶¶ 76-79. Further, there is nothing in the case law that even remotely suggests that knowledge cannot be inferred from the act of lobbying. The prohibition is on the imposition of a sanction or penalty that impairs the First Amendment right to lobby, and the Corporate Defendants do not even attempt to articulate how such a concern applies in this case. The Corporate Defendants are free to exercise their right to lobby for more arms sales to the Coalition today and forever without concern for any "sanction" for doing so, at least based on current law.

Plaintiffs' allegations and the referenced public reports leave no doubt that the Corporate Defendants had knowledge that the weapons they were selling to the Coalition were used to bomb and kill innocent civilians in Yemen, satisfying the most widely accepted *mens rea* standard for aiding and abetting. Plaintiffs' additional allegations that the Corporate Defendants also "supported" and "benefitted" from the weapons sales that killed civilians also satisfies the more stringent "purpose" standard. *See Cisco*, 73 F.4th at 735, n. 22.

If there is any question at all about the state of the Corporate Defendants' knowledge or intent, these questions are generally inappropriate for summary judgment, let alone resolution on a motion to dismiss. *See* 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2729 (4th ed. 1998).

     b.  <u>The Focus of Plaintiffs' Claims Occurred in the United States</u>.

The Corporate Defendants present a caricature of Plaintiffs' allegations in their truncated arguments that Plaintiffs' claims do not satisfy the Supreme Court's requirements in *Nestle*, 141 S. Ct. at 1936, and *Kiobel v. Royal Dutch Petrol. Co*., 569 U.S. 108, 124-25 (2013), for the ATS to apply to their claims. *See* RTX/LM MTD at 30-31; GD MTD at 25-26. Ignoring most of Plaintiffs' allegations, the Corporate Defendants essentially argue that "*all*" of the alleged conduct occurred outside the United States. Review of the actual allegations in the Complaint demonstrates that, as the *Nestle* Court contemplated, Plaintiffs allege that the *actus reus* of their aiding and abetting claim against the Corporate Defendants is the "focus" of their claim and this conduct occurred in the United States. *See Nestle*, 141 S. Ct. at 1936-37 (majority op.). Prior to *Nestle*, the Second Circuit applied a similar approach, explaining that the "relevant conduct" to be examined in assessing whether plaintiffs' claims are not improperly extraterritorial is "the conduct constituting the alleged offenses under the law of nations." In that case, as well as this case, such conduct is that which "constitutes aiding and abetting another's violation of the law of nations." *Mastafa v. Chevron Corp*., 770 F.3d 170, 184-85 (2d Cir. 2014).

Applying *Nestle* and *Mastafa*, the *Cisco* Court considered "the specific actions the defendants were alleged to have taken to assist the principal—that is, the *actus reus* of the alleged aiding and abetting," and the statute's focus, and found "Cisco designed, developed, and optimized important aspects of the Golden Shield surveillance system in California; that Cisco

manufactured hardware for the Golden Shield in California; that Cisco employees in California

provided ongoing maintenance and support; and that Cisco in California acted with knowledge

of the likelihood of the alleged violations of international law and with the purpose of facilitating

them." 73 F.4th at 738. The Court further reasoned that this U.S.-based conduct

> well exceeded "mere corporate presence" or simple corporate oversight and direction
> [that was found to be insufficient U.S. conduct by *Kiobel*, 569 U.S. at 125]. Rather, the
> design and optimization of integrated databases and other software, the manufacture of
> specialized hardware, and ongoing technological support all took place in California.
> Unlike in *Kiobel* and *Nestle*, in which all or nearly all the actions that constituted
> assistance to the principal occurred abroad, the domestic activities alleged here
> constituted essential, direct, and substantial assistance for which aiding and abetting
> liability can attach. So, with regard to corporate defendant Cisco, Plaintiffs' allegations
> support application of the ATS.

73 F.4th at 738-39.

It is important to note that in *Cisco*, the Chinese government developed the concept of

"the Golden Shield," and then sought the assistance of Western tech companies to build it. Cisco

was ultimately awarded the contract. *Id*. at 710. Here, considering Plaintiffs' actual allegations

and not the Corporate Defendants' restrictive presentation of them, it is clear that virtually all of

the Corporate Defendants' conduct amounting to aiding and abetting the Coalition's war crimes,

torture and extrajudicial killings occurred in the U.S. In contrast to *Cisco*, there was **no** input

from the Coalition governments on the design of weapons made in the U.S. and provided by the

Corporate Defendants to the Coalition. The Corporate Defendants are all U.S.-based companies

that design and manufacture their lethal products in the United States. *See* Complaint ¶¶

46,49,52.  In fact, the Corporate Defendants created new U.S. jobs to accommodate the demand

for weapons sold to the Coalition, particularly Saudi Arabia. *See* M. LaForgia & W. Bogdanich,

*Why Bombs Made in America Have Been Killing Civilians in Yemen*, **N.Y. Times** (May 16,

2020).[12]   When he was President, Donald Trump promoted weapons sales to Saudi Arabia and stated "I want Lockheed and I want Raytheon to take those orders and to hire lots of people to make that incredible equipment." *Id*. and Complaint ¶ 75. In this case, the Plaintiffs from both the wedding attack and the funeral attacks were injured by U.S.-made weapons. *Id*. ¶ 164.

Like Cisco, which engaged in a "marketing campaign" to win the "Golden Shield" contract from the Chinese government, 73 F.4th at 710, the Corporate Defendants spent tremendous resources in the United States to market their weapons for the Yemen conflict. *See* Complaint ¶¶ 35,45,50,53,73,76,79,80,92,199,203,209, and 213. The Corporate Defendants were very successful at this marketing measured by their increased profits attributable to weapons sales for the Coalition. *See id*. ¶¶ 5,48,58,59.73,80,150,199,209,230.

In short, virtually all of the Corporate Defendants' conduct aiding and abetting the Coalition's illegal bombings in Yemen occurred within the United States. Without the aid of U.S.-weapons made available to the Coalition through the Corporate Defendants' U.S.-based manufacturing, procurement, and sales strategies, the indiscriminate attacks on Yemini civilians would not have been possible. *Id*. ¶ 168.

A few other factors establishing that the "focus" of the Corporate Defendants' conduct was in the United States are provided by *Al Shimari v. CACI Premier Tech., Inc.*, 758 F.3d 516 (4th Cir. 2014). The *Al Shimari* Court found the defendant CACI's conduct was focused on the United States because, among other factors, CACI was a United States corporation, CACI's U.S. contracts with the U.S. government were issued in the United States, and CACI managers in the

---

[12] Available at: https://www.nytimes.com/2020/05/16/us/arms-deals-raytheon-yemen.html

U.S. failed to disclose known wrongful acts committed by its contractors. *Id.* at 530-31. These three factors are also present in this case. *See* Complaint ¶¶ 46,49,52 (Corporate Defendants are all U.S.-based); ¶¶ 56-59, 154-55, 224-26 (the Corporate Defendants' contracts to provide FMS to the Coalition were awarded, implemented, managed, and regulated by the U.S. Government in the United States); and ¶¶ 82,91,93 (officers for Corporate Defendants in the United States had inside information on atrocities in Yemen but did not disclose to the public).

At a minimum, Plaintiffs have raised factual questions in dispute that their ATS claims are focused on the United States. The Corporate Defendants failed to address the actual allegations in taking the unsupportable position that all of the relevant conduct occurred outside the United States.

2.  **Plaintiffs State a TVPA Claim against the CEO Defendants for Aiding and Abetting Extrajudicial Killings and Torture**.

Plaintiffs' Fourth Cause of Action is against the CEO Defendants only[13] for violations of the Torture Victim Protection Act of 1991 ("TVPA"), 28 U.S.C. § 1350 (note). *See* Complaint ¶¶ 206-15. The CEO Defendants raise a limited challenge to the claim, whether the Complaint properly addresses the "color of law" requirement of the TVPA. *See* RTX/LM MTD at 42; GD MTD at 27-28. They cite to *Harbury v. Hayden*, 444 F. Supp. 2d 19, 43 (D.D.C. 2006), *aff'd*, 522 F.3d 413 (D.C. Cir. 2008), as the foundation of their color of law challenge, but that case, and the CEOs' argument, fail to address the specific TVPA claim made by Plaintiffs. Their claim is that, as with their ATS claim, the CEO Defendants aided and abetted the governments of the

---

[13] The Supreme Court held in *Mohamad v. Palestinian Authority*, 566 U.S. 449 (2012), that the TVPA's use of the term "individual" as the operative defendant excludes corporations or any other non-person.

Coalition when they committed torture and extrajudicial killings by bombing innocent civilians in Yemen with weapons provided by the Corporate Defendants. *See* Complaint ¶¶ 206-15.

The *Cisco* Court, after discussing the legislative history of the TVPA and numerous other decisions, stated "based on the text and Convention Against Torture background of the TVPA, we conclude that the TVPA encompasses claims against those who aid and abet torture or extrajudicial killing." 73 F.4th at 744. The "state action" requirement of the TVPA was satisfied in *Cisco* because the defendants aided and abetted the Chinese government's implementation of the "Golden Shield." *Id*. at 744-45. Here, likewise, the allegations that the CEO Defendants aided and abetted the Coalition governments' torture and extrajudicial killings satisfies the TVPA's state action requirement. Aiding and abetting liability, or other forms of secondary liability, would not be possible under the TVPA if, as GD argues (GD MTD at 27), the defendant was required to act directly "under" a foreign authority.

The CEO Defendants also argue that the aiding and abetting allegations against them are not sufficiently detailed, but they are the same aiding and abetting allegations made against the CEO Defendants and the Defense Contractor Defendants collectively as the Corporate Defendants with Plaintiffs' ATS claim, which are discussed in detail in section IV.E.1, *supra*.

In addition to being a matter of pleading, Plaintiffs alleged (Complaint ¶ 44) the CEOs are responsible for the acts of their respective companies and subordinates by virtue of the doctrine of command responsibility. *See, e.g.*, *Ford ex rel. Estate of Ford v. Garcia*, 289 F.3d 1283, 1288 (11th Cir. 2002). As the *Cisco* Court noted, "our circuit and others have determined that the TVPA provides for 'command responsibility' liability—that is, the vicarious liability of superior officers for the actions of subordinates if the superior knew of the unlawful actions a

subordinate planned to take and did not act to stop them." 73 F.4th at 743 (citations to other command responsibility cases omitted).

At this stage of the proceedings, Plaintiffs' TVPA allegations are more than sufficient to state a claim against the CEO Defendants for aiding and abetting the governments of the Coalition in committing torture and extrajudicial killings.

3. **Plaintiffs Have Properly Stated Viable Claims Against the Corporate Defendants for Negligent Supervision, Unjust Enrichment, and Intentional Infliction of Emotional Distress.**

The Corporate Defendants' cursory treatment of Plaintiffs' state law claims[14] for negligent supervision, unjust enrichment, and intentional infliction of emotional distress fails to justify dismissal of the claims as a matter of law. *See* RTX/LM MTD at 39-41; GD MTD at 29-31. Plaintiffs' allegations, taken as true, state viable claims that should proceed to discovery.

As to all the state law claims, the Corporate Defendants raise the statute of limitations as an affirmative defense. RTX/LM MTD at 40; GD MTD at 29, n. 12. Plaintiffs agree with the Corporate Defendants (RTX/LM MTD at 40) that the applicable statute of limitations is three years for their state law claims. *See, e.g. News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005) and D.C. Code § 12-301(8).

However, in their rush to dismiss Plaintiffs' state law claims as untimely, the Corporate Defendants fail to consider the application of equitable tolling. As the Court of Appeals for the District of Columbia Circuit explained:

> "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo*, 544 U.S.

---

[14] Plaintiffs agree with the Corporate Defendants that D.C. law should be applied to the "state" law claims.  *See* RTX/LM MTD at 39, n. 28; GD MTD at 29, n. 12.

> 408, 418 (2005) (citations omitted). "[T]o support equitable tolling, the
> circumstances that caused a litigant's delay must have been beyond its
> control." *Menominee Indian Tribe of Wis. v. United States*, 764 F.3d 51, 58 (D.C.
> Cir. 2014), *aff'd*, 136 S. Ct. 750 (2016) . . .  "The circumstance that stood in a
> litigant's way cannot be a product of that litigant's own misunderstanding of the
> law or tactical mistakes in litigation." *Id*.

*Young v. SEC*, 956 F.3d 650, 655 (D.C. Cir. 2020).

Within the general scope of "equitable tolling," the District of Columbia currently recognizes two specific forms of tolling: the lulling doctrine and the discovery rule." *Roe v. Wilson*, 365 F. Supp. 3d 71, 78 (D.D.C. 2019). Here, Plaintiffs' claims were tolled by the discovery rule, which means a "claim does not accrue until the plaintiff, exercising due diligence, has discovered or reasonably should have discovered all of the essential elements of her possible cause of action[.]" *Farris v. Compton*, 652 A.2d 49, 54 (D.C. 1994) (citation omitted). As this Court put it, "a cause of action does not accrue under District of Columbia law until the time when the plaintiff both should have known of the defendant's actions and suffered actual injury." *Resolution Trust Corp. v. Gardner*, 788 F. Supp. 26, 29 (D.D.C. 1992).

Courts uniformly agree that equitable tolling is warranted when extraordinary circumstances that were beyond the plaintiff's control caused a delay in the ability to file a claim. *See, e.g.*, *Marshall v. Honeywell Tech. Sols., Inc*., 536 F. Supp. 2d 59, 68 (D.D.C. 2008). The D.C. Circuit has stated that equitable tolling may apply "when a plaintiff knows he has been injured but is unaware that his injury may be the result of possible misconduct by the defendant." *Chung v. United States DOJ*, 333 F.3d 273, 279 (D.C. Cir. 2003).

Here, the areas in Yemen where Plaintiffs were injured have been bombed back to the stone age by Coalition forces using lethal weapons supplied by the Corporate Defendants. Yemen is experiencing a raging civil war and one of the world's worst humanitarian disasters.

Complaint ¶¶ 4,62-63,67-72,94-95.  Plaintiffs were not required to plead facts establishing their entitlement to equitable tolling as the statute of limitations is an affirmative defense that must first be raised by Defendants, but the roiling civil conflict and the lack of access to justice in Yemen are textbook examples of facts that would have prevented Plaintiffs from reasonably discovering the necessary elements of their claims against the Corporate Defendants.

"[E]very court that has considered the question of whether a civil war and a repressive authoritarian regime constitute 'extraordinary circumstances' which toll the statutes of limitations . . . has answered in the affirmative." *Jean v. Dorelien*, 431 F.3d 776, 780 (11th Cir. 2005). In *Arce v. Garcia*, 400 F.3d 1340, 1358-65 (11th Cir. 2005), the Court applied equitable tolling to plaintiffs' actions arising out of the civil conflict in El Salvador between 1983 and 1992. The Court confirmed that the applicable ten-year statute of limitations would not begin for such claims until the El Salvador Peace Agreement was reached, *id*. at 1258-59, 1265, because until then "the fear of reprisals against the plaintiffs' relatives orchestrated by people aligned with the defendants excused the plaintiffs' delay in prosecuting their claims against the defendants." *Id.* at 1259.

The Eleventh Circuit added that "[t]he doctrine of equitable tolling allows a court to toll the statute of limitations until such a time that the court determines would have been fair for the statute of limitations ***to begin running*** on the plaintiffs' claims." *Id*. at 1261 (emphasis added). "When a statute is equitably tolled, the statutory period ***does not begin to run until the impediment to filing a cause of action is removed*** . . ." *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1155-56 (11ᵗʰ Cir. 2005) (emphasis added). *See also*, *Chavez v. Carranza*, 559 F.3d 486, 494 (6ᵗʰ Cir. 2009) (applying equitable tolling to claims arising from the civil war in El Salvador because "[w]hether the plaintiffs knew they had an actionable claim under United States law

does not change the fact that at least until March 1994, the circumstances in El Salvador were not sufficiently safe for plaintiffs to seek redress in court"); *Lizarbe v. Rondon*, 642 F. Supp. 2d 473, 482 (D. Md. 2009) (applying equitable tolling where the plaintiffs "pled that until at least the year 2000, the political climate in Peru was unremittingly hostile to any effort on their part to pursue remedies against Rivera Rondon in Peru"); *Doe v. Saravia*, 348 F. Supp. 2d 1112, 1147-48 (E.D. Cal. 2004) (applying equitable tolling where "[t]he evidence is that from 1980 to 1994, and even through to the present, any person who leveled allegations against active or former members of the [Salvadoran] military risked reprisal, including death").

Factual questions abound as to the impact of the brutal civil conflict in Yemen on Plaintiffs' reasonable ability to discover the role of the Corporate Defendants in their injuries and their ability to obtain access to justice in U.S. Courts to seek redress for their injuries. The law is clear that any factual questions regarding equitable tolling are for a jury to decide, and certainly cannot be resolved in the context of a motion to dismiss:

> As a general matter, "what a plaintiff knew and when [she] knew it, in the context of a statute of limitations defense, are questions of fact for the jury." *Riddell v. Riddell Washington Corp.,* 275 U.S. App. D.C. 362, 866 F.2d 1480, 1484 (D.C. Cir. 1989). This court held in *Byers v. Burleson,* 230 U.S. App. D.C. 62, 713 F.2d 856, 861 (D.C. Cir. 1983), that, **under District of Columbia law, "summary judgment is not appropriate in a case applying the discovery rule if there is a genuine issue of material fact as to when, through the exercise of due diligence, the plaintiff knew or should have known of her injury."**

*Goldman v. Bequai*, 19 F.3d 666, 672 (D.C. Cir. 1994) (emphasis added).

As the Court of Appeals for the District of Columbia Circuit added:

> **There is an inherent problem in using a motion to dismiss for purposes of raising a statute of limitations defense**. Although it is true that a complaint sometimes discloses such defects on its face, **it is more likely that the plaintiff can raise factual setoffs to such an affirmative defense.** The filing of an answer, raising the statute of limitations, allows both parties to make a record adequate to measure the applicability of such a defense, to the benefit of both the trial court and any reviewing tribunal.

*Richards v. Mileski*, 662 F.2d 65, 73 (D.C. Cir. 1981) (emphasis added).

Here, among the factual questions that are key to whether equitable tolling based on the discovery rule applies and that cannot be resolved on a Motion to Dismiss are:

- Given Plaintiffs' injuries, when were they physically and mentally able to begin investigating the causes and perpetrators of their injuries;
- The barriers Plaintiffs faced in obtaining access to justice in Yemen due to the ongoing civil war;
- The extent that Plaintiffs' lack of access to information due to the destruction of infrastructure in Yemen by the illegal Coalition bombings prevented them from learning the causes and perpetrators of their injuries; and
- Once Plaintiffs were able to obtain access to appropriate legal representation, how long did they take to file their claims in this Court.

These and other factual questions cannot be addressed on a motion to dismiss and need to be considered and resolved by the finder of fact. *See Richards,* 662 F.2d at 73. As a general matter, "what a plaintiff knew and when [she] knew it, in the context of a statute of limitations defense, are questions of fact for the jury." *Riddell v. Riddell Washington Corp.,* 866 F.2d 1480, 1484 (D.C. Cir. 1989). Under District of Columbia law, "summary judgment is not appropriate in a case applying the discovery rule if there is a genuine issue of material fact as to when, through the exercise of due diligence, the plaintiff knew or should have known of her injury." *Byers v. Burleson,* 713 F.2d 856, 861 (D.C. Cir. 1983).

Accordingly, assessment of the statute of limitations with respect to Plaintiffs' state law claims must be deferred until the finder of fact weighs the facts and determines whether Plaintiffs exercised due diligence before they were able to file their complaint on March 3, 2023.

Assuming Plaintiffs' state law claims cannot be dismissed as a matter of law based on the statute of limitations, they have stated viable claims for negligent supervision, unjust enrichment, and intentional infliction of emotional distress. Complaint ¶¶ 229-46. In prematurely relying

heavily on the statute of limitations, the Corporate Defendants failed to seriously address Plaintiffs' claims on the merits. *See* RTX/LM MTD at 39-41; GD MTD at 29-31.

   a.   <u>Plaintiffs Alleged a Viable Claim for Negligent Supervision.</u>

   Plaintiffs properly allege the three elements of negligent supervision: (1) the Corporate Defendants knew or should have known that their weapons provided to the Coalition were being used to bomb innocent civilians; (2) the Corporate Defendants failed to adequately supervise the use of their weapons supplied to the Coalition; (3) resulting in harm to Plaintiffs. *See Phelan v. City of Mount Rainier,* 805 A.2d 930, 937–38 (D.C. 2002). Complaint ¶¶ 237-41. Plaintiffs' allegations on these elements, at a minimum, raise factual issues in dispute that cannot be resolved on a Motion to Dismiss.

   Satisfying the first element, the Corporate Defendants knew or should have known that their weapons were being used by the Coalition for targeted bombings of innocent civilians, including Plaintiffs. This was widely known based on public reports and the Corporate Defendants' own inside information based on, among other things, their contacts with the U.S. Government and the key governments of the Coalition. Complaint ¶¶ 5,73,76-79,82,83-87,91, 93,153-154,162. "Starting in the Fall of 2015 through Spring of 2016, . . . Congress raised concerns about FMS to Saudi Arabia due to reports of civilian casualties in Yemen. GAO Report at p. 9 (Figure 1). If Congress had knowledge in 2015, it is more than a reasonable inference that the Corporate Defendants, which depended on these weapons sales for major profits and had inside information on atrocities in Yemen, knew as well. They certainly should have known.

   As to the second element, Plaintiffs have also established that the Corporate Defendants failed to properly supervise the use of their lethal weapons and did nothing to prevent the massive death and destruction of the civilian population in Yemen. *See, e.g.*, Complaint ¶¶

81,83-89,92,239-41. Again, Defendants had policies that they claimed to the public would ensure human rights compliance in their operations, but they did little or nothing to implement these policies, instead allowing extreme violence to rain down on the civilians of Yemen, including Plaintiffs. *See id.* ¶¶ 81,84,87-90. Courts have uniformly held that "failure to implement policies sufficient to combat a known problem in one's operations can rise to the level of willful blindness or negligence." *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 968 (S.D. OH 2019); *see also Brown v. Corr. Corp. of Am.*, 603 F.Supp.2d 73, 81 (D.D.C. 2009).

The Corporate Defendants argue in opposition to the second element that "the Complaint contains no well-pleaded allegations of any dangerous or incompetent behavior by a Contractor Defendant employee." RTX/LM MTD at 41; *see also* GD MTD at 30.[15] Plaintiffs need not identify a specific negligent employee when they have alleged that the Corporate Defendants failed on a systematic basis to take steps to prevent their weapons from killing and injuring innocent people. *See, e.g.*, Complaint ¶¶ 81,83,85,89,92,239-41.

Finally, there is no question that the third element is satisfied here – Plaintiffs' allegations as to the serious harm they suffered are undisputed. *See, e.g.,* Complaint ¶¶ 5,11-25.

b. Plaintiffs Alleged a Viable Claim for Unjust Enrichment.

As Plaintiffs alleged, *see* Complaint ¶¶ 229-36, unjust enrichment occurs when (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust. *News World Commc'ns, Inc,*. 878 A.2d at 1222 (D.C. 2005); *Mazor v. Farrell*, 186 A.3d 829, 833 (D.C. 2018).

---

[15] As Plaintiffs established in their Opp Govt. MTD at 22-32, the FMS to the Coalition were in violation of the requirements of the AECA and FAA and thus were not properly "authorized" by the Executive Branch. GD's argument that authorized sales cannot be negligent ignores this fundamental disputed issue. See GD MTD at 30.

The Corporate Defendants challenge only the first element -- whether Plaintiffs conferred a benefit upon them. *See* RTX/LM MTD at 40; GD MTD at 29.[16] Plaintiffs acknowledge that their allegation of conferring a benefit on the Corporate Defendants is not within the traditional scope of unjust enrichment claims, but there is no question that the Corporate Defendants received enormous financial benefits from supplying weapons for the Coalition's bombing of civilians in Houthi-controlled areas of Yemen, including Plaintiffs. *See, e.g.*, Complaint ¶¶ 44, 45,73,232. Plaintiffs and others similarly situated were victims of the Corporate Defendants' unlawful acts that were performed for profit. Without a civilian population, including Plaintiffs and others similarly situated, for the Coalition to target, the Corporate Defendants would not have been able to sell their lethal weapons to the Coalition.

Thus, while Plaintiffs did not choose to confer any benefits to the Corporate Defendants, there are facts in dispute as to whether they were essential to the massive profits flowing to Defendants. Further, because Plaintiffs suffered damages from the Corporate Defendants' lucrative sales of weapons, their effort to recover the benefits conferred on the Corporate Defendants, profits from the sales, is directly a form of restitution for the wrongful acts.

The Corporate Defendants assert that Plaintiffs fail to allege "there was any relationship between the Plaintiffs and the Contractor Defendants." RTX/LM MTD at 40. It is hard to imagine a more direct form of contact than being the target of one of the Corporate Defendants' bombs, as Plaintiffs certainly were. Complaint ¶¶ 11-25,164. At a minimum, there is a factual question as to the amount of benefits that were conferred on Defendants as a result of weapons sales to the Coalition that targeted Plaintiffs and others similarly situated.

---

[16] Defendant GD also attempts to establish an additional element, stating "Plaintiffs do not allege that GD was paid for something it did not provide[.]" GD MTD at 29-30. This is not a required element of unjust enrichment. *See News World Commc'ns, Inc.,* 878 A.2d at 1222.

The other elements of unjust enrichment, unchallenged by the Corporate Defendants, are easily met in this case. As to the second element, as Plaintiffs alleged in the Complaint ¶¶ 44, 45, 73,232-33, the Corporate Defendants have retained the benefits conferred upon them because they profited from the massive weapons sales to the Coalition and certainly did not provide compensation or restitution to Plaintiffs and other victims of the bombings. *See, e.g., Kramer Assocs., Inc. v. Ikam, Ltd.*, 888 A.2d 247, 254 (D.C. 2005).

Finally, the third element, that the Corporate Defendants' retention of the benefit is unjust, is easily satisfied. Plaintiffs have alleged that these Defendants aided and abetted war crimes, extrajudicial killings, and torture, the epitome of wrongful acts that would be unjust to profit from. *See* section IV.E.1, *supra*, and Complaint ¶¶ 168, 196-215.

In sum, the Corporate Defendants took advantage of and were enriched by a known population of victims, including Plaintiffs, who were unlawfully attacked by Coalition bombings with weapons supplied, at great and unjust profit, by the Corporate Defendants.

c.   Plaintiffs Alleged a Viable Claim for Intentional Infliction of Emotional Distress.

As Plaintiffs alleged, *see* Complaint ¶¶ 242-46, there are three prongs to a claim for intentional infliction of emotional distress: "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Purcell v. Thomas,* 928 A.2d 699, 711 (D.C. 2007) (quoting *Howard University v. Best,* 484 A.2d 958, 985 (D.C. 1984)). Plaintiffs allege these three elements: the Corporate Defendants engaged in extreme and outrageous conduct by providing weapons to the Coalition that were used to bomb innocent civilians in Yemen, including Plaintiffs (Complaint ¶¶ 2,3,45-54,57-59,81,148,153,164), the Corporate Defendants knew or recklessly disregarded that the

weapons they were providing to the Coalition would be used to bomb innocent civilians in Yemen, including Plaintiffs (Complaint ¶¶ 5,73,76-79,81-83,91-93,153-54,162,199), and as a result of the horrific bombings they survived, Plaintiffs suffered physical injury and severe emotional distress (Complaint ¶¶ 5,11-25).

The Corporate Defendants challenge only the first element, whether they engaged in extreme and outrageous conduct that caused the injury to Plaintiffs, and do not dispute the other two elements. *See* RTX/LM MTD at 41; GD MTD at 31. They thus admit that they knew or recklessly disregarded that the Coalition was using the weapons provided to them through the Corporate Defendants' FMS to bomb innocent civilians and that Plaintiffs suffered physical injury and severe emotional distress as a result of the bombings they endured.

The Corporate Defendants dispute the first element mainly based on causation; they argue that they did not engage in outrageous conduct that caused Plaintiffs' injuries. *See* RTX/LM MTD at 41; GD MTD at 31. In responding to the challenge to Plaintiffs' standing to sue, Plaintiffs demonstrated that their injuries were fairly traceable to or caused by the Corporate Defendants. *See* section IV.B, *supra*. Plaintiffs specifically alleged they were injured from the Corporate Defendants' joint action with the Coalition to bomb innocent civilians in Yemen, including Plaintiffs. *See* Complaint ¶¶ 5,11-25,164,246.

The Corporate Defendants seek to avoid responsibility for Plaintiffs' injuries by arguing the Coalition, not them, engaged in the outrageous conduct of bombing Plaintiffs and other innocent civilians in Yemen, while the Corporate Defendants merely engaged in the normal business practice of selling the Coalition the weapons used to attack the Plaintiffs. RTX/LM MTD at 41; GD MTD at 31. This ignores Plaintiffs' actual allegations and improperly disputes factual allegations on a motion to dismiss. Plaintiffs have established that the Corporate

Defendants aided and abetted the Coalition's bombings of innocent civilians in Yemen, *see* section IV.E.1, *supra*, and their outrageous conduct was to "intentionally and continuously" participate in the systematic bombing of civilians in Yemen. Complaint ¶¶ 243, 246.

      Whether facts alleging outrageous conduct are sufficient to constitute intentional infliction of emotional distress is a question of fact that should not be resolved on a motion to dismiss. *See, e.g.*, *Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107, 119-20 (D.D.C. 2012). Plaintiffs claim here is sufficiently alleged to avoid a dismissal as a matter of law.

### F.  Plaintiffs Seek Leave to Amend if There Are Any Issues the Court Identifies As Requiring More Specificity.

      Plaintiffs have demonstrated that their Complaint has sufficiently alleged facts to meet all legal elements of their claims. If the Court identifies issues that require further factual pleadings, Plaintiffs seek leave to file a motion to amend their complaint and submit a First Amended Complaint to address any such rulings by the Court. It is axiomatic that Fed. R. Civ. P. 15(a) requires leave to amend "'shall be freely given when justice so requires.'" *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "It is an abuse of discretion to deny leave to amend unless there is sufficient reason, such as 'undue delay, bad faith or dilatory motive . . . [or] futility of amendment.'" *Id*.

## V. CONCLUSION

For the reasons detailed herein, Plaintiffs' Complaint, complimented by the GAO Report, has properly alleged the elements of Plaintiffs' ATS, TVPA, and state law claims. At a minimum, Plaintiffs' allegations identify material questions of fact in dispute for all elements of their claims, making them inappropriate for resolution on a Motion to Dismiss. The Corporate Defendants' Motion should be denied in its entirety.

Respectfully submitted on this 28th day of February 2024,

/s/ Terrence P. Collingsworth
Terrence P. Collingsworth
(DC Bar # 471830)
INTERNATIONAL RIGHTS ADVOCATES
621 Maryland Avenue NE
Washington, D.C. 20002
Tel.: (202) 543-5811
tc@iradvocates.org
***Counsel for Plaintiffs***

**CERTIFICATE OF SERVICE**

I hereby certify that on February 28, 2024, I electronically filed the foregoing with the

United States Court District Court for the District of Columbia by using the CM/ECF system,

which will send a notice of filing to all registered users, including counsel for all parties.


Date: February 28, 2024

/s/ Terrence P. Collingsworth
Terrence P. Collingsworth
(D.C. Bar No. 471830)
INTERNATIONAL RIGHTS ADVOCATES
621 Maryland Avenue, NE
Washington, D.C. 20002
Telephone: (202) 543-5811
tc@iradvocates.org

*Counsel for Plaintiffs*

46