**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Amin Allawi Ali, *et al*. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action 1:23-cv-00576-RDM |
| | ) | |
| Mohamed Ben Zayed Al-Nahyan, *et al*. | ) | |
| | ) | |
| Defendants. | ) | |

**<u>GENERAL DYNAMICS CORPORATION'S
AND PHEBE NOVAKOVIC'S REPLY IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................ 2

I.     THE POLITICAL QUESTION DOCTRINE BARS PLAINTIFFS' CLAIMS. ............................................................................................... 2

    A.     The Political Question Doctrine Applies To Statutory Claims That Second-Guess National Security And Foreign Policy Judgments. ......................... 3

    B.     Plaintiffs' "Statutory" Claims Require Resolution Of A Political Question. ................................................................................................. 4

    C.     Plaintiffs' Retreat From Damages Claims Cannot Save The Injunctive Claims. ................................................................................................... 6

II.    GD IS ENTITLED TO DERIVATIVE SOVEREIGN IMMUNITY ............................... 8

III.   PLAINTIFFS CANNOT ESTABLISH STANDING. ......................................... 9

IV.   PLAINTIFFS' ATS CLAIMS MUST BE DISMISSED. .................................. 11

    A.     Binding Authority Forecloses Implying Claims Against GD Under The ATS. ................................................................................................ 11

    B.     Plaintiffs Impermissibly Seek To Apply The ATS Extraterritorially. .................. 13

    C.     Plaintiffs Have Not Adequately Alleged Aiding And Abetting Liability. ................................................................................................ 14

V.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE TVPA. ..................... 14

VI.   PLAINTIFFS' COMMON LAW CLAIMS MUST BE DISMISSED. ........................... 15

    A.     Plaintiffs' Unjust Enrichment Claim Must Be Dismissed. .................................. 15

    B.     Plaintiffs' Negligent Supervision Claim Must Be Dismissed. ............................. 16

CONCLUSION ....................................................................................................... 17

# TABLE OF AUTHORITIES*

CASES

*Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1 (D.D.C. 2010) .......................................................4

*Brown v. Correctional Corp. of America*, 603 F. Supp. 2d 73 (D.D.C. 2009) ............................16

*Chapman v. American Cyanamid Co.*, 861 F.2d 1515 (11th Cir. 1988) ......................................11

*Chicago & Southern Air Lines v. Waterman Steamship Corp.*, 333 U.S. 103 (1948) .......................................................................................................................4

*Corrie v. Caterpillar, Inc.*, 503 F.3d 974 (9th Cir. 2007) .......................................................4

*Cunningham v. General Dynamics Information Technology, Inc.*, 888 F.3d 640 (4th Cir. 2018) .......................................................................................................................8

*DKT Memorial Fund, Ltd. v. Agency for International Development*, 810 F.2d 1236 (D.C. Cir. 1987) .......................................................................................................6

*Doe 1 v. Apple Inc.*, No. 19-CV-03737, 2021 WL 5774224 (D.D.C. Nov. 2, 2021), *aff'd*, 96 F.4th 403 (D.C. Cir. 2024) .......................................................................10

*\*Doe 1 v. Apple Inc.*, 96 F.4th 403 (D.C. Cir. 2024) .........................................................9, 10, 17

*Doe I v. Cisco Systems, Inc.*, 73 F.4th 700 (9th Cir. 2023) .....................................................12, 13

*Doe I v. Nestle USA, Inc.*, 766 F.3d 1013 (9th Cir. 2014) ............................................................14

*\*El-Shifa Pharmaceutical Industries Co. v. United States*, 607 F.3d 836 (D.C. Cir. 2010) (en banc) .......................................................................................................3, 4, 5, 7

*Federation for American Immigration Reform, Inc. v. Reno*, 897 F. Supp. 595 (D.D.C. 1995), *aff'd*, 93 F.3d 897 (D.C. Cir. 1996) .................................................................6

*Gutrejman v. United States*, 596 F. Supp. 3d 1 (D.D.C. 2022), *aff'd on other grounds*, 77 F.4th 806 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 688 (2024) .........................4

*Harbury v. Hayden*, 444 F. Supp. 2d 19 (D.D.C. 2006), *aff'd*, 522 F.3d 413 (D.C. Cir. 2008) .......................................................................................................................15

*Harisiades v. Shaughnessy*, 342 U.S. 580 (1952) ...................................................................6

*Jaber v. United States*, 861 F.3d 241 (D.C. Cir. 2017) ............................................................6

---

* Authorities upon which GD chiefly relies are marked with an asterisk.

*Jesner v. Arab Bank, PLC*, 584 U.S. 241 (2018) ........................................................................11

*Jones v. Louisiana State Bar Ass'n*, 738 F. Supp. 2d 74 (D.D.C. 2010), *aff'd*, No. 10-5327, 2011 WL 11025624 (D.C. Cir. Oct. 3, 2011) ................................................9

*Lin v. United States*, 177 F. Supp. 3d 242 (D.D.C. 2016), *aff'd*, 690 F. App'x 7 (D.C. Cir. 2017) ................................................................................................9

*M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959 (S.D. Ohio 2019) ....................16

*\*Nestle USA, Inc. v. Doe*, 593 U.S. 628 (2021) ..............................................................11, 13

*Phelan v. City of Mount Rainier*, 805 A.2d 930 (D.C. 2002) ..........................................16

*Saldana v. Occidental Petroleum Corp.*, 774 F.3d 544 (9th Cir. 2014) ............................4

*\*Saleh v. Titan Corp.*, 580 F.3d 1 (D.C. Cir. 2009) ....................................................12, 14

*Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005) ................................................4

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ..........................................................12

*Whiting v. AARP*, 701 F. Supp. 2d 21 (D.D.C. 2010), *aff'd*, 637 F.3d 355 (D.C. Cir. 2011) ....................................................................................................16

*\*Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940) ......................................8

**STATUTES**

22 U.S.C. § 2304(a)(4) ..........................................................................................3

22 U.S.C. § 2752(b) ..........................................................................................3, 5

22 U.S.C. § 2753(a)(1) ......................................................................................3, 5

22 U.S.C. § 2776(b)(1)(P) ......................................................................................6

28 U.S.C. § 1350 note ..........................................................................................15

**OTHER AUTHORITIES**

36(b)(1) Arms Sales Notification, 80 Fed. Reg. 74,094 (Nov. 27, 2015) ............................5

President Joseph R. Biden, Jr., *National Security Memorandum on Safeguards and Accountability With Respect to Transferred Defense Articles and Defense Services* (Feb. 8, 2024), https://www.whitehouse.gov/briefing-room/presidential-actions/2024/02/08/national-security-memorandum-on-safeguards-and-accountability-with-respect-to-transferred-defense-articles-and-defense-services ....................7

Defendants General Dynamics Corporation and Phebe Novakovic (collectively, "GD") respectfully submit this reply brief in support of their motion to dismiss.

## INTRODUCTION

Current events underscore that a political question entrusted to the political branches lies at the center of this dispute.  Since GD filed its motion to dismiss, repeated Houthi attacks have killed and wounded American and allied forces.  The policy considerations involved in providing support to combat the Houthis are changing by the day.  Plaintiffs' lawsuit would thrust this Court headlong into micromanaging the strategic decisions of the U.S. government in that ongoing military conflict—the most political of questions.  And as the Government explains, adopting Plaintiffs' position would open the door to judicial supervision of analogous transfers to Ukraine, Israel, and other allies.  The political question doctrine ensures that the weighty responsibility for determining whether to provide Ukraine equipment to defend itself against Russia, or Israel from Hamas, rests not with the judiciary but with policymakers in the political branches who have the information to make those judgments and who are democratically accountable for them.

Plaintiffs protest that they seek only a "narrow," "limited," "very-limited," "case-specific," and "routine" "clarification" of statutory language that will "have no impact on foreign relations." There is nothing narrow about Plaintiffs' claims.  Plaintiffs would have this Court second-guess whether America's foreign policy and national security interests warranted the transfer of defense articles to Coalition countries.  As the Government explains, the Executive assessed human rights concerns among many other policy considerations before approving each of those transfers. Plaintiffs are entitled to disagree with the Executive's judgment.  But it is blackletter law that the political question doctrine prevents this Court from overruling the Executive's judgment.  GD is not liable for carrying out decisions constitutionally committed to the political branches.

The political question doctrine's application to this case is so clear that Plaintiffs beat a late retreat.  In their brief, Plaintiffs now disclaim seeking any "potentially embarrassing retroactive reversal" of decisions to authorize transfers and merely ask the Court to enjoin the Executive from approving transfers going forward.  Plaintiffs' concession that they "do not and cannot" ask this Court to "second-guess" prior transfer decisions is significant.  It requires dismissal of *all* their claims for damages against GD, whether under the ATS, TVPA, or D.C. law, because those claims are based on transfers that this Court "cannot" adjudicate.  Plaintiffs' concession also gives the lie to Plaintiffs' scurrilous accusations that GD acted to harm civilians; as Plaintiffs now admit, those transfers were made pursuant to Executive determinations whose propriety they cannot challenge.

Moreover, Plaintiffs' "modest" proposal that this Court enjoin the Executive from authorizing and GD from carrying out future transfers presents the same political question as assessing prior transfers and is barred by the same binding precedent.  Plaintiffs ask this Court to sit as an all-powerful Article III Commander-in-Chief, charged with determining when the actual Commander-in-Chief may provide arms to Coalition countries—and when GD may supply materials pursuant to that authorization.  Prospective relief would require equal, if not greater, intrusion into national security, military conflict, human rights, and other political determinations.

The political question doctrine is sufficient to dispose of this case, but Plaintiffs' claims are foreclosed on many other grounds as well.  Binding Supreme Court and D.C. Circuit precedents require dismissing Plaintiffs' claims on sovereign immunity, standing, and additional grounds to which Plaintiffs have no meaningful answer.  This Court should grant GD's motion to dismiss.

## ARGUMENT

## I.     THE POLITICAL QUESTION DOCTRINE BARS PLAINTIFFS' CLAIMS.

The political question doctrine requires dismissal of Plaintiffs' claims, which ask this Court to "reconsider[] the wisdom of discretionary decisions made by the political branches in the realm

of foreign policy or national security." *El-Shifa Pharma. Indus. Co. v. United States*, 607 F.3d

836, 842 (D.C. Cir. 2010) (en banc).  Plaintiffs protest that their claims require "mere[] . . . statutory

interpretation" that does not give rise to a political question.  Dkt. 41 at 14–15 (Pls.' Opp., § IV.A).

Bolding much of the statutory language they ask this Court to interpret, Plaintiffs assert that no

political question would be implicated by this Court's review of the President's conclusion that

transferring defense articles to Coalition countries "***w[ould] strengthen the security of the United***

***States and promote world peace***"; the Secretary of State's assessment that "***the foreign policy of***

***the United States would be best served***" by the transfers; or the President's determination that the

Coalition countries had not engaged in a "***pattern of gross [human rights violations]***."  22 U.S.C.

§ 2752(b), Dkt. 40 at 12, 34 (Pls.' Opp., §§ IV.A, IV.C.2.a) (quoting 22 U.S.C. §§ 2753(a)(1),

2304(a)(4) (first and third emphases Plaintiffs')).  To read that language is to refute Plaintiffs'

argument.  The interpretation of these terms plainly poses political questions directed at the most

sensitive national security and foreign policy determinations.   Binding precedents—largely

ignored by Plaintiffs—foreclose Plaintiffs' contrary arguments.

### A.   The Political Question Doctrine Applies To Statutory Claims That Second-Guess National Security And Foreign Policy Judgments.

The crux of Plaintiffs' argument is that the political question doctrine does not apply to

statutory claims.  Dkt. 41 at 13–14 (Pls.' Opp., § IV.A).  That is wrong.  Under binding D.C.

Circuit law, the doctrine applies to any claim—statutory or otherwise—that requires a court to

"call into question the prudence of the political branches in matters of foreign policy or national

security constitutionally committed to their discretion."  *El-Shifa*, 607 F.3d at 842.

Plaintiffs offer only a concurrence from the D.C. Circuit's decision in *El-Shifa* as support

for their statutory argument.  *See* Dkt. 40 at 41 (Pls.' Opp., § IV.C.3).  Plaintiffs neglect to mention

that the en banc *majority* held the doctrine *is* applicable to statutory claims and bars adjudication

of statutory terms like the ones at issue here.  607 F.3d at 842–43.  The *El-Shifa* Court explained: "Neither a common law nor statutory claim may require the court to reassess 'policy choices and value determinations' the Constitution entrusts to the political branches alone." *Id.* at 843 (citation omitted).  Congress cannot legislate jurisdiction for courts beyond what Article III authorizes.  *Id.*

The Supreme Court, the D.C. Circuit, and this Court have applied the political question doctrine to bar statutory claims that would have required the adjudication of issues committed to the judgment of the political branches.  For example, the Supreme Court, in *Chicago & Southern Air Lines v. Waterman Steamship Corp.*, held that the Civil Aeronautics Act, did not—and could not—authorize judicial review of Presidential foreign policy decisions made under the statute.  333 U.S. 103 (1948).  The Court explained that those decisions were "of a kind for which the Judiciary has neither aptitude, facilities nor responsibility" to resolve "and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry." *Id.* at 111.  Just so here.

Indeed, nearly all the cases GD cited in its opening brief involved the application of the political question doctrine to statutory claims.  *See Gutrejman v. United States*, 596 F.Supp.3d 1, 12 (D.D.C. 2022) (Moss, J.) (APA claims), *aff'd on other grounds*, 77 F.4th 806 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 688 (2024); *Schneider v. Kissinger*, 412 F.3d 190, 192 (D.C. Cir. 2005) (FTCA claims); *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 13 (D.D.C. 2010) ("statutory [ATS]" claims); *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 979 (9th Cir. 2007) (ATS, RICO, and TVPA claims); *Saldana v. Occidental Petroleum Corp.*, 774 F.3d 544, 545 (9th Cir. 2014) (ATS claims).  Plaintiffs have no answer to this authority.

### B.     Plaintiffs' "Statutory" Claims Require Resolution Of A Political Question.

Beyond their bald assertion that statutory claims can never present political questions, Plaintiffs do not explain how this Court could actually adjudicate "whether the [government] failed to comply with" the statutory language at issue here in a way that satisfies the *Baker* factors.  Dkt.

41 at 14 (Pls.' Opp., § IV.A).  Plaintiffs simply say they are not inviting the Court to second-guess issues of national security or foreign policy.  Of course they are.  Every transfer of GD's defense articles was made only because the Executive, after "tak[ing] into account [the] political, military, economic, arms control, and human rights conditions implicated by each sale" concluded that the transfer would "strengthen [national] security" and "promote world peace."[1]  *See* Dkt. 42 at 28 (Govt. Reply, § III) (quoting 22 U.S.C. §§ 2752(b), 2753(a)(1)).

Though the statutes guiding those determinations appear in the U.S. Code, these questions remain "discretionary decisions made by the political branches in the realm of foreign policy or national security."  *El-Shifa*, 607 F.3d at 843.  As the Government asks: "How should this Court weigh the risks of a particular sale, including risks of misuse or 'human rights conditions,' with the United States' diplomatic, geopolitical, and economic goals in a country or region, including the 'long-term implications for regional security?'"  Dkt. 42 at 12 (Govt. Reply).  Making a contrary determination would require this Court to veto the President's and State Department's decisions that neither Saudi Arabia nor the UAE has engaged in a consistent pattern of gross violations of human rights.  *See* Dkt. 42 at 13-15 (Govt. Reply).  "[U]sing a judicial forum to reconsider [that] wisdom would be anathema to the separation of powers."  *El-Shifa*, 607 F.3d at 845.

Plaintiffs respond that Congress must have wanted the judiciary to answer these questions because it wrote these terms into the AECA and FAA.  Dkt. 40 at 44 (Pls.' Opp., § IV.C.3).  That

---

[1] Executive notifications to Congress of transfers certify consideration of these policy factors.  For example, one notification explained that the transfer would "contribut[e] to the foreign policy and national security of the United States by helping the UAE remain an active member of the OPERATION INHERENT RESOLVE (OIR) coalition working to defeat the Islamic State in Iraq and Levant (ISIL) and as part of the Saudi-led coalition to restore the legitimate government in Yemen."  36(b)(1) Arms Sales Notification, 80 Fed. Reg. 74,094, 74,096 (Nov. 27, 2015).

proposition simply rehashes Plaintiffs' erroneous argument that the political question doctrine does not apply to statutes. But "nothing in the structure of our Government or the text of our Constitution [] warrant[s] judicial review by standards which would require [courts] to equate [their] political judgment with that of Congress." *Harisiades v. Shaughnessy*, 342 U.S. 580, 590 (1952). Plaintiffs' argument is especially misguided because these statutes expressly provide that the Executive should make the relevant determinations (consistent with its constitutional role). And Plaintiffs' insistence that judicial review is necessary to carry out Congress's intent is likewise meritless because Congress had notice of, and the statutory authority to block, the sales and chose not to do so. *See* 22 U.S.C. § 2776(b)(1)(P).

Plaintiffs invoke the truism that courts are not barred from resolving legal questions simply because that review "may have an effect on foreign affairs." *DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*, 810 F.2d 1236, 1238 (D.C. Cir. 1987). No one disputes that. Courts cannot, however, "impose [their] own foreign policy judgment on the political branches," and the political question doctrine is at its apex where courts are forced to decide foreign policy questions to resolve a case. *Jaber v. United States*, 861 F.3d 241, 249 (D.C. Cir. 2017). The cases Plaintiffs cite do not say otherwise, as the Government explains. *See* Dkt. 42 at 24–25 (Govt. Reply).[2]

### C.   Plaintiffs' Retreat From Damages Claims Cannot Save The Injunctive Claims.

Plaintiffs ultimately concede their claims are barred at least in part by the political question doctrine—abandoning their request for relief concerning past "decisions regarding foreign policy or defense." Dkt. 40 at 38 (Pls.' Opp., § IV.C.3). Plaintiffs acknowledge that they "do not and

---

[2] Plaintiffs' authorities addressing other statutes are inapposite. *DKT*, 810 F.2d at 1238 (addressing decisions regarding reproductive services that might have foreign policy implications but were not themselves discretionary foreign policy determinations); *Fed'n for Am. Immigr. Reform, Inc. v. Reno*, 897 F. Supp. 595, 602 (D.D.C. 1995) (rejecting argument that challenge to immigration policy was a non-justiciable political question given, among other things, that such questions had traditionally been subject to judicial review), *aff'd*, 93 F.3d 897 (D.C. Cir. 1996).

cannot ask this Court to overturn the Govt. Defendants' prior decisions to provide FMS to the Coalition." *Id.* They acknowledge that relief would result in "potentially embarrassing retroactive reversal of decisions already made by the Govt. Defendants" in violation of the political question doctrine. *Id.* at 44 (Pls.' Opp., § IV.C.3). They now purport to seek only "limited," prospective relief "requir[ing] future compliance with the AECA and FAA." Dkt. 41 at 14 (Pls.' Opp., § IV.A).

Plaintiffs' concession is important: it requires dismissal of all their claims for damages against GD. Whether under the ATS, TVPA, or D.C. law, those claims turn on the legality of "the Govt. Defendants' prior decisions to provide FMS to the Coalition" that Plaintiffs now concede they "cannot" challenge. Dkt. 40 at 38 (Pls.' Opp., § IV.C.3). This Court should hold Plaintiffs to their effective admission that damages claims "second-guess" the Executive's decisions.

Any remaining, forward-looking claims are equally barred "regardless of how they are styled." *El-Shifa*, 607 F.3d at 842. As the Government explains, an injunction would paralyze the political branches' ability to make critical military and foreign policy decisions at a time when conflicts in the region have flared. Dkt. 42 at 8–9 (Govt. Reply, Introduction). And endorsing Plaintiffs' claims would greenlight courts to block Presidential transfers of weapons to Ukraine, Israel, or other allies around the globe. Dkt. 37-2 at 15–16 (GD Mot., Background, § I).[3] This Court should not countenance that result.

---

[3] The Executive recently issued a directive requiring countries to give "credible and reliable written assurances" that they will utilize transfers consistent with international humanitarian law. President Joseph R. Biden, Jr., *National Security Memorandum on Safeguards and Accountability with Respect to Transferred Defense Articles and Defense Services* (Feb. 8, 2024), https://www.whitehouse.gov/briefing-room/presidential-actions/2024/02/08/national-security-memorandum-on-safeguards-and-accountability-with-respect-to-transferred-defense-articles-and-defense-services.

## II.        GD IS ENTITLED TO DERIVATIVE SOVEREIGN IMMUNITY.

Even if Plaintiffs had not abandoned their damages claims, those claims would still be barred by derivative sovereign immunity.  Plaintiffs misstate the scope of derivative sovereign immunity.  If a contractor satisfies the *Yearsley* factors—as GD has here—it is entitled to the same protection as the U.S. government.  Plaintiffs do not dispute that the government authorized GD's FMS sales, or that GD performed as directed under those contracts—that ends the inquiry.

Plaintiffs insist that if the Executive Branch misjudged sales to the Coalition under the relevant statutory authorities (a question not amenable to judicial resolution under the political question doctrine), then *Yearsley* does not apply.  *See* Dkt. 41 at 25 (Pls.' Opp., § IV.D).  But *Yearsley* immunizes a contractor's actions pursuant to authority "validly conferred, that is, . . . within the constitutional power of Congress."  *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 20 (1940).  As the Fourth Circuit explained, asserting "the government cannot 'validly confer' the authority to engage in conduct that violates the law[] . . . misinterprets the scope of *Yearsley*'s second step.  The question is . . . whether Congress had the authority to assign [the contractor] to complete that task."  *Cunningham v. General Dynamics Information Technology, Inc.*, 888 F.3d 640, 648 (4th Cir. 2018).  That logic defeats Plaintiffs' argument.  And that result makes sense. "*Yearsley* immunity …prevent[s] a government contractor from facing liability for *an alleged violation of law*," so "it cannot be that an alleged violation of law per se precludes *Yearsley* immunity."  *Id*. at 648–49 (emphasis added).  No one disputes that Congress possesses the authority to enable contractors to execute FMS sales.[4]

---

[4] Plaintiffs also embark on a lengthy and irrelevant discussion of the *Boyle* doctrine, Dkt. 41 at 26–28 (Pls.' Opp., § IV.D), which GD did not invoke in its motion to dismiss.

III.    **PLAINTIFFS CANNOT ESTABLISH STANDING.**

Plaintiffs also lack standing for two reasons: their claims are not fairly traceable to GD; and the Complaint does not adequately allege any harm from a GD-produced defense article.

*Intervening Conduct of Third Parties*.  As GD has explained, it has no control over how the Coalition Defendants use defense articles.  That bars standing, full stop.  Dkt. 37-2 at 26–28 (GD Mot., § III).  Now that the Coalition Defendants have been dismissed, it is particularly clear that "[i]ssuing an injunction" "would not bind the [alleged] direct perpetrators of the … [attacks]," since they "are not before this [C]ourt."  *Doe 1 v. Apple Inc.*, 96 F.4th 403, 414 (D.C. Cir. 2024).

Even if Plaintiffs had not abandoned their damages claims, the chain of causation between GD's alleged actions and Plaintiffs' alleged injuries is too attenuated to support standing.  Through the FMS program, GD sells defense articles to the U.S. government—not the Coalition—and can do so only with Executive Branch authorization.  Even if those Executive Branch decisions were reviewable, Plaintiffs' injuries are not "fairly traceable" to GD's FMS sales because of the government's intervening and independent authority to authorize FMS, combined with the Coalition's intervening and independent authority to use those weapons in a manner that GD did not intend.  *Lin v. United States*, 177 F. Supp. 3d 242, 252 (D.D.C. 2016) ("[I]f by Plaintiffs' own allegations, the [U.S.] did not authorize [China] to issue the nationality decrees in 1946, then any alleged injury arising from the decrees cannot be 'fairly traceable' to the [U.S.]." (internal quotation marks omitted)), *aff'd*, 690 F. App'x 7 (D.C. Cir. 2017); *Jones v. La. State Bar Ass'n*, 738 F. Supp. 2d 74, 79–80 (D.D.C. 2010) (plaintiff could not "allege an injury 'fairly traceable' to [the defendant's] conduct" when the injury stemmed "from the acts of third parties" including the "governmental bodies[] which allegedly implemented deficient, or otherwise mismanaged" programs they administered), *aff'd*, No. 10-5327, 2011 WL 11025624 (D.C. Cir. Oct. 3, 2011).

In their brief, Plaintiffs suggest that the D.C. Circuit's then-forthcoming decision in *Doe* would help them.  But *Doe* cannot salvage Plaintiffs' retrospective claims given the unique involvement of the government in this case.  *Doe* concerned the Trafficking Victims Protection Reauthorization Act of 2008's codification of broad liability for anyone who "knowingly benefits from 'participation in a venture' that uses forced labor."  96 F.4th at 409 (quoting 18 U.S.C. § 1595(a)).  As set forth in GD's opening brief, Dkt. 37-2 at 27–28 (GD Mot., § III), the district court in *Doe* held that a class of injured cobalt mine workers lacked standing to bring damages claims against technology companies given that third-party cobalt suppliers bore direct responsibility for the labor conditions that caused plaintiffs' injuries, *Doe 1 v. Apple Inc.*, No. 19-CV-03737, 2021 WL 5774224 at *6–7 (D.D.C. Nov. 2, 2021), *aff'd*, 96 F.4th 403 (D.C. Cir. 2024).  On appeal, the D.C. Circuit disagreed and found that the companies' cobalt purchases conferred standing because "the [TVPRA] identifie[d] the necessary causal link" "between the injury of forced labor and actors who indirectly facilitate it": mere participation in a venture was sufficient. 96 F.4th at 411–12.  By contrast, GD's FMS sales—made to the government after the political branches' authorization—bear no resemblance to the illicit "venture" between two private companies that the D.C. Circuit found dispositive in *Doe*, under the specific language of a statute not at issue here.  *Doe* does not disturb the long line of authority holding that third-party decisions, particularly decisions by government actors, foreclose standing for retrospective relief.

*No Alleged Harm From Any GD Defense Article*.  Plaintiffs also lack standing because the Complaint never plausibly alleges injury by any GD defense articles.  Plaintiffs insist that specific allegations are unnecessary, arguing instead that GD is "jointly and severally liable" for the other Contractor Defendants' actions because they "acted in concert."  Dkt. 41 at 19 (Pls.' Opp., § IV.B).

The portions of the Complaint Plaintiffs cite, however, nowhere actually allege that the Contractor Defendants acted in concert.  *See id.* (citing Compl. ¶¶ 200–05, 209–15).

Plaintiffs also assert it is "more likely than not that [the Contractor Defendants] collectively are responsible for any given bombing" because they are "collectively responsible for a major portion of the bombs."  *Id.*  But the seven Plaintiffs in this case have offered no well-pleaded allegations to support any probability-based claim.  The Complaint contains no allegations that all, or even a majority, of the defense articles the Coalition used in Yemen were manufactured or sold by the Contractor Defendants, let alone GD—or that those defense articles injured them.  *Cf. Chapman v. Am. Cyanamid Co.*, 861 F.2d 1515, 1520 (11th Cir. 1988) (permitting a claim against one of the only two vaccine manufacturers provided in a doctor's office).  Plaintiffs' statistics about exports, imports, and sales figures also cannot help them.  They show at most that the United States provided some defense articles to Saudi Arabia and the UAE, and not that defense articles provided by the Contractor Defendants were responsible for the alleged injuries of the seven Plaintiffs in this case.  *See, e.g.*, Dkt. 1 at 3–4 (Compl. ¶ 3 n.5 (citing SIPRI report)).  In short, Plaintiffs have failed to overcome any of their standing deficiencies, let alone all of them.

## IV.   PLAINTIFFS' ATS CLAIMS MUST BE DISMISSED.

### A.   Binding Authority Forecloses Implying Claims Against GD Under The ATS.

This case does not present the "very limited circumstances" that could justify implying a new cause of action under the ATS under the Supreme Court's test.  *Nestle USA, Inc. v. Doe*, 593 U.S. 628, 631 (2021).  To the contrary, it implicates the very "foreign-policy and separation-of-powers concerns" that the Supreme Court has suggested "preclude[s] courts from ever recognizing any new causes of action under the ATS."  *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 265 (2018).

At the outset, the D.C. Circuit has expressly declined to imply direct and aiding and abetting claims against corporations for torture and war crimes, as they are not recognized

violations of a "settled international norm."[5]  *Saleh v. Titan Corp.*, 580 F.3d 1, 15 (D.C. Cir. 2009).

In a footnote, *see* Dkt. 41 at 29 (Pls.' Opp., § IV.E.1.a.i), Plaintiffs contend that *Saleh* did not

address a claim against a private entity for aiding and abetting a government actor.  But it addressed

precisely that situation.  *See* Dkt. 37-2 at 31–33(GD Mot., § IV.A.2).

      Even if the D.C. Circuit had not already addressed this kind of claim, implying a cause of

action would carry severe "collateral consequences" for our "foreign relations" and "imping[es]

on the discretion of the Legislative and Executive Branches in managing foreign affairs."  *Sosa v.*

*Alvarez-Machain*, 542 U.S. 692, 728 (2004).  That is why Plaintiffs "voluntarily dismissed all

foreign Defendants"; in an attempt "to ensure" the case would not "trigger foreign policy disputes."

Dkt. 41 at 32 (Pls.' Opp., § IV.E.1.a.ii).  But, again, that shift does not ameliorate the consequences.

      Plaintiffs nevertheless urge this Court to borrow the Ninth Circuit's approach in *Doe I v.*

*Cisco Systems, Inc.*, 73 F.4th 700 (9th Cir. 2023).  This Court should not do so.  *Cisco*'s

freewheeling approach to implying ATS claims is inconsistent with the D.C. Circuit, which

declined to imply a cause of action for direct and aiding-and-abetting claims against corporations

for torture and war crimes.  *See Saleh*, 580 F.3d at 15.  And it contravenes the Supreme Court's

stringent approach to implying causes of action.  *See supra* 11.  Moreover, there is no comparison

between Plaintiffs' claims and those at issue in *Cisco*.  Cisco designed, implemented, and

optimized clandestine technology for the Chinese government that enabled "violent political

crackdowns," "human rights abuses," and "torture" of a non-violent religious minority.  73 F.4th

at 709–10.  By contrast, GD sold weapons to the U.S. government designated for our national

security partners.  Plaintiffs claim that a judicial finding against "Saudi Arabia and [the] U.A.E."

---

[5] Despite Plaintiffs' representations otherwise, Dkt. 41 at 30 (Pls.' Opp., § IV.E.1.a.i), GD does not suggest that corporations are exempt from ATS liability in all circumstances—just that there is no corporate aiding and abetting liability for the causes of action Plaintiffs assert against GD.

would "not pose the same risk of a major foreign policy incident as [a finding against] China." Dkt. 41 at 32 (Pls.' Opp., § IV.E.1.a.ii).  But the opposite is true.  The former are allies in the *current* conflict against the Houthis, and the Government has said this suit poses a "considerable cost to the United States' foreign relations" given the Coalition countries are "vital" partners.  Dkt. 31-1 at 18, 42 (Fed. Defs. Mem., Fact. Background § I; Arg. § III).  Judicial action in this context has the potential to cause a significant foreign policy incident by dividing the branches of the U.S. government over the support permitted for its allies.  The relevant factors all counsel against implying a cause of action.

### B. Plaintiffs Impermissibly Seek To Apply The ATS Extraterritorially.

Plaintiffs' ATS claim is also impermissibly extraterritorial under *Nestle*.  *See* 593 U.S. at 634.  All the activities Plaintiffs rely on to establish a domestic nexus—lobbying, manufacturing, procurement, and sales—constitute general corporate activities and operational decisions for a defense contractor.  ATS claims premised on these activities (without more) would make any defense contractor liable for every weapon they manufacture and sell, their core business activities.

In fact, this case is easier than *Nestle*.  There, the defendants accused of aiding and abetting forced labor had a direct relationship with the parties responsible for the plaintiffs' alleged harms.  No such relationship exists between GD and the Coalition.  All of GD's FMS sales occurred through contracts with and approved by the U.S. government, not the foreign countries, and GD had no control over what the Coalition governments ultimately used those arms for.

Plaintiffs again insist *Doe I v. Cisco* controls.  But defendant Cisco assigned a special domestic engineering team to design, purpose-build, and—after it had been deployed—optimize the bespoke surveillance product ordered by the Chinese government.  *Cisco*, 73 F.4th at 709–10, 738.  Plaintiffs here admit GD's activities were generalized; "there was no input from the Coalition governments on the design of weapons." Dkt. 41 at 40 (Pls.' Opp., § IV.E.1.b) (emphasis omitted).

**C.      Plaintiffs Have Not Adequately Alleged Aiding And Abetting Liability.**

Finally, Plaintiffs' ATS claims fail because they have not and cannot plausibly allege that GD lobbied the government or conducted FMS sales with the specific purpose of facilitating the alleged civilian casualties.[6]  Plaintiffs do not dispute this reality; nor can they, since GD's FMS sales could be made only to the U.S. government with its approval.  The government was best positioned to conclude sales were proper, and GD appropriately relied on that determination.

Plaintiffs are left to argue that "purpose" can be shown in other ways, including when a defendant "support[s]" and "benefit[s]" from the alleged violation.  Dkt. 41 at 36 (citing *Cisco*, 73 F.4th at 735 n.22) (Pls.' Opp., § IV.E.1.a.iii).  But *Doe I v. Nestle USA, Inc*., 766 F.3d 1013, 1024 (9th Cir. 2014), the case *Cisco* drew its "support" and "benefit" standard from, required the defendant to "support" and "benefit" from the violation itself.  There, the defendants "supported the use of child slavery" in order to "reduce costs," and the use of child slavery benefitted their bottom-line.  *Id.*  Here, it would be beyond the pale for Plaintiffs to allege that GD supported and benefitted from harm to civilians, which is presumably why they have not so argued.

**V.      THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE TVPA.**

Plaintiffs' TVPA claim against Ms. Novakovic ignores the D.C. Circuit's clear holding that the TVPA can never apply to "private U.S. persons, whether or not acting in concert with government employees."  *Saleh*, 580 F.3d at 16.  That binding rule forecloses the TVPA claims against Ms. Novakovic, whether based on her own actions or those of her private, U.S.-based "subordinates" via "command responsibility."  Dkt. 41 at 43 (Pls.' Opp., § IV.E.2).

---

[6] Contrary to Plaintiffs' arguments, Dkt. 41 at 38 (Pls.' Opp., § IV.E.1.a.iii), using lobbying—protected First Amendment activity—to seek damages from GD is the same as imposing sanctions.

Plaintiffs attempt to distinguish "the[ir] specific TVPA claim" as premised on aiding and abetting liability but cannot explain how that alters the facts of this case or the TVPA's statutory requirements. *Id.* at 42. An aiding and abetting claim against Ms. Novakovic is foreclosed because the TVPA's plain text provides a cause of action against "[a]n individual who, under actual or apparent authority, or color of law, *of any foreign nation*" subjects another individual to "torture" or "extra-judicial killing." 28 U.S.C. § 1350 note (emphasis added). As D.C. Circuit precedent confirms, Plaintiffs' claim fails because they do not and cannot allege that Ms. Novakovic "possessed authority by virtue of the laws of [a foreign country], or [was] somehow clothed with the authority of [foreign] law." *Harbury v. Hayden*, 444 F. Supp. 2d 19, 43 (D.D.C. 2006) (internal quotation marks omitted), *aff'd*, 522 F.3d 413 (D.C. Cir. 2008). To the contrary, GD contracted with the U.S. government to carry out FMS sales, and thus any involvement by Ms. Novakovic would be "under the color of law" of, the U.S. government. Plaintiffs again resort to *Cisco*. But unlike Ms. Novakovic (whose company was carrying out a federal contract), the individual defendants in *Cisco* were *not* acting under color of U.S. law; again, they developed, designed, sold, and maintained a surveillance product for the Chinese government.

## VI.    PLAINTIFFS' COMMON LAW CLAIMS MUST BE DISMISSED.

### A.    Plaintiffs' Unjust Enrichment Claim Must Be Dismissed.

Plaintiffs concede that unjust enrichment requires the plaintiff to "confer[] a benefit on the defendant," and they "acknowledge that their allegation of conferring a benefit [on GD] is not within the traditional scope of [an] unjust enrichment claim[]." Dkt. 41 at 50–51 (Pls.' Opp., § IV.E.3.b). Plaintiffs cite no precedent for their novel claim.

Even if the law recognized Plaintiffs' framing of the supposed "benefit" (though it does not)—an opportunity to sell weapons to the government—Plaintiffs are wrong that *they* conferred that "benefit" on GD. *Id.* at 51 (claiming GD would "not have been able" to execute FMS sales

"[w]ithout a civilian population … for the Coalition to target").  The national security interests that caused the U.S. to support the transfer of defense articles to Coalition countries—including the conflict and presence of designated Houthi terrorists—supported the demand for FMS sales (not civilians).  In any event, it is not "unjust" for GD to retain payment for services rendered.  *See Whiting v. AARP*, 701 F. Supp. 2d 21, 31–32 (D.D.C. 2010), *aff'd*, 637 F.3d 355 (D.C. Cir. 2011).

### B.     Plaintiffs' Negligent Supervision Claim Must Be Dismissed.

Plaintiffs' negligent supervision claim fails.  As Plaintiffs' cases establish, such claims can be brought only against actors who have legal duties to supervise others, but GD had no ability— let alone duty—to supervise the Coalition.   Plaintiffs' precedents address employer-employee relationships, the heartland of negligent supervision.  *See Phelan v. City of Mount Rainier*, 805 A.2d 930, 937–38 (D.C. 2002); *Brown v. Correctional Corp. of Am.*, 603 F. Supp. 2d 73, 79–81 (D.D.C. 2009).  The only case outside the employment context, *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 964–68 (S.D. Ohio 2019), concerns the TVPRA, which imposes a statutory duty on anyone who knowingly benefits from participating in a human trafficking venture to refrain from acting negligently towards trafficking victims.  Plaintiffs cite no statute imposing a duty on GD.  No case supports a negligent supervision claim based on a non-existent duty to supervise the end user of a product.  And fundamentally, there can be no claim based on negligence because, as discussed, GD was reasonable in relying on the government's determination to sell defense articles, and the government was responsible for monitoring use thereafter.

### A.     Plaintiffs' IIED Claim Must Be Dismissed.

The Complaint's IIED claim likewise is meritless.  GD did not admit elements of this claim by choosing to attack the most obviously deficient one.  To support the required "outrageous conduct," Plaintiffs allege only that GD "intentionally and continuously participat[ed] in a venture that profits from Plaintiffs' suffering and injuries."  Dkt. 1 at 99 (Compl. ¶ 243).  Plaintiffs never

allege that GD intentionally caused them emotional distress, and the D.C. Circuit recently dismissed an IIED claim premised on identical "venture" allegations. *See Doe*, 96 F.4th at 416. Plaintiffs do not dispute that performing a government contract is not "outrageous" behavior.

## CONCLUSION

GD respectfully requests that Plaintiffs' claims against it be dismissed in their entirety and with prejudice. This Court should deny leave to amend given that no amendment could make Plaintiffs' claims justiciable or otherwise legally valid.

Dated: April 18, 2024

Respectfully submitted,

*/s/ Matthew S. Hellman*

Matthew S. Hellman (DC Bar #484132)
JENNER & BLOCK LLP
1099 New York Avenue, NW
Washington, DC 20001-4412
Telephone: (202) 639-6861
mhellman@jenner.com

Michael A. Doornweerd (*pro hac vice*)
Andrew F. Merrick (*pro hac vice*)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Telephone: (312) 923-2631
mdoornweerd@jenner.com
amerrick@jenner.com

*Counsel for Defendants General Dynamics Corporation and Phebe Novakovic*